IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC, | Case No. 4:24-cv-03177 |
| Plaintiff, | |
| vs. | BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | |
| Defendants. | |

Plaintiff Jim Daws Trucking, LLC ("JDT") submits this brief in support of its Motion for Temporary Restraining Order.

## I. INTRODUCTION

In 2022, Jim Daws ("Jim") sold his trucking business, Daws Trucking, to JDT for twelve million dollars ($12,000,000.00). JDT has two members, father and son, Ricardo Fernandez ("Rick") and Ricardo Daniel Fernandez ("Ricky"). Jim agreed that he was selling the business of Daws Trucking as a going concern, which is precisely what Rick and Ricky intended to purchase. As such, JDT bought all the tangible and intangible assets of the business, including goodwill that the parties valued at four million five hundred thousand dollars ($4,500,000.00). Jim has breached the parties' agreement in multiple ways, and JDT's lawsuit seeks redress for all such breaches. This motion relates specifically to Jim's breaches of the parties' reasonable and enforceable non-competition provision and breaches of his duty of loyalty as an employee of JDT.

## II. FACTS

**A.    The Acquisition of Daws Trucking by JDT**

1.    JDT was formed on April 19, 2022, by Rick and Ricky for the purpose of acquiring the trucking business owned and operated by Jim Daws in Milford, Nebraska, commonly referred to as "Daws Trucking" (the "Company" or "Daws Trucking") [Rick Decl., ¶ 2.]

2.    In the discussions which led to JDT's purchase of Daws Trucking, Jim told Rick that he wanted to sell Daws Trucking and retire. Jim then reached an agreement-in-principle for Rick and Ricky to purchase the business of Daws Trucking. [Rick Decl., ¶ 3.]

3.    Jim said the business of Daws Trucking was owned by and conducted through Daws, Inc. [Rick Decl., ¶ 4.]

4.    On May 4, 2022, JDT and Daws, Inc. entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") [Rick Decl., ¶ 4, Ex. A.]

5.    In the Asset Purchase Agreement, JDT purchased the business of Daws Trucking as a going concern and acquired all the tangible and intangible assets used in the business of Daws Trucking, including its trade name and its U.S. Department of Transportation (DOT) number [Rick Decl., ¶ 5, Ex. A, Recital B, ¶ 1.]

6.    Pursuant to the Asset Purchase Agreement, JDT has already paid Jim over $10,000,000.00 for the business of Daws Trucking [Rick Decl., ¶ 6.]

7.    The Asset Purchase Agreement allocated $4,500,000 to the goodwill purchased by JDT [Rick Decl., ¶ 7, Ex. A, ¶ 12.]

8.    Paragraph 12 of the Asset Purchase Agreement also contained a non-compete, drafted by Jim's attorney, that was fundamental to JDT's agreement to buy the business from Jim:

> It is understood and agreed that $4,500,000 of the purchase price shall be allocated to the goodwill of the Business, and in connection with the sale to the Buyer of the goodwill, Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any other person deriving title to the goodwill of said business from Buyer carries on a like business in such area.

> By affixing their signatures to this Agreement, Seller's shareholders join in the foregoing noncompetition agreement and agree to be individually bound thereby.

[Rick Decl., ¶ 7, Ex. A, ¶ 12.]

9.    Jim and Lana were both shareholders of Daws, Inc. at the time the Asset Purchase Agreement was executed, and they both signed the Asset Purchase Agreement, agreeing to be bound by the terms of the noncompete. [Rick Decl., ¶ 8, Ex. A, Signature Page.]

10.    At the time the Asset Purchase Agreement was signed, Daws Trucking in fact carried on a trucking business throughout the continental United States. JDT continued to carry on such a business in all forty-eight continental United States after execution of the Asset Purchase Agreement [Rick Decl., ¶ 9.]

11.    The non-competition provision in the Asset Purchase Agreement is reasonable in time and scope and is designed to protect the legitimate business interests of JDT, principally the goodwill of the Business purchased by JDT,

which the parties valued at $4.5 million dollars. For such goodwill and customer relationships to transfer, Daws, Inc., Jim, and Lana must exit the trucking business for the 5-year period. Moreover, the geographic scope matches the geographic scope of the business that was acquired [Rick Decl., ¶¶ 7, 9, Ex. A, ¶ 12.]

