IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC, | Case No. 4:24-cv-03177 |
| Plaintiff, | |
| v. | DECLARATION OF RICARDO "RICK" FERNANDEZ |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | |
| Defendants. | |

Ricardo ("Rick") Fernandez, pursuant to 28 U.S.C. § 1746(2), states as follows under penalty of perjury:

1. I am over 18 years of age and have personal knowledge of the matters addressed in this Declaration.

2. I have worked in the trucking industry since 1979. Among other trucking interests and operations, I am presently a member of Jim Daws Trucking, LLC ("JDT"), which is a Nebraska limited liability company that I formed on April 19, 2022, for the purpose of acquiring the trucking business owned and operated by Jim Daws ("Jim") in Milford, Nebraska, commonly referred to as "Daws Trucking" ("Daws Trucking"). The other member of JDT is my son, Ricardo Daniel Fernandez ("Ricky").

3. I have known Jim for many years. In the discussions which led to JDT's purchase of Daws Trucking, Jim told me that he wanted to sell Daws Trucking and retire. We reached an agreement-in-principle for Ricky and me to purchase the business of Daws Trucking.

4. Jim said the business of Daws Trucking was owned by and conducted through Daws, Inc. On May 4, 2022, JDT and Daws, Inc. entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"). A copy of the Asset Purchase Agreement is attached hereto as **Exhibit A**.

5. In the Asset Purchase Agreement, JDT purchased the business of Daws Trucking as a going concern and acquired all the tangible and intangible assets used in the business of Daws Trucking, including its trade name and its U.S. Department of Transportation (DOT) number [Ex. A, Recital B, ¶ 1.]

6. Pursuant to the Asset Purchase Agreement, JDT has already paid Jim over $10,000,000.00 for the business of Daws Trucking.

7. Paragraph 12 of the Asset Purchase Agreement also contained a non-compete, drafted by Jim's attorney, that was fundamental to our agreement to buy the business from Jim:

> It is understood and agreed that $4,500,000 of the purchase price shall be allocated to the goodwill of the Business, and in connection with the sale to the Buyer of the goodwill, Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any other person deriving title to the goodwill of said business from Buyer carries on a like business in such area.
>
> By affixing their signatures to this Agreement, Seller's shareholders join in the foregoing noncompetition agreement and agree to be individually bound thereby.

[Ex. A, ¶ 12.]

8. Jim and Lana were both shareholders of Daws, Inc. at the time the Asset Purchase Agreement was executed, and they both signed the Asset

Purchase Agreement, agreeing to be bound by the terms of the noncompete. [Ex. A, Signature Page.]

9. At the time the Asset Purchase Agreement was signed, Daws Trucking in fact carried on a trucking business throughout the continental United States. JDT continued to carry on such a business in all forty-eight continental United States after execution of the Asset Purchase Agreement.

10. After the sale of the Business, Jim became an employee of JDT and was paid a salary of approximately $90,000 per year.

11. Based on Jim's words and actions both before his employment with JDT ended and thereafter—as further described below—it is clear that Jim and Lana, along with their business entities and/or partners, are actively engaged in the trucking business, in competition with JDT and in the pursuit of business opportunities that arose while Jim was working for JDT, and that they intend to continue to do so.

**A.     Jim refused to transfer the Daws Trucking DOT Number.**

12. After the purchase of Daws Trucking closed, Jim refused to transfer the DOT number used by Daws Trucking, as agreed in the Asset Purchase Agreement. His initial excuse was that the DOT number was held by a separate company he owned, Daws Trucking, Inc. ("DTI"), and that federal regulations would not allow DTI to transfer the number. When our attorneys discussed a stock purchase agreement to address this issue, Jim demanded to be paid an additional $500,000, plus an acceleration of the outstanding debt owed to him under the Asset Purchase Agreement.

13. I would not agree to pay more for the DOT number than the parties had already agreed.

**B.   Jim and DTI signed drivers up to their own contracts.**

14. As part of the discussions over the DOT number, in April 2024, attorney Julie Karavas, who represented Jim and JDT, sent an email stating, "Per Jim, the main purpose of [DTI] is to own the DOT number, no financial activity." A true and correct copy of this email is attached hereto as **Exhibit B.**

15. But in contrast to the representations of Jim and his attorney, Jim was operating DTI as a trucking business, without my knowledge, while he was employed by JDT, despite his agreement to the non-compete and his ongoing duty of loyalty as an employee of JDT.

16. In the last week, I discovered an Independent Contractor Agreement dated April 19, 2023, between DTI and a driver named Walter Haven, attached hereto as **Exhibit C**, which was left behind in a truck.

17. The footer of the Independent Contractor Agreement describes it as "Confidential Information for Daws Trucking Inc." The agreement recites that DTI is a "for-hire motor carrier" and obligates Mr. Haven to "perform all of the work necessary" for the "transportation of such commodities as [DTI] provides for in its tariffs, schedules and contracts," and the "loading and unloading, securing, or tarping of such commodities as [DTI] provides for in its tariffs, schedules, and contracts." [Ex. C at p. 1, p. 4, ¶ 5.]

