IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM DAWS TRUCKING, LLC, | ) | CASE NO. 4:24-CV-3177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF JIM DAWS** |
| | ) | |
| DAWS, INC.; JAMES R. DAWS; LANA R. DAWS; DAWS TRUCKING, INC.; and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

I, James R. Daws, hereby declare as follows:

1. I am currently 70 years old and am competent to testify. I have personal knowledge of all facts set forth herein.

2. I have a commercial drivers license and have been involved in the trucking industry since approximately 1976.

3. I am the founder of Daws Trucking, Inc., and Daws, Inc., which specialized in hauling over the road flatbed freight such as agricultural products and construction materials using solely flatbed trailers.

4. A flatbed trailer has a long open bed without walls or a roof. In contrast to a flatbed trailer, some trucking companies operate refrigerated freight ("Reefer") trailers, dry vans, tankers, or other closed walled trailers which operate is a different market segment. For example, for obvious reasons a shipment of processed beef cannot be reasonably transported using a flatbed trailer because it is not refrigerated.

1

EXHIBIT 1

5. Over the course of my career, I also formed or acquired an ownership interest in other companies, including Columbus Transportation & Logistics, LLC ("CTL"). CTL is a separate company that is a registered freight broker with the Federal Motor Carrier Safety Administration ("FMCSA"). A freight broker does not transport goods in commerce, does not operate motor vehicles, does not have drivers, and does not assume responsibility for the cargo being transported. A freight broker arranges transportation of freight between a consignor and a trucking company.

6. I am also a co-owner of companies with other non-related partners who own and lease tractors and trailers to third parties. For example, I own one third of the membership shares in Loyal Trucking, LLC and 50% of the membership interests in JLD Truck Lines, LLC.

7. I also have an ownership interest with my wife, Lana, in J&L Trucking, LLC which owns real estate where the shop and office out of which Daws, Inc. operated.

**The APA**

8. In 2022, when I reached the age of 68, I contemplated slowing down and transitioning out of managing the day-to-day operations of Daws, Inc.

9. In 2022, Ricardo Fernandez ("Rick"), whom I had known for many years, approached me about purchasing the assets of Daws, Inc. through a company he would eventually form called Jim Daws Trucking, LLC ("JDT").

10. Rick told me that if he purchased the assets of Daws, Inc. he wanted me to run JDT for two years during which time I could train Rick's son, Ricardo Daniel Fernandez ("Ricky"), so that Ricky could eventually take over JDT's operations.

**The Asset Purchase Agreement**

11. On May 4, 2022, JDT entered into an asset purchase agreement (the "APA") in which it agreed to purchase certain assets of Daws, Inc., including tractors, flatbed trailers, and parts valued in excess of $8.4 million.

12. In the APA, JDT did not purchase the stock of Daws, Inc., nor the stock or assets of Daws Trucking, Inc., nor any interest in CTL or any of its assets, or any of other company in which I had an ownership interest.

13. After the APA, Daws, Inc., Daws Trucking, Inc., and CTL remained entities owned by me and my wife.

14. Pursuant to the APA, JDT was to pay Daws, Inc. a total of $12,000,000 for the assets purchased from Daws, Inc.

15. Of the $12,000,000 purchase price, JDT was to pay Daws, Inc. $8,000,000 in cash, and JDT would finance the balance of the purchase.

16. Daws, Inc. agreed to loan $4,000,000 to JDT at 3% interest per annum commencing on May 31, 2022 (the "Note") to finance JDT's purchase of the assets.

17. JDT has defaulted on the Note and owes Daws, Inc. over $2.4 million on the Note. Through its attorneys, Daws, Inc. demanded payment, but JDT, and Rick and Ricky who personally guaranteed the Note, have refused to pay.

18. JDT purchased the assets of Daws, Inc. at the height of the market. Since the APA, the trucking industry has been in a multi-year's long freight recession that has reduced the value of trucking companies.

**Employment with JDT**

19. After the APA, I became an employee of JDT. I did not have a written employment agreement with JDT. My last day of employment at JDT was September 30, 2024.

**JDT's Business**

20. After the APA, like Daws, Inc. before, JDT specialized in hauling over the road flatbed freight.

21. After the APA, JDT's business did not involve the operation of Reefers, dry van trailers, tankers, or any other type of enclosed trailer. JDT did not broker freight. JDT did not lease tractors or trailers to third parties or own any real estate.

**CTL Remains a Separate Operating Company after the APA**

22. Daws, Inc. had no ownership interest in CTL.

23. The assets of CTL were not sold to JDT under the APA.

24. After the APA, CTL continued to operate its freight brokerage business just as it had before the APA.

25. After the APA, JDT never claimed that CTL was an asset of Daws, Inc. that was sold to JDT under the APA.

26. In more than two years after the APA was entered into, prior to the filing of this lawsuit, JDT never claimed that my involvement in, or ownership of, CTL violated the Non-Compete in the APA.

