IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM DAWS TRUCKING, LLC, | ) | CASE NO. 4:24-CV-3177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' BRIEF IN** |
| | ) | **SUPPORT OF MOTION FOR** |
| DAWS, INC.; JAMES R. DAWS; LANA R. | ) | **PROTECTIVE ORDER** |
| DAWS; DAWS TRUCKING, INC.; and | ) | |
| COLUMBUS TRANSPORTATION & | ) | |
| LOGISTICS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

This Court has recognized that "[T]he attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system." *Benson v. City of Lincoln,* 343 F.R.D. 595, 607 (D.Neb., 2023) (Buescher, J.) (quoting *United States v. Ivers,* 967 F.3d 709, 716 (8th Cir. 2020) (internal citation omitted). Jim Daws Trucking, LLC ("JDT") seeks to trample on this sacred privilege by claiming that all data contained on a server it purchased from Daws, Inc. as part of an Asset Purchase Agreement ("APA"), including attorney-client communications between Jim4:24 Daws ("Jim") and his attorneys, is now the property of JDT, so it can review Jim's confidential communications with his attorneys. JDT's position is untenable. JDT asserts all privilege has been waived for communications between Jim and his attorneys, extending as far back as 2018, four years before the APA, and which are irrelevant to this suit, to the near-present confidential attorney-client communications and work product related to this lawsuit. JDT's position is contrary to law, and a protective order should be entered requiring JDT to destroy Defendants' privileged communications that are housed on the server.

## RELEVANT FACTUAL BACKGROUND

Jim is the founder and President of Daws, Inc. (Filing 35-1 ¶ 3). Over the course of Jim's career, he also formed or acquired ownership interests in other companies, including Daws Trucking, Inc., Columbus Transportation & Logistics ("CTL"), and J&L Enterprises, LLC. *Id.* ¶ 4. Jim did not have separate e-mail addresses for each of his companies; he used his "@daws-trucking.com" e-mail address to conduct all company business. *Id.* ¶ 5. As the founder and owner of such businesses, Jim also used that e-mail address for personal communications. *Id.* ¶ 11. To house the data of such companies, a server was purchased. Unbeknownst to Jim, who is not tech savvy, his e-mails were stored on this server. *Id.* ¶ 10.

Jim has maintained a long-standing relationship with the law firm Karavas and Kranz, P.C. ("Karavas and Kranz"). *Id.* ¶ 7. Over the years, Jim has retained Karavas and Kranz as both his personal and corporate business attorneys. *Id.*

In early 2022, Rick Fernandez ("Rick") approached Jim about purchasing the assets of Daws, Inc. Jim, sought legal advice from Karavas and Kranz regarding that transaction, which resulted in the sales of the assets of Daws, Inc. to JDT, on or about May 4, 2022. *Id.* ¶ 8 (Filing 1-1). JDT did not purchase the shares, or liabilities, of Daws, Inc. in the APA. Filing 35-1 ¶ 9. Daws, Inc. remains a separate company owned by Jim and his wife. Filing 35-1.

As part of the APA, Daws, Inc. sold its server to JDT. Jim did not intend to sell the data on the server that belonged to his other companies, nor his personal communications. *Id.* ¶ 10.

Before and after the APA, Jim used his "jim@daws-trucking.com" e-mail address for personal and business purposes. *Id.* ¶ 11. Daws, Inc. had an employee handbook that expressly permitted employees to use company e-mail for limited personal use. The Daws, Inc. Handbook stated:

2

> The Company provides E-mail and computer equipment for use in conducting Company business. Such equipment and services should be used primarily for business purposes. They are to be used for personal reasons only during nonworking time.
>
> …
>
> Electronic Mail – Electronic Mail (E-mail) is to be used primarily for business purposes and only for personal reasons during nonworking time. Like your computer, the Company may need to access your E-mail for various reasons. You should be aware that such messages are not entirely confidential. They can be forwarded to others without the original sender's knowledge. E-mail can be viewed by others who may improperly use a password to breach the security of the system. In addition, disclosure of E-mail messages may be required in lawsuits against the Company. As a rule of thumb, nothing should be sent by E-mail that you would not put in a formal memo or that you would not like to become public knowledge. Do not use derogatory, offensive or insulting language in any E-mail message.

(Filing 35-3 p. 20). The Handbook goes on to state that the "President of the Company" would enforce such policies "at its sole discretion." *Id.* at p. 23. Jim was the President of Daws, Inc.—and, therefore, enforcer of the e-mail policy. As such, he reasonably had a complete expectation of privacy *in his own e-mails*. Filing 35-1 ¶¶ 11, 16, 17, 18, 19, 21, 22. He did not interpret the policy to apply to his e-mails. *Id.* ¶ 28. He never monitored his employees' e-mails. *Id.* ¶ 12.

