IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JIM DAWS TRUCKING, LLC,

   Plaintiff

v.

DAWS, INC., JAMES R. DAWS, LANA R.
DAWS, DAWS TRUCKING, INC., and
COLUMBUS TRANSPORTATION &
LOGISTICS, LLC,

   Defendants.

Case No. 4:24-cv-03177

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR PROTECTIVE ORDER AND DESTRUCTION OF
PRIVILEGED DOCUMENTS IN PLAINTIFF'S POSSESSION**

---

Prepared and submitted by:

Andre R. Barry #22505
Henry L. Wiedrich #23696
Madeline C. Hasley #27870
CLINE WILLIAMS WRIGH
JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
(402) 479-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com
mhasley@clinewilliams.com

December 2, 2024

Plaintiff Jim Daws Trucking, LLC ("JDT") respectfully submits this Brief in Opposition to the Motion for Protective Order and Destruction of Privileged Documents in Plaintiff's Possession filed by Defendants Daws, Inc., James R. Daws ("Jim Daws" or "Jim"), Lana R. Daws ("Lana Daws" or "Lana"), Daws Trucking, Inc. ("DTI"), and Columbus Transportation & Logistics, LLC ("CTL") (collectively "Defendants") [Filing No. 34.]

## I.  INTRODUCTION

Defendants have submitted a purported privilege log and are claiming the application of the attorney-client privilege to 428 communications and related documents). Most of the communications (369 of the 428) were either sent by or to Jim. Only 59 messages were sent or received by Lana.

The communications can be divided into three broad categories: (1) communications that were sent prior to May 4, 2022, which were saved on a server owned and used by Daws, Inc., the possession and ownership of which (and all intangible assets) was transferred to JDT as part of the sale of Daws Trucking to JDT (the "Pre-Sale Communications"); (2) communications that were sent on or after May 4, 2022, using JDT's server and company email addresses, but before September 27, 2024 (the "Post-Sale Communications); and (3) communications that were sent after JDT secured and shut down the servers at noon on September 27, 2024 (the "Post-Shutdown Communications"). There are 134 Pre-Sale Communications, 288 Post-Sale Communications, and 6 Post-Shutdown Communications.

As explained more fully below, Defendants' privilege claims fail for at least the following four reasons:

1.      Defendants turned over possession of the Pre-Sale Communications to JDT on May 4, 2022. All the Post-Sale Communications and Post-Shutdown Communications were always in the possession of JDT, from their creation and transmission, thereby waiving any claim of privilege. The server, all its data, the email addresses, and the emails (all intangible assets) were all acquired by JDT on May 4, 2022. Defendants could have easily removed the alleged privileged Pre-Sale Communications before then, but they did not. Instead, Defendants delivered possession and ownership of the Pre-Sale Communications to JDT and did not ask for those emails to be returned or deleted until, over two years later, Jim orchestrated a walkout of JDT employees and drivers and realized he didn't have control of the server and emails he sold to JDT. Parties who waive the attorney-client privilege by their own intentional actions have no basis to request that the Court safeguard that which they failed to protect themselves.

2.      The Post-Sale Communications and Post-Shutdown Communications were sent with no reasonable expectation of confidentiality or privacy, meaning no privilege ever attached to such communications. Based on his prior ownership of the company, Jim understood that employees had no expectation of privacy in their workplace emails. The employee handbook used before and after the sale, which itself was part of the sale, made clear that employees had no reasonable expectation of privacy in their emails. When Jim became an employee of JDT, he carried that knowledge and awareness with him,

and the evidence shows that the handbook policies continued to apply. It would have been simple for Jim to use a non-JDT email address to correspond with legal counsel for matters he wanted to keep confidential from his employer. He chose not to do so. Perhaps this was because Jim (a) used his JDT email to correspond with Julie Karavas and her law firm regarding both JDT matters and personal matters, even when those personal matters were adverse to JDT, and (b) had JDT pay for the legal fees charged by Julie Karavas and her law firm, even as to matters adverse to JDT. While Jim tries to argue he is not "tech-savvy" (a claim belied by his review of other employees' data), he had no objectively reasonable expectation of privacy in communications sent using JDT's email service provider and server.

3.    Even after the server was shut down and legal counsel for JDT and Jim exchanged correspondence on the waiver of privilege, the Post-Shutdown Communications were still sent to Jim's JDT email address. While Jim attempts to argue this disclosure was "inadvertent," he offers no competent evidence that his attorneys took reasonable steps to avoid disclosure or to promptly seek return of the communications they now claim are privileged.

4.    To the extent privilege attached to any of the communications and was not subsequently waived, any emails that were exchanged by Defendants with their legal counsel for the purposes of (a) committing the fraud of denying JDT from receiving the goodwill and other assets that JDT purchased from Daws, Inc., Jim, and Lana, (b) accomplishing a shakedown of JDT (and by extension Rick and Ricky Fernandez) for additional payments for goodwill and assets it had

already paid for; and/or (c) violating a duty of loyalty owed to JDT are not privileged under the crime-fraud exception. To the extent the Court finds that any of the communications may be privileged, JDT requests that the Court conduct *in camera* review of emails from August 21 through September 27, 2024, based on JDT's good faith belief that the emails reflect an effort and plan by Jim to breach his duty of duty of loyalty to JDT and inflict direct harm on the company.

## II. STATEMENT OF FACTS

### A.    The Parties

1.    Rick Fernandez ("Rick") has worked in the trucking industry since 1979. Among other trucking interests and operations, Rick is presently a member of JDT, which is a Nebraska limited liability company that Rick formed on April 19, 2022, for the purpose of acquiring the trucking business owned and operated by Jim Daws in Milford, Nebraska, commonly referred to as "Daws Trucking" ("Daws Trucking"). The other member of JDT is Rick's son, Ricardo Daniel Fernandez ("Ricky") [Declaration of Rick Fernandez ("Rick Decl."), ¶ 2.]

2.    Rick has known Jim for many years. In the discussions which led to JDT's purchase of Daws Trucking, Jim told Rick that he wanted to sell Daws Trucking and retire. Jim and Rick reached an agreement-in-principle for Rick and Ricky to purchase the business of Daws Trucking, through JDT [Rick Decl., ¶ 3.]

**B.     The Asset Purchase Agreement.**

3.     Jim told Rick that the business of Daws Trucking was owned by and conducted through Daws, Inc. On May 4, 2022, JDT and Daws, Inc. entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") [Rick Decl., ¶ 4, Ex. A.]

4.     In the Asset Purchase Agreement, JDT purchased the business of Daws Trucking as a going concern and acquired all the tangible and intangible assets used in the business of Daws Trucking. [Rick Decl., ¶ 5, Ex. A, ¶ 1.] More specifically, the Asset Purchase Agreement provided that JDT acquired, among other things:

> b. All of the inventory, machinery, and equipment of the Business as determined by a complete inventory and accounting of such inventory, machinery, and equipment and depreciation schedule to be taken by the parties hereto as of the Closing.
>
> c. All of the fixtures and other tangible assets of the Business as shown on the financial statements of the Business prepared as of January 1, 2022 and April 30, 2022, annexed hereto as Exhibit A…
>
> d. The trade, business name, goodwill, and all other intangible assets of the Business, including but not limited to Business's US DOT Number (hereinafter referred to as the "DOT Number") and Motor Carrier number (hereafter referred to as the "MC Number") and **all other assets of the Business whether described herein or not**…

*Id.* (emphasis added).

5.     Exhibit A to the Asset Purchase Agreement specifically listed Daws Trucking's server as an asset that was transferred to JDT as part of the sale. It was listed under "Office Equipment" and it was valued at $39,585.00 [Rick Decl., ¶ 6, Ex. A, ¶ 1(c), p. 15.]

