IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC, | Case No. 4:24-cv-03177 |
| Plaintiff, | |
| v. | DECLARATION |
| | OF |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | RICARDO "RICK" FERNANDEZ |
| Defendants. | |

Ricardo ("Rick") Fernandez, pursuant to 28 U.S.C. § 1746(2), states as follows under penalty of perjury:

1.     I am over 18 years of age and have personal knowledge of the matters addressed in this Declaration.

2.     I have worked in the trucking industry since 1979. Among other trucking interests and operations, I am presently a member of Jim Daws Trucking, LLC ("JDT"), which is a Nebraska limited liability company that I formed on April 19, 2022, for the purpose of acquiring the trucking business owned and operated by Jim Daws ("Jim") in Milford, Nebraska, commonly referred to as "Daws Trucking" ("Daws Trucking"). The other member of JDT is my son, Ricardo Daniel Fernandez ("Ricky").

3.     I have known Jim for many years. In the discussions which led to JDT's purchase of Daws Trucking, Jim told me that he wanted to sell Daws Trucking and retire. We reached an agreement-in-principle for Ricky and me to purchase the business of Daws Trucking.

**A.    The Asset Purchase Agreement.**

4.    Jim said the business of Daws Trucking was owned by and conducted through Daws, Inc. On May 4, 2022, JDT and Daws, Inc. entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"). A copy of the Asset Purchase Agreement is attached hereto as **Exhibit A**.

5.    In the Asset Purchase Agreement, JDT purchased the business of Daws Trucking as a going concern and acquired all the tangible and intangible assets used in the business of Daws Trucking. [Ex. A, ¶ 1.] More specifically, the Asset Purchase Agreement provided that JDT acquired, among other things:

> b. All of the inventory, machinery, and equipment of the Business as determined by a complete inventory and accounting of such inventory, machinery, and equipment and depreciation schedule to be taken by the parties hereto as of the Closing.
>
> c. All of the fixtures and other tangible assets of the Business as shown on the financial statements of the Business prepared as of January 1, 2022 and April 30, 2022, annexed hereto as Exhibit A...
>
> d. The trade, business name, goodwill, and all other intangible assets of the Business, including but not limited to Business's US DOT Number (hereinafter referred to as the "DOT Number") and Motor Carrier number (hereafter referred to as the "MC Number") and **all other assets of the Business whether described herein or not**...

*Id.* (emphasis added).

6.    Exhibit A to the Asset Purchase Agreement specifically listed Daws Trucking's server as an asset that was transferred to JDT as part of the sale. It was listed under "Office Equipment" and it was valued at $39,585.00. [Ex. A, ¶ 1(c), p. 15.]

2

7.     The Asset Purchase Agreement lists February 28, 2021, as the date of acquisition of the server—just a year before the sale to JDT. [Ex. A, ¶ 1(c), p. 15.]

8.     The Asset Purchase Agreement transferred to JDT a tangible asset in the document titled "daws handbook office 2-2017" (the "Daws Handbook"). A copy of the Daws Handbook is attached hereto as **Exhibit B**.

9.     The Asset Purchase Agreement transferred to JDT all of the data belonging to the business and all of the data on the server and other computer equipment.

**B.     The Daws Handbook Was Used by the Business Before and After the Sale.**

10.     After the sale of Daws Trucking to JDT, Jim became an employee of JDT. He was paid a salary of $90,000 per year. Jim was also subject to the employment policies that existed before the sale, and which continued thereafter.

11.     Because JDT bought Daws Trucking as a going concern, after Daws Trucking was sold to JDT, JDT continued to use the Daws Handbook to govern its employment relationships, employees referenced the Daws Handbook, and employees followed policies found in the Daws Handbook.

12.     Jim never received a new employee handbook because the Daws Handbook was still in effect. And, as an employee, he was subject to the policies in the Daws Handbook.

13.     On October 31, 2022, Kathy Temme, an employee of JDT, emailed Bill Molthan, an employee of JDT, and said, "Our bereavement policy is you have to use your PTO time. See attached." Kathy attached the Paid Time Off policy

3

found on page 15 of the Daws Handbook. A copy of the email and attachment is attached hereto as **Exhibit C**.

14.    On November 2, 2023, Kathy Temme, an employee of JDT, emailed Ranae Muencrath, an employee of JDT, and said, "Here's the page from the handbook". Kathy attached the Personal Appearance policy found on page 18 of the Daws Handbook. A copy of the email and attachment is attached hereto as **Exhibit D**.

15.    On July 26, 2024, Lana Daws emailed Jaisa Douty, an employee of JDT, and asked for a copy of the Employee Handbook and Driver Orientation Handbook. Jaisa responded, "Daws Handbook Office is the only handbook we have." Jaisa attached "daws handbook office 2-2017," the Daws Handbook. A copy of the email is attached hereto as **Exhibit E**.

