IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM DAWS TRUCKING, LLC, | ) | CASE NO. 4:24-CV-3177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' REPLY BRIEF** |
| | ) | **IN SUPPORT OF MOTION** |
| DAWS, INC.; JAMES R. DAWS; LANA R. DAWS; DAWS TRUCKING, INC.; and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | ) ) ) ) | **FOR PROTECTIVE ORDER** |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Despite submitting a 44 page brief, and more than 85 pages of exhibits, Jim Daws Trucking, LLC ("JDT") is unable to cite to a single instance, ever, of Daws, Inc., before the May 2, 2024 Asset Purchase Agreement ("APA"), or JDT after the APA, monitoring or reviewing e-mail communications of employees, let alone e-mails belonging to Jim Daws ("Jim"). That's because it never happened. Jim had a reasonable expectation of privacy built up over many years in communicating with his lawyers using his "jim@daws-trucking.com" e-mail address.

As the Court is aware from the TRO hearing, Jim has long owned a number of companies which were *not* sold in the APA. Before and after the APA Jim used his "jim@daws-trucking.com" e-mail address to communicate with his lawyers about personal matters, including his estate planning and gifts to charity, and matters relating to his other companies which JDT doesn't even attempt to argue are relevant to this case.

Despite counsel agreeing to a protocol whereby the issue of privilege could be brought before this court through this motion, Rick Fernandez ("Rick") admits he has already reviewed Jim's privileged communications, which violates the spirit, if not the letter, of counsel's agreement. (Filing 41-1 at ECF p. 5, ¶ 19). Defendants

welcome JDT's invitation for this Court to review the August 21, 2024 through September 27, 2024 e-mails *in camera* so the Court can see for itself Rick's false representation to this Court that "Those emails show Jim was working with Ms. Karavas to orchestrate a mass resignation of employees from JDT, receive additional value for what was already sold to JDT, and/or devalue JDT to the point where Jim could reacquire it for far less than he sold it to me." (Filing 41-1 at ECF p. 5, ¶ 19).

## ARGUMENT

I. **THIS COURT SHOULD DECLARE THE DOCUMENTS ON DEFENDANTS' PRIVILEGE LOG ARE PRIVILEGED AND ORDER JDT TO DESTROY THESE PRIVILEGED DOCUMENTS IN ITS POSSESSION OR CONTROL**

    A. **Defendants have established that the documents on its log are subject to the attorney-client privilege.**

JDT does not dispute that all of the documents on Jim's privilege log consist of communications between him and his attorneys, and in a limited number of instances, include Jim's wife, Lana. As the privilege log, and Jim's declaration, demonstrates these communications were made for the purpose of securing legal advice, and were made with the reasonable expectation that they were confidential.

The parties are in agreement that the four factors a court should consider in determining whether Jim's expectation of privacy was objectively reasonable are:

    (1)    does the corporation maintain a policy banning personal or other objectionable use,

    (2)    does the company monitor the use of the employee's computer or e-mail,

    (3)    do third parties have a right of access to the computer or e-mails, and

> (4)   did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257 (Bankr.S.D.N.Y.2005). Jim has met his burden that the documents are privileged.

**1.   JDT had no e-mail use policy.**

JDT has failed to show that it had any e-mail policy. Rather, it relies on the Daws, Inc. handbook. JDT asks this Court to believe that the Daws, Inc. handbook applied to JDT employees because the handbook was a tangible asset purchased in the APA. (Filing 40 at ECF p. 7).

JDT acknowledges that it never provided Jim with a JDT employee handbook after Jim became a JDT employee. (Filing 41-1 at ECF p. 3, ¶ 12). That's because there never was a JDT handbook. JDT has not produced any evidence that JDT ever ratified or approved the Daws, Inc. handbook's application to JDT employees. JDT does not dispute that Jim never signed the Daws, Inc. handbook after he became an employee of JDT. JDT has failed to produce any evidence that JDT ever notified Jim that the Daws, Inc. handbook would apply to Jim as an employee of JDT. JDT has failed to produce any JDT handbook or e-mail use policy that purports to apply to JDT employees. The fact that JDT can't point to its own e-mail use policy supports the conclusion that Jim had a reasonable expectation that his use of his "Jim@daws-trucking.com" e-mail address to communicate with his lawyers would remain private.

