IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC, | Case No. 4:24-cv-03177 |
| Plaintiff, | |
| vs. | |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | |
| Defendants. | |

---

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Prepared and submitted by:

Andre R. Barry #22505
Henry L. Wiedrich #23696
Madeline C. Hasley #27870
CLINE WILLIAMS WRIGH
JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
(402) 479-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com
mhasley@clinewilliams.com

January 10, 2025

Plaintiff Jim Daws Trucking, LLC ("JDT" or "Daws Trucking") submits this Brief in support of its Motion for Preliminary Injunction against Defendants Daws, Inc., James R. Daws ("Jim"), Lana R. Daws ("Lana"), Daws Trucking, Inc. ("DTI"), and Columbus Transportation and Logistics, LLC ("CTL").

## I. INTRODUCTION

In 2022, Jim sold his trucking business, Daws Trucking, to JDT as a going concern. JDT bought all tangible and intangible assets of the business, including the name "Daws Trucking" and goodwill which the parties valued at $4.5 million. After the sale, Jim informed employees that nothing would change. In some respects that statement was true. Jim remained a highly compensated employee of JDT. In addition, Jim continued largely to control the company through its Chief Financial Officer, Tony Glenn ("Tony"), and other employees who remained loyal to him. In other respects, Jim changed things. Gradually, through Tony, Jim began to accumulate trucks, trailers, and drivers in other companies he owned, which was advantageous for him personally, at the expense of JDT. When it became apparent that Jim didn't want to give up control, JDT's owners, Rick and Ricky Fernandez ("Rick" and "Ricky," respectively) tried to negotiate a buyout, but Jim refused to buy back the assets of JDT on terms which Rick and Ricky considered fair. Finally, in August of 2024, Jim informed Rick that he was leaving Daws Trucking, and all its employees would be leaving with him. Jim made good on his threat. Virtually all the employees of Daws Trucking resigned effective September 27, 2024, Jim left on September 30, and most of the company's drivers left with him.

2

In statements to the Court—including statements under penalty of perjury—Jim has tried to paint an innocent picture of what transpired. For example, he has claimed he simply wants to retire, that he didn't encourage any employees of JDT to quit and go into another business with him, and that he was only giving general advice to Jeremy Becker ("Jeremy") about a business opportunity that arose while he was still employed by JDT. Documents produced in discovery paint a very different picture—that Jim intended all along to compete with JDT if he could not force Rick to abandon his investment, that Jim helped coordinate a mass resignation of employees from JDT, that until an email was inadvertently sent to "the enemy," Jim worked incessantly on a competing venture with Jeremy, and that Jim has set his former employees up in competition with JDT using businesses he established and still participates in.

The evidence provides two grounds for a preliminary injunction directed toward Jim, the other Defendants, and those acting in concert with them. First, Jim breached his duty of loyalty to JDT by helping to coordinate a mass resignation of employees to form a competing venture, and by recruiting Jeremy Becker to join that venture. Second, Jim has breached and continues to breach the noncompete obligations he undertook in exchange for over $10 million, by setting up a competing trucking business, soliciting the top customers of JDT, seizing payments intended for JDT through a bank account he continues to control, and by remaining involved in the competing trucking venture he helped establish. In the words of the Nebraska Supreme Court, it is intolerable for this course of conduct to continue.

## II. FACTS

Many of the key facts are set forth in JDT's Brief in Support of its Motion for Temporary Restraining Order [Filing No. 18]. JDT incorporates those facts here in their entirety and will adduce evidence of them at the hearing on its Motion for Preliminary Injunction. Additional facts are set forth below.

### A.    Jim and Lana execute an Asset Purchase Agreement with a five-year noncompete.

As the Court is aware, this case involves the Asset Purchase Agreement (APA) between Daws, Inc. and JDT dated May 4, 2022. In the APA, Jim and Lana sold the assets of Daws, Inc. to JDT as a going concern, for a price of $12 million. They also individually undertook noncompete obligations to JDT:

> It is understood and agreed that $4,500,000 of the purchase price shall be allocated to the goodwill of the Business, and in connection with the sale to the Buyer of the goodwill, Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any other person deriving title to the goodwill of said business from Buyer carries on a like business in such area.
>
> By affixing their signatures to this Agreement, Seller's shareholders join in the foregoing noncompetition agreement and agree to be individually bound thereby.

[Ex. 1 at ¶ 12.][1] In addition, after the sale of the Business, Jim became an employee of JDT. Jim told drivers and employees he planned to work another two years and was paid a salary of approximately $90,000 per year.