12.    After the sale of the Business, Jim became an employee of JDT and was paid a salary of approximately $90,000 per year [Rick Decl., ¶ 10.]

13.    Based on Jim's words and actions both before his employment with JDT ended and thereafter—as further described below—it is clear that Jim and Lana, along with their business entities and/or partners, are actively engaged in the trucking business, in competition with JDT and in the pursuit of business opportunities that arose while Jim was working for JDT, and that they intend to continue to do so [Rick Decl., ¶ 11.]

**B.    Jim refused to transfer the Daws Trucking DOT Number.**

14.    After the purchase of Daws Trucking closed, Jim refused to transfer the DOT number used by Daws Trucking, as agreed in the Asset Purchase Agreement. His initial excuse was that the DOT number was held by a separate company he owned, Daws Trucking, Inc. ("DTI"), and that federal regulations would not allow DTI to transfer the number. When JDT's attorneys discussed a stock purchase agreement for JDT to acquire title to the DOT number it had purchased, Jim demanded to be paid an additional $500,000, plus an acceleration of the outstanding debt owed to him under the Asset Purchase Agreement [Rick Decl., ¶ 12.]

4

15.    Rick, Ricky, and JDT would not agree to pay more for the DOT number than the parties had already agreed [Rick Decl., ¶ 13.]

**C.    Jim and DTI signed drivers up to their own contracts.**

16.    As part of the discussions over the DOT number, in April 2024, attorney Julie Karavas, who represented Jim and JDT, sent an email stating, "Per Jim, the main purpose of [DTI] is to own the DOT number, no financial activity" [Rick Decl., ¶ 14, Ex. B.]

17.    But in contrast to the representations of Jim and his attorney, Jim was operating DTI as a trucking business, without JDT's knowledge, while he was employed by JDT, despite his agreement to the non-compete and his ongoing duty of loyalty as an employee of JDT [Rick Decl., ¶ 15.]

18.    In the last week, Rick discovered an Independent Contractor Agreement dated April 19, 2023, between DTI and a driver named Walter Haven, which was left behind in a truck. [Rick Decl., ¶ 16, Ex. C.]

19.    The footer of the Independent Contractor Agreement describes it as "Confidential Information for Daws Trucking Inc." The agreement recites that DTI is a "for-hire motor carrier" and obligates Mr. Haven to "perform all of the work necessary" for the "transportation of such commodities as [DTI] provides for in its tariffs, schedules and contracts," and the "loading and unloading, securing, or tarping of such commodities as [DTI] provides for in its tariffs, schedules, and contracts" [Rick Decl., ¶ 17, Ex. C at p. 1, p. 4, ¶ 5.]

20.    The file of signed Independent Contractor Agreements appears to have been removed from JDT's offices. However, the JDT computer server

contains many unsigned Independent Contractor Agreements with DTI dated after the Asset Purchase Agreement [Rick Decl., ¶ 18.]

**D.    Jim applied for trademark registration of the trade name he sold to JDT, representing that he is using the mark in commerce.**

21.    In November 2023, again without informing Rick or Ricky, Jim filed a trademark application for the trade name he sold to JDT in the Asset Purchase Agreement—the word mark "Daws Trucking"—with the United States Patent and Trademark Office, on behalf of DTI [Rick Decl., ¶ 19, Ex. D.]

22.    The trademark application states the mark is being used in commerce and will be used for the following class of goods and services: Class 100 and 105 for "Truck hauling; Truck transport; Trucking services, namely hauling of agricultural products and construction materials and equipment" [Rick Decl., ¶ 20, Ex. D.]

23.    On October 22, 2024, the trademark application was approved, and the mark was registered with the USPTO. [Rick Decl., ¶ 20, n. 1, Ex. E.]

**E.    Jim tried to negotiate a buyback of Daws Trucking at a discount.**

24.    When Jim refused to transfer the Daws Trucking DOT number to JDT, it suggested to Rick that Jim wanted to stay involved in the trucking business, and that it would be difficult for Rick and Ricky to operate JDT successfully if Jim did in fact intend to retire [Rick Decl., ¶ 21.]

25.    Rick thus proposed selling Daws Trucking back to Jim for essentially what JDT paid for it [Rick Decl., ¶ 22.]

26.    Jim refused that proposal but offered to buy the business back at a steep discount—approximately $500,000 [Rick Decl., ¶ 23.]