18. The file of signed Independent Contractor Agreements appears to have been removed from JDT's offices. However, the JDT computer server

4

contains many unsigned Independent Contractor Agreements with DTI dated after the Asset Purchase Agreement.

**C.   Jim applied for trademark registration of the trade name he sold to JDT, representing that he is using the mark in commerce.**

19.   In November 2023, again without informing me, Jim filed a trademark application for the trade name he sold to me in the Asset Purchase Agreement—the word mark "Daws Trucking"—with the United States Patent and Trademark Office, on behalf of DTI. A true and correct copy of trademark application Jim filed for DTI is attached hereto as **Exhibit D**.

20.   The trademark application states the mark will be used for the following class of goods and services: Class 100 and 105 for "Truck hauling; Truck transport; Trucking services, namely hauling of agricultural products and construction materials and equipment."[1]

**D.   Jim tried to negotiate a buyback of Daws Trucking at a discount.**

21.   When Jim refused to transfer the Daws Trucking DOT number to me, it suggested to me that Jim wanted to stay involved in the trucking business, and that it would be difficult for Ricky and me to operate JDT successfully if Jim did in fact intend to retire.

22.   I thus proposed selling Daws Trucking back to Jim for essentially what I paid for it.

---

[1] On October 22, 2024, the trademark application was approved, and the mark was registered with the USPTO. A copy of the trademark registration is attached hereto as **Exhibit E**.

5

23. Jim refused that proposal but offered to buy the business back at a steep discount—approximately $500,000.

24. I did not agree to the price Jim proposed, and no deal was reached.

**E.  Jim began to work on a new opportunity in the trucking business.**

25. At about this same time, also without my knowledge, Jim began to work on a new opportunity with Jeremy Becker ("Jeremy"), who appears to be the Chief Revenue Officer of another trucking company, Kirsch Transportation Services, Inc.

26. In an email to Jim dated July 23, 2024, which I first discovered last week, Jeremy thanked Jim for "thinking of me when it comes to showing me an opportunity at a respected company you have built." A copy of this email is attached hereto as **Exhibit F.**

27. While the details of this opportunity aren't totally clear to me at this time, it appears to involve a plan to ship products for a meatpacker near North Platte, Nebraska, known as Sustainable Beef. JDT's largest account over the past two years has involved the construction of a meatpacking plant for Sustainable Beef by Schmeeckle Bros. Construction Co., which appears to be owned and operated by Wayne and Lukas Schmeeckle.

**F.  Jim quit working at JDT and took most of JDT's employees with him.**

28. Jim held a party on July 30, 2024, in York, Nebraska, which was represented to me as a retirement party. I received a save-the date but not an invitation. When I asked Jim about this, he said he took me off the invite list because we weren't getting along. I did not attend.

29. I have since learned, by reviewing a guest-list Jim left behind, that Wayne Schmeeckle, his wife, Robin, and his son, Lukas, were all added to the guest list toward the end.

30. In retrospect, the party appears not to have been a retirement party but a celebration of Jim and his plans to remain in the trucking business, by either forcing Ricky and me to abandon the business of Daws Trucking or by continuing in the trucking business in competition with us.

31. On August 23, 2024, I was working at JDT's offices in Milford, Nebraska. I planned to talk to Jim about what I understood to be his upcoming retirement.

32. Jim refused to meet with me for most of the day on August 23. Instead, he met with other employees of JDT behind a closed door or otherwise out of my presence. Toward the end of the day, he finally invited me into his office. While we were there, Jim said that he was leaving JDT, and everyone else would be leaving with him.

33. Most employees of JDT resigned on Friday, September 27, 2024.

34. From reviewing company emails, I have since learned that Tony Glenn, the former controller of JDT who resigned as part of the mass resignation on September 27, sent numerous JDT files and confidential information, including JDT's financial records, equipment lists, depreciation schedules, driver information, the Daws Trucking logo, and many other corporate files, from JDT's server to his personal Gmail account. A true and correct copy of representative emails are attached hereto as **Exhibit G.**

35. Since September 27, 2024, we have lost almost all the office personnel employed by JDT. Of more than 80 drivers it had before September 30, JDT now has fewer than 30. We have heard from drivers who left JDT that they did so out of loyalty to Jim. The loss of drivers has had a devasting effect on JDT's ability to serve customers and generate revenue, both now and in the future.

**G.     Jim is either operating or continuing to operate a new venture.**

36. On Friday, September 27, out of concern that Jim would try to retain and use JDT's business records or that he might delete damaging emails or other documents, I physically removed JDT's server. I had previously directed JDT's IT vendor not to delete any emails.