**Non-Competition with JDT**

27. Other than my work performed as an employee of JDT for JDT, at no time since the APA have I directly or indirectly carried on, engaged in as an owner, part owner, manager, operator, employee, agent or other participant in the business of trucking in the continental United States of America in which JDT carried on a like business in such area.

**Management of JDT**

28. After the APA, I managed JDT. In doing so, I promoted JDT's business the same as I had done for Daws, Inc., encouraging customers to use JDT for their flatbed freight hauling.

29. Despite the ongoing freight recession, I was successful in helping JDT earn over $825,000 in profits in 2023 and over $550,000 in profits at the time I left employment with JDT in September 2024.

**Rick's Declaration**

30. I have reviewed Rick's declaration and he makes a number of statements that are false, incomplete, or at best, taken out of context.

**Rick Proposes that Jim Buy-Back the Assets**

31. In a text message dated April 22, 2024, a true and correct copy of which is attached as Exhibit A, Rick offered to sell JDT's assets back to me with me only

5

assuming JDT's outstanding loan while Rick would keep the more than $1.3 million in profits JDT earned under my management after the APA. Rick wrote: "Better yet let me get my money back with my gains..you take over the loans And I'm good We'll part on good terms." In other words, Rick initially proposed that I pay nothing to Rick to purchase the assets, but simply assume JDT's loans.

32. In subsequent negotiations, Rick repeatedly increased the amount he was demanding that I pay to purchase back the assets. After many months of negotiating, ultimately, I offered to buy the assets back for $500,000 in cash, while assuming over $5 million in debt, and writing off the balance of the $2.5 million owed under the Note. This was a fair offer considering the bulk of the assets JDT purchased over two years previously, tractors and flatbed trailers, had significantly depreciated in value. Rick rejected the offer and I informed him I was no longer willing to re-purchase the assets. Rick's statements in Paragraphs 22 and 23 of his declaration that "I [Rick] thus proposed selling Daws Trucking back to Jim for essentially what I paid for it" and "Jim refused that proposal but offered to buy the business back at a steep discount---approximately $500,000" is incomplete at best and false at worst.

33. In July 2024, I had conversations with Jeremy Becker, whom I had known for many years, about his interest in joining JDT. The e-mail string attached at Filing 19-7 reflects those conversations with Mr. Becker. Ultimately, Mr. Becker was not hired at JDT nor any other company in which I have an ownership interest. I was not, and am not, engaged in any business with Mr. Becker to compete with JDT.

6

34. Similarly, Rick states in paragraph 38 of his declaration that on October 22, 2024, Mr. Becker was discussing an "ongoing venture with Jim." I have never been involved in a business venture with Mr. Becker. As a long-time friend, in late October, 2024, after I left employment with JDT, Mr. Becker asked me for advice regarding a new business he was considering opening with two other individuals, Renee and Corey.

35. As Mr. Becker's October 22, 2024, email, which is attached to Rick's affidavit (See Filing 19-9), plainly states: "3) Tell me more about how you see **ownership among Renee, Corey, and myself [Becker]**." (emphasis added). As my lawyer truthfully informed Rick's attorney when this issue was first raised, neither I nor my wife have, nor plan to have, an ownership interest in whatever business Mr. Becker was planning nor have we, nor will we, receive any payments for work for that business. (See Filing 19-11),

36. As the October 22, 2024, email shows, Mr. Becker asked me for some general advice such as: Would it be better to finance the purchase of a truck through the manufacturer or a bank? What type of profits and loss could a brokerage expect? What type of overhead would it have? Would it be better to take on investors, borrow from private individuals, or finance through a bank? The Non-Compete should not prevent me from speaking with friends about business advice relating to businesses I have no ownership interest in and receive no compensation from.

37. Mr. Becker and I also discussed the possibility of his new business leasing space in a building owned by J&L Trucking. The Non-Compete should not

7

prevent J&L Trucking from leasing real estate. JDT was never in the business of leasing real estate.

**DOT Number Transfer**

38. Rick claims that I refused to transfer the Department of Transportation number to JDT. What Rick fails to state is that the DOT number is registered to, and is an asset of, Daws Trucking, Inc., not Daws, Inc.

39. Daws, Inc. never had a DOT number, and none was transferred in the APA.

**Independent Contractor Agreements**

40. After the APA was signed, we often re-used forms that the business had used for years. Admittedly, in retrospect we did not do a good job of updating those form documents after the APA to state "JDT" instead of "Daws Trucking, Inc."

41. I have reviewed the April 19, 2023, Independent Contractor Agreement entered into between Daws Trucking, Inc. and Walter Haven attached at Filing 19-4. This is the standard agreement we used for years prior to the APA. We continued to use it after the APA on behalf of JDT. It should have been updated to state "JDT" instead of "Daws Trucking, Inc." and I should have signed it on behalf of JDT, not Daws Trucking, Inc.