Furthermore, no one else had authority to monitor Jim's e-mail use under the Daws, Inc. policy. *Id.* ¶ 12. In practice, Daws, Inc. did *not* examine employees' personal e-mails sent from their "daws-trucking.com" e-mail addresses, and employees were in fact permitted to use their "@daws-trucking.com" for personal use. *Id.* ¶ 12. No one monitored Jim's e-mail. *Id.* ¶ 12 Jim respected his employees personal privacy and never claimed that if his employees communicated with their attorneys using their company e-mail address that they waived their attorney-client privilege with their lawyers. *Id.* ¶ 28.

After the APA, Jim became an employee of JDT. *Id.* ¶ 13. Rick represented to all Daws, Inc. employees who chose to become JDT employees after the APA, that nothing would change in how JDT operated. *Id.* After the APA, Jim was never

presented with a JDT Handbook, JDT employment agreement, nor a JDT e-mail use policy. *Id.* ¶ 14. After the APA, Jim continued to use his "jim@daws-trucking" e-mail to communicate with his attorneys about personal and business matters, as he had done in the past. *Id.* Jim reasonably believed his communications with his attorneys about personal matters, or matters related to his other companies, to be confidential and privileged. *Id.*

For example, before the APA Jim routinely communicated with his attorneys throughout 2018 and 2019 about his personal estate plan using his "jim@daws-trucking" e-mail. *Id.* JDT had not yet purchased Daws, Inc. and such e-mails are clearly not relevant to this lawsuit—yet JDT claims it can view such e-mails under its broad waiver theory.

Additionally, JDT goes so far as to assert it can view e-mails in which it and Jim were adverse parties and separately represented by legal counsel. *Id.* ¶ 17. For example, in 2022 and 2024, Rick and Jim were negotiating the APA, and later a potential buy-back of JDT's assets. Jim engaged Karavas and Kranz as legal counsel, and JDT was represented by its own counsel in such negotiations. Throughout such negotiations, Jim continued to communicate with his counsel at Karavas & Kranz using his "jim@daws-trucking.com" e-mail address, again believing that such communications were privileged and confidential.

When the relationship between Rick and Jim soured after failed negotiations, JDT removed the server. JDT has since held hostage all items on the server, including business records and documents for Daws Trucking, Inc., CTL, J&L Enterprises and Jim's other businesses. Despite never notifying Jim that JDT could monitor his e-mails, on September 30, 2024, Jim's last day of employment at JDT, JDT claimed that Jim had waived privilege over all communications he had with his attorneys and that JDT could read and use Jim's e-mails with his attorneys as it wished. (Filing 35-2) Jim's counsel objected to JDT's contention. *Id.*

4

Counsel since agreed on a protocol whereby JDT's vendor would provide copies of documents between Jim and lawyers so Jim's lawyers could review them and prepare a privilege log. JDT's vendor provided a total of 667 electronic files. Defendants' counsel reviewed those files, agreed that 239 of them were not privileged, and on November 14, 2024, provided Plaintiff's counsel with an initial privilege log regarding the remaining 428 documents. Counsel met and conferred on the afternoon of November 20, 2024. Rather than discuss specific entries on the log to see if the issues could be narrowed, JDT's counsel took the blanket position that none of the documents on the log were privileged, necessitating the filing of this motion.

## ARGUMENT

I. **THIS COURT SHOULD DECLARE THE DOCUMENTS ON DEFENDANTS' PRIVILEGE LOG ARE PRIVILEGED AND ORDER JDT TO DESTROY THESE PRIVILEGED DOCUMENTS IN ITS POSSESSION OR CONTROL**

   A. **Defendants have established that the documents on its log are subject to the attorney client privilege.**

A party withholding documents based on attorney-client or work-product privilege bears the burden of proving that privilege." *BJ's Fleet Wash, LLC v. City of Omaha*, No. 8:22cv131, 2024 WL 1962633, at *1 (D.Neb. June 24, 2024) (Nelson, M.J.) A cursory review of the privilege log prepared by Defendants shows that Defendants have met their burden to establish the attorney-client privilege applies to such communications between Jim and his attorneys.