6.      The Asset Purchase Agreement lists February 28, 2021, as the date of acquisition of the server—about a year before the sale to JDT [Rick Decl., ¶ 7, Ex. A, ¶ 1(c), p. 15.]

7.      The Asset Purchase Agreement transferred to JDT a tangible asset in the document titled "daws handbook office 2-2017" (the "Daws Handbook") [Rick Decl., ¶ 8, Ex. B.]

8.      The Asset Purchase Agreement transferred to JDT all the data belonging to the business and all of the data on the server and other computer equipment [Rick Decl., ¶ 9.]

## C.    JDT continued to use the Daws Handbook it purchased from Daws, Inc. after the sale.

9.      After the sale of Daws Trucking to JDT, Jim became an employee of JDT. He was paid a salary of $90,000 per year. Jim was subject to the employment policies that existed before the sale, and which continued thereafter [Rick Decl., ¶ 10.]

10.     In his own declaration in support of the motion for protective order, Jim admitted that he became an employee of JDT and "that nothing would change from how the company was run before the APA" [Filing No. 35-1, ¶ 13.]

11.     Because JDT bought Daws Trucking as a going concern, after Daws Trucking was sold to JDT, JDT continued to use the Daws Handbook to govern its employment relationships, employees referenced the Daws Handbook, and employees followed the policies found in the Daws Handbook [Rick Decl., ¶ 11.]

12.     Jim never received a new employee handbook because the Daws Handbook was still in effect. And, as an employee, he was subject to the policies in the Daws Handbook [Rick Decl., ¶ 12.]

13.     On October 31, 2022, Kathy Temme, an employee of JDT, emailed Bill Molthan, an employee of JDT, and said, "Our bereavement policy is you have to use your PTO time. See attached." Kathy attached the Paid Time Off policy found on page 15 of the Daws Handbook [Rick Decl., ¶ 13, Ex. C.]

14.     On November 2, 2023, Kathy Temme, an employee of JDT, emailed Ranae Muencrath, an employee of JDT, and said, "Here's the page from the handbook." Kathy attached the Personal Appearance policy found on page 18 of the Daws Handbook [Rick Decl., ¶ 14, Ex. D.]

15.     On July 26, 2024, Lana Daws emailed Jaisa Douty, an employee of JDT, and asked for a copy of the Employee Handbook and Driver Orientation Handbook. Jaisa responded, "Daws Handbook Office is the only handbook we have." Jaisa attached "daws handbook office 2-2017," the Daws Handbook. [Rick Decl., ¶ 15, Ex. E.]

16.     The Daws Handbook contains the following provisions, found on pages 20–21:

> Computers - All data entered on the Company's computers is considered the property of the Company. No employees should knowingly enter false or misleading information in the Company's computer system or destroy any data, which the Company needs to conduct its business. Please realize that for various reasons, the Company will access your equipment. As a result, your computer should not be used for personal business even during nonworking time if you don't want the Company to see your personal documents. Unauthorized access to any computer, computer system, computer software or computer program is specifically prohibited.

8

Violators will be prosecuted to the fullest extent allowed by civil or criminal law.

Electronic Mail - Electronic mail (E-mail) is to be used primarily for business purposes and only for personal reasons during nonworking time. Like your computer, the Company may need to access your E-mail for various reasons. You should be aware that such messages are not entirely confidential. They can be forwarded to others without the original sender's knowledge. E-mail can be viewed by others who may improperly use a password to breach the security of the system. In addition, disclosure of E-mail messages may be required in lawsuits against the Company. As a rule of thumb, nothing should be sent by E-mail that you would not put in a formal memo or that you would not like to become public knowledge. Do not use derogatory, offensive or insulting language in any E-mail message.

[Rick Decl., ¶ 16, Exhibit B, p. 20–21.]

**D.    Emails contained on JDT servers.**

17.    After JDT acquired Daws Trucking, neither Jim nor his attorneys, Julie Karavas and Thomas Kranz, ever instructed JDT, Rick, or Ricky to delete any of their email communications that were made prior to the execution of Asset Purchase Agreement [Rick Decl., ¶ 17.]

18.    After Rick acquired Daws Trucking, by reviewing company emails, Rick has since learned that Jim continued to correspond with Karavas & Kranz, sometimes on behalf of JDT, and sometimes adverse to JDT, and that such emails were saved to the Daws Trucking server. Neither Jim nor his attorneys, Ms. Karavas and Thomas Kranz, took any measures to protect their ongoing communications from disclosure to JDT or Rick through the server [Rick Decl., ¶ 18.]

19.    Rick has reviewed the emails between Jim and Ms. Karavas on JDT's email server. Those emails support a reasonable belief that Jim was working with

9

Ms. Karavas to orchestrate a mass resignation of employees from JDT, receive additional value for what was already sold to JDT, and/or devalue JDT to the point where Jim could reacquire it for far less than he sold it to Rick. [Rick Decl., ¶ 19.]

**E.    Jim accessed information from employees' computer files on at least one occasion.**

20.    On at least one occasion, Jim accessed information from an employee's computer files and contacted Bizco, JDT's IT service provider, about it. On April 11, 2024, in an email to Ms. Karavas's partner, Thomas Kranz, which Jim does not assert is privileged, Jim described the results of a review of the computer files of a former JDT employee whose first name was Charles. In the email, Jim outlined a list of changes that Charles made:

> Deleted files from the U: drive his personal file for our permit system.
> Deleted files from the P: drive Bizco was able to recover and reinstall.
> The documents folder that held contracts was empty.
> Bizco said he was deleting files before he gave notice.

[Rick Decl., ¶ 20, Ex. F.]

21.    In addition to the policies in the Daws Handbook, this incident in April 2024 shows that Jim understood that employees' activities on the server were subject to monitoring and review, JDT, as owners of the server and the party with whom Bizco had a contract, could review activity on the server, and that employees, of which he was one, had no expectation of privacy.

**F.    Jim Refused to transfer the Daws Trucking Number.**

22.    After the purchase of Daws Trucking closed, Jim refused to transfer the DOT number used by Daws Trucking, as agreed in the Asset Purchase

Agreement. His initial excuse was that the DOT number was held by a separate company he owned, Daws Trucking, Inc. ("DTI"), and that federal regulations would not allow DTI to transfer the number. When JDT's attorneys discussed a stock purchase agreement for JDT to acquire title to the DOT number it had purchased, Jim demanded to be paid an additional $500,000, plus an acceleration of the outstanding debt owed to him under the Asset Purchase Agreement [Filing No. 19-1, ¶ 12.]

23.    Rick, Ricky, and JDT would not agree to pay more for the DOT number than the parties had already agreed [*Id.*, ¶ 13.]

**G.    Jim and DTI fraudulently applied for trademark registration of the trade name he sold to JDT, representing that DTI was using the mark in commerce, and charged JDT for the legal fees.**

24.    In November 2023, again without informing Rick or Ricky, Jim filed a trademark application for the trade name he sold to JDT in the Asset Purchase Agreement—the word mark "Daws Trucking"—with the United States Patent and Trademark Office, on behalf of DTI [*Id.*, ¶ 19, Ex. D.]

25.    The trademark application states the mark is being used in commerce and will be used for the following class of goods and services: Class 100 and 105 for "Truck hauling; Truck transport; Trucking services, namely hauling of agricultural products and construction materials and equipment" [*Id.*, ¶ 20, Ex. D.]

26.    On October 22, 2024, the trademark application was approved, and the mark was registered with the USPTO [*Id.*, ¶ 20, n. 1, Ex. E.]

**H.    Jim tried to negotiate a buyback of Daws Trucking at a discount.**

27.    When Jim refused to transfer the Daws Trucking DOT number to JDT, it suggested to Rick that Jim wanted to stay involved in the trucking business, and that it would be difficult for Rick and Ricky to operate JDT successfully if Jim did in fact intend to retire [*Id.*, ¶ 21.]