16.    The Daws Handbook contains the following provisions, found on pages 20–21:

> Computers - All data entered on the Company's computers is considered the property of the Company. No employees should knowingly enter false or misleading information in the Company's computer system or destroy any data, which the Company needs to conduct its business. Please realize that for various reasons, the Company will access your equipment. As a result, your computer should not be used for personal business even during nonworking time if you don't want the Company to see your personal documents. Unauthorized access to any computer, computer system, computer software or computer program is specifically prohibited. Violators will be prosecuted to the fullest extent allowed by civil or criminal law.
>
> Electronic Mail - Electronic mail (E-mail) is to be used primarily for business purposes and only for personal reasons during nonworking time. Like your computer, the Company may need to access your E-mail for various reasons. You should be aware that such messages are not entirely confidential. They can be forwarded to others without the original sender's knowledge. E-mail can be viewed by others who may improperly use a

4

password to breach the security of the system. In addition, disclosure of E-mail messages may be required in lawsuits against the Company. As a rule of thumb, nothing should be sent by E-mail that you would not put in a formal memo or that you would not like to become public knowledge. Do not use derogatory, offensive or insulting language in any E-mail message.

[Exhibit A, p. 20–21.]

## C.    Emails contained on JDT servers.

17.    After I acquired Daws Trucking, neither Jim nor his attorneys, Julie Karavas and Thomas Kranz, asked or instructed JDT, me, or Ricky to delete any of their email communications that were made prior to the execution of Asset Purchase Agreement.

18.    After I acquired Daws Trucking, by reviewing company emails, I have since learned that Jim continued to correspond with Karavas & Kranz, sometimes on behalf of JDT, and sometimes adverse to JDT, and that such emails were saved to the Daws Trucking server. Neither Jim nor his attorneys, Ms. Karavas and Thomas Kranz, took any measures to protect their ongoing communications from disclosure to me through the server.

19.    I have reviewed the emails between Jim and Ms. Karavas on JDT's email server. Those emails show Jim was working with Ms. Karavas to orchestrate a mass resignation of employees from JDT, receive additional value for what was already sold to JDT, and/or devalue JDT to the point where Jim could reacquire it for far less than he sold it to me.

5

**D.    Jim accessed information from employees' computer files on at least one occasion.**

20.    On at least one occasion, Jim accessed information from an employee's computer files and contacted Bizco, JDT's IT service-provider, about it. On April 11, 2024, in an email to Ms. Karavas's partner, Thomas Kranz, which Jim does not assert is privileged, Jim described the results of a review of the computer files of a former JDT employe whose first name was Charles. In the email, Jim outlined a list of changes that Charles made:

> Deleted files from the U: drive his personal file for our permit system.
> Deleted files from the P: drive Bizco was able to recover and reinstall.
> The documents folder that held contracts was empty.
> Bizco said he was deleting files before he gave notice.

A true and correct copy of the email is attached hereto as **Exhibit F**.

**E.    Legal invoices and payments.**

21.    On April 1, 2024, Jim emailed me and said, "Also, in the contract, I have total control." A true and correct copy of the representative email is attached hereto as **Exhibit G**.

22.    I have since learned that as part of Jim's scheme for total control, he also retained Karavas & Kranz to perform work for JDT, and he orchestrated Karavas and Kranz to represent him adverse to JDT.

23.    Ms. Karavas and her firm represented Ricky and me in connection with the formation of JDT and our purchase of Daws Trucking, at the same time represented Jim and entities he owned, in the same transaction, without any consent to joint representation or waiver of conflicts-of-interest.

24.    Following the sale in May 2022, Ms. Karavas and her firm continued to represent JDT, on the one hand, and Jim and other entities he owned, on the other hand, without any consent to joint representation or conflict waiver.

25.    Legal invoices from Karavas & Kranz which were paid by JDT and which include legal services for JDT and legal services for Jim, are set forth on **Exhibit H**.

26.    JDT paid legal fees to Karavas and Kranz for legal services in the amount of $7,930.23 for "LEGAL WORK – SALE" on September 22, 2022, invoice 5506.

27.    Invoice 5506 covered work performed by Karavas & Kranz from May 2, 2022, through May 11, 2022, for the sale of the business by Jim to JDT, all of which were adverse to JDT.

28.    There is a hand-written note on invoice 5506 which reads, "These aren't duplicates… this one J&L and other JDT?" Written below that is "JDT."

29.    I recognize the handwriting to be Tony Glenn's handwriting, who was the CFO of JDT. I am personally familiar with Tony Glenn's handwriting. I also know, from reviewing the financial records of JDT after Jim and Tony resigned, that Jim and Tony were in regular communication about the financial affairs of JDT and the other business owned by Jim.

30.    JDT paid legal fees to Karavas & Kranz in the amount of $1,942.00 for "O/O DOCS REVISION" on November 17, 2022, invoice 5981.

31.    JDT paid legal fees to Karavas & Kranz in the amount of $192.00 for "LEASE DOCS, DOT ISSUE" on December 22, 2022, invoice 6188.

32.    JDT paid legal fees to Karavas & Kranz in the amount of $96.00 for "STATUS OF ENTITIES" on November 13, 2023, invoice 7406.