To the extent the Daws, Inc. handbook applies to JDT's employees, and Jim, the e-mail policy in the handbook is very lenient. The handbook specifically states that employees may use company e-mail for personal purposes. (Filing 35-3 at ECF p. 21). While the handbook states that "You should be aware that such messages are not entirely confidential" *Id*. that statement is made in the following context: "They [e-mails] can be forwarded to others without the original sender's knowledge.

E-mail can be viewed by others who may improperly use a password to breach the security of the system." *Id*. The policy addresses the actions of outside actors—third parties who forward an e-mail or who hack into the system through an improper use of a password. Nothing in the Daws, Inc. electronic mail policy says anything about Daws, Inc. or JDT monitoring or reviewing employee e-mails.

Moreover, the handbook granted Jim, as President of Daws, Inc., a position he continued to hold after the APA, with sole discretion to interpret the policy. ([Filing 35-3 at ECF p. 23](#)). Jim never monitored employee e-mails and he never interpreted the policy to apply to him, which is further evidence confirming his reasonable expectation of privacy in his own e-mail communications with his attorneys.

### 2. Neither Daws, Inc. nor JDT monitored the use of employee's e-mail.

JDT also fails to cite any evidence that Daws, Inc. or JDT monitored employee's personal e-mails. JDT relies solely on an April 11, 2024, situation involving a former employee who changed a message on the company's phone system ([Filing 41-7 at ECF p. 2](#)) and deleted files on a shared drive on a company computer. The document upon which JDT relies reads:

> Changes he made;
>
> Phone system DILLIGAF | really didn't even know about this but our customers and drivers didn't need to be aware.
> Deleted files from the U: drive his personal file for our permit system.
> Deleted files from the P: drive Bizco was able to recover and reinstall.
> The documents folder that held contracts was empty.
> Bizco said he was deleting files before he gave notice.

([Filing 41-7 at ECF p. 1](#)). None of these exhibits have anything to do with JDT reviewing that former employee's e-mail. They deal with a former employee's deletion of files from a shared computer drive. The evidence cited by JDT says nothing about Jim or JDT monitoring that former employee's e-mails.

4

JDT does not cite a single instance where the Daws, Inc. handbook's policies regarding e-mail communications were applied to monitor JDT employee e-mail, let alone applied to Jim who remained the president of Daws, Inc. after the APA. Rather, JDT relies on stray e-mails where employees of JDT sent sections of the Daws, Inc. handbook regarding bereavement leave ([Filing 41-4](#)), grooming ([Filing 41-5](#)), or sent a copy of the handbook and driver orientation manual to Lana ([Filing 41-6](#)). None of these e-mails are specific to an e-mail policy of JDT.

The fact that there is no evidence that Daws, Inc. or JDT actually monitored or reviewed any employee's e-mails, especially Jim's, is further evidence that Jim had an objectively reasonable belief that his communications with his lawyers were confidential.

### 3. JDT has no right to access Jim's e-mails.

With respect to the Pre-Sale e-mails, the APA is silent as to the ownership of the data on the server that was sold. Unable to cite to any provision of the APA that transferred to JDT ownership of Jim's private e-mail communications with his lawyers, or e-mails with Jim's lawyers about his other companies, JDT contends that these emails fall within the broad penumbra of "intangible" assets of Daws, Inc. that were sold. But the e-mails at issue largely weren't e-mails owned by Daws, Inc. In many cases, the pre-sale e-mails involved legal advice regarding Jim's estate planning which is personal to Jim. Clearly, Jim didn't sell his personal e-mails with his attorney in the APA. Because these attorney-client e-mails were not sold as part of the APA, JDT has no right to them.