---

[1] Citations in this Brief are to the Index of Evidence filed herewith. For the sake of brevity, JDT has not included all exhibits on its Exhibit List in the Index of Evidence, but only particularly significant exhibits which speak for themselves.

**B.    Through his CFO Tony Glenn, Jim controlled the operations and his other companies, which he operated jointly for his own benefit.**

As the sale was closing, Jim revealed to Rick that he owned some of the trucks used in Daws Trucking through other companies. These companies owned semi-tractors and leased them to JDT. Jim initially told Rick he only owned a handful of trucks. Rick later learned that Jim owned more trucks than he had initially said. This arrangement hurt JDT because JDT made less money shipping freight using tractors owned by Jim, as opposed to tractors it owned itself. Still, as Jim's lawyer emphasized, "[t]he leasing of the tractors [did] not compete with the business of the LLC," and, in a sense, "support[ed] it," even if that support was something less than if JDT would have achieved if it had owned the tractors itself. [Ex. 2 at 2.]

Throughout the time he was employed by JDT, Jim received weekly, sometimes daily, reports from JDT's CFO, Tony Glenn, via email. These emails told Jim the amounts in the bank account of JDT and the companies Jim owned. Tony also sought and took direction from Jim on payment of bills—including the payment of bills by one company for another—and transfers of money between companies. Tony was careful to take direction from Jim—not Rick—on the management of the enterprise. In one instance, Tony emailed Jim, "I will just continue sending him [Rick] what I normally do which is the Monday trip reports and monthly JDT financials unless you tell me otherwise. If he contacts me, I'll forward it on to you and not respond." [Ex. 3.] Neither Jim nor Tony shared these email communications with Rick.

5

**C.    Jim refuses to give up control of Daws Trucking.**

While Jim was employed by JDT, differences of opinion arose between him and Rick. One difference of opinion involved the Department of Transportation (DOT) number used by Daws Trucking in its business. Unbeknownst to JDT at the time the APA was executed, the DOT number was owned by an affiliate of Daws, Inc., DTI. Rick believed, and still believes, that Jim had an obligation to convey the DOT number to JDT for no additional compensation, since it was part of the assets sold in the APA. Jim, however, refused to convey the DOT number unless he received additional compensation, which Rick was not willing to pay. On April 17, 2024, Jim emailed Rick, "I have decided to not let go of the DOT number. I'm not happy with the Chuck deal or taking money from Nebraska to Chicago to fund your businesses." [Ex. 4.] Chuck was a prospective employee that Rick was looking to hire. At around the same time, Jim emailed Rick that the APA gave him "total control" of JDT, which, contrary to Jim's belief, it did not do. [Ex. 5.]

**D.    Rick and Jim begin to discuss a possible buyback.**

The differences of opinion between Rick and Jim culminated in discussions about the possible buy-back of assets. In Rick's view, if Jim was having second thoughts about giving up control of the company, he was welcome to buy back the assets at the same price Rick had purchased them. For his part, Jim was intent on negotiating a discount.

**E.      Jim begins to secretly court Jeremy Becker.**

At around the same time, in the summer of 2024, without telling Rick, Jim engaged in frequent communications with Jeremy, the Chief Revenue Officer of another trucking company, about having Jeremy join Daws Trucking. The text messages Jim produced in discovery reflect many communications, by text, over the phone, and in person, between Jim and Jeremy, and their wives.

In his discussions with Jeremy, Jim shared the identities of JDT's top customers and ideas he had for gaining leverage over Rick. A major theme of the text messages Jim and Jeremy exchanged was Jim's plan to buy out Rick. On August 7, 2024, Jeremy asked, "Curious . . . do you think you can get the company bought back for less than you sold?" Jim responded that Rick wanted "way more than it's worth without me," prompting Jeremy to write, "You have major leverage IMO," with a crying/laughing emoji for emphasis. [Ex. 6 at 2.]

The courtship continued. In late August, Jeremy expressed his enthusiasm and desire "to shape things out on how we will make it work!" [*Id.* at 4.] A few days later, in early September, Jim told Jeremy, "I would like to start talking about what we can do for each other." [*Id.* at 6.] At the same time, Jim kept Jeremy abreast of his efforts to buy the company back from Rick, and the two were sharing laughing emojis about the prospect of Jim getting yelled at by Rick. [*Id.* at 8.] Later that month, Jeremy emphasized their project was—

> a big leap of faith for my career and family, but one that I want to be part of. I cannot help but appreciate to have a longstanding industry great like you being there with this offer to join. Most importantly, though, the camaraderie we can build and for me to learn as much as I can from you while you are willing before you ride off on the white horse.