27.    JDT did not agree to the price Jim proposed, and no deal was reached [Rick Decl., ¶ 24.]

**F.    Jim began to work on a new opportunity in the trucking business.**

28.    At about this same time, also without Rick or Ricky's knowledge, Jim began to work on a new opportunity with Jeremy Becker ("Jeremy"), who appears to be the Chief Revenue Officer of another trucking company, Kirsch Transportation Services, Inc. [Rick Decl., ¶ 25.]

29.    In an email to Jim dated July 23, 2024, which Rick first discovered last week, Jeremy thanked Jim for "thinking of me when it comes to showing me an opportunity at a respected company you have built." [Rick Decl., ¶ 26, Ex. F.]

30.    While the details of this opportunity aren't totally clear to JDT at this time, it appears to involve a plan to ship products for a meatpacker near North Platte, Nebraska, known as Sustainable Beef. JDT's largest account over the past two years has involved the construction of a meatpacking plant for Sustainable Beef by Schmeeckle Bros. Construction Co., which appears to be owned and operated by Wayne and Lukas Schmeeckle [Rick Decl., ¶ 27.]

**G.    Jim quit working at JDT and took most of JDT's employees with him.**

31.    Jim held a party on July 30, 2024, in York, Nebraska, which was represented to Rick as a retirement party. Rick received a save-the date but not an invitation. When Rick asked Jim about this, Jim said he took Rick off the invite list because they weren't getting along. Rick did not attend [Rick Decl., ¶ 28.]

32. Rick since learned, by reviewing a guest-list Jim left behind, that Wayne Schmeeckle, his wife, Robin, and his son, Lukas, were all added to the guest list toward the end [Rick Decl., ¶ 29.]

33. In retrospect, the party appears not to have been a retirement party but a celebration of Jim and his plans to remain in the trucking business, by either forcing Ricky and me to abandon the business of Daws Trucking or by continuing in the trucking business in competition with Rick, Ricky, and JDT [Rick Decl., ¶ 30.]

34. On August 23, 2024, Rick was working at JDT's offices in Milford, Nebraska. Rick planned to talk to Jim about what Rick understood to be his upcoming retirement [Rick Decl., ¶ 31.]

35. Jim refused to meet with Rick for most of the day on August 23. Instead, he met with other employees of JDT behind a closed door or otherwise out of Rick's presence. Toward the end of the day, Jim finally invited Rick into his office. While in the office, Jim said that he was leaving JDT, and everyone else would be leaving with him [Rick Decl., ¶ 32.]

36. Most employees of JDT resigned on Friday, September 27, 2024 [Rick Decl., ¶ 33.]

37. From reviewing company emails, JDT has since learned that Tony Glenn, the former controller of JDT who resigned as part of the mass resignation on September 27, sent numerous JDT files and confidential information, including JDT's financial records, equipment lists, depreciation schedules, driver

information, the Daws Trucking logo, and many other corporate files, from JDT's server to his personal Gmail account [Rick Decl., ¶ 34, Ex. G.]

38.    Since September 27, 2024, JDT has lost almost all of its office personnel. Of more than 80 drivers it had before September 30, JDT now has fewer than 30. JDT has heard from drivers who left JDT that they did so out of loyalty to Jim. The loss of drivers has had a devasting effect on JDT's ability to serve customers and generate revenue, both now and in the future [Rick Decl., ¶ 35.]

## H.    Jim is either operating or continuing to operate a new venture.

39.    On Friday, September 27, out of concern that Jim would try to retain and use JDT's business records or that he might delete damaging emails or other documents, Rick physically removed JDT's server. Rick had previously directed JDT's IT vendor not to delete any emails [Rick Decl., ¶ 36.]

40.    When Jim and those loyal to him left at the end of September, JDT retained its emails and took JDT's email server out of its offices. This appeared to surprise Jim and the employees who were loyal to him. At least two employees tried to delete their emails that afternoon but were unsuccessful in doing so because of JDT's instructions to its IT vendor [Rick Decl., ¶ 37.]

41.    On October 22, 2024, JDT received an email from Jeremy sent to Jim's old JDT email address, apparently by mistake. In the email, Jeremy discusses an ongoing venture with Jim and two of his business partners who are also former JDT employees, Corey Stull and Ranae Muenchrath [Rick Decl., ¶ 38, Ex. H.]