37. When Jim and those loyal to him left at the end of September, we retained JDT's emails and took JDT's email server out of its offices. This appeared to surprise Jim and the employees who were loyal to him. At least two employees tried to delete their emails that afternoon but were unsuccessful in doing so because of our instructions to JDT's IT vendor.

38. On October 22, 2024, JDT received an email from Jeremy sent to Jim's old JDT email address, apparently by mistake. In the email, Jeremy discusses an ongoing venture with Jim and two of his business partners who are also former JDT employees, Corey Stull and Ranae Muenchrath. A true and correct copy of this email is attached hereto as **Exhibit H.**

8

39. In the email, Jeremy asks for specific plans to buy trucks, refers to ownership by Corey and Ranae, and discusses plans for investment by "Wayne" and "Lucas," presumably Wayne and Lukas Schmeeckle.

40. In his email, Jeremy emphasizes the importance of Jim's reputation and knowledge in the trucking industry to Jeremy's decision to join the venture:

> By the way, you walking me through this is worth its weight in gold. One of the big reasons I want to work with you moving forward is your knowledge and experience in all the categories I am asking about. You will teach me a ton about knowing more on the profitability of a trucking company. I don't have much anxiety because I believe in the way we make this work.

41. Jeremy's email also underscores that this venture is ongoing, beginning with the observation of "things starting to show positive entry," and referring to the fact that JDT's lease of its office from Jim is scheduled to end on October 31:

> You mentioned you get your property back on October 31. Does this include everything except the trucks/trailers and staff that Rick has? Do you figure to move back into that property as fast as you can to help expedite our venture, right?

42. JDT's mechanic has told me that in the past week he has observed trucks affiliated with Jim, on JDT's yard, being modified in a way that will allow them to haul refrigerated trailers.

43. In his October 22 email, Jeremy asks for more information on Jim's "brokerage." Jim's brokerage is Columbus Transportation & Logistics, LLC ("CTL"). CTL operated in close connection with JDT. In reviewing company records since Jim and Tony left JDT, I have learned that JDT paid the wages of CTL employees.

44. Jim continues to own and operate numerous trucking-related businesses in addition to CTL, including JLD Truck Lines, LLC, J & L Enterprises, L.L.C., Loyal Trucking, L.L.C., and H-J Trucking, LLC. I found records on JDT's servers indicating that Jim has financed and continues to finance the purchase of trucks, in connection with the entities listed above and former employees of JDT, through Jones Bank.

45. Jim has refused numerous demands to stop engaging in the trucking business through his other entities.

46. Not only is Jim using these entities to now compete with JDT in the trucking business, in violation of the non-competition provision, he is doing so to pursue corporate opportunities rightfully belonging to JDT.

47. In addition to unlawfully competing with JDT, Jim has come to the offices and shop of JDT in the past week on a daily basis and has interfered with our ability to remove tangible property JDT purchased in the Asset Purchase Agreement before the end of JDT's lease with Jim.

48. Despite the sale of the business and its trade name, Jim continues to represent himself as the owner of Daws Trucking on the website https://www.dawstruckingne.com/. The website reads in part: "The owner of Daws Trucking, Jim Daws, has been in the trucking industry since 1976. Jim stands by his company motto of "Anchored in Excellence" which applies to all areas of the company with a goal to provide clients with the highest level of service possible."

49. The website further provides: "Daws Trucking is near Milford, Nebraska located a few miles south of Interstate 80, specializing in hauling over the road flatbed freight. Daws Trucking's location in the middle of the continental United States has allowed us to transport freight from coast to coast."

50. Jim has been in the trucking industry for nearly fifty years. His reputation in the industry and his relationships with customers, potential customers, potential business partners, employees, and drivers are all part of the goodwill that Ricky and I purchased from Jim and Daws, Inc., through JDT, in the Asset Purchase Agreement. Jim has already used that goodwill to start at least one new trucking venture, which was an opportunity of JDT. He has also used his reputation and relationships to directly harm JDT, by encouraging employees and drivers to quit working for JDT and work with him. JDT has already suffered great harm because of Jim's actions. If his actions continue, it will be difficult, if not impossible, to calculate all the harm to JDT.

51. On Friday, October 25, our attorneys (JDT's, Ricky's, and mine) sent Jim's attorneys a letter demanding that Jim cease and desist and provide confirmation he will do so by Monday, October 28, at 12 p.m. A copy of this letter is attached hereto as **Exhibit I.**

52. On the morning of Monday, October 28, Jim's attorneys responded with an email stating that Jim is entitled to continue in the trucking business, including the venture with Jeremy Becker that began while he was an employee of JDT. A copy of this email is attached hereto as **Exhibit J.**

53. A copy of our attorney's response is attached hereto as **Exhibit K.**

11

54. I declare under the penalty of perjury that the foregoing is true and correct.

Dated October 29, 2024

_____
Ricardo ("Rick") Fernandez