42. While I do not have access to any information regarding Mr. Haven's work because Rick has removed my access to the server, I am confident that Mr. Haven's work under this agreement was done for JDT and the revenue earned from

8

this contract accrued to JDT. Daws Trucking, Inc. was not competing with JDT through this agreement with Mr. Haven, or any other drivers, or in any other way.

**Trademark**

43. In the fall of 2023, I learned that another company was using the name "Daws Trucking."

44. I spoke with an attorney, Tom Krans, who recommended that we register "Daws Trucking" for a trademark to protect the trademark.

45. Mr. Krans completed and filed the trademark application.

46. Mr. Krans apparently incorrectly filed the Trademark under Daws Trucking, Inc., instead of JDT.

47. I do not dispute that JDT has the right to the trademark.

48. I have authorized my attorneys to assign the Daws Trucking trademark to JDT. To avoid unnecessary litigation, my attorneys requested that in exchange for voluntarily assigning the trademark, that JDT provide a limited release of any claims for trademark infringement and that JDT's lawyers prepare an assignment. JDT refused. I remain willing to assign the Daws Trucking trademark to JDT. We're simply waiting for JDT to provide us with the assignment language they want.

**JDT's Employees**

49. I never encouraged any JDT employee to quit their employment at JDT.

50. Rick had informed some employees that that he intended to move some of JDT's Nebraska office operations to Illinois. This did not sit well with JDT's

9

employees who feared that they would lose their jobs when Rick took over day to day management of JDT.

51. It is my experience having worked at JDT for over two years after the APA, that JDT's employees did not like Rick, and did not want to work for him.

**E-mailed Files Regarding Other Companies**

52. With respect to Rick's allegation that Tony Glenn emailed documents to his personal account before he left employment, I have reviewed the list of e-mails attached at Filing 19-8. While I do not have access to the actual documents listed as attachments to the e-mails, based on the titles, it appears that the documents relate to companies that I have an ownership interest in, and which were not sold under the APA, such as Loyal Trucking, J&L Trucking, and JLD Trucking. That data belongs to those companies. Those companies, and their data, were not sold pursuant to the APA.

53. Mr. Glenn was the controller for JDT. Essentially, all companies were operated out of a Daws, Inc. account. It is my understanding that Mr. Glenn would make accounting entries on at least a monthly basis transferring funds between the proper entities.

54. Rick and JDT continue to possess important data files relating to my other companies that were housed on JDT's server. For example, despite my attorney's repeated requests that JDT return copies of CTL's Keystone data so CTL can pay third parties amounts they are owed for brokerage services, JDT has refused, and instead is holding CTL's data hostage. Rick and JDT also continue to hold

Keystone data, and other computer files such as Excel spreadsheets, relating to my other companies, including JDL and Loyal Trucking. I would like copies of those electronic files returned to me immediately so those companies can pay people what they are owed.

### The Website

55. In paragraphs 48 and 49 of his declaration, Rick claims that I continue to hold myself out as the owner of Daws Trucking, Inc. on the website https://www.dawstruckingne.com. I am not a techie. I didn't create the website, and I don't know how to change it. The current website has the same language as was present before the APA. It was simply never changed after the APA. Neither I, nor Daws Trucking, Inc. are using the website to compete with JDT. The website was primarily used to recruit drivers. It is my understanding that after the APA, drivers who applied through the website were directed to JDT, not any company owned by me. I am not using the website to compete with JDT, and I am willing to transfer control of the website to JDT.

### Rick and JDT are Damaging My Company's Property

56. On October 29, 2024, Rick's and/or JDT's representatives entered the shop and cut electrical lines to air compressors owned by J&L Trucking. There is no good reason for Rick's agents to cut these electrical lines. Below are photos of the damage Rick's representatives have done to the electrical wiring of J&L Trucking's property.







57. On October 29, 2024, Rick and/or JDT's representatives also removed paper files from the shop that belong to my other companies.

58. I estimate that CTL has approximately $200,000 per month, or $50,000 per week, in revenue. If CTL is not allowed to operate its freight brokerage business it will suffer significant damages.

59. I estimate that Loyal Trucking, LLC has annual revenue of approximately $1.9 million, or approximately $36,500 per week, from leasing tractors and trailers to third parties.

60. I estimate that JLD Truck Lines, LLC has approximately $1.2 million in annual revenue or approximately $23,000 per week in revenue from leasing tractors and trailers to third parties.

13

61. If Loyal Trucking, LLC and JLD Truck Lines, LLC, in which I own less than a majority interest, are prevented from operating, they will suffer significant damages, which will also damage my partners who are not bound by any Non-Compete with JDT.

62. I enjoy driving truck and would still like to do so on occasion. Indeed, when things were slow in the office while I was employed by JDT, I drove truck for JDT. I estimate I drove truck for over 60,000 miles for JDT in 2023.

I declare, under penalty of perjury, that the foregoing declaration, executed on the 30th day of October, 2024, at Seward, Nebraska, is true and correct.

_____    James R. Daws

3303576.02