For the attorney-client privilege to apply, "the parties to the communication in question must bear the relationship of attorney and client," and "the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity." *Diversified* Indus., Inc. v. Meredith, 572 F.2d 596, 602 (8th Cir. 1978) (en banc). The attorney-client privilege

5

also applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role in addition to when they represent their clients in litigation. *Martinez v. Cty. of Antelope, Nebraska,* No. 4:15CV3064, 2016 WL 3248241, at *7 (D. Neb. June 13, 2016) (citing *United States v. Chen,* 99 F.3d 1495, 1501 (9th Cir. 1996)). Additionally, "factual investigations performed by attorneys as attorneys fall comfortably within the protection of the attorney-client privilege." *Crutcher-Sanchez v. Cty. of Dakota, Neb.,* No. 8:09CV288, 2011 WL 612061, at *7 (D. Neb. Feb. 10, 2011). "The attorney-client privilege is strongest where a client seeks counsel's advice to determine the legality of conduct before taking action." *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 643 (8th Cir. 2001) (quoting *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997)).

Here, there is no question that the e-mails at issue are communications between Jim and his attorneys at Karavas and Kranz, and in one case at Fraser Stryker. "When a client communicates with an attorney, it is 'prima facie committed for the sake of legal advice and [is], therefore, within the privilege absent a clear showing to the contrary.'" *BJ's Fleet Wash,* 2024 WL 1962633, at *1 (quoting *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 610 (8th Cir. 1977)). Defendants have produced a thorough privilege log. That log identifies the e-mails and documents in question, states the basis for the privilege, contains factual details—such as the date, senders, recipients, and subject line of the e-mail—and an explanatory note about the contents of each e-mail when not otherwise obvious. *See Rabushka ex rel. U.S. v. Crane Co.,* 122 F.3d 559, 565 (8th Cir. 1997) (holding a party "met its burden of providing a factual basis for asserting the privileges when it produced a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit of its general counsel").

The bulk of such communications can be divided into roughly six categories:
1. communications about Daws, Inc. and other company business matters before the APA;

6

2. personal estate planning communications;
3. negotiations and strategy discussions regarding the APA in early 2022;
4. negotiations and discussions regarding the DOT number;
5. negotiations and discussions regarding a potential buy-back;
6. negotiations and discussions regarding this litigation, and general employment advice.

Certainly, such communications were for the "purpose of obtaining legal services or advice" that a lawyer gives "in his capacity as a lawyer," or in a counseling role. *Diversified Indus., Inc.*, 572 F.2d at 602; *Martinez*, 2016 WL 3248241, at *7.

Importantly, Defendants are *not* claiming privilege as to communications between Jim and Karavas and Kranz that were made on behalf of JDT, which equates to 239 files. Defendants' counsel has provided a log of those e-mails that it is not claiming are privileged.

### B. JDT cannot establish a waiver of the privilege.

JDT has taken the position that *all* e-mails between Jim and his attorneys—regardless of subject-matter or timeframe—are not privileged because they exist on a server purchased by JDT in 2022 and are JDT's property as Jim's employer. This position is incompatible with the law, and JDT cannot meet its burden to establish waiver.

"The burden of establishing waiver of the attorney-client privilege is on the party asserting the waiver." *Voter v. Avera Brookings Medical Clinic*, No. 06-4129, 2008 WL 4372707, at *3 (D.S.D., Sep. 22, 2008). "Thus, contrary to the doctrine of attorney-client privilege, the party seeking to establish waiver carries the burden of persuasion on the waiver issue." *Monsanto Co. v. Aventis Cropscience, N.V.*, 214 F.R.D. 545, 546 (E.D.Mo. 2002). "The majority view is that the employees do not waive the privilege in material on their work computer simply because the employer can monitor their communications." *United States v. Hudson*, No. CRIM.A. 13-20063-01, 2013 WL 4768084, at *9 (D. Kan. Sept. 5, 2013).

In general, courts apply four factors to determine whether privilege applies to materials on a workplace computer: "(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?" *Hudson,* No. CRIM.A. 13-20063-01, 2013 WL 4768084, at *9 (quoting *In re Asia Global Crossing, Ltd.,* 322 B.R. 247, 257 (Bankr.S.D.N.Y.2005)); *In re Reserve Fund Secs. & Derivative Litig.,* 275 F.R.D. 154, 160 (S.D.N.Y.2011).

The central question is whether the employee had a reasonable expectation of privacy and confidentiality in such communications. Here, all four factors weigh in favor of concluding that Jim had a reasonable expectation of privacy in his e-mails sent to or from his "jim@daws-trucking.com" e-mail account and he did not waive privilege simply because such communications are stored on his former employer's server.