28.    Rick thus proposed selling Daws Trucking back to Jim for essentially what JDT paid for it [*Id.*, ¶ 22.]

29.    Jim refused that proposal but offered to buy the business back at a steep discount—approximately $500,000 [*Id.*, ¶ 23.]

30.    JDT did not agree to the price Jim proposed, and no deal was reached [*Id.*, ¶ 24.]

**I.    Legal invoices and payments.**

31.    On April 1, 2024, Jim emailed Rick and said, "Also, in the contract, I have total control." [Rick Decl., ¶ 21, Ex. G.]

32.    Rick later learned that as part of Jim's scheme for total control, Jim also retained Karavas & Kranz to perform work for JDT, and he orchestrated Karavas and Kranz to represent him adverse to JDT. [Rick Decl., ¶ 22.] Jim's own testimony confirms this: "I have long used Julie Karavas and Tom Kranz of the law firm Karavas and Kranz, P.C. as both my personal attorneys as attorneys for my companies." [Filing No. 35, ¶ 7.] However, what Jim failed to realize is that JDT was not one of his companies, and that by continuing this approach, Jim and Karavas & Kranz were creating conflicts of interest and undermining any hope of confidentiality.

33.     Ms. Karavas and her firm represented Ricky and Rick in connection with the formation of JDT and their purchase of Daws Trucking, at the same time represented Jim and entities he owned, in the same transaction, without any consent to joint representation or waiver of conflicts-of-interest [Rick Decl., ¶ 23]

34.     Following the sale in May 2022, Ms. Karavas and her firm continued to represent JDT, on the one hand, and Jim and other entities he owned, on the other hand, without any consent to joint representation or conflict waiver [Rick Decl., ¶ 24]

35.     Legal invoices from Karavas & Kranz were paid by JDT and include legal services for JDT and legal services for Jim [Rick Decl., ¶ 25, Ex. H.]

36.     JDT paid legal fees to Karavas & Kranz for legal services in the amount of $7,930.23 for "LEGAL WORK – SALE" on September 22, 2022, for invoice 5506 [Rick Decl., ¶ 26, Ex. H, p. 1.] Invoice 5506 covered work performed by Karavas & Kranz from May 2, 2022, through May 11, 2022, for the sale of the business by Jim to JDT, all of which was adverse to JDT [Rick Decl., ¶ 27, Ex. H, p. 2–3.]

37.     There is a hand-written note on invoice 5506 which reads, "These aren't duplicates… this one J&L and other JDT?" Written below that is "JDT" [Rick Decl., ¶ 28.] The handwriting belongs to Tony Glenn, who was the CFO of JDT, and who was in regular communication with Jim about the financial affairs of JDT and the other business owned by Jim [Rick Decl., ¶ 29.]

38.    JDT paid legal fees to Karavas & Kranz in the amount of $1,942.00 for "O/O DOCS REVISION" on November 17, 2022, for invoice 5981 [Rick Decl., ¶ 30, Ex. H, p. 1.]

39.    JDT paid legal fees to Karavas & Kranz in the amount of $192.00 for "LEASE DOCS, DOT ISSUE" on December 22, 2022, for invoice 6188 [Rick Decl., ¶ 31, Ex. H, p. 1.]

40.    JDT paid legal fees to Karavas & Kranz in the amount of $96.00 for "STATUS OF ENTITIES" on November 13, 2023, for invoice 7406 [Rick Decl., ¶ 32, Ex. H, p. 1.]

41.    JDT paid legal fees to Karavas & Kranz in the amount of $937.50 for "TRADEMARK REGISTRATION" on December 14, 2023, for invoice 7506 [Rick Decl., ¶ 33, Ex. H, p. 1.]

42.    JDT paid legal fees to Karavas & Kranz in the amount of $1,359.68 for "LEGAL – DOT NUMBER" on June 7, 2024, for invoice 8081 [Rick Decl., ¶ 34, Ex. H, p. 1.]

43.    JDT paid legal fees to Karavas & Kranz in the amount of $836.05 for "LEGAL – DOT NUMBER" on June 7, 2024, for invoice 7956 [Rick Decl., ¶ 35, Ex. H, p. 1.]

44.    JDT paid legal fees to Karavas & Kranz in the amount of $247.00 for "LEGAL (DAWS EXPENSE) on July 11, 2024, for invoice 8318 [Rick Decl., ¶ 36, Ex. H, p. 1, 8.] This invoice related to the legal work done by Julie Karavas to fraudulently register the Daws Trucking trademark with the USPTO on behalf of Jim Daws, and not JDT.

14

45.    JDT paid legal fees to Karavas & Kranz in the amount of $87.00 for "HR MATTER" on September 19, 2024, for invoice 8477. Invoice 8477 is directed to James and Lana Daws, **and** Jim Daws Trucking, LLC. This invoice was related to the termination of an employee, and the services were rendered on August 19, 2024 [Rick Decl., ¶ 37, Ex. H, p. 1, 11.]

46.    The payments set forth on Exhibit H were made without Rick's knowledge or authorization [Rick Decl., ¶38, Ex. H.]

**J.    Jim quit working at JDT and took most of JDT's employees with him.**

47.    On August 23, 2024, Rick was working at JDT's offices in Milford, Nebraska. Rick planned to talk to Jim about what Rick understood to be his upcoming retirement [Filing No. 19-1, ¶ 31.]

48.    Jim refused to meet with Rick for most of the day on August 23. Instead, he met with other employees of JDT behind a closed door or otherwise out of Rick's presence. Toward the end of the day, Jim finally invited Rick into his office. While in the office, Jim said that he was leaving JDT, and everyone else would be leaving with him [*Id.*, ¶ 32.]

49.    Most employees of JDT resigned on Friday, September 27, 2024 [*Id.*, ¶ 33.]

50.    From reviewing company emails, JDT has since learned that Tony Glenn, the former controller of JDT who resigned as part of the mass resignation on September 27, sent numerous JDT files and confidential information, including JDT's financial records, equipment lists, depreciation schedules, driver

information, the Daws Trucking logo, and many other corporate files, from JDT's server to his personal Gmail account [*Id.*, ¶ 34, Ex. G.]

51.    During this critical time, from August 21 through September 27, 2024, Jim was regularly corresponding with Karavas & Kranz, and such communications are included on Defendant's privilege log [Filing 38-1, pp. 19-27.] Indeed, there were 143 communications between these dates, when Jim executed on his plan to orchestrate a mass resignation of employees in an attempt to cripple JDT, all while being employed by JDT [*Id.*]

**K.    Prior to and after the Post-Shutdown Communications, legal counsel for the parties corresponded regarding the legal work performed for JDT, the server, and the waiver of privilege.**

52.    JDT retained Andre R. Barry as legal counsel in this matter. Mr. Marry and Ms. Karavas corresponded on multiple occasions regarding the legal work performed for JDT, the server, and the waiver of privileged emails [Rick Decl., ¶ 39, Ex. I.]

53.    On September 19, 2024, Mr. Barry followed up with Ms. Karavas regarding these topics: "We're also still waiting for your responses to our questions concerning the draft employment agreement for Jim Daws, your bills to Jim Daws Trucking, LLC, and all communications related to work you performed for Jim Daws Trucking, LLC." [Rick Decl., ¶ 40, Ex. I, p. 1–2.]

54.    On September 25, 2024, Mr. Barry again followed up with Ms. Karavas on this issue: "In addition, to pick up on a subject of prior correspondence, we note that the LLC's records show payments to your law firm from August 2, 2022, through September 3, 2024. Whether or not an

engagement agreement was signed, your firm was clearly performing work on behalf of the LLC. We therefore reiterate our request for all communications and other records related to that representation." [Rick Decl., ¶ 41, Ex. I, p. 3–5.]