33.    JDT paid legal fees to Karavas & Kranz in the amount of $937.50 for "TRADEMARK REGISTRATION" on December 14, 2023, invoice 7506.

34.    JDT paid legal fees to Karavas & Kranz in the amount of $1,359.68 for "LEGAL – DOT NUMBER" on June 7, 2024, invoice 8081.

35.    JDT paid legal fees to Karavas & Kranz in the amount of $836.05 for "LEGAL – DOT NUMBER" on June 7, 2024, invoice 7956.

36.    JDT paid legal fees to Karavas & Kranz in the amount of $247.00 for "LEGAL (DAWS EXPENSE) on July 11, 2024, invoice 8318.

37.    JDT paid legal fees to Karavas & Kranz in the amount of $87.00 for "HR MATTER" on September 19, 2024, invoice 8477. Invoice 8477 is directed to James and Lana Daws, **and** Jim Daws Trucking, LLC. This invoice was related to the termination of an employee, and the services were rendered on August 19, 2024.

38.    The payments set forth on **Exhibit H** were made without my knowledge or authorization.

**F.    Prior to the Post-Shutdown Communications, legal counsel for the parties corresponded regarding the legal work performed for JDT, the server, and the waiver of privilege.**

39.    JDT retained Andre R. Barry as legal counsel in this matter. Mr. Barry and Ms. Karavas corresponded on multiple occasions regarding the legal work performed for JDT, the server, and the waiver of privileged emails. A true and correct copy of the representative emails are attached hereto as **Exhibit I.**

8

40.     On September 19, 2024, Mr. Barry followed up with Ms. Karavas regarding these topics: "We're also still waiting for your responses to our questions concerning the draft employment agreement for Jim Daws, your bills to Jim Daws Trucking, LLC, and all communications related to work you performed for Jim Daws Trucking, LLC."

41.     On September 25, 2024, Mr. Barry again followed up with Ms. Karavas on this issue: "In addition, to pick up on a subject of prior correspondence, we note that the LLC's records show payments to your law firm from August 2, 2022, through September 3, 2024. Whether or not an engagement agreement was signed, your firm was clearly performing work on behalf of the LLC. We therefore reiterate our request for all communications and other records related to that representation."

42.     On September 26, 2024, Mr. Barry sent the following message to Ms. Karavas: "Attached please find a report showing legal fees to your firm by Jim Daws Trucking, LLC, reflecting dates, amounts and subject matter. We're still investigat[ing], so this report may not be comprehensive, but at this time please provide all communications and work product (including drafts) related to these matters."

43.     On September 30, 2024, Mr. Barry, following a phone conversation, sent an email to Ms. Karavas in which he advised her of the following:

     a.     "As I stated on the phone, JDT retains possession of all emails on its email server. We have reviewed the Asset Purchase Agreement, the Employee Handbook used at JDT, and the payment records showing JDT has

been paying your firm for legal work and have concluded that no emails between Jim and your firm are protected by the attorney client privilege."

      b.    "JDT purchased the entire business of Daws Inc., including the server and all intangible assets, in the Asset Purchase Agreement you drafted. These intangible assets included the firm's email accounts. The Employee Handbook also warned that computer data is owned by the company and may be viewed by the company, and that company computers should not be used for personal business..."

      c.    "Jim's use of email to communicate with you adverse to Rick and JDT was personal to him; it was not use for the benefit of JDT. In addition, Jim knew he had sold the servers and the entire business to JDT, and by extension, to Rick and Ricky. Knowing that, Jim still chose to send emails to you on a computer system owned by JDT, despite warnings that all data on that system is property of JDT, that his computer would be accessed by JDT, and that he should not use his computer for personal business. If Jim actually believed JDT would not access his emails, such a belief was not objectively reasonable, particularly when was using JDT's email server to conduct a campaign against JDT and its owners, and JDT was paying not only for the server and internet support, but was paying your legal bills for work performed for the benefit if Jim adverse to JDT. Under these circumstances, the emails Jim sent and received using JDT's server are not confidential. No privilege attaches to Jim's email communications with you, and if any privilege did attach, it has been waived."

44.    At 11:52 a.m. on October 1, Ms. Karavas responded to Mr. Barry and asserted that certain pre-sale communications were privileged. She did concede that "all the communications and work product (including drafts) we ever shared with [JDT] personnel that are covered by the invoices you identified and inquired about last week, which apparently [JDT] paid for and, if related to [JDT] business _after_ May 4, 2022, we agree would not be privileged." (Emphasis in original.) "Accordingly," she wrote, "we consider your request satisfied."

45.    The Post-Shutdown Communications were sent by Julie to Jim's JDT email address and stored on JDT's email server after our attorney informed Ms. Karavas that we had secured the server and disagreed that any emails between Ms. Karavas and Jim on that server were protected by privilege.

46.    I declare under the penalty of perjury that the foregoing is true and correct.

Dated December 2, 2024

_[signature]_

Ricardo ("Rick") Fernandez