While there is no dispute that JDT purchased the server, it did not purchase all data on the server relating to Jim's other companies, or his personal e-mail. It strains credulity for JDT to now claim that Jim intended to sell, and JDT intended to buy, Jim's personal e-mails with his lawyers in the APA. The reality is Jim is not tech savvy and never contemplated that by selling the Daws, Inc. server, he was selling all of his e-mails and data unrelated to Daws, Inc., including his private

5

communications with his lawyers and files regarding his other companies—files which JDT is now holding hostage. Jim is not a computer scientist and didn't have knowledge of the technical aspects of how his year's old e-mails were stored. Again, this factor weighs in favor of concluding that Jim had a reasonable expectation of privacy in his communications with his lawyers.

### 4. JDT did not notify Jim, and Jim was not aware of, any e-mail monitoring policies.

As discussed above, neither Daws, Inc., nor JDT, had an e-mail monitoring policy. The Daws, Inc. handbook that JDT is now trying to claim as its own simply does not state that JDT can monitor employee e-mail. JDT does not dispute that in his decades of work for Daws, Inc. and his more than two years as a JDT employee, that he was ever informed of an e-mail monitoring policy, and Jim has testified that he is unaware of any such policy. (Filing 35-1 at ECF p. 3, ¶ 14). This evidence is unrefuted.

While JDT relies heavily on *Doe 1 v. George Washington University*, 480 F.Supp.3d 224, 227 (D.D.C., 2020), JDT omits the fact that the court in Doe 1 held that the lead plaintiff, Doe 1, had "an objectively reasonable expectation of privacy in their e-mail communications with their attorneys that were sent and received through their GW-issued e-mail accounts." *Id*. Thus, the Court held that Doe 1's communications with her attorney were privileged.

In *Doe 1*, George Washington University ("GW") had a specific e-mail policy that provided that GW "may search, review, monitor[,] or copy any e[-]mail sent to or from a GW e[-]mail account for approved purposes only, including without limitation[,] ... [g]athering information potentially relevant to legal claims by or against [GW]." *Doe 1*, 480 F.Supp.3d at 227. With respect to Does 2-5, "the actual record before the Court shows that when Jane Does 2 through 5 'opened their e[-]mail accounts, they accepted [the terms and conditions of] [GW's] Information Security Policy [that] specifically references the e[-]mail policy.'" *Id*. But no such

6

showing was made with respect to Doe 1 which the Court held was sound basis to conclude that Doe 1 had a reasonable expectation of privacy.

Similarly, here JDT has made no showing that JDT had any express policy that JDT could search, review, monitor, or copy any e-mail sent from a JDT e-mail account, nor that Jim was provided notice of, or affirmatively accepted any such policy. Thus, Jim's situation is analogous to Doe 1, who the Court held had an objectively reasonable expectation of privacy in her e-mail communications with attorneys using a company e-mail account.

Because Jim had an objectively reasonable expectation that his e-mails with his attorneys using his "Jim@daws-trucking.com" e-mail address were private, Jim has established that the e-mails in question are privileged.

**B.      Defendants did not waive the privilege.**

JDT argues that under Nebraska law, the burden of proving a waiver of the attorney-client privilege did not occur. (Filing 40 at ECF p. 20). Contrary to JDT's argument, under Nebraska Supreme Court precedent, the burden is on the party seeking production of privileged documents to prove that a waiver occurred. *See Nebraska ex rel. Stivrins v. Flowers,* 29 N.W.2d 311, 316 (Neb. 2007) ("Once Pace [the party asserting the privilege] established the attorney-client relationship, the plaintiff [the party challenging the privilege] had the burden to establish that the inquiry related to or was an exception to this rule or that the communications were outside the scope of the privilege.").

Regardless of who the burden of proving waiver falls upon, the evidence here shows that no waiver occurred. "Fairness is an important and fundamental consideration in assessing the issue of whether there has been a waiver of the lawyer-client privilege." *League v. Vanice,* 374 N.W.2d 849, 856 (Neb. 1985). "A person upon whom these rules confer a privilege against disclosure of a confidential matter or communication waives the privilege if he or his predecessor, while holder

7

of the privilege, **voluntarily discloses or consents to disclosure of any significant part of the matter or communication**. This rule does not apply if the disclosure is itself a privileged communication." Neb. Rev. Stat. § 27-511 (emphasis). Similarly, under Nebraska law regarding waiver:

> Waiver has been defined as a voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed; the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered and such person forever deprived of its benefits; or such conduct as warrants an inference of the relinquishment of such right; or the intentional doing of an act inconsistent with claiming it.