[*Id.* at 10.] In response, Jim assured Jeremy he wasn't going anywhere: "I'm excited about getting us together and when that happens I'll be available for quite sometime [sic]." [*Id.* at 10.]

On September 27, the same day JDT's employees resigned, Jeremy asked "what the benefits look like at Daws." Jim responded, "It's turning into a shit show. Rick is here and moving out." [*Id.* at 12.]

## F.    Jim coordinated a mass resignation of JDT employees.

Rick was present at JDT's offices in Milford, Nebraska on September 27, but he wasn't moving out. He was securing control of the company's server and its ability to remain in business.

Approximately one month earlier, in late August, Rick had also been in the Milford office. He planned to talk to Jim about what he understood to be Jim's upcoming retirement. Jim refused to meet with Rick for most of the day. Instead, Jim met with other employees of JDT behind a closed door or otherwise out of Rick's presence. Toward the end of the day, Jim told Rick he was leaving JDT, and everyone would be leaving with him. Rick said he wanted to speak to employees. Jim said it wouldn't make a difference.

On September 17, Jim informed Rick of his intention to resign at the end of the month. About one week later, on September 27, the vast majority of JDT's employees—and all those loyal to Jim—resigned as a group. While Jim has sought to portray this resignation as having nothing to do with him, the documents he produced show that Jim was at the center of a plan for them to stick together and stay in business following the resignation:

8

- During the week leading up to September 27, Jim's CFO, Tony Glenn emailed scores of JDT financial records from his Daws Trucking email address to a personal Gmail account.

- On September 27, Jim and other JDT employees loyal to him tried to delete thousands of emails. Their efforts were in vain because a litigation hold had been put in place.

- Late in the afternoon of September 27, Jim sent an email from his own Gmail address to the Gmail accounts of the employees loyal to him, with the subject "Daws Contacts", listing the Gmail address and telephone number of each member of the group. [Ex. 7.]

**G.    Jim encouraged drivers to quit JDT and work for his competing venture.**

Jim may also seek to claim that driver resignations or career changes have nothing to do with him, but the fact of the matter is that Jim was not only encouraging drivers to work for his competing venture, he incentivized them to do so. On October 9, 2024, Jim texted Cory Pinnel, a JDT driver, "Corey [Stull] and I will pay you to stay home. $1,000 a week. But reach out to the Nebraska department of labor about not getting paid." [Ex. 8 at 2.] Jim also emailed his banker asking if certain drivers had a clause saying they cannot leave and whether that can be put on hold. On October 15, Jim told Jeff Cyphers, a driver, that "a plan is coming together should have answers Friday."[2] [Ex. 9 at 2.]

---

[2] Documents Rick and Ricky recently uncovered show this course of conduct dates to 2022. Jim, behind Rick's back, used Tony Glenn to sign a Truck Sales Contract as "Tony Glenn for James Daws" as "President" of JDT, whereby Tony and Jim sold a truck valued at $180,000 to John Vance for $0, with payments under a promissory note

**H.    Jim tried to disrupt the business of JDT.**

Jim's texts to employees and drivers he took with him show he instructed them to spy on Rick and to influence other drivers and employees:

- Question Matt roach [a driver who stayed with JDT] and try to figure out how loyal he is. [Ex. 10 at 2.]

- I would call Chuck [a JDT employee] and ask him that question. If you do video when you call it tapes the conversation or take notes. [Ex. 11 at 2.]

- Keep notes or tape every conversation for me please. [Ex. 12 at 2.]

- Call Chuck in Chicago. Take good notes about the conversation please. [Ex. 13 at 2.]

- Do you know if Mattie went to work for Rick? . . . Please ask her as I can't. [Ex. 14 at 2.]

- Can you send a mass text to the drivers. [Ex. 15 at 2.]

- Scott Mitchell has a lawyer and he wants a list of the guys that have escrow so they can take him to court. . . Scott will need the escrow amounts for each driver as he is contacting each of the guys so they have 1 lawyer. [*Id.* at 2-3.]

---

to be paid to J & L Enterprises, LLC. In other words, Jim transferred a JDT truck to a driver, without Rick's permission, for $0, while collecting payments under his other company. Tony even indicated to CPA Ryan Burger that "these related companies may rival the new trucking company [JDT] in size before too long!" to which Burger replied, "maybe he [Jim] can sell it off again" with a smiley emoji. [Ex. 23.]