42.    In the email, Jeremy asks for specific plans to buy trucks, refers to ownership by Corey and Ranae, and discusses plans for investment by "Wayne" and "Lucas," presumably Wayne and Lukas Schmeeckle [Rick Decl., ¶ 39, Ex. H.]

43.    In his email, Jeremy emphasizes the importance of Jim's reputation and knowledge in the trucking industry to Jeremy's decision to join the venture:

> By the way, you walking me through this is worth its weight in gold. One of the big reasons I want to work with you moving forward is your knowledge and experience in all the categories I am asking about. You will teach me a ton about knowing more on the profitability of a trucking company. I don't have much anxiety because I believe in the way we make this work.

[Rick Decl., ¶ 40, Ex. H.]

44.    Jeremy's email also underscores that this venture is ongoing, referring to the fact that JDT's lease of its office from Jim is scheduled to end on October 31:

> You mentioned you get your property back on October 31. Does this include everything except the trucks/trailers and staff that Rick has? Do you figure to move back into that property as fast as you can to help expedite our venture, right?

[Rick Decl., ¶ 41, Ex. H.]

45.    JDT's mechanic has told Rick that in the past week he has observed trucks affiliated with Jim, on JDT's yard, being modified in a way that will allow them to haul refrigerated trailers. [Rick Decl., ¶ 42.]

46.    In his October 22 email, Jeremy asks for more information on Jim's "brokerage." Jim's brokerage is Columbus Transportation & Logistics, LLC ("CTL"). CTL operated in close connection with JDT. In reviewing company

records since Jim and Tony left JDT, JDT has learned that JDT paid the wages of CTL employees [Rick Decl., ¶ 43.]

47.    Jim continues to own and operate numerous trucking related businesses in addition to CTL, including JLD Truck Lines, LLC, J & L Enterprises, L.L.C., Loyal Trucking, L.L.C., and H-J Trucking, LLC [Rick Decl., ¶ 44.]

48.    Records on JDT's servers indicate that Jim has financed and continues to finance the purchase of trucks, in connection with the entities listed above and former employees of JDT, through Jones Bank [*Id.*]

49.    Jim has refused numerous demands to stop engaging in the trucking business through his other entities [Rick Decl., ¶ 45.]

50.    Not only is Jim using these entities to now compete with JDT in the trucking business, in violation of the non-competition provision, he is doing so to pursue corporate opportunities rightfully belonging to JDT [Rick Decl., ¶ 46.]

51.    In addition to unlawfully competing with JDT, Jim has come to the offices and shop of JDT in the past week on a daily basis and has interfered with JDT's ability to remove tangible property JDT purchased in the Asset Purchase Agreement before the end of JDT's lease with Jim [Rick Decl., ¶ 47.]

52.    Despite the sale of the business and its trade name, Jim continues to represent himself as the owner of Daws Trucking on the website https://www.dawstruckingne.com/. The website reads in part: "The owner of Daws Trucking, Jim Daws, has been in the trucking industry since 1976. Jim stands by his company motto of "Anchored in Excellence" which applies to all

areas of the company with a goal to provide clients with the highest level of service possible" [Rick Decl., ¶ 48.]

53.    The website further provides: "Daws Trucking is near Milford, Nebraska located a few miles south of Interstate 80, specializing in hauling over the road flatbed freight. Daws Trucking's location in the middle of the continental United States has allowed us to transport freight from coast to coast." [Rick Decl., ¶ 49.]

54.    Jim has been in the trucking industry for nearly fifty years. His reputation in the industry and his relationships with customers, potential customers, potential business partners, employees, and drivers are all part of the goodwill that Rick and Ricky purchased from Jim and Daws, Inc., through JDT, in the Asset Purchase Agreement. Jim has already used that goodwill to start at least one new trucking venture, which was an opportunity of JDT. He has also used his reputation and relationships to directly harm JDT, by encouraging employees and drivers to quit working for JDT and work for him. JDT has already suffered great harm because of Jim's actions. If his actions continue, it will be difficult, if not impossible, to calculate all the harm to JDT [Rick Decl., ¶ 50.]

55.    On Friday, October 25, JDT's attorneys sent Jim's attorneys a letter demanding that Jim cease-and-desist and provide confirmation he will do so by Monday, October 28, at 12 p.m. [Rick Decl., ¶ 51, Ex. I.]