1. **JDT did not have a policy banning personal use of company e-mail.**

As to the first factor, JDT did not have a policy banning personal use of company e-mail. To the extent it did, Jim is unaware of such a policy, and JDT has not yet produced one. JDT never asked Jim to review or sign a privacy or e-mail policy to that effect. *See, e.g., Maxtena, Inc. v. Marks,* No. CIV.A. DKC 11-0945, 2013 WL 1316386, at *5 (D. Md. Mar. 26, 2013) ("There is no evidence here indicating that the State maintained any sort of monitoring or use policy. . . Based on the current record, there is no basis for concluding that Mr. Dann necessarily waived the confidentiality of his communications with Maxtena's counsel by using the State's e-mail system.").

JDT has argued that by purchasing the assets of Daws, Inc., it also purchased the Daws, Inc. handbook. But even if JDT purchased the Daws, Inc. handbook as an intangible asset under the APA that doesn't mean that employees of JDT were bound by the Daws Inc. handbook after the APA when they became

8

employees of JDT. JDT didn't purchase the stock in Daws, Inc. which remains a separate company owned by Jim. JDT didn't purchase Daws, Inc.'s employees. After the APA, JDT hired Jim as an employee of JDT. But JDT never issued any e-mail policies or handbook to Jim, or anyone else. JDT's attempt to bootstrap the Daws, Inc. handbook onto employees of JDT must fail. JDT can cite to no policy JDT had, or notified Jim of, that JDT could monitor Jim's e-mails.

### 2. JDT never monitored employee use of e-mail.

Second, there is no evidence that JDT actually monitored the use of employees' e-mail. For any and all communications prior to the APA, Jim was the President of Daws, Inc., and any hypothetical review of company e-mails would have been conducted by himself and at his "sole discretion." In policy and practice, Daws, Inc. allowed personal use of e-mail and did not review employees' personal use of company e-mail. *United States v. Hudson*, No. CRIM.A. 13-20063-01, 2013 WL 4768084, at *9 (D. Kan. Sept. 5, 2013) ("The Court finds that defendant had a reasonable expectation of privacy in the documents which were on his workplace computer. The Technology Usage Policy for the Raytown School District does not prohibit personal use of the technology equipment."). The Daws, Inc. policy expressly permitted employees to use company computers and e-mail "for personal reasons during nonworking time." (Daws, Inc. Employee Handbook, p. 20).

### 3. Third parties did not have a right of access to JDT's e-mails.

Jim is not aware of any third-parties that would have had access to his "jim@daws-trucking.com" e-mail during his employment.

### 4. JDT did not notify Jim, and Jim was not aware of, any use of monitoring policies of his e-mail by JDT until his last day of employment on September 30, 2024

Finally, JDT never notified Jim of any e-mail monitoring policy, monitoring practice. JDT did not have its own Handbook or e-mail use policy, and never informed him that it would enforce the Daws, Inc. handbook against him once he became a JDT employee. JDT did not require that Jim sign the Handbook or advise

9

him that it would be applying such policies to him. In such circumstances, courts routinely find that employees have an expectation of privacy, and using company e-mail to communicate with an attorney does not waive privilege. *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97 (D.D.C. 2009) (employee's expectation of privacy in e-mails sent to his personal attorney through his work e-mail account was reasonable and, therefore, e-mails were protected from discovery by attorney-client privilege; DOJ maintained a policy that did not ban personal use of the company e-mail, and although the DOJ had access to personal e-mails sent through his account, employee was unaware that department would be regularly accessing and saving e-mails sent from his account); *Mason v. ILS Techs., LLC*, No. CIVA304CV-139RJC-DCK, 2008 WL 731557, at *4 (W.D.N.C. Feb. 29, 2008) (declining to find waiver of privilege when no evidence established that the employee was aware of the employer's policy and no one alleged that he agreed to abide by it). JDT never enforced the computer policy in the Daws, Inc. Handbook, and even if it had, personal use was authorized in the Daws, Inc. policy. *United States v. Long*, 64 M.J. 57, 64 (C.A.A.F.2006) (defendant had reasonable expectation of privacy in work computer where policy regarding personal e-mails had always been lenient and such use of network was considered authorized).

      It was not until his last day of employment that JDT's lawyers claimed that Jim had waived the attorney-client privilege over all of his communications with his lawyers that resided on the server. This after-the-fact rationalization by JDT does not change the fact that at the time Jim communicated with his lawyers, he reasonably expected that his communications were confidential and privileged.

      Under the facts and circumstances here, it is clear that JDT did not have its own computer privacy policy, and any reliance on the lenient Daws, Inc. policy does not change the calculus. All factors point to Jim having a reasonable expectation of privacy in his attorney-client privileged communications. *Hudson*, No. CRIM.A. 13-20063-01, 2013 WL 4768084, at *9. JDT cannot meet its burden to show waiver of the privilege.