55.    On September 26, 2024, Mr. Barry sent the following message to Ms. Karavas: "Attached please find a report showing legal fees to your firm by Jim Daws Trucking, LLC, reflecting dates, amounts and subject matter. We're still investigat[ing], so this report may not be comprehensive, but at this time please provide all communications and work product (including drafts) related to these matters." [Rick Decl., ¶ 42, Ex. I, p. 6–11.]

56.    On September 30, 2024, Mr. Barry, following a phone conversation, sent an email to Ms. Karavas in which he advised her of the following:

a.    "As I stated on the phone, JDT retains possession of all emails on its email server. We have reviewed the Asset Purchase Agreement, the Employee Handbook used at JDT, and the payment records showing JDT has been paying your firm for legal work and have concluded that no emails between Jim and your firm are protected by the attorney client privilege."

b.    "JDT purchased the entire business of Daws Inc., including the server and all intangible assets, in the Asset Purchase Agreement you drafted. These intangible assets included the firm's email accounts. The Employee Handbook also warned that computer data is owned by the company and may be viewed by the company, and that company computers should not be used for personal business…"

c.  "Jim's use of email to communicate with you adverse to Rick and JDT was personal to him; it was not use for the benefit of JDT. In addition, Jim knew he had sold the servers and the entire business to JDT, and by extension, to Rick and Ricky. Knowing that, Jim still chose to send emails to you on a computer system owned by JDT, despite warnings that all data on that system is property of JDT, that his computer would be accessed by JDT, and that he should not use his computer for personal business. If Jim actually believed JDT would not access his emails, such a belief was not objectively reasonable, particularly when was using JDT's email server to conduct a campaign against JDT and its owners, and JDT was paying not only for the server and internet support, but was paying your legal bills for work performed for the benefit if Jim adverse to JDT. Under these circumstances, the emails Jim sent and received using JDT's server are not confidential. No privilege attaches to Jim's email communications with you, and if any privilege did attach, it has been waived."

[Rick Decl., ¶ 43, Ex. I, p. 14–16.]

57.  At 11:52 a.m. on October 1, Ms. Karavas responded to Mr. Barry to address the request for communications between her firm and JDT. She asserted certain pre-sale communications were privileged but conceded "all the communications and work product (including drafts) we ever shared with [JDT] personnel that are covered by the invoices you identified and inquired about last week, which apparently [JDT] paid for and, if related to [JDT] business _after_ May 4, 2022, we agree would not be privileged." (Emphasis in original.) "Accordingly,"

she wrote, "we consider your request satisfied." [Rick Decl., ¶ 44, Ex. I, p. 12–14.]

58.    After this email exchange, Ms. Karavas sent additional emails to Jim at Jim's JDT email address. These emails were also stored on JDT's email server. [Rick Decl., ¶ 45.]

59.    Defendants' Privilege Log reflects that Defendants' current counsel also emailed Jim at his JDT email address.

60.    While Jim asserts these final emails to him at his JDT email address were inadvertent, he provides no evidence as to the steps his attorneys took to avoid waiving privilege or attempts to secure return of the emails.

### III.    LEGAL STANDARD

Because the attorney-client privilege "stands in derogation of the public's right to every man's evidence," and is "an obstacle to the investigation of the truth," the privilege "must be narrowly construed." *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.) (internal citations omitted), cert. denied 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *United States v. Collis*, 128 F.3d 313, 320 (6th Cir.1997); *In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005). Indeed, the attorney-client privilege "exists only to aid in the administration of justice, and when it is shown that the interests of the administration of justice can only be frustrated by the exercise of the privilege, the trial judge may require that the communication be disclosed. *League v. Vanice*, 374 N.W.2d 849, 856 (Neb. 1985) (quoting *Cohen, et vir v. Jenkintown Cab Co., et al.*, 238 Pa.Super. 456, 464, 357 A.2d 689, 693–94 (1976)).

19

The party asserting a privilege has the burden of proving its existence, which includes showing waiver did not occur. *Greenwalt v. Wal-Mart Stores, Inc.*, 567 N.W.2d 560, 566 (Neb. 1997) ("We determine that the party asserting the attorney-client privilege or work product doctrine has the burden of proving that the documents sought are protected."). *See also Rasby v. Pillen*, No. 8:15CV226, 2016 WL 4995036, at *3 (D. Neb. Sept. 19, 2016) (citing *Nebraska ex rel. Stivrins v. Flowers*, 29 N.W.2d 311, 316 (Neb. 2007); *Seger v. Ernest-Spencer Metals, Inc.*, No. 8:08CV75, 2010 WL 378113, at *5 (D. Neb. Jan. 26, 2010); *Doe 1 v. George Washington University*, 480 F. Supp. 3d 224, 226 (D.D.C. 2020).

In their brief, Defendants, citing two cases and ignoring the cases from Nebraska[1] and the great weight of authority, argue that JDT has the burden to show waiver of the attorney-client privilege. *See* Filing No. 37, p. 7. Defendants' representation to the Court is simply wrong. First, *Voter v. Avera Brookings Med. Clinic*, 2008 WL 4372707, at *3 (D.S.D. Sept. 22, 2008), cited by Defendants, is based on South Dakota law and is inconsistent with Nebraska and federal law. Second, Defendants quote *Monsanto Co. v. Aventis Cropscience, N.V.*, 214 F.R.D. 545, 546 (E.D.Mo. 2002) for the following proposition: "Thus, **contrary to the doctrine of attorney-client privilege**, the party seeking to establish waiver carries the burden of persuasion on the waiver issue." (emphasis added). However, the *Monsanto* case involved the waiver of the work-product privilege,

---

[1] State law governs attorney-client privilege claims when subject-matter jurisdiction is based on diversity of citizenship. *See, e.g.*, *Resolute Forest Products, Inc. v. Greenpeace Int'l*, No. 17-cv-02824-JST (KAW), 2022 WL 885368, at *1 (N.D. Cal. Mar. 25, 2022); *Gargiulo v. Baystate Health, Inc.*, 826 F. Supp. 2d 323, 325 (D. Mass. 2011). For this reason, JDT cites Nebraska law wherever possible.

not the attorney-client privilege, and the court was making the clear statement that the waiver rule is the opposite for attorney-client privilege (at least in that jurisdiction) than it is for the work-product doctrine. The case cited by the *Monsanto* court to support this quotation was *Johnson v. Gmeinder*, 191 F.R.D. 638 (D. Kan. 2000), which stated outright: "In other words, the burden to establish that waiver has not occurred remains with the party who is asserting the attorney-client privilege." *Id.* at 643. Therefore, Defendants have the burden to show the attorney-client privilege applies to the communication and that the privilege was not waived.

## IV.    ARGUMENT

### A.    Defendants waived privilege as to pre-sale communications by selling their email server to JDT.

The law is clear that if a person or entity voluntarily discloses privileged communications to a third party, the disclosing party or entity waives the privilege as to those communications and to other communications directly related to that which was disclosed. *See* Neb. Rev. Stat. § 27-511 (privilege is waived if the holder of the privilege "voluntarily discloses or consents to disclosure of any significant part of the matter or communication"); *Stetson v. Silverman*, 770 N.W.2d 632, 641 (2009) ("Generally, an evidentiary privilege is waived when the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication."); *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) ("Voluntary disclosure of attorney client communications expressly waives the privilege, ... [as to] any

information directly related to that which was actually disclosed."); *Prism Tech., LLC v. McAfee, Inc.*, No. 8:10CV220, 2012 WL 5471894, at *2 (D.Neb. Nov. 9, 2012) (quoting *Workman*, 138 F.3d at 1263).

This general rule remains true when the disclosure occurs as part of a transfer of a server containing the communications, made in connection with an asset sale between entities. In the context of corporate transactions, "where confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying the assets, the [seller's] privilege is waived as to those communications." *In re In–Store Advertising Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995). *See also Lynx Servs. Ltd. V. Horstman*, No. 3:14CV01967, 2016 WL 4565895, at *2-3 (N.D.Ohio Sept. 1, 2016); *GOT I, LLC v. XRT, Inc.*, No 1:16-cv-00038-WSD, 2017 WL 3113408, at *2-3 (N.D.Ga. Feb. 28, 2017).