*Five Points Bank v. Scoular-Bishop Grain Co.*, 350 N.W.2d 549, 552 (Neb. 1984).

Jim never disclosed the contents of his privileged communications with his lawyers to third parties and did not voluntarily and intentionally relinquish his right to maintain the privilege of his communications. Nor did Jim engage in conduct that warrants an inference that he relinquished his right keep his attorney-client communications confidential.

Not knowing the technical aspects of how his e-mail is stored, in some cases from years before the APA, by selling Daws, Inc.'s server, Jim did not contemplate that he was selling all of the data on the server relating to his other companies, including his e-mail communications with his lawyers regarding personal matters or matters relating to his other businesses. JDT is simply taking advantage of the situation to claim, in some cases six years after the communications were made, that all of Jim's e-mails on the server with his attorneys were "sold" to JDT so JDT is free to snoop through Jim's attorney-client privileged communications. This is fundamentally unfair and treats the sacred attorney-client privilege as game of gotcha.

JDT does not claim that any of the Pre-sale communications that largely deal with Jim's estate planning and charitable donations, have any relevance to this lawsuit. But JDT wants the right to review those privileged e-mails because after the APA "JDT took possession of the server which contained the Pre-Sale Communications. This transfer constituted a voluntary disclosure of the communications and waived the privilege." ([Filing 40 at ECF p. 24](#)).

JDT cites to non-binding cases from New York, Ohio, and Georgia which involve factually distinct situations. ([Filing 40 at ECF p. 22-23](#)). None of those cases involved a situation where multiple companies, not all of which were sold in a transaction, used the same server for e-mail communications. None of the cases cited by JDT involved e-mail communications with attorneys regarding personal matters unrelated to the litigation or communications regarding other companies owned by the seller. The present case is unique in that while JDT purchased the assets of Daws, Inc., which included the server, it did not purchase the assets of Jim's other companies that also used the server.

JDT argues that Jim should have just deleted the confidential e-mails before the sale occurred. But again, this pre-supposes that those attorney-client communications regarding personal matters, matters relating to Jim's other companies, and matters regarding the negotiation of the APA were sold with the server. They were not.

There is a distinction between confidential communications regarding a company's ongoing operations that may have been purchased in a transaction, and confidential communications related to the acquisition where the parties were in an adversarial situation. *See [Orbit One Communications, Inc. v. Numerex Corp., 255 F.R.D. 98, 105 (S.D.N.Y. 2008)](#)* (noting that "the predecessor company continued to control the attorney-client privilege with respect to confidential communications concerning the acquisition, and was entitled to refuse to disclose such communications to the successor company.").

9

> Allowing Numerex to control Old Orbit One's privilege would lead to a fundamentally unfair result, "the equivalent of turning over to the buyer all of the privileged communications of the seller concerning the very transaction at issue." *Tekni–Plex,* 89 N.Y.2d at 138, 651 N.Y.S.2d at 962, 674 N.E.2d 663. Numerex cannot both pursue the rights of the buyer and simultaneously assume the attorney-client rights of the buyer's adversary, Old Orbit One. *Id.* Old Orbit One retained ownership of, and continues to control, the attorney-client privilege as to confidential communications with Lowenstein concerning the acquisition transaction.

*Orbit One*, 255 F.R.D. at 106–07.