- Yes but they don't always lock up so I been [sic] checking on things.

[Ex. 16 at 3.]

These texts show Jim actively taking steps to learn which additional employees and drivers he can poach from JDT, and to disrupt JDT's business. In one text, Jim told Otho, a driver, to "chew [Rick's] ass but no threats or violence. Tell everyone you talk to please." [Ex. 17 at 2.] In addition to the text messages, phone records obtained from Jim show he was constantly engaged in communications with drivers and former JDT employees from September 30 forward.

## I. Jim solicited key customers of JDT and directed his drivers to haul freight for them.

It was no coincidence that JDT customers took their business to Jim. Some of JDT's biggest customers, Concrete Industries and Claas, for example, began corresponding with Jim through his Gmail address as a continuation of previous email threads through Jim's Daws Trucking email address by the first week of October. Where did they get Jim's Gmail address, which he claims not to have had until his last days with JDT? The only logical explanation is that Jim, or one of the former JDT employees he shared it with, provided it to JDT customers. Jim also indicated he would call Valmont, another top JDT customer. Jim was fully aware he was soliciting JDT's customers and of their value to his competing venture. On October 7, he thanked Wayne Schmeeckle, of Schmeeckle Bros. Construction, who was also the subject of discussions with Jeremy, for the "support from customers like you." [Ex. 18 at 2.]

**J.    Jim laid the groundwork for one or more new trucking ventures involving his former employees and Jeremy.**

In late October, after "the enemy" received Jeremy's errant email, and the hearing on JDT's Motion for TRO approached, Jim attempted an evasive maneuver. With the help of Julie Karavas, the attorney who had represented Jim, Rick, and JDT, Jim prepared agreements purporting to redeem his equity interests in Loyal Trucking and JLD Truck Lines effective November 1. Jim hasn't been paid anything as part of this "redemption." Instead, Loyal Trucking and JLD Truck Lines have signed promissory notes agreeing to pay him the value of his equity in the businesses over five years, beginning in June 2025. In other words, the amount of Jim's investment in Loyal Trucking and JLD Truck Lines remains the same; his investments have just been converted from equity to debt.

Moreover, the documents show this plan was hatched by Jim as a continuation of the venture he started earlier in the month. On October 23, in a text to Ranae, Jim said "we can start running flatbed freight if we can get trailers and activate loyal so we will be talking more this week. Jeff [Keeler] and I are having breakfast at pac n save at 8 if you want to join us." [Ex. 19 at 2.] On October 30, after the plan between Jim and Jeremy had been uncovered, Jim told a driver, "[T]he kids will get it going again." [Ex. 20 at 2.] The next day, Jim told his counsel of record in this case, in an email he later forwarded to Jeremy and Robin Schmeeckle, "I would expect that Corey, Ranae, and Jermey will finish getting a trucking company going." [Ex. 21 at 2.] The operative word here is "finish," because the work was begun by Jim long before October 31. He had been carrying it out throughout the month of October.

12

**K.**     **Jim remains involved in the competing trucking ventures he helped establish.**

In his Declaration and through counsel at the TRO hearing, Jim characterized his other companies as mere leasing or brokerage companies, not in the "business of trucking." The documents show this is untrue. First, Jim omitted that Loyal Trucking has its own DOT number and that, at the time of his Declaration, he planned to activate that number so that Loyal Trucking could haul flatbed freight. [Ex. 20 at 2.] Jim also omitted to say he operated those companies in combination with each other. While Jim was employed by JDT, that was not a violation of the noncompete agreement because, as Julie Karavas stated, the companies were operated to support JDT. [Ex. 2 at 1.] But after Jim left JDT, he continued to operate the same businesses in essentially the same way, but now using the DOT number of Loyal Trucking. This is "the business of trucking" in competition with JDT. Jim continued to receive near daily emails from Tony informing him of the account balances in each company, in the same format Tony used when Jim was still at JDT. [Ex. 24.]

While Jim may have changed course slightly after his plan with Jeremy accidentally came to light and the Court entered its TRO, he has remained steadfast in his efforts to stay in the trucking business in competition with JDT. The ongoing business of Loyal Trucking and JLD Truck Lines, which Jim launched while he was still an owner and in which he remains a participant, is a continuation of fiduciary and noncompete obligations that began before entry of the TRO. Jim started the new venture, and his investment sustains it. That alone violates Jim's obligations under the noncompete and the TRO.