56.    On Monday, October 28, Jim's attorneys responded with an email stating that Jim is entitled to continue in the trucking business, including the

venture with Jeremy Becker that began while he was an employee of JDT [Rick Decl., ¶ 52, Ex. J.]

57.    As outlined above, if this injunction is not granted, JDT, Rick, and Ricky will be irreparably harmed.

### III. ARGUMENT

"[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657,664-65 (8th Cir. 2022). Those factors are set forth in *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113–14 (8th Cir. 1981):

1. The threat of irreparable harm to the movant in the absence of relief.

2. The balance between this harm and harm the relief would cause to the other litigants.

3. The movant's likelihood of success on the merits.

4. The public interest.

The evidence offered by JDT easily meets the standard for issuance of a TRO.

In evaluating the four factors above, "the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. The evidence here demonstrates a clear threat of irreparable harm to JDT and a likelihood of success on the merits of its claims. In contrast, an injunction would impose little or no harm to Jim, who has already been paid over $10 million for his business and who continues to profess his desire to retire from trucking.

13

**A.    JDT Has Met its Burden to Establish a Fair Chance of Prevailing on the Merits.**

While no single factor is determinative, the movant's probability of success is the most significant. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). The moving party need not "prove a greater than fifty per cent likelihood that [it] will prevail on the merits." *Dataphase*, 640 F.2d at 113. Rather, it must demonstrate a "fair chance of prevailing." *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). The evidence proffered by JDT shows it has more than a fair chance of prevailing on its claims that Jim has violated his noncompete agreement and his duty of loyalty as an employee of JDT.

**1.    Jim's noncompete, which was entered into as part of the sale of a business, is reasonable and enforceable.**

The enforceability of a restrictive covenant is a legal question to be decided by the Court. *See ADT Sec. Servs., Inc. v. A/C Sec. Sys., Inc.*, 15 Neb. App. 666, 703-04, 736 N.W.2d 737, 769-70 (2007). Whether a restrictive covenant is enforceable (i.e., reasonable in time and scope) "is dependent upon the facts of each particular case." *ADT Sec. Servs., Inc.*, 15 Neb. App. at 704, 736 N.W.2d at 770.

In the employment context, absent confidentiality concerns, restrictive covenants are generally limited to restrictions on the solicitation of the employer's customers with whom the employee did business and had personal contact. *See, e.g., Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 668, 407 N.W.2d 751, 756 (1987).

In the context of the sale of a business, however, this limitation does not apply. *See H&R Block Tax Servs., Inc. v. Circle A Enter., Inc.*, 269 Neb. 411, 422, 693 N.W.2d 548, 556 (2005) ("Because we conclude that this franchise agreement is akin to a sale of a business, the 'customer specific' rule articulated in [the employment] cases is not applicable."). To the contrary, "Nebraska courts are generally more willing to uphold promises to refrain from competition made in the context of the sale of goodwill as a business asset than those made in connection with contracts of employment." *H&R Block*, 269 Neb. at 417, 693 N.W.2d at 554. *See also CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 338, 518 N.W.2d 652, 655 (1994); *ADT Sec. Servs.*, 15 Neb. App. at 703, 736 N.W.2d at 770. Generally, in the case of a "covenant not to compete ancillary to the sale of a business, a restraint is enforceable if it is reasonable in both time and scope" viewed in the light of the interests transferred. *H&R Block*, 269 Neb. at 422, 693 N.W.2d at 557 (citing *Presto-X-Company v. Beller*, 253 Neb. 55, 63, 568 N.W.2d 235, 239 (1997)).

The rationale behind this greater leniency was aptly described by the Nebraska Supreme Court in *Swingle & Co. v. Reynolds*, and has since been repeated in every Nebraska appellate opinion on the issue of restrictive covenants arising from the sale of business:

> It is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area, and then use the funds thus obtained to do the very thing the contract prohibits. Unless such contract be against the public interest, the parties should be held to their engagements.

140 Neb. 693, 695, 1 N.W.2d 301, 309 (1941). Stated another way: "Nebraska has recognized the legitimate need of one who purchases a business to reasonably protect himself against competition from the seller." *Presto-X-Company*, 253 Neb. at 60, 568 N.W.2d at 238.