C.   **Inadvertent disclosure is not a knowing, intelligent, and voluntary waiver.**

There were only two e-mails on the privilege log after JDT provided Jim's lawyer's with JDT's September 30, 2024, novel interpretation of the law; one on October, 1, and a second on October 9. Both communications were from Jim's lawyer who inadvertently sent them to Jim's old e-mail address. Her inadvertent use of Jim's old e-mail address is understandable considering Jim had communicated with her for years using that e-mail address and the common auto-populating feature of e-mail. An innocent mistake by a lawyer shouldn't waive the privilege, which requires a knowing, intelligent, and voluntary waiver. *See Gunter v. City of Omaha, No. 8:21cv281, 2022 WL 3597762, at \*2 (D.Neb. Aug. 23, 2022)* (Nelson, M.J.) ("Under Rule 502(b), an inadvertent disclosure does not operate as a waiver of the attorney-client privilege if the holder of the privilege took reasonable steps to prevent disclosure and the holder promptly took reasonable steps to rectify the error after learning of the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).").

Here, pursuant to the parties' agreed upon protocol, Defendants received copies of the documents from JDT's vendor on or around November 6, 2024, and provided a privilege log by November 14, 2024. In that privilege log, Defendants claimed that the two post September 30, 2024, e-mails were privileged. Under the circumstances, Defendants took reasonable steps to rectify this inadvertent error.

## CONCLUSION

There is no dispute that the e-mails and documents at issue were sent between Jim Daws and his attorneys for the purpose of seeking legal advice on personal and business matters. As the privilege log shows, some of those communications were made in the context of negotiating with Rick and/or JDT who were separately represented by their own counsel. Clearly, Jim had the expectation that his communications with his lawyers would not be shared with opposing parties and lawyers to the negotiation. Defendants have met their burden to

11

establish the privilege applies through the production of a detailed review and privilege log.

JDT cannot meet its burden to show that the attorney-client privilege was waived simply because the e-mails and documents are contained on its server. As set forth herein, JDT did not have a workplace policy prohibiting use of company e-mail for business purposes. To the extent JDT relies on the Daws, Inc. Handbook (which, it should not be allowed to do), the policy in that handbook is lenient and specifically allowed for personal use of company e-mail. The Daws, Inc. policy was never applied to spy on Daws, Inc.'s employees' communications with their lawyers, and was never interpreted to apply to Jim as President and owner of Daws, Inc.

The fact of the matter is approximately 111 of the documents on the privilege log relate to attorney communications from before October 12, 2021, dating back as far as 2018—years before the APA. These communications relate to legal advice, related to estate planning, charitable giving, tax advice, etc. and, therefore, have no possible relation to this lawsuit. Yet JDT refuses to concede that even these unrelated communications are privileged. Consistent with its heavy-handed approach, JDT wants everything.

Jim clearly had a reasonable expectation of privacy in his e-mails, based on years of past practice, and no notice to the contrary. Under such circumstances, courts routinely conclude that such communications remain privileged. The waiver of an attorney-client privilege shouldn't be turned into a parlor game where JDT can claim that it purchased the intangible assets of Daws, Inc. so it can review communications with Jim and his attorneys on matters unrelated to the operation of JDT's business. JDT's attempt to invade the sacredness of the attorney-client privilege based on novel arguments regarding its purchase of hardware, a server, and an employee handbook for a separate company, should be rejected. Defendants respectfully request that the Court order JDT to delete all privileged communications identified on their privilege log from the server and award any other relief the Court deems just and equitable.

DATED this 22nd day of November, 2024.

                DAWS, INC., JAMES R. DAWS,
                LANA R. DAWS, DAWS TRUCKING, INC.
                and COLUMBUS TRANSPORTATION &
                LOGISTICS, LLC, Defendants

      BY:   /s/ Timothy J. Thalken
              David C. Mullin, #21985
              Timothy J. Thalken, #22173
              Kristin M. Nalbach, #27125
              FRASER STRYKER PC LLO
              500 Energy Plaza
              409 South 17th Street
              Omaha, NE  68102-2663
              (402) 341-6000
              (402) 341-8290 - fax
              tthalken@fraserstryker.com
              dmullin@fraserstryker.com
              knalbach@fraserstryker.com
              ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d), counsel certifies that this brief contains 4157 words including all text, captions, headings, footnotes, and quotations according to the word count function of Microsoft Word 365.

                /s/ Timothy J. Thalken

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of November, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

                /s/ Timothy J. Thalken

3314907.7