In *In–Store Advertising Sec. Litig.*, 163 F.R.D. at 458, a third party, Valassis, produced documents it received as part of a transfer of assets from another company, Emarc. There, the United States District Court for the Southern District of New York concluded that the transferred documents were not privileged and stated, "When those communications were transferred to Valassis in connection with a sale of assets by Emarc to Valassis, Emarc thereby waived any privilege as to those communications." *Id.*

In *Lynx Servs.*, 2016 WL 4565895, at *2-3, a dispute arose as to the privilege of communications that were transferred as part of an asset sale. "Accella acquired substantially all of the assets of Ultimate Systems and Banbury

International. Among those assets, as noted, were Ultimate Systems' corporate records, computers, and servers containing the email communications at issue." The United States District Court for the Northern District of Ohio ruled that "[b]y transferring the email communications to Accella, the defendants voluntarily disclosed privileged information to a third party and, as a result, waived the attorney-client privilege as to those communications." *Id.*

In *GOT I*, 2017 WL 3113408, at *2-3, the issue of whether privilege was waived as to communications transferred in connection with the sale of a server as part of an asset sale was again at issue. XRT attempted to distinguish the *Lynx Servs.* case, but to no avail. *Id.* First, XRT argued that the purchaser in the *Lynx Servs.* case expressly bargained for the communications at issue, but the United States District Court for the Northern District of Georgia could find no support for that in the opinion. Instead, the court read the opinion as "suggesting that the emails were resident on the servers but were not specifically enumerated as an acquired asset," which was the same circumstances in the present case. *Id.* at 2. The court noted that even if the communications were carved out of the asset purchase agreement, waiver would still result because "XRT nevertheless voluntarily transferred them to Kids II." *Id.*

XRT further tried to distinguish *Lynx Servs.* by arguing that the ruling did not apply because the seller became an employee of the purchaser and allegedly had an expectation of privacy in connection with emails sent at work. The court rejected this argument because the communications at issue were sent before the seller became an employee. *Id.* at 3.

23

The asset sale between JDT and Defendants closed on May 4, 2022, and the server was sold to JDT, along with all tangible and intangible assets of Daws, Inc. Thereafter, JDT took possession of the server which contained the Pre-Sale Communications. This transfer constituted a voluntary disclosure of the communications and waived the privilege. Defendants have zero legal basis to claim privilege as to the Pre-Sale Communications and should not have claimed privilege as to such communications. JDT respectfully requests that the Court deny Defendants' motion with respect to the Pre-Sale Communications.

**B.    No privilege applies to post-sale communications because there was no objectively reasonable expectation of confidentiality.**

### 1.    The Factors to Be Considered in Assessing Reasonableness.

The applicable legal rule is that for documents sent through email to be protected by attorney-client privilege, there must be a subjective expectation of confidentiality that is found to be objectively reasonable. *Doe 1 v. George Washington University*, 480 F. Supp. 3d 224, 226 (D.D.C. 2020); *In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 255 (Bankr. S.D.N.Y. 2005). *See also State of Nebraska v. Lynch*, 243 N.W.2d 62, 65 (Neb. 1976) ("[I]it has long been the rule that communications between client and attorney made in the presence of others do not constitute privileged communications."); *State of Nebraska v. Strohl*, 587 N.W.2d 675, 681 (Neb. 1999) (requiring that for the purposes of the Nebraska intercepted communication statutes, an oral statement will not fall within the statute unless the person has a subjective expectation of privacy that is objectively reasonable under the circumstances). Or stated another way, "the

24

question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable." *Doe 1*, 480 F. Supp. 3d at 226 (quoting *Convertino v. U.S. Dept. of Justice*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009)).

In determining whether there was an objectively reasonable expectation of confidentiality on email communications sent on an employer's or third-party's email server, the following four factors are relevant:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*Doe 1*, 480 F. Supp. 3d at 226; *Asia Glob. Crossing*, 322 B.R. at 257. In applying these factors, "[e]ach case should be given an individualized look to see if the party requesting the protection of the privilege was reasonable in its actions." *Convertino*, 674 F. Supp. 2d at 110. Here, each of these factors weigh in favor of finding that Jim and Lana had no subjective or objectively reasonable expectation of confidentiality in the Communications.

### 2.    The *Doe 1* Decision.

In *Doe 1*, the plaintiffs, who were students at George Washington University, filed a motion for protective order and requested an order directing the defendants to destroy all emails in their possession between the plaintiffs and their lawyers. 480 F. Supp. 3d at 225. The District Court applied the four factors listed above and found that none of the plaintiffs, except for Jane Doe 1,

had a reasonable expectation of confidentiality in emails sent using their college-issued email addresses. *Id.* at 227.

The first factor was found to favor the plaintiffs, as the university "placed no caveat on the use of the school email address for personal use." *Id.* The second factor favored waiver of the privilege, as the university's policy informed students that they had no right to privacy in the messages sent on the email system and the university may search, review, or monitor the emails. *Id.* The court noted that whether the university actually did such monitoring was not required; instead, a simple reservation of rights to do so was sufficient to destroy an expectation of privacy. *Id.* The court stated: ("[M]ost courts have not required evidence that the employer actually did so, but rather the reservation of the right to do so has sufficed as a basis for concluding that the employees had no reasonable expectations of privacy.") *Id.* (quotations and brackets omitted).

The third factor—access by third parties—was handled oddly and briefly, as the District Court only noted that the policy was silent. *Id.* However, given that the policy stated that the university could monitor, search, and review emails, and that would necessarily be done by people other than the student assigned the email address (i.e., third parties), this necessarily means that "third parties" (i.e., the university) could access the emails. This is how the United States District Court for the Southern District of New York applied this factor in *Asia Global Crossing*, 322 B.R. at 259. The court in *Asia Global Crossing* found this factor weighed against a finding of privilege because Asia Global had access to its own servers and any other part of the system where e-mail messages were

stored. *Id.* at 259. In doing so, the court differentiated emails from files saved on office computers or hard copy files because "Asia Global did not require access to the [employees'] offices or their office computers to read their e-mails." *Id.* The court concluded that "sending a message over the debtor's e-mail system was like placing a copy of that message in the company files. Short of encryption, the [employee] E-mails could be reviewed and read by anyone with lawful access to the system." *Id.*

The fourth factor in *Doe 1*—notice of the policy—was also found to favor waiver of the privilege for those students who received notice, which included all of the plaintiffs except for Jane Doe 1. The court further stated that this factor can be satisfied even without actual or direct notice of the policy, so long as there is a policy that exists and the employees have access to it. *Id.* at 228 (citing *GSD&M Idea City*, No. 3:11-cv-1154-O, 2012 WL 12925016, at *3 (N.D.Tex. May 15, 2012) ("Courts have found that this prong of the analysis does not require 'actual or direct' notification … of a [ ] policy governing e-mail communications sent or received on the [ ] network if the policy is available to the employee.") (citation omitted); *In re Royce Homes, LP*, 449 B.R. 709, 741 (Bankr. S.D. Tex. 2011) ("[A]ctual or direct notification to employees is unnecessary if the corporation has a communications policy that is memorialized.").

After evaluating the factors, the *Doe 1* Court concluded: "[T]he Court concludes that the plaintiffs, with the exception of Jane Doe 1, effectively **waived** the attorney-client privilege when they used their GW-issued e-mail accounts to communicate with their attorneys." *Id.* at 229-30 (emphasis added).