The Oregon Supreme Court adopted a sensible and fair approach to a similar situation in *Gollersrud v. LPMC, LLC,* 541 P.3d 864 (Ore. 2023). In *Gollersrud*, a party subpoenaed a litigant's former employer to obtain the litigant's e-mails stored on the former employer's servers. Like JDT, the requesting party argued that that the former employee waived privilege by failing to delete e-mails with his attorneys before leaving employment. The court quashed the subpoena holding that a failure to delete e-mails was not a voluntary waiver. "Nothing in this record establishes even actual disclosure—there is no evidence that Mr. Gollersrud's former employers have ever read, reviewed, or learned the contents of the emails—let alone a voluntary disclosure on the part of Mr. Gollersrud." *Id.* at 874.

Here, while JDT argues that Jim had two years to delete the e-mails, the evidence shows that JDT unilaterally shut down the server on September 27, 2024. (Filing 40 at ECF p. 2). On September 30, 2024, JDT first raised the issue that it was claiming it owned all of the e-mails on the server, including Jim's communications with his lawyers, and that Jim waived any privilege. The next day Jim's lawyer promptly notified JDT's lawyer that the documents were privileged. (Filing 35-2 at ECF p. 2). This simply wasn't an issue until JDT locked everyone out of the server, and then tried to take advantage of the situation years after the fact to try to gain an advantage in this litigation.

Unlike the present case, the litany of cases cited by JDT in support of their waiver argument involve situations where the company had very strict e-mail policies that were communicated to employees and which made it clear that e-mails belonged to the company and could be monitored. A strict policy is lacking in the present case. *See, e.g., In re Royce Homes, LP*, 449 B.R. 709, 717 (Bkrtcy.S.D.Tex., 2011) ("**POLICY:** All electronic communications are the property of the Company and all information contained on any electronic communication system belongs to the company and nothing on them will be considered private."); *Long v. Marubeni America Corp.*, No. 05CIV.639(GEL)(KNF) 2006 WL 2998671, at *1 (S.D.N.Y. Oct. 19, 2006) ("'all communications and information transmitted by, received from, created or stored in [MAC's automated systems] (whether through word processing programs, database programs, e-mail, the internet or otherwise) are company records' and 'MAC's property.' The Handbook advised MAC employees to use MAC's automated systems for 'job-related purposes,' since 'use of the systems for personal purposes are (*sic*) prohibited.' The Handbook advised further, that MAC had the right to monitor its automated systems and that its employees 'have no right of personal privacy in any matter stored in, created, received, or sent over the e-mail, voice mail, word processing, and /or internet systems provided' by MAC."); *Chechele v. Ward*, No. CIV-10-1286-M, 2012 WL 4481439, at *2 (W.D.Okla. Sept. 28, 2012) ("SandRidge's Computer, E-mail, Telephone and Internet Usage policy clearly notifies SandRidge's employees that their e-mails are not guaranteed to be private or confidential, that their e-mails are considered SandRidge property, that SandRidge reserves the right to examine, monitor, and regulate e-mail messages…."); *Stavale v. Stavale*, 957 N.W.2d 387, 394 (Mich.App., 2020) (noting that company policy provided: "***Users have no legitimate and/or reasonable expectation of privacy regarding system usage.*** As a result, you should not use the Company's electronic communication systems to discuss or correspond about anything personal, particularly sensitive, confidential, or privileged personal communications to outside parties, as the Company reserves the right to monitor all system usage, including such communications."); *Thygeson v. U.S. Bancorp*, No. CV-

03-467-ST, 2004 WL 2066746, at *20 (D.Or. Sep. 15, 2004) ("Our ... personal computers, ... including e-mail, ... are intended for Company business only" and the employer "reserves the right to monitor any employee's e-mail and computer files for any legitimate business reason, including when there is a reasonable suspicion that employee use of these systems violates ... a company policy [.]").; *United States ex rel. Ray v. GSD&M Idea City LLC*, 3:11-cv-1154-O, 2012 WL 12925016, at *1 (N.D.Tex., May 15, 2012) ("All portions of GSD&M's email infrastructure are the *property of GSD&M.* This includes all electronic mail transmitted or received through GSD&M's information infrastructure. Since email is the property of GSD&M, all email accounts and the content stored in the accounts are *subject to audits at any time and without notice."); U.S. v. Finazzo*, No. 10-CR-457 RRM RML, 2013 WL 619572, at *4 (E.D.N.Y. Feb. 19, 2013) ("Systems are provided to serve business purposes only and are considered assets of the Company. You should have no expectation of privacy when using Company Systems. All information on the Systems may be monitored, accessed, deleted or disclosed at any time without your permission."); *Hanson v. First Nat. Bank,* No. CIV.A. 5:10-09062011 WL 5201430, at *2 (S.D.W.Va., Oct. 31, 2011) ("Because we reserve the right to obtain access to all voice mail and electronic mail messages left on or transmitted over these systems, employees should not assume that such messages are private and confidential or that First National Bank or its designated representatives will not have a need to access and review this information. Employees should understand that these systems are intended for business use, and all computer information, voice mail and electronic mail messages are to be considered as company records.")