Jim is also still personally involved in the venture. To date, Jim has produced only a few emails and text messages from after November 1. The limited documents he has produced from this time show he has continued to come into the office in Milford and communicate with employees. JDT continues to seek a complete production of documents from Jim and those in business with him. In the meantime, Jim's cell phone records help to fill in the gap. Beginning on September 30, the cell phone records show Jim engaged in regular—on some days, continuous—phone contact with former JDT employees and drivers, continuing into late November, when the current production comes to an end. [Ex. 25.] The record leaves no doubt that Jim is a participant in a trucking business which involves the same entities, employees, and drivers as he had with him at Daws Trucking, and with which he remains in regular communication.

## III. ARGUMENT

On October 30, 2024, this Court entered a TRO preventing Jim from engaging in the business of trucking, including any business venture with Jeremy Becker, and any provision of advice to his tenants. The documents produced by Defendants and facts that will be adduced at the hearing confirm that the Court's decision was correct and support converting the TRO to a preliminary injunction. Indeed, the evidence which has come to light since the TRO was entered show (1) Jim has violated the TRO and (2) the injunction should be clarified to prohibit Defendants, and those acting in concert with them, from engaging in the business of trucking without any qualification.

The documents Jim has now produced show he spent August and September trying to drive Rick and Ricky out of JDT. When that did not work, Jim announced his intention to resign, coordinated the resignation of nearly every employee of JDT, and made it possible for them to continue in the trucking business operating through other entities he owned. Jim's efforts to remain in the trucking business and compete with JDT were myriad. He recruited JDT's drivers, found loads for them to haul, solicited work from JDT's largest clients, continued to court Jeremy and pursue a business opportunity with Wayne and Lukas Schmeeckle, and set up a new trucking venture using a Loyal Trucking and JLD Truck Lines. On paper, Jim has converted his equity ownership in Loyal Trucking and JLD Truck Lines to debt; the companies now owe him principal and interest instead of dividends. But that does not change the fact that Jim maintains a direct financial interest in those trucking companies and that, through them, he is a participant in the business of trucking. This violates Jim's obligations under both the noncompete and the TRO.

The factors governing the entry of a preliminary injunction are (1) a threat of irreparable harm, (2) the balance of harm among the litigants, (3) the movant's likelihood of success on the merits, and (4) the public interest. *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113–14 (8th Cir. 1981). These factors strongly support the entry of a preliminary injunction to stop the competing venture Jim began while still employed by JDT, developed in the month prior to the TRO, and is probably still engaged in with loyal employees who left JDT with him.

A.    **JDT is likely to prevail on the merits of its claims.**

While no single factor is determinative, the movant's probability of success is the most significant. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). The moving party need not "prove a greater than fifty per cent likelihood that [it] will prevail on the merits." *Dataphase*, 640 F.2d at 113. Rather, it must demonstrate a "fair chance of prevailing." *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).

1.    **Jim's noncompete, which was entered into as part of the sale of a business, is reasonable and enforceable.**

The enforceability of a restrictive covenant is a legal question to be decided by the Court. *See ADT Sec. Servs., Inc. v. A/C Sec. Sys., Inc.*, 15 Neb. App. 666, 703-04, 736 N.W.2d 737, 769-70 (2007). Whether a restrictive covenant is enforceable (i.e., reasonable in time and scope) "is dependent upon the facts of each particular case." *ADT Sec. Servs., Inc.*, 15 Neb. App. at 704, 736 N.W.2d at 770.

In the employment context, absent confidentiality concerns, restrictive covenants are generally limited to restrictions on the solicitation of the employer's customers with whom the employee did business and had personal contact. *See, e.g., Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 668, 407 N.W.2d 751, 756 (1987).

In the context of the sale of a business, however, this limitation does not apply. *See H&R Block Tax Servs., Inc. v. Circle A Enter., Inc.*, 269 Neb. 411, 422, 693 N.W.2d 548, 556 (2005) ("Because we conclude that this franchise

agreement is akin to a sale of a business, the 'customer specific' rule articulated in [the employment] cases is not applicable."). To the contrary, "Nebraska courts are generally more willing to uphold promises to refrain from competition made in the context of the sale of goodwill as a business asset than those made in connection with contracts of employment." *H&R Block*, 269 Neb. at 417, 693 N.W.2d at 554. *See also CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 338, 518 N.W.2d 652, 655 (1994); *ADT Sec. Servs.*, 15 Neb. App. at 703, 736 N.W.2d at 770. Generally, in the case of a "covenant not to compete ancillary to the sale of a business, a restraint is enforceable if it is reasonable in both time and scope" viewed in the light of the interests transferred. *H&R Block*, 269 Neb. at 422, 693 N.W.2d at 557 (citing *Presto-X-Company v. Beller*, 253 Neb. 55, 63, 568 N.W.2d 235, 239 (1997)). Jim and Lana were paid over $10 million for the noncompete in the Asset Purchase Agreement. As the Court observed at the TRO hearing, the noncompete is very likely to be found enforceable under Nebraska law.