In correspondence, Jim's attorneys have invoked *Presto-X* to argue that the noncompete here is unreasonably broad. The noncompete in *Presto-X* covered a geographic area that was broader than the company's trade area. That is not the case here. JDT operated throughout the continental United States, which is the area covered by the noncompete. [Rick Decl., ¶¶ 7, 9.] Jim continues to represent on his website that "Daws Trucking's location in the middle of the continental United States has allowed us to transport freight from coast to coast. [*Id.*, ¶ 49.] Not surprisingly, Jim's attorneys have not even tried to argue the geographic scope is unreasonable in correspondence.

Jim's attorneys have posited two arguments, neither of which finds any support in the law or the facts.

First, Jim argues the noncompete is unreasonably broad because Jim needs to earn a living. However, at the time Jim signed the noncompete, he represented that he wanted to retire. Certainly, the amount he received in the Asset Purchase Agreement—over $10 million—was enough for him to do so. But even if Jim needed to keep working, any work he performs in the trucking industry will of necessity take advantage of his reputation, *i.e.*, the goodwill that he sold to JDT for $4.5 million. JDT is not aware of any case which supports Jim's argument on this point.

16

Second, Jim argues the noncompete only prevents him from engaging in a "like business" to JDT, which he claims is limited to over-the-road flatbed trucking. Jim bases this argument on a clear misreading of the noncompete. The noncompete clearly provides that Jim—

> shall not, either directly or indirectly, carry on or engage in, either as owner, part owner, manager, operator, employee, agent, or other participant, **the business of trucking** in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any other person deriving title to the goodwill of said business from Buyer carries on a like business in such area.

[Rick Decl., ¶ 7, Ex. A, ¶ 12 (emphasis added).] The noncompete is not limited to the business of flatbed trucking. Neither is the phrase "like business." "Like business" is used to refer to "the business of trucking," so that the noncompete prevents Jim from engaging in the business of trucking in the continental United States so long as JDT, or any other person deriving title to the goodwill it purchased, does so.

The facts of this case illustrate the reasonableness of a noncompete tied to trucking generally, rather than just flatbed trucking. Jim's new plan with Jeremy involves refrigerated trucks. *See* Statement of Facts, ¶¶ 28-30, 41-44. In his email dated October 22, 2024, Jeremy, provided an unsolicited explanation of the importance of Jim's reputation and experience to the success of that venture:

> By the way, you walking me through this is worth its weight in gold. One of the big reasons I want to work with you moving forward is your knowledge and experience in all the categories I am asking about. You will teach me a ton about knowing more on the profitability of a trucking company. I don't have much anxiety because I believe in the way we make this work.

[Rick Decl., ¶ 40, Ex. H.] As Jeremy grasps and relates in his email, the value of Jim's knowledge, reputation, and experience is not limited to flatbed trucking; it extends to trucking in general. The noncompete he signed was reasonably drafted to cover the same scope and is thus enforceable under Nebraska law.

### 2.    As its employee, Jim also owed a duty of loyalty to JDT.

"Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his employment . . . irrespective of the existence of a covenant not to compete or nonsolicitation clause." *West Plains, L.L.C. v. Retzlaff Grain Co.*, 870 F.3d 774 (8th Cir. 2017) (citation omitted). To give rise to liability, the employee's disloyal conduct must be "so harmful as to substantially hinder the employer in the continuation of his business." *Id.* "Such conduct might include soliciting customers of the employer or forming one's own competition business while still working for the employer." *Id.* (citing *Buell, Winter, Mousel & Assocs., Inc. v. Perry Consulting Eng'rs, Inc.*, 277 Neb. 770, 420 N.W.2d 280, 283 (1988)).

### 3.    Jim breached his noncompete and duty of loyalty.

The evidence offered by JDT, without any discovery yet from Jim, shows clearly that Jim planned to continue in the trucking business and is currently executing that plan. Jim refused to convey the DOT number he agreed to sell, signed up drivers under DTI, and applied for and obtained a trademark registration for the trade name "Daws Trucking," which name had previously sold to JDT. More specifically, he has engaged in the following events since this past summer:

- On or about July 23, 2024, Jim discussed a trucking "opportunity" with Jeremy Becker, who then emailed to thank Jim for "thinking of me when it comes to showing me an opportunity **at a respected company you have built.**" [Rick Decl., ¶ 26, Ex. F (emphasis added).]

- As a later email reveals, that "opportunity" appears to have involved Wayne and Lukas Schmeeckle of Schmeeckle Bros. Construction Co., which built the meatpacking plant which was a major delivery site for JDT this year. [*Id.*, ¶¶ 27, 39, Ex. H.]