27

3. **Other Cases Finding No Reasonable Expectation of Confidentiality.**

In addition to the *Doe 1* decision, the case law demonstrates that employees are routinely found to have waived the attorney-client privilege (or really, the privilege never attached because the communications were not sent in confidence) when they use work email to correspond with their attorneys. *See*:[2]

- *Thygeson v. U.S. Bancorp,* No. CV–03–467, 2004 WL 2066746, at *20 (D. Or. Sept. 15, 2004) (no reasonable expectation of privacy in computer files and e-mail where employee handbook explicitly warned of employer's right to monitor files and e-mail).

- *United States v. Finazzo*, No. 10-CR-457 RRM RML, 2013 WL 619572, at *11 (E.D.N.Y. Feb. 19, 2013) ("Therefore, viewing the facts as a whole, the Court finds that Finazzo [an executive at Aeropostale] has no reasonable expectation of privacy or confidentiality in any communications he made through his Aéropostale e-mail account.")

- *Hanson v. First Nat. Bank*, No. CIV.A. 5:10-0906, 2011 WL 5201430, at *6 (S.D. W. Va. Oct. 31, 2011) (an employee has no objectively reasonable expectation of privacy or confidentiality when it knew the employer could access and monitor email communications).

- *In re Royce Homes, LP*, 449 B.R. 709, 741 (Bankr. S.D. Tex. 2011) (employee "waived the attorney-client privilege by transmitting and receiving personal e-mails on the [company]'s computer and email servers.

---

[2] Some of the cases cited in this section, including their parenthetical explanations, are from the collection of cases made by the District Court in *Asia Glob. Crossing*, 322 B.R. at 258.

It was unreasonable for [employee] to believe his e-mails would remain confidential.")

- *Chechele v. Ward*, No. CIV-10-1286-M, 2012 WL 4481439, at *2 (W.D. Okla. Sept. 28, 2012) (employee has no reasonable expectation of privacy and waived privilege when it used company email for personal business, and the employer reserves the right to review, but has not reviewed, employee emails).

- *Smyth v. Pillsbury Co.,* 914 F. Supp. 97, 101 (E.D. Pa.1996) (no reasonable expectation of privacy where employee voluntarily sends an e-mail over the employer's e-mail system).

- *Long v. Marubeni Am. Corp.*, No. 05CIV.639(GEL)(KNF), 2006 WL 2998671, at *3 (S.D.N.Y. Oct. 19, 2006) (emails were stripped of the confidential cloak when an employee, who helped prepare the electronic communications policy, disregarded the policy and knew of, or should have known of, the policy).

- *Garrity v. John Hancock Mutual Life Ins. Co.,* No. Civ. A. 00–12143, 2002 WL 974676, at *1–2 (D. Mass. May 7, 2002) (no reasonable expectation of privacy where, despite the fact that the employee created a password to limit access, the company periodically reminded employees that the company e-mail policy prohibited certain uses, the e-mail system belonged to the company, although the company did not intentionally inspect e-mail usage, it might do so where there were business or legal reasons to do so, and the plaintiff assumed her e-mails might be forwarded to others).

29

- *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1110 (W.D. Wash. 2011) (employee emails stored on laptops or company servers were not privileged as the company policy encompassed all resources used for electronic communications, even when employees were not aware of the policy).

- *GSD&M Idea City*, No. 3:11-cv-1154-O, 2012 WL 12925016, at *8 (N.D.Tex. May 15, 2012) ("Based on the foregoing, the Court finds that Relator did not have a reasonable expectation of privacy in the e-mail communications transmitted to and received from his attorney over his workplace computer using his workplace e-mail account.")

- *Stavale v. Stavale*, 332 Mich. App. 556, 569, 957 N.W.2d 387, 394 (2020) (rejecting a claim of attorney-client privilege on emails sent on a workplace computer where the workplace policy clearly stated there was no expectation of privacy and stating: "Use of an employer-provided e-mail to communicate with a personal attorney with knowledge of this policy is not indicative of having taken reasonable precautions to preserve the confidentiality of the communication.")

Likewise, although this is not the question before the Court, courts have also regularly held that employees can waive attorney-client privilege on files stored on their work computers, where policies make clear that there is no expectation of privacy.[3]

---

[3] *See United States v. Simons,* 206 F.3d 392, 398 & n. 8 (4th Cir.2000); *Muick v. Glenayre Elec.,* 280 F.3d 741, 743 (7th Cir.2002); *Banks v. Mario Indus. of Virginia, Inc.,* 274 Va. 438, 454, 650 S.E.2d 687, 695–96 (2007).

4.    **The *Hudson* Case is inapplicable.**

Defendants rely heavily on the decision in *United States v. Hudson*, No. Crim. A. 13-20063-01-JWL, 2013 WL 4768084 (Sept. 5, 2013), and ignore the *Doe 1* decision entirely, along with the many other cases JDT cites above. However, the *Hudson* decision is inapposite and distinguishable for at least the following reasons. First, the *Hudson* case involved files stored on the employee's individual computers, not communications and emails sent over the employer's server. This is why the *Hudson* court described the issue before it as "determining whether a privilege applies to materials kept on a workplace computer…" *Id.* at *9. The communications are not simply files Jim maintained on a workplace computer but communications sent using a business email, on the Daws Trucking server, and saved on the server. This is why Defendants' quotation of an alleged majority view espoused by *Hudson* (even assuming that is true) is unpersuasive. It is not the issue before the Court.

Second, the workplace policy issues at issue in *Hudson* were also different. These policies focused on actual monitoring of the equipment used by the employee, and not generally to email practices. In the instant case, Daws Trucking had an employee handbook that made clear that (1) all data on Daws Trucking computers belongs to Daws Trucking, (2) the business can access employee's equipment and email, (3) if an employee wanted to keep things personal, they should not use their computer for personal business, and (4) emails on work computers were not confidential. Jim understood and applied these policies while he was the owner, and they continued to apply (with his

31

knowledge) when he became an employee. Jim should have started acting like an employee, but he instead continued to act like the owner. In doing so, he failed to keep his personal matters confidential.

**5.    Any expectation of privacy in the emails was not subjectively or objectively reasonable.**

It is doubtful Jim had any subjective expectation that emails stored on the JDT server were truly confidential. It strains credulity for Jim to suggest that, in 2024, he was not "tech-savvy" to such a degree that he didn't understand the utility of a Gmail address, when his own wife communicated using Gmail. As noted below, the evidence also shows Jim used tech and the Daws Handbook to monitor other employees' data. The evidence suggests Jim wasn't worried about email confidentiality because he never intended to relinquish control of the company he sold for $12 million. In the words of his email to Rick, Jim acted as though he had "total control" of a business he sold as a going concern for $12 million. [Rick Decl. ¶ 21.] This belief wasn't even subjectively reasonable.

Even if Jim had an expectation of confidentiality that was subjectively reasonable, that expectation was not objectively reasonable under the relevant factors set forth in the case law.

First, JDT does maintain policies, in the Daws Handbook, which was used by the business before and after the sale to JDT, that make it clear to employees that personal use of email should be limited, email can be accessed and monitored, and nothing sent over email or saved on a company computer is confidential. The Daws Handbook provides in part:

- "All data entered on the Company's computers is considered the property of the Company."

- "Please realize that for various reasons, the Company will access your equipment. As a result, your computer should not be used for personal business even during nonworking time if you don't want the Company to see your personal documents."

- "Electronic mail (E-mail) is to be used primarily for business purposes and only for personal reasons during nonworking time."

- "Like your computer, the Company may need to access your E-mail for various reasons."

- "You should be aware that such messages are not entirely confidential."

- "In addition, disclosure of E-mail messages may be required in lawsuits against the Company."

- "As a rule of thumb, nothing should be sent by E-mail that you would not put in a formal memo or that you would not like to become public knowledge."

[Rick Decl, Exhibit B, p. 20–21.] This means that the first three *Doe 1* factors weigh against privilege, as there was no subjective or objectively reasonable expectation of confidentiality.