One of the cases cited by JDT, involved a wrongful discharge lawsuit that did not even involve a claim that the e-mails were privileged nor a motion for a protective order and, therefore, has no application to the motion before this Court. See *Smyth v. Pillsbury Co., 914 F.Supp. 97 (E.D.Pa.,1996).*

In sum, JDT had no e-mail policy. To the extent the Daws, Inc. policy applied, it was very lenient and did not remove Jim's reasonable expectation that his

communications with his lawyers using his "jim@daws-trucking.com" e-mail account would be private. When JDT first raised the issue of waiver on September 30, 2024, the next day Jim's lawyer notified JDT that the e-mails remained privileged. Under Nebraska's fairness standard for determining whether a waiver of the attorney-client privilege has occurred, *see Vanice,* 374 N.W.2d at 856, and standard that a knowing and voluntary waiver must occur, see Neb. Rev. Stat. § 27-511; *Five Points Bank,* 350 N.W.2d at 552, Jim has not voluntarily waived the attorney-client privilege regarding the e-mails at issue in this motion.

C.   **The Crime-Fraud Exception does not apply.**

In its brief in opposition, JDT claims that the documents on Defendants' privilege log should also be produced under the crime-fraud exception to the attorney-client privilege. (Filing 40 at ECF p. 39). Under the crime-fraud exception, the attorney-client privilege "does not extend to communications made for the purpose of getting advice for the commission of a fraud or a crime." *In re Green Grand Jury Proc.,* 492 F.3d 976, 979 (8th Cir. 2007) (quoting *United States v. Zolin,* 491 U.S. 554, 563 (1989)).

"The crime-fraud exception does not apply to attorney-client communications just because Plaintiff believes attorney-client communications may provide helpful evidence to support civil claims, none of which are for fraud or have any element of fraud." *BJ's Fleet Wash, LLC v. City of Omaha,* No. 8:22cv 131, 2024 WL 1962633, at *2 (D.Neb. May 3, 2024) (Nelson, M.J.); *see also Triple Five of Minnesota, Inc. v. Simon,* 212 F.R.D. 523, 529 (D.Minn.,2002) (stating that the analysis of the crime-fraud exception requires a threshold showing the attorney-client communications are linked to "a specific cause of action based on fraud or a cause of action requiring an element of fraud, such as fraudulent intent."). While there are many flaws in JDT's reliance on the crime-fraud exception, the most obvious is that JDT has not pled any claims involving a crime or which involved an element of fraud. Plaintiff has asserted claims for (1) breach of contract, (2) breach of fiduciary duty,

13

(3) tortious interference, and (4) declaratory judgment. (Filing 1). None of these claims allege criminal conduct nor an element of fraud.

The cases JDT relies on from the District of New York that hold that the crime-fraud exception broadly applies to conduct that does not involve fraud are inapplicable because Nebraska, and this Court, have rejected the expansive application of the crime-fraud exception adopted by the District of New York. *See* (Filing 40 at ECF p. 40). JDT acknowledges that this Court has taken a "narrow approach" to the crime-fraud exception. (Filing 40 at ECF p. 41)(citing to *Milroy v. Hanson*, 902 F.Supp. 1029, 1035 (D.Neb.,1995) (Kopf, J.))