The facts here underscore why Nebraska law supports the enforceability of broad noncompetition agreements in connection with the sale of a business. In the asset purchase agreement, the parties allocated $4.5 million in value to goodwill, *i.e.*, Jim's reputation, experience, and knowledge in the industry. In his communications with Jeremy, Jim told Jeremy JDT wasn't worth as much without him. Jeremy repeatedly emphasized the value he placed on Jim's knowledge and reputation. What Jim did was take the reputation, knowledge, and experience he sold to JDT and use it to start a competing venture, in direct violation of the noncompete.

### 2.    As its employee, Jim also owed a duty of loyalty to JDT.

Jim also owed a duty of loyalty to JDT while he was employed by the company and drawing a salary of $90,000 per year. "Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his employment . . . irrespective of the existence of a covenant not to compete or nonsolicitation clause." *West Plains, L.L.C. v. Retzlaff Grain Co.*, 870 F.3d 774 (8th Cir. 2017) (citation omitted). To give rise to liability, the employee's disloyal conduct must be "so harmful as to substantially hinder the employer in the continuation of his business." *Id.* "Such conduct might include soliciting customers of the employer or forming one's own competition business while still working for the employer." *Id.* (citing *Buell, Winter, Mousel & Assocs., Inc. v. Perry Consulting Eng'rs, Inc.*, 277 Neb. 770, 420 N.W.2d 280, 283 (1988)).

### 3.    Jim breached his noncompete and duty of loyalty.

The evidence offered adduced in support of JDT's Motion for TRO has already established that Jim breached his duty of loyalty and his noncompete obligation. The evidence Jim has now produced put those breaches in sharper focus:

- In July, Jim held a "retirement" party. But he had no plans to resign. At the time of his party, Jim was courting Jeremy as a new employee of JDT. It is evident from Jim's communications that he was recruiting Jeremey for a management position. He did so without consulting Rick or Ricky. In fact, in August and September, Jim was

sharing with Jeremy his plans to try to buy out Rick and Ricky at a discount or to walk away from JDT. Jim and Jeremy shared a laugh over the text about the idea that Jim was planning to retire.

- In late September, while still employed by JDT, Jim coordinated a mass resignation that included most of JDT's employees and drivers. While Jim appears to have been careful not to communicate too much about this plan in writing, there was evident coordination. The employees loyal to him all resigned on the same day, many at the same exact time. On their last day at work, Jim sent an email with the subject line "Daws Trucking" to everyone so they would have each other's Gmail addresses. Out of approximately 80 drivers, roughly 30 remain with JDT. After they left, Jim continued to employ those loyal to him and to find work for them in the trucking industry.

- On their way out the door, in the days leading up to and including September 27, JDT employees loyal to Jim transferred numerous company files and confidential information to themselves, including JDT's financial records, equipment lists, depreciation schedules, driver information, the Daws Trucking logo, and many other corporate files. They also tried to delete emails, although their efforts were blocked by a litigation hold.

- In the month of October, Jim set up a competing trucking venture. In addition to employing former JDT staff, he persuaded most of the Daws Trucking drivers to stay with him. He found loads for those

drivers to haul from some of JDT's biggest customers. He encouraged them to make complaints about JDT and generally disrupt its business. He also continued to communicate with Jeremy about his joining the venture.

- In the Declaration he submitted in opposition to JDT's Motion for TRO, Jim tried to portray his conversations with Jeremy as "general advice" to a friend regarding "a new business he was considering opening with two individuals, Renee [sic] and Corey." [Filing No. 22-1 at 7, ¶ 36.] The documents Jim has now produced show this was a lie. The "new business" with Renae and Corey was an idea that came from Jim and an extension of Jim's efforts to recruit Jeremy prior to his resignation from JDT. Nor was there anything "general" about their discussions in October. Jim and Jeremy were discussing a specific plan, led by Jim, for Jeremy to join Jim's new business venture. This plan involved Wayne and Lukas Schmeeckle and discussions about the "Rick scenario."