- Although Jim originally sent Rick a save-the-date to his "retirement" party, he never sent an invitation. But Wayne and Lukas were added to the invite list. [*Id.*, ¶¶ 28-30.]

- While still employed by JDT, Jim coordinated a mass resignation that included most of JDT's employees and drivers. Out of more than 80 drivers, fewer than 30 remain with JDT. [*Id.* ¶¶ 31-35.]

- On their way out the door, JDT employees loyal to Jim transferred numerous company files and confidential information to themselves, including JDT's financial records, equipment lists, depreciation schedules, driver information, the Daws Trucking logo, and many other corporate files. [*Id.*, ¶ 34, Ex. G.]

- On October 22, 2024, apparently by mistake, Jeremy sent Jim an email with questions about their venture, including, "Do you figure to

move back into that property as fast as you can to help expedite our venture, right?" [*Id.*, ¶ 38, Ex. H.]

- JDT's mechanic has told Rick that in the past week he has observed trucks affiliated with Jim, on JDT's yard, being modified in a way that will allow them to haul refrigerated trailers. [*Id.*, ¶ 42.]

Before this Court's decision in *West Plains* was affirmed by the Eighth Circuit, the Court found a likelihood of success on the merits and entered a TRO and preliminary injunction based on similar facts. *West Plains* did not involve noncompete agreements, but it did involve alleged breaches of employees' duty of loyalty in the context of efforts to start a new, competing trucking business. Judge Smith Camp first entered a TRO to preserve the status quo until a hearing could be held on plaintiff's motion for preliminary injunction. *West Plains,* Case No. 8:13-cv-00047-LSC-FG3, Doc # 17, at 9. She then entered a preliminary injunction based, in part, on evidence that the defendants had violated their duties of loyalty to their former employer while still employed there. *Id.*, Doc. # 45, at 13–15. Among the evidence Judge Smith Camp found supported a TRO and preliminary injunction was the defendants' transfer of confidential corporate information to their own personal email accounts, and one defendant's failed attempt to erase data. *Id.,* Doc. # 17, at 4, 7–8, Doc. # 45 at 14–15. As set forth above, the JDT employees loyal to Jim who resigned with him executed a "data dump" of corporate records that would not have been needed if there were no intent to continue in the trucking business. Some employees attempted to delete emails, which indicates an awareness that their actions were not above board.

At a hearing on its Motion for Preliminary Injunction, JDT will present additional evidence of Jim's breaches of the duty of loyalty and Jim's duties under the noncompete. In the meantime, as in *West Plains*, the evidence currently before the Court is sufficient to demonstrate a likelihood of success on the merits of both these claims.

**B.    JDT is suffering irreparable harm.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors. Corp. v. Harry Brown's, LLC*, 563 F. 3d 312, 319 (8th Cir. 2009). "To demonstrate a threat of irreparable harm, the harm must be 'certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Izabella HMC-MF, LLC v. Radisson Hotels Int'l, Inc.*, 378 F. Supp. 3d 775, 778 (D. Minn. 2019) (quoting *Roudachevski v. All-American Care Ctrs.*, Inc., 648 F. 3d 701, 706) (8th Cir. 2011)).

The inability of a plaintiff to maintain goodwill with staff and customers, and the threat of unrecoverable financial harm given the uncertainty of damage calculations, have been held to be irreparable harm. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F. 3d 737, 741 (8th Cir. 2002) (noting it is well established that the "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury."; *Iowa Utils. Bd. v. F.C.C.*, 109 F. 3d 418, 425 (8th Cir. 1996) (finding "the petitioners' potential loss of consumer goodwill qualifies as irreparable harm."); *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F. 3d 801, 805 (8th Cir. 2003) (finding that a franchisor was threatened with

21

irreparable harm to its business reputation and goodwill); *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Asso.*, 744 F.2d 588, 591 (7th Cir. 1984) ("[T]he difficulties of proving lost profits . . . make it chancy to rely on a damage award to provide full compensation even where . . . a preliminary injunction is not necessary to keep the plaintiff afloat while the suit is proceeding toward final judgment."); *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 874 (D. Minn. 2015) ("[L]ost profits that are difficult to quantify may constitute irreparable harm.").