Second, the Daws Handbook was implemented and used by Jim prior to the sale, and it continued being used thereafter. Jim himself admits that he became an employee, but that otherwise "nothing would change from how the

33

company was run before the APA" [Filing 35-1, ¶ 13.] This means that the policies in place before the sale, at Jim's approval as the owner of the company, would continue to apply after the sale, except that now Jim was an employee. What is clear is that the policy warned employees that nothing sent via email or saved on a work computer was confidential and that it could be accessed and monitored by the business, and that was true whether the right to monitor or access was exercised or not. Therefore, Jim cannot now claim to lack knowledge of the policy.

Third, the evidence shows that the business continued to use the Daws Handbook. For example:

- On October 31, 2022, Kathy Temme, an employee of JDT, emailed Bill Molthan, an employee of JDT, and said, "Our bereavement policy is you have to use your PTO time. See attached." Kathy attached the Paid Time Off policy found on page 15 of the Daws Handbook [Rick Decl., Ex. C.]

- On November 2, 2023, Kathy Temme, an employee of JDT, emailed Ranae Muencrath, an employee of JDT, and said, "Here's the page from the handbook." Kathy attached the Personal Appearance policy found on page 18 of the Daws Handbook [Rick Decl., Ex. D.]

- On July 26, 2024, Lana Daws emailed Jaisa Douty, an employee of JDT, and asked for a copy of the Employee Handbook and Driver Orientation Handbook. Jaisa responded, "Daws Handbook Office is the only handbook we have." Jaisa attached "daws handbook office 2-2017," the Daws Handbook. [Rick Decl., Ex. E.]

Fourth, Jim's claim to confidentiality of workplace actions and files is belied by his own access of an employee's file. On at least one occasion, Jim accessed information from an employee's computer files and contacted Bizco, JDT's IT service-provider about it [Rick Decl., ¶ 21 & Ex. F.] On April 11, 2024, Jim emailed Thomas Kranz and described efforts that were made to access an employee's computer folder [*Id.*] Jim outlined a list of changes that the employee made:

> Deleted files from the U: drive his personal file for our permit system.
> Deleted files from the P: drive Bizco was able to recover and reinstall.
> The documents folder that held contracts was empty.
> Bizco said he was deleting files before he gave notice.

[*Id.*] Accordingly, any confidentiality claim by Jim as to emails sent via the Daws Trucking server, or files saved to work computers, should be rejected. Jim accessed computer files of an employee, and knew or should have known that it could be done to him as well. Therefore, Jim had no subjective or objective expectation of confidentiality, and the self-serving claims in his declaration that he was not tech savvy enough to know that he should use a Gmail account for his personal emails with his attorney (like Lana did), are simply not credible.

Finally, there are the legal representation issues, wherein Jim retained the law firm of Karavas & Kranz to represent both Jim and JDT, even where JDT and Jim were adverse to each other, without proper consent or waiver of a conflict of interest, and JDT (at Jim's direction) paid the invoices for the legal services performed by Karavas & Kranz, for both Jim and JDT, without Rick's or Ricky's authorization. [Rick Decl., ¶¶ 35–46 & Ex. H.]

35

In *State ex rel. Couns. for Discipline of Nebraska Supreme Ct. v. Chvala*, Chvala was charged with "representing clients with differing or conflicting interests without obtaining informed consent." 935 N.W.2d 446, 482 (Neb. 2019). "Informed consent requires that *each affected client* be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client....[T]he information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved." *Id.* at 485. Similar to *Chvala*, there is no evidence that Karavas & Kranz discussed the ways in which their common representation of JDT's and Jim's interests could have adverse effects on the interest of the other client. Instead, the evidence shows they failed to obtain informed consent. [Rick Decl. ¶¶ 33–34.]

The actions by Jim and Karavas & Kranz further undermine any claim to an expectation of confidentiality. By retaining the same lawyers to represent himself and JDT, even as to matters in which he and JDT were adverse, without a consent to joint representation or even any attempt to explain the dangers of joint representation to the owners and managers of JDT, Jim created a situation in which there was no expectation of confidentiality. It is difficult to list all the reasons why. Suffice it to say, no reasonable person in Jim's position could have expected that JDT would not read the emails he sent to JDT's own conflicted lawyers, using JDT's own email server, on matters which involved Jim's efforts and plans to inflict direct harm on the company.

36

**C.    Defendants have offered no evidence to support their claim of inadvertent disclosure.**

As noted above, state law governs attorney-client privilege claims when subject-matter jurisdiction is based on diversity of citizenship. *See, e.g.*, *Resolute Forest Products, Inc. v. Greenpeace Int'l*, No. 17-cv-02824-JST (KAW), 2022 WL 885368, at *1 (N.D. Cal. Mar. 25, 2022); *Gargiulo v. Baystate Health, Inc.*, 826 F. Supp. 2d 323, 325 (D. Mass. 2011). The Nebraska evidentiary statutes do not have a corollary to Federal Rule of Evidence 502(b), with respect to inadvertent disclosures.

Although "Nebraska courts have not yet addressed the applicable standard to determine when the attorney-client privilege has been waived in the context of an ***inadvertent production of a privileged document***," this Court has previously held that the "so-called 'middle of the road' approach set forth in *Hydraflow, Inc. v. Enidine Inc.,* 145 F.R.D. 626, 637 (W.D.N.Y.1993), which has been followed by the Eighth Circuit Court, is the appropriate standard to apply." *Adams Land & Cattle Co. v. Hartford Fire Ins. Co.*, No. 8:06CV486, 2007 WL 4522627, at *1 (D.Neb. Dec. 18, 2007) (citing *Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir. 1996) (emphasis added)). The *Hydroflow* factors are:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error.

*Adams Land & Cattle Co.*, 2007 WL 4522627, at *1. Similarly, "[u[nder Rule 502(b), an inadvertent disclosure does not operate as a waiver of the attorney-

client privilege if the holder of the privilege took reasonable steps to prevent disclosure and the holder promptly took reasonable steps to rectify the error after learning of the error…" *Gunter v. City of Omaha*, No. 8:21CV281, 2022 WL 3597762, at *2 (D. Neb. Aug. 23, 2022).

Moreover, regardless of the standard to be applied, Defendants have "the burden of proving the existence of the privilege…and that any waiver by disclosure was inadvertent." *United States v. Koning*, No. 4:09CR3031, 2009 WL 2982910, at *3 (D. Neb. Sept. 11, 2009).

Here, there are just six Post-Shutdown Communications included on the privilege log. Defendants rely only on Federal Rule of Evidence 502(b) and assert, without any real evidence, that "Defendants took reasonable steps to rectify this inadvertent error" [Filing No. 37, p. 11.] However, Defendants describe no reasonable steps taken by Defendants to prevent disclosure or to rectify the alleged error in sending the emails, nor do Defendants expand on any of the *Hydroflow* factors. And Defendants cite no evidence. [*Id.*]

The only evidence provided in support of Defendants' motion is Jim's declaration. In Jim's declaration, he states that two of the Post-Shutdown Communications are from his lawyers to him, at the jim@dawstrucking.com [Filing No. 35-1, ¶ 30.] Jim states that these emails were sent inadvertently, but Jim was not the sender of such emails. More importantly, there is no evidence that any of the senders took reasonable steps to rectify the alleged error. Ms. Karavas had been corresponding with JDT's legal counsel about privilege issues and knew about the server shutdown, see Statement of Facts, ¶¶ 52-58, yet she

sent an email to jim@dawstrucking.com on October 1, 2024 [Filing No. 38-1, p. 27.] There is no evidence that Ms. Karavas advised JDT's counsel of the errant message and sought to remedy it. Then on October 9, 2024, Jim's new attorneys again sent an email to jim@dawstrucking.com [*Id.*, p. 28.] Again, there is no evidence that Jim's attorneys advised JDT's counsel of the errant message and sought to remedy it.