In *Milroy*, a plaintiff filed a claim alleging that he was the subject of oppression as a minority shareholder. The plaintiff argued that attorney-client communications with the defendant should be reviewed *in camera* to determine whether the crime-fraud exception applied. Judge Kopf held that Magistrate Judge Piester erred in even approving an in camera review because there was no allegation of fraud in the lawsuit. "I find and conclude that Judge Piester erred by equating evidence of oppression of a minority stockholder with fraud for purposes of piercing the corporate attorney-client privilege." *Id.* at 1030.

JDT argues *Milroy* doesn't apply because that case involved oppressive conduct, not fraudulent conduct, or a breach of fiduciary duty. (Filing 40 at ECF p. 41). But the present case doesn't allege any fraudulent conduct either. And as discussed below a mere allegation of a breach of fiduciary duty does not trigger the crime-fraud exception.

*Doyle v. Union Ins. Co.*, 277 N.W.2d 36, 39 (Neb. 1979), does not support JDT's argument that a mere claim for breach of fiduciary duty gives rise to the crime-fraud exception. In *Doyle*, policyholders of a mutual insurance company filed a class action alleging that directors of the company breached their fiduciary duties to policyholders by selling the company for less than fair value and "failing to make complete and adequate disclosures to the policyholders in the proxy statements by

14

which policyholders' approval of the terms of the contract were solicited." *Id*. Said differently, the directors committed fraud in the proxy statement. "An analysis of the facts shows quite clearly that Gerleman's proposed acquisition for nominal consideration of an equity interest in New Union **would be fraudulent** and a violation of his fiduciary duties." *Id*. at 44 (emphasis added). Thus, *Doyle* also required an element of fraud as a threshold that had to be met before the crime-fraud exception could apply.

JDT cites to four "facts" supporting application of the crime-fraud exception in the present case. (Filing 40 at ECF p. 43). None do. Those "facts" are:

- Jim's refusal to transfer the DOT number and a demand for an additional $500,000.00 to do so. *See* Statement of Facts, ¶¶ 22–23.
- Jim's attempt to buy back the business at a discount, after damaging the company and refusing to transfer the goodwill and assets purchased by JDT. *See* Statement of Facts, ¶¶ 27–30.
- The mass resignation of employees and drivers orchestrated by Jim. *See* Statement of Facts, ¶¶ 47–51.
- The fraudulent trademark application for "Daws Trucking" that Jim pursued on his own behalf, without authorization by JDT. *See* Statement of Facts, ¶¶ 24–26.

(Filing 40 at ECF p. 43).

None of these "facts" raise an allegation of fraud. For example, there is a bona fide dispute as to whether the Daws Trucking, Inc.'s DOT number was sold in the APA which only involved the sale of the assets of Daws, Inc.—a different company. There is no allegation of fraud regarding the dispute over the DOT number. There is also nothing fraudulent about Jim negotiating with Rick to buy back the business at a discount more than two years after a sale and after the primary tangible assets, trucks and trailers, had significantly depreciated. Negotiation is not fraud, and the buyback never occurred. Nor is there any element of fraud regarding the false allegation that Jim supposedly orchestrated a mass resignation of employees and drivers.

15

Finally, JDT continues to attempt to mislead the Court on the trademark issue, now characterizing that registration as fraudulent. Defendants have not claimed in their privilege log that Jim's communications with lawyers regarding the trademark are privileged, so there's no basis to say the crime-fraud exception applies. Moreover, a review of those communications shows that JDT's wild conspiracy theory that Jim registered the Daws Trucking trademark to compete with JDT is made up out of whole cloth.