- Jim's written communications with Jeremy seemingly came to a halt shortly after October 28, when Jim told Jeremy "[t]he enemy got your email from last week," Jeremy asked for news from Jim's legal team, and Jim replied, "Call me." [Ex. 22 at 2.]

- While Jim stated under penalty of perjury that Jeremy was considering a business venture with Corey and Ranae, it is clear the idea for that business combination came from Jim, not Jeremy. It was not until after the TRO was entered, on October 31, that Jim sent Jeremy's contact information to Corey and Ranae.

- In his Declaration, Jim stated "neither I nor my wife have, nor plan to have, an ownership interest in whatever business Mr. Becker was planning nor have we, nor will we, receive any payments for work for that business." [Filing No. 22-1 at 7, ¶ 35.] Viewed charitably toward Jim, this statement is a gross minimization of his involvement in the business venture. Viewed honestly, it is simply false. First, as noted above, the business venture was not planned solely by Jeremy. It was planned, first and foremost, by Jim. Second, based on the limited documents JDT has received in discovery so far, the venture involves several entities affiliated with Jim. The venture involves shipping freight using a DOT number owned by Loyal Trucking, a business Jim owned until October 29. The plan to use Loyal Trucking's DOT number came straight from Jim. [Ex. 19 at 2.]

- In addition, Jim failed to state he planned to retain a direct financial interest in both Loyal Trucking and JDT Truck Lines. The day before he executed his Declaration, Jim executed Redemption Agreements with Loyal Trucking and JLD Truck Lines. But almost no cash was paid to Jim. Instead, Loyal Trucking signed an unsecured promissory note to pay Jim $656,667 over five years, and JLD Truck Lines signed an unsecured note to pay him $457,000 over the same time. In other words, while Jim converted his equity interest to debt, he maintains a direct financial interest—to the tune of over $1.1 million—in the success of Loyal Trucking and JLD Truck Lines in the venture Jim launched them on.

- As he has done from the beginning, Jim has tried to minimize his obligations under the APA in general and the noncompete in particular. The noncompete is not limited to businesses in which Jim is an owner. It prevents Jim from engaging in the business of trucking, "**directly or indirectly**," as "an owner, part owner, manager, operator, employee, agent, or **other participant**." [Ex. 1 at ¶ 12 (emphasis added).] Jim was a participant in setting up the trucking venture being pursued by his former employees. He is also a direct participant in financing and operating it.

- While he was building a business to compete with JDT, Jim was also interfering with JDT's finances by refusing to grant JDT access to the bank account at American National Bank (ANB) that was used to operate its business. As of September 30, 2024, there was approximately $170,000 in the ANB account. In the last days Jim and Tony were with JDT, they refused to sign paperwork to allow Rick or Ricky authority over the ANB account. JDT funds have continued to flow into the ANB account since then, as JDT customers have paid via direct deposit. The ANB account was also used by JDT drivers to pay fuel and other expenses. But, in addition to wrongfully maintaining control over ANB's funds, Jim also instructed ANB to disallow automatic debits to the account, which had the effect of denying payment to JDT drivers and vendors. As of December 31, there was over $435,000 in the ANB account. Jim has thus used control over the account to deprive JDT of its operating cash and to prevent JDT from paying the expenses of its drivers.

**B.    JDT is suffering irreparable harm.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors. Corp. v. Harry Brown's, LLC*, 563 F. 3d 312, 319 (8th Cir. 2009). "To demonstrate a threat of irreparable harm, the harm must be 'certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Izabella HMC-MF, LLC v. Radisson Hotels Int'l, Inc.*, 378 F. Supp. 3d 775, 778 (D. Minn. 2019) (quoting *Roudachevski v. All-American Care Ctrs.*, Inc., 648 F. 3d 701, 706) (8th Cir. 2011)).

Harm to goodwill with staff and customers, and the threat of unrecoverable financial harm given the uncertainty of damage calculations, have been held to be irreparable harm. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F. 3d 737, 741 (8th Cir. 2002) (noting it is well established that the "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury."; *Iowa Utils. Bd. v. F.C.C.*, 109 F. 3d 418, 425 (8th Cir. 1996) (finding "the petitioners' potential loss of consumer goodwill qualifies as irreparable harm."); *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F. 3d 801, 805 (8th Cir. 2003) (finding that a franchisor was threatened with irreparable harm to its business reputation and goodwill); *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Asso.*, 744 F.2d 588, 591 (7th Cir. 1984) ("[T]he difficulties of proving lost profits . . . make it chancy to rely on a damage award to provide full compensation even where . . . a

preliminary injunction is not necessary to keep the plaintiff afloat while the suit is proceeding toward final judgment."); *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 874 (D. Minn. 2015) ("[L]ost profits that are difficult to quantify may constitute irreparable harm.").