Here, given Jim's longstanding relationship with the business of Daws Trucking, Jim has significant goodwill with JDT's employees, drivers, and customers (and now former employees, drivers, and customers). In the event Jim engages in the business of trucking, Jim is likely to be able to solicit away and secure JDT's customers, employees, and drivers, which he has already done in good measure. [Rick Decl., ¶¶ 35, 50]. Indeed, since September 27, 2024, JDT has lost almost all the office personnel employed by JDT, and of the 80 drivers JDT it had before September 30, less than 30 remain. Departing drivers are leaving to work with Jim. [Rick Decl., ¶ 35].

This would mean that JDT would not only lose the revenue associated with the lost customers, but it would be impossible to bid and secure other work without drivers or quantify with certainty what amount of work was lost. This would bring JDT to a full stop, damage JDT in an amount that would not be calculable, and would irreparably harm JDT, Rick, and Ricky. [Rick Decl., ¶ 50].

The business Rick and his son bought from Jim through JDT is on the verge of being destroyed by Jim's conduct, which appears to be part of what Jim is trying to do. Unless restrained by this Court, Jim's continued violations of the noncompete and his duty of loyalty will result in irreparable harm.

## C.    The Irreparable Harm JDT will Suffer Outweighs Any Harm to Defendants.

As outlined above, JDT stands to suffer grievous harm. Jim, in contrast, will suffer no harm. He has already been paid over $10 million. At the time Jim signed the Asset Purchase Agreement, he said he wanted to retire. His lawyers continue to say he wants to. It would cause Jim no harm to stay out of the trucking business until a hearing on JDT's Motion for Preliminary Injunction.

To the extent Jim may seek to argue he will be harmed if he, and others acting with him, are prohibited from carrying out a competing venture he hatched while still employed at JDT, they are wrong as a matter of law. Any "harm" suffered by Defendants as the result of the issuance of the preliminary injunction enforcing the non-competition provision is a harm Jim inflicted upon himself and does not provide a basis for denying relief. *See Jiffy Lube Int'l v. Weiss Bros.*, 834 F. Supp. 683, 693 (D.N.J. 1993) (holding that to the extent the defendants suffer damage from the granting of the preliminary injunction, "this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant.") In short, Jim is not harmed by an order requiring that he comply with the duties he agreed to in the noncompete and assumed as an employee of JDT.

23

**D.    The public interest supports a temporary restraining order.**

"The Eighth Circuit Court of Appeals has recognized that 'the determination of where the public interest lies is also dependent on the determination of likelihood of success on the merits,' because it is in the public interest to protect rights." *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 80 F. Supp. 2d 953 (N.D. Iowa 2011) (quoting *Phelps–Roper v. Nixon*, 545 F. 3d 685, 690 (8th Cir. 2008). This general principle carries over to restrictive covenants, such as the non-competition provision at issue here: "It is as much a matter of public concern to see that valid [non-competition provisions] are observed as it is to frustrate oppressive ones." *Lockhart v. Home-Grown Indus. Of Ga., Inc.*, 2007 WL 2688551, at *6 (W.D.N.C. Sept. 10, 2007) (citation omitted).

The public interest further favors the entry of a TRO here, where Jim and his confederates have tried to conceal their dishonest conduct by acting in secret to develop a business venture—one which Jeremy described just last week as "starting to show positive entry"—by a last-minute transfer of company files and attempts to erase emails. The public interest does not condone such conduct.

## V. CONCLUSION

Based on the limited information currently available to JDT, it is clear Jim has breached his duty of loyalty and his obligations under the noncompete, that his violations have caused and are continuing to cause irreparable damage to the business of JDT, and that the balance of factors weighs in favor of a TRO until the Court can hold a full hearing on JDT's Motion for Preliminary Injunction.

Dated October 29, 2024

JIM DAWS TRUCKING, LLC,
Plaintiff

By:    s/ *Andre R. Barry*
Andre R. Barry, #22505
Henry L. Wiedrich, #23696
CLINE WILLIAMS WRIGHT
JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
(402) 474-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com

## CERTIFICATE OF SERVICE

I, Andre R. Barry, hereby certify that on October 29, 2024, I electronically filed the foregoing with the Clerk of the United States District Court for the District of Nebraska using the CM/ECF system, which sent notification of such filing to all registered case participants.

s/ *Andre R. Barry*
Andre R. Barry

25