In short, Defendants have failed to meet their burden to prove that the Post-Shutdown Communications were mere inadvertent disclosures and that privilege was not waived.

**D.    If the Court finds the emails are otherwise protected by privilege, the emails are still subject to *in camera* review.**

Even if Jim had an objectively reasonable expectation that his emails with counsel, sent through and stored on the JDT server, were confidential, the communications would still not be protected by the attorney-client privilege or the work-product doctrine.

"A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." *Amusement Ind., Inc. v. Stern*, 293 F.R.D. 420, 425 (S.D.N.Y. 2013) (quoting *Clark v. United States*, 289 U.S. 1, 15 (1933)). Thus, the attorney-client privilege does not apply "[i]f the services of the lawyer are sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud," including an employee's planned breach of fiduciary duty to his employer. *Doyle v. v. Union Ins. Co.*, 202 Neb. 599, 614–15 (1979) (applying Neb. Rev. Stat. § 27-503).

Just as "[t]he crime-fraud exception removes the privilege from attorney-client communications made in furtherance of contemplated or ongoing criminal or fraudulent conduct," *United States v. Koning*, No. 4:09CR3031, 2009 WL 2982910, at *3 (D. Neb. Sept. 11, 2009) (quoting *United States v. Zolin,* 491 U.S. 554, (1989)), the work-product doctrine likewise does not protect such communications. *In re Green Grand Jury Proceedings*, 492 F.3d 976, 980 (8th Cir. 2007).

The crime-fraud exception is not limited to torts that involve all the elements of fraud. Rather, the majority rule holds that the crime-fraud exception applies "beyond the technical definitions of crimes or frauds to include other wrongful conduct." *Amusement Ind.*, 293 F.R.D. at 425. Some courts have ruled the exception applies to tortious conduct generally. *See In re Heuwetter*, 584 F. Supp. 119, 127 (S.D.N.Y. 1984) (holding that "communications that enable or aid the client to commit a tort or crime" are not protected); *Irving Trust Co. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y. 1983) (holding the exception extends to "unlawful conduct regardless of whether such conduct constitutes fraud or any other intentional tort"). Other courts have taken a somewhat narrower view of the exception, holding that it applies to intentional torts that are akin to or involve some element in common with fraud. *See Sackman v. Liggett Grp., Inc.*, 173 F.R.D. 358, 364 (E.D.N.Y.1997) ("[T]he crime-fraud exception applies to 'intentional torts moored in fraud.'"); *Madanes v. Madanes*, 199 F.R.D. 135 (S.D.N.Y. 2001) (collecting cases).

In *Milroy v. Hanson*, 902 F. Supp. 1029, 1033 (D. Neb. 1995), Judge Kopf took a narrow approach. The question in *Milroy* was whether the crime-fraud exception applied to attorney-client communications in furtherance of alleged minority-shareholder oppression. Judge Kopf determined that when Rule 503 uses the word "fraud," "the word should be given its ordinary meaning of common-law civil fraud." *Id.* He ultimately held that "Rule 503 requires a showing of 'intentional misrepresentation' for the purpose of gain." *Id.*

The holding in *Milroy* does not govern here. The allegations of wrongdoing in *Milroy* involved "freeze-out" and "squeeze-out" strategies which, while they may be oppressive, are not fraudulent. Unlike this case, there was no allegation in *Milroy* that an employee had breached his fiduciary duty to his employer by committing dishonest acts. In contrast, in *Doyle*, the Nebraska Supreme Court found fraud sufficient to trigger the crime-fraud exception where there was evidence that the president of a company proposed to engage in self-dealing and thus violate his fiduciary duty. *Id.* at 613–15. In assessing the application of the crime-fraud exception, the Court found that the president's "proposed acquisition for nominal consideration of an equity interest…would be fraudulent and a violation of his fiduciary duties," and thus the communications at issue fell within the crime-fraud exception. *Id.* at 614-15. Thus, under the Nebraska Rules of Evidence, which apply in this diversity case, an employee's plan to violate his duty of loyalty and to profit from that breach of duty trigger the crime-fraud exception and render attorney-client privilege inapplicable.

41

The evidence in this case is sufficient to trigger an *in camera* review of certain of the Communications (if they are privileged at all, which they are not), whether the *Doyle* standard under Nebraska law is applied, as it should be, or the federal standard under Rule 503 is applied, and under both standards, the crime-fraud exception applies. The threshold to trigger *in camera* review is not a "stringent one." *Zolin*, 491 U.S. at 572. "Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person…that *in camera* review of the materials ***may reveal*** evidence to establish the claim that the crime-fraud exception applies." *Id.* (citation and quotations omitted) (emphasis added). In applying this standard, "the party opposing the privilege may use any nonprivileged evidence in support of its request for in camera review, even if its evidence is not 'independent' of the contested communications…" *Id.* at 574, 575 ("Finally, we hold that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged.")

Here, Rick lawfully obtained the emails in question. He purchased the servers and maintained control of the servers and emails accounts as owner of JDT. He has also reviewed the emails and states, in his declaration, that the emails show Jim was working with Karavas & Kranz to orchestrate a mass resignation of employees from JDT, receive additional value for what was already sold to JDT, and/or devalue JDT to the point where Jim could reacquire it for far less than he sold it to JDT. [Rick Decl., ¶ 19.]

42

Moreover, the following evidence also supports JDT's request for *in camera* review:

- Jim's refusal to transfer the DOT number and a demand for an additional $500,000.00 to do so. *See* Statement of Facts, ¶¶ 22–23.

- Jim's attempt to buy back the business at a discount, after damaging the company and refusing to transfer the goodwill and assets purchased by JDT. *See* Statement of Facts, ¶¶ 27–30.

- The mass resignation of employees and drivers orchestrated by Jim. *See* Statement of Facts, ¶¶ 47–51.

- The fraudulent trademark application for "Daws Trucking" that Jim pursued on his own behalf, without authorization by JDT. *See* Statement of Facts, ¶¶ 24–26.

All this conduct supports *in camera* review by the Court. Specifically, JDT requests that the Court conduct *in camera* review of the communications sent between August 21–September 27, 2024, the days leading up to and including the mass resignation of JDT drivers and employees. JDT has shown a reasonable basis to believe these emails reflect an effort and plan for Jim to breach his duty of loyalty to JDT. [Rick Decl. ¶ 19.] Under Nebraska law, which governs the attorney-client privilege in this case, such a breach triggers the crime-fraud exception. *See Doyle*, 202 Neb. at 614–15. Under *Zolin*, *in camera* review is warranted in these circumstances.

## V. CONCLUSION

For the reasons stated above, Jim Daws Trucking, LLC, respectfully requests that Defendants' Motion for Protective Order and Destruction of Privileged Documents in Plaintiff's Possession or Strike be denied.

Dated December 2, 2024

JIM DAWS TRUCKING, LLC, Plaintiff

By    s/ Andre R. Barry
        Andre R. Barry #22505
        Henry L. Wiedrich #23696
        Madeline C. Hasley #27870
        CLINE WILLIAMS WRIGHT
        JOHNSON & OLDFATHER, L.L.P.
        233 South 13th Street
        1900 US Bank Building
        Lincoln, NE 68508
        (402) 474-6900
        abarry@clinewilliams.com
        hwiedrich@clinewilliams.com
        mhasley@clinewilliams.com

### CERTIFICATE OF COMPLIANCE

The undersigned certifies that the word count of this brief complies with local rule NECivR 7.1(d). The word-count function of Microsoft Word M365, states that this brief, inclusive of all text, contains 11,302 words.

s/ Andre R. Barry
Andre R. Barry

### CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2024, the foregoing was filed with the Clerk of Court using the CM/ECF system, which will effectuate service on all counsel of record.

s/ Andre R. Barry
Andre R. Barry

4930-9487-0016, v. 4

44