Contrary to JDT's unsupported theory, the communications show that on November 10, 2023, JDT staff received an unsolicited e-mail from the legal department from a company called "Trademark Swift" stating:

> An applicant is intending to file an application with the USPTO for the trademark registration of the brand name "Daws Trucking" from North Carolina. While searching for this brand name, your information appeared. According to online research, your brand is not registered with the USPTO and anyone can register this brand name under their information.
>
> Since the USPTO treats applications on a first-come, first-served basis, the other applicant will be respected if you are not using the brand name "Daws Trucking" in commerce and are unwilling to register the trademark so.
>
> We would appreciate it if you can revert to us ASAP, in case of no objection is raised from you, so the other applicant will be allowed to begin their registration following the standard examination and filing procedure with USPTO.
>
> However, there's a bit of a time-sensitive issue. Another applicant is also looking to trademark the same business name as yours under their ownership, and if we don't move forward with you to register with USPTO for trademarking, they could have federal rights and you will lose rights to use this name legally and they can file a case against you they can own your profit since they have rights of the brand name. As per the Act of 1946 §§ 1051 et seq, it is mandatory to register your mark to hold the ownership rights federally. We are looking forward to your response. Thanks & regards,

(Filing 42-1 at ECF p. 6).

As the e-mail string confirms, concerned that another company from North Carolina was attempting to register the Daws Trucking name as a trademark, On Friday, November 10, 2023, Jim forwarded the e-mail to Karavas & Kranz seeking legal advice to protect the name. (Filing 42-1 at ECF p. 5). Karavas & Kranz advised Jim that protect the name, he should consider registering it. (Filing 42-1 at ECF p. 5). Jim responded simply "I want to protect the name, if possible." (Filing 42-1 at ECF p. 5). After confirming that they've used the name since 2002, Jim instructed Mr. Kranz to "Please start the paperwork!" (Filing 42-1 at ECF p. 4). Without consulting with Jim as to which entity the trademark should be registered to, or providing him with a draft of the application, on November 14, 2023, Mr. Kranz filed the application under the name Daws Trucking, Inc. (Filing 42-1 at ECF p. 2 ¶ 5) Jim did not instruct Mr. Kranz to file the application on behalf of Daws Trucking, Inc. (Filing 42-1 at ECF p. 2 ¶ 5) Mr. Kranz alone chose to file the application in the name of Daws Trucking, Inc. because that was the company Mr. Kranz was most familiar with. (Filing 42-1 at ECF p. 2 ¶ 5) Contrary to JDT's false allegations, there is no evidence Jim registered the trademark under Daws Trucking, Inc. with the intent to compete with JDT.

Defendants do not dispute that JDT owns the "Daws Trucking" trademark and has offered on multiple occasions to assign it to JDT. (Filing 22-1 at ECF p. 9, ¶¶ 43-48). JDT has never prepared the requested assignment. JDT won't take yes for an answer. It is clear, JDT would rather complain about the trademark issue and make wild, false accusations about it to this Court, rather than do the paperwork to see that the trademark is properly assigned to JDT. As they have for more than a month when JDT first raised this issue, Defendants remain willing to assign this trademark to JDT. JDT's allegation regarding the trademark does not trigger the crime fraud exception on any communications, let alone communications that have nothing to do with the trademark.

17

## CONCLUSION

Defendants have established that the communications on its privilege log are privileged and that Jim has not waived the privilege. Accordingly, Defendants' motion for a protective order should be granted.

DATED this 9th day of December, 2024.

                                DAWS, INC., JAMES R. DAWS,
                                LANA R. DAWS, DAWS TRUCKING, INC.
                                and COLUMBUS TRANSPORTATION &
                                LOGISTICS, LLC, Defendants

                    BY:   /s/ Timothy J. Thalken
                            David C. Mullin, #21985
                            Timothy J. Thalken, #22173
                            Kristin M. Nalbach, #27125
                            FRASER STRYKER PC LLO
                            500 Energy Plaza
                            409 South 17th Street
                            Omaha, NE  68102-2663
                            (402) 341-6000
                            (402) 341-8290 - fax
                            tthalken@fraserstryker.com
                            dmullin@fraserstryker.com
                            knalbach@fraserstryker.com
                            ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d), counsel certifies that this brief contains 5,821 words including all text, captions, headings, footnotes, and quotations according to the word count function of Microsoft Word 365.

                                              /s/ Timothy J. Thalken

## CERTIFICATE OF SERVICE

      I hereby certify that on the 9th day of December, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

      /s/ Timothy J. Thalken

3319447.2