Since September 27, 2024, JDT has lost almost all the office personnel employed by JDT, and of the approximately 80 drivers JDT had before that date, only roughly 30 remain. JDT needs drivers to drive trucks to generate revenue. By taking drivers with him, and continuing to stir discontent among drivers, Jim has caused JDT severe and irreparable harm.

Jim has also damaged JDT's customer relationships. From emails and text messages Jim produced, it is clear Jim was in contact with top customers of JDT and arranging for drivers loyal to him to haul loads. Witnesses will further testify that Jim's enterprise is currently hauling freight for JDT customers. This direct competition has caused and continues to cause irreparable harm.

The records produced by Jim show he was not only trying to build a business, but to harass and destroy JDT. He has come close to succeeding. Jim's breaches of fiduciary duty and breaches of his noncompete obligations have resulted in a catastrophic loss of revenue to JDT. It has been a daily struggle for Rick and Ricky to save the business they bought for over $10 million. Unless restrained by this Court, Jim's continued violations of the noncompete and his duty of loyalty will result in even more financial harm, including irreparable harm in the form of damage to customer and driver relationships and lost profits which case law recognizes are difficult to calculate in cases like this.

24

**C.    The harm to JDT outweighs any harm to Defendants.**

As outlined above, JDT has suffered grievous harm and stands to suffer still greater harm. Jim, in contrast, will suffer no harm from an injunction, even assuming he complies with it. Any "harm" Jim may claim to suffer if he is prohibited from carrying on a competing trucking business does not factor into the analysis. "Harm" suffered as the result of enforcing the non-competition provision is a harm Jim inflicted upon himself and does not provide a basis for denying relief. *See Jiffy Lube Int'l v. Weiss Bros.*, 834 F. Supp. 683, 693 (D.N.J. 1993) (holding that to the extent the defendants suffer damage from the granting of the preliminary injunction, "this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant.")

**D.    The public interest supports a temporary restraining order.**

"The Eighth Circuit Court of Appeals has recognized that 'the determination of where the public interest lies is also dependent on the determination of likelihood of success on the merits,' because it is in the public interest to protect rights." *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 80 F. Supp. 2d 953 (N.D. Iowa 2011) (quoting *Phelps–Roper v. Nixon*, 545 F. 3d 685, 690 (8th Cir. 2008). This general principle carries over to restrictive covenants, such as the non-competition provision at issue here: "It is as much a matter of public concern to see that valid [non-competition provisions] are observed as it is to frustrate oppressive ones." *Lockhart v. Home-Grown Indus. Of Ga., Inc.*, 2007 WL 2688551, at *6 (W.D.N.C. Sept. 10, 2007) (citation omitted).

The public interest further favors the entry of a TRO here. Jim and those loyal to him have tried to conceal their dishonest conduct by acting in secret to develop a business venture in clear violation of fiduciary and noncompete obligations. Jim was at best evasive in describing his ongoing business venture and plans to continue in business at the TRO hearing in October. And Jim has remained in near-daily communication with the competing venture he established in October, in clear violation of the noncompete and this Court's TRO. The public interest does not condone such conduct.

## V. CONCLUSION

For the foregoing reasons, JDT respectfully requests that the Court enter a Preliminary Injunction which, without qualification, prohibits Defendants and those acting in concert with them from carrying on any trucking business in the continental United States.

Dated January 10, 2025

JIM DAWS TRUCKING, LLC,
Plaintiff

By:   s/ *Andre R. Barry*
Andre R. Barry #22505
Henry L. Wiedrich #23696
Madeline C. Hasley #27870
CLINE WILLIAMS WRIGHT
JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
(402) 479-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com
mhasley@clinewilliams.com

## CERTIFICATE OF SERVICE

I, Andre R. Barry, hereby certify that on January 10, 2025, I electronically filed the foregoing with the Clerk of the United States District Court for the District of Nebraska using the CM/ECF system, which sent notification of such filing to all registered case participants.

s/ *Andre R. Barry*
Andre R. Barry

27