IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM DAWS TRUCKING, LLC, | ) | Case No. 4:24CV3177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | ) | |
| | ) | Lincoln, Nebraska |
| Defendants. | ) | October 30, 2024 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SUSAN M. BAZIS
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF: Mr. Andre R. Barry
Ms. Madeline C. Hasley
Cline Williams Law Firm
233 South 13th Street
1900 U.S. Bank Building
Lincoln, NE 68508-2095

FOR THE DEFENDANTS: Mr. Timothy J. Thalken
Fraser Stryker Law Firm
409 South 17th Street
Suite 500, Energy Plaza
Omaha, NE 68102

COURT REPORTER: Ms. Lisa Grimminger, RDR, CRR, CRC
100 Centennial Mall North
Room 587
Lincoln, NE 68508
(402) 437-1908

Proceedings recorded by mechanical stenography, transcript produced with computer.

(At 2:00 p.m. on October 30, 2024; with counsel for the parties and Mr. Ricardo Fernandez present:)

THE COURT: We are on the record in 4:24CV3177, Jim Daws Trucking versus Daws, Inc., et al. Will the attorneys for the plaintiff please enter their appearance for the record.

MR. BARRY: Andy Barry and Maddie Hasley for plaintiff, Jim Daws Trucking, LLC, Your Honor.

THE COURT: And for the defendant.

MR. THALKEN: Tim Thalken for the defendants.

THE COURT: All right. We are here in relation to the plaintiff's motion for temporary restraining order.

As I understand it, Mr. Barry, the two issues in regards to the temporary restraining order -- and you also have a motion for preliminary injunction, but obviously that will happen at a different day after some discovery. So in case I forget, everybody can remind me. We're going to deal with the other motions that are on -- that have been filed in regards to that prior to leaving here today.

But in regards to the motion for temporary restraining order, it's my understanding from the motion that for the temporary restraining order purposes only, which is the only thing we're talking about right now, it has to do with in regards to the defendant, Jim Daws in particular, violating the noncompetes and his duty of loyalty. Is that correct?

MR. BARRY: That's correct, Your Honor.

THE COURT: All right. It is your burden. Do you have any evidence you wish to present or want the Court to consider? I guess maybe what you have already filed.

MR. BARRY: We would ask the Court to consider the index -- all the evidence in the index that we filed already.

THE COURT: All right. So you're asking the Court to take judicial notice, I'm assuming, of the complaint and what's attached thereto, your motion for temporary restraining order, the brief in support -- the motion is 17, the brief in support is number 18 -- as well as your index of evidence, which is number 19. Is that correct?

MR. BARRY: Yes, Your Honor.

THE COURT: Any objection?

MR. THALKEN: We have a few objections to the specific statements in the declaration, evidentiary objections. I don't know if you want me to make those on the record or in writing later.

THE COURT: No. You can make them on the record.

MR. THALKEN: All right. I'll just go through this. So this is filing 19-1 for the Court's reference. Paragraph 11, we object to foundation, speculation --

THE COURT: Okay. Hold on one minute. Let me get there. Hold on. Computers are great when they're fast but not....

All right. Nineteen -- what did you say, 19-1?

MR. THALKEN: 19-1, paragraph 11, which is on page 3. And the objections are foundation, speculation, and legal conclusion.

THE COURT: Give it to me one more time. Foundation?

MR. THALKEN: Foundation, speculation, and a legal conclusion as to whether they're actively engaged in the trucking business and that they intend to do so.

THE COURT: Okay. All right. Next one.

MR. THALKEN: Next one is -- paragraph 25 is foundation.

THE COURT: I'm sorry. Twenty-five, what?

MR. THALKEN: Paragraph 25, I object on foundation.

THE COURT: Foundation? Okay. Next one.

MR. THALKEN: Paragraph 27, foundation and speculation. He states while the details aren't clear to me and then goes on to state what it appears to him to be.

THE COURT: Say that again.

MR. THALKEN: Yeah. So --

THE COURT: Can you talk into the microphone a little bit. Sorry.

MR. THALKEN: Sorry. Yeah.

THE COURT: It's so far. It's a little hard to hear.

MR. THALKEN: Paragraph 27, foundation and speculation as to the statement -- he leads off with "the details...aren't totally clear to me" but "it appears," and I

think he's speculating.

THE COURT: Okay. All right. Next one.

MR. THALKEN: Thirty, foundation as to the retirement party about what it appeared to have been when he admits he's never -- he didn't attend that party.

THE COURT: Okay. Next one.

MR. THALKEN: Thirty-five is hearsay. When he states, "We have heard from drivers who left JDT that they did so out of loyalty to Jim," that's hearsay.

THE COURT: Okay. Next one.

MR. THALKEN: Thirty-seven. We object on foundation as to two other employees who tried to delete their emails. I don't think this witness has personal knowledge of any of that.

THE COURT: Okay.

MR. THALKEN: At least --

THE COURT: All right. Next one.

MR. THALKEN: Forty-two, hearsay. "JDT's mechanic has told me," that's an out-of-court statement offered for the truth.

THE COURT: All right. Next one.

MR. THALKEN: And those are my objections.

THE COURT: All right. Mr. Barry, do you want to respond?

MR. BARRY: Yes, Your Honor.

THE COURT: And we'll just take them in order. The

first one is number 11.

MR. BARRY: Sure. Paragraph 11 isn't speculation or a legal conclusion. It is a summary of other factual assertions that come later in the declaration.

THE COURT: Okay.

MR. BARRY: You want me to just walk through them in order?

THE COURT: Yes.

MR. BARRY: Paragraph 25 similarly is a description of what's shown in subsequent paragraphs and exhibits to the declaration.

THE COURT: Okay. As to 27.

MR. BARRY: As to 27, I think that Mr. Fernandez, as owner of the company, has some leeway to draw conclusions about what he's seeing from the corporate records. That would go to the first sentence. The rest of the declaration isn't any type of an inference that he's drawing. He's stating as a matter of fact that JDT's largest account over the past two years involved the construction of that plant, and the ownership of Ranae and Lukas Schmeeckle obviously from the website is something that's observable to him. It's not speculation. And also he knows who they are by virtue of the fact that he's the owner of the company.

Paragraph 30, again, that's an inference I think he's entitled to draw from his ownership of the business.

Paragraph 35, statements by drivers. A statement of present state of mind or intent is an exception to the hearsay rule, so I don't think the hearsay exception -- or the hearsay objection there is well-founded.

Paragraph 37. Mr. Fernandez does have personal knowledge from his review of the emails on the server, which he also refers to in the declaration. He has personal knowledge of the deletion of those files or attempts to delete the files.

And again, paragraph 42, in terms of the hearsay objection, it's present sense impression of what the mechanic was observing at the time. I also think that there's some leeway in the context of a TRO hearing for hearsay just because of the speed at which things are moving.

Those are my responses.

THE COURT: All right. Anything further, Mr. Thalken?

MR. THALKEN: No, Your Honor.

THE COURT: All right. The defendants' objections to the index of evidence, which is document number 19, the Court will note those objections. However, they are overruled. I will say a couple of -- and I will take the statements for what they are worth. I understand all the arguments that you have made in reference to those. I do think since it is a TRO and obviously discovery has not occurred, there has to be a little bit of leeway.

Having said that, I do understand, appreciate, and will consider the defendants' objections to those where, for example, they may be assuming, but obviously we'll look at each individual sentence individually within those subparagraphs to determine whether those assumptions may or may not be appropriate, but I'll take those for whatever those are worth.

So the Court will take judicial notice of the complaint at number 1, the motion at 17, the brief at 18, and Exhibit 19 over the objection to those specific paragraphs from the defendants.

Any further evidence, Mr. Barry?

MR. BARRY: No, Your Honor.

THE COURT: All right. Mr. Thalken, any evidence you wish to present? And I'm assuming you may want me to take judicial notice of the -- let me refresh this -- your index of evidence in opposition to the plaintiff's motion at filing number 22.

MR. THALKEN: Correct. We would offer exhibit -- or filing 22.

THE COURT: Any objection?

MR. BARRY: With the understanding that the Court will take the same approach to that evidence as it takes to the plaintiff's evidence, no objection, Your Honor.

THE COURT: And the Court will do so.

Any further evidence, Mr. Thalken?

MR. THALKEN: No, Your Honor.

THE COURT: All right. Argument, Mr. Barry.

MR. BARRY: Thank you, Your Honor.

As you mentioned, there are two -- well, the purpose of a temporary restraining order is to prevent additional irreparable harm between now and the time the Court can hear the motion for preliminary injunction, and we think that that is a necessity in this case.

You accurately stated the two main legal issues raised by the motion. One is violations of the noncompete agreement. The other is violations of the duty of loyalty. On the noncompete agreement, I want to look to the language, which is very broad, and I would say I think that Mr. Daws' declaration which has been offered admits ongoing violations of the noncompete agreement. So the noncompete is at paragraph 12. It's not -- that's a purchase agreement. It's paragraph 12 of the Asset Purchase Agreement, which doesn't have page numbers.

But, Your Honor, when you look at that, it says, "Seller agrees," and the seller here includes both Jim and Lana Daws, because they both signed the agreement. That's referred to later. But "Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as owner, part owner, manager" -- and I want to say "part owner" because Jim is a part owner of these companies, but it's clearly covered there -- "manager, operator, employee, agent, or other

participant" -- and I looked up "participant" in the dictionary before coming over here. It means to take part in. -- "the business of trucking in the continental United States...for a period of no less than five years from the date of this Agreement." That's the noncompete agreement.

The declaration of Jim Daws admits that through companies JDL -- or sorry, JLD and Loyal Trucking, he's clearly engaged in the business of trucking by leasing trucks actively, and he admits in his declaration that he's earning substantial income weekly from those activities and apparently has no intention of stopping engaging in those activities. So I think that's a clear violation of the noncompete agreement.

Also, with respect to CTL, which is a broker -- and I understand there may be some argument about, well, is it broker or the business of trucking? Let me back up. I think clearly leasing trucks to other drivers so that you can make money as those drivers drive those trucks in commerce, that's the business of trucking. When it comes to CTL, that's brokering. So is brokering the business of trucking or not? It may be a little bit vaguer there, but I think there are three important things to keep in mind.

Jim admits in his declaration that he was running all of these businesses at the same time out of Daws, Inc. Clearly, a brokerage firm gives him the ability to steer business to other trucking companies he owns, JLD and Loyal Trucking. In

addition, as Mr. Fernandez states in his declaration, JDT was paying the employees of CTL. They were JDT employees while this was going on, so it isn't like there's a clear separation between these two businesses even at the employment level.

And then we'll get to this in a minute when it comes to the corporate opportunity, but in the second email from Jeremy Becker, the October 22nd email, Jeremy specifically asks about CTL. So we believe that a temporary restraining order to prevent violations of the noncompete should apply to Jim Daws individually, and then under Rule 65, that extends to anyone participating with him or acting in concert with him, which would clearly include anything Jim does through any of these businesses.

On the issue of the corporate opportunity, we have a declaration now from Jim Daws that I view as largely a kid with his hand getting caught in the cookie jar declaration trying to come up with some revisionist history as to what happened. But I want to start with the email from October 22nd of 2024 and just spend some time with that. The attempt here on Jim's part is to say, well, Jeremy Becker was just asking for some general advice. I think in Mr. Thalken's email it was like he was just offering tips to Jeremy Becker. That's all that was going on.

That's not the way the email reads. If you actually read the email, it starts, "Naturally, with things starting to show positive" inquiry, "I have inquiry" -- sorry, "positive entry,

I have inquiry." What's starting to show positive entry? That entry, that would indicate that there's some business activity that Jeremy's interested in. He says -- then he goes on to state, "As things stay moving." It looks like Jim was trying to speak with Jeremy over the phone, maybe to avoid trading documents, but Jeremy says, "I wanted to get it down on paper so you could read them and allows me to elaborate a little better."

The structure of this venture, which is what Jeremy refers to it as, is clearly part of the vision of Jim Daws. If you look at paragraph 3, "Tell me more about how you see ownership among Renee, Corey, and myself." Then this involves leasing property, but this isn't just bare property. It's an outfitted shop and office that's ready to be -- it's ready for the trucking industry. That is clearly part of the plan.

And Jeremy says, "You get your property back on Oct 31." "Do you figure to move back into that property as fast as you can to help expedite our venture," so clearly participation in that venture with Jeremy Becker. He says, "Walking me through this is worth its weight in gold...I want to work with you moving forward...I don't have much anxiety because I believe in the way we make this work." It's clear that Jim is integral to that despite what he's saying in his declaration, and the idea that this started only in October is belied by the email from July.

Now, Jim is saying, well, this was just an employment inquiry. It never actually went anywhere. Well, it didn't have an opportunity to go anywhere because the deal that Jim was trying to strike with Rick to take the money -- the company back for virtually nothing didn't materialize and Jim walked out of the business with all the employees, so now they're doing it outside of JDT. But that doesn't change the fact that in the July 23rd email, it was Jim who reached out to Jeremy.

And again, this wasn't just a casual inquiry. They talk about a nondisclosure agreement at the time. All this goes back to the time Jim was employed at the company. And if you go back and look at the *Retzlaff Grain* case, it's a clear violation of the duty of loyalty, and the continued pursuit of that is a continued breach, and it's causing continuing harm to JDT.

There have been some arguments in correspondence we don't have a brief yet about, you know, complaining about the breadth of the noncompete. The law is clear that in the sale of a business, particularly a business that sold for -- you know, the purchase price was $12 million. Rick has paid 10 million, and the goodwill was valued at 4.5 million. That's more than enough to support the breadth of this noncompete.

And last, the ongoing activities of Jim through these companies and with Jeremy Becker is -- and Rick outlines this in his declaration, and there hasn't been any objection to it

or any attempt to refute it. It's destroying the value of JDT. It's destroying the value of the business that he bought. It's doing it in multiple ways, but the most important way is with drivers. If these drivers who are loyal to Jim can keep driving with him through his other entities, if there's a business opportunity for them through this deal with Wayne and Lukas Schmeeckle -- and I would note just parenthetically, there was no effort in Jim's declaration to deny that there was a business opportunity to haul for Sustainable Beef and Wayne and Lukas Schmeeckle, none whatsoever.

But under either one of those two things, the corporate opportunity that's being pursued with Jeremy or just trucking, that starves JDT of the drivers it needs to generate income and stay in business, and it threatens the ability of JDT to stay alive even until there is a preliminary injunction hearing in this case. And so for that reason we think we've clearly met the standard for issuance of a TRO until there can be a preliminary injunction hearing.

THE COURT: So just -- I just want to be clear so defendants can respond to all of this. At the end of the day, what you want this Court to do is enter a TRO providing that Jim or anyone who is affiliated with -- well, number one, not to pursue any or be involved with any plan, opportunity in regards to Jeremy Becker, whatever that is, not to be involved in that or anything else that may have been as a result of his

employment contact at JDT, number one.

Number two, that he not be able to participate in any way in regards to, I think -- is it the three other companies, the CTL, Loyal Trucking, and JL Trucking?

MR. BARRY: I think there's another entity also called HJ that's involved here. I'm not sure exactly what his involvement in it is. But certainly in any other ways mentioned in the noncompete, and it would apply to any other company. Those are just the ones we know about. But yes, Your Honor.

THE COURT: All right. And then as far as his duty of loyalty pertaining to him, if he was allowed -- I mean, obviously, if he couldn't participate in his other corporations, then that's done. But if he was allowed to do that, to not either use -- use any of the drivers that were employed by JDT. Is that right?

MR. BARRY: That's right, Your Honor.

THE COURT: Okay. Anything else? Anything I'm missing?

MR. BARRY: The only other thing would be J & L, which owns the property and has a truck shop and office, to lease that as a facility, as a trucking facility, and then to show up on the property, provide input, advice, you know, management, consulting, in other words, to participate in any way, would also be a violation of the noncompete.

THE COURT: So is your issue that he shouldn't be able to lease to a trucking company yet? But I think that's what that property is for. Or is it more that if he leases it, that may be okay, but he can't go and participate, give advice, or do anything in that regards to help whatever business goes in there?

MR. BARRY: I think the latter is clearly prohibited. The first one I think is arguably prohibited, but it's a closer call. And certainly, if it involves Jeremy Becker, it would be prohibited.

THE COURT: Right, right, right, right.

All right. Mr. Thalken, argument.

MR. THALKEN: Thank you, Your Honor.

Let me address the duty of loyalty issue first, since that's kind of where we left off.

First, there's a factual issue here, which is Mr. Becker's emails show that there is no such business and that Jim isn't involved in it. If you look at the October email, which is filing 19-9, at paragraph 3, "Tell me more about how you see ownership among Renee, Corey, and myself," Mr. Becker. Not Jim Daws. And so the ownership of this company, if it ever comes to be, does not involve Mr. Daws.

Mr. Daws testified in his declaration he's not involved in that company. He has received no payment related to that company, and he has no plans to receive payment from that

company and so -- and furthermore, this is an October email. This was a week ago. Mr. Daws hasn't worked for JDT since September 30. There's no ongoing duty of loyalty after he leaves. So to the extent they're saying under the duty of loyalty, he should be enjoined from what he testifies to, which is he's known Mr. Becker for 30 years, I mean, he's a lifelong friend of him. And I'll provide a declaration when we get to the preliminary injunction stage, but my understanding is Mr. Daws has been friends with Mr. Becker's parents for a long time. They grew up together or in the same area.

And so if you look at what he says in this, he's saying, hey, Jim, you know, if I want to finance -- purchase a truck, should I go through the manufacturer, or should I go through the bank? Should I -- when you account for trucks, do you do it on a weekly or a monthly basis? Would it be better to take on a private investor -- or a loan from a private individual or a loan from a bank? These are general pieces of advice about a business. This is not a competition. Jim is getting nothing out of this other than he's talking to a friend about these issues.

He's testified he's not an owner, he's not a part owner, manager, operator, employee, agent, or any other participant in whatever business Mr. Becker is planning, and he's received no remuneration. So neither the noncompete agreement, which I'll address later, nor the duty of loyalty says that Mr. Daws can't

talk to his friend about trucking. And then I think that goes beyond this to show just how broad they're claiming this noncompete is, and I'll address that in a little bit. But aside from that, so that's the factual issue about Mr. Becker.

But let's talk about the general argument. So their second part of their motion is prevent Mr. Daws from pursuing any business opportunity that was presented to Jim while he was employed by JDT. Well, what does that mean? That is incredibly vague. Rule 65, 65(d)(1)(B) and (C), requires that every injunction must state its terms specifically and describe in reasonable detail and not by referring to the complaint or other document the act or acts restrained or required.

And I know we haven't had the chance to brief this yet. We will in our preliminary injunction. But I direct the Court's attention to *Calvin Klein vs. Parfums*. It's an Eighth Circuit case, 824 F.2d. 665. And what the Eighth Circuit held is that broad language in an injunction that essentially requires a party to obey the law in the future is not encouraged and may be struck from an order for injunctive relief, for it is basic to the intent of Rule 65(d) that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.

In other words, Your Honor, there's a line of case law in the Eighth Circuit that says you can't issue an injunction to

say "follow the law," and that's what that first part of their second request is. It's you have a duty of loyalty and so -- to not take corporate opportunities, so follow the law. I mean, they don't have any specifics other than the Jeremy Becker situation. In the Jeremy Becker situation, Mr. Daws says, "I'm not involved in that."

Look at the -- and then if you go back to the July 23 email, I think Mr. Barry said that Jim instigated that. If you could go back, I think the first email is from Jeremy. It's not from Jim. And again, this is in the context of Jim was negotiating to buy back the assets of this company, and Jeremy approached him, saying, hey, is there an opportunity for me in this business? That's all it is. Is he prohibited from -- in the midst of a negotiation to talk to people about, well, if I buy it back, can you work for me? There's no allegation Mr. Becker works for him. Mr. Daws denies it, and so there's just nothing there on a factual basis for the duty of loyalty.

And the relief that they want, the TRO that they want, is incredibly vague. Don't take any corporate opportunity. That's a -- you're enjoined from taking any corporate opportunity. Well, what are you talking about? How is my client supposed to respond to that under penalty of contempt of court? Because the next thing, they'll come in -- and we'll see it later, where there's all these other companies here and you're taking corporate opportunities, even though these

companies have existed for years, were not sold as part of this deal.

That's the issue here is that Jim Daws Trucking thinks they own the world now. They own the world of trucking, the business of trucking. They think they bought everything. But look at the Asset Purchase Agreement. It's with Daws, Inc. It's got a schedule of what was sold. It's an asset agreement. They didn't buy the company. They didn't own the stock. They bought assets, and now they're saying, well, we own everything, and you can't do anything.

Your Honor, it shouldn't be lost on the Court that in Mr. Fernandez's affidavit he points out that JDT has taken the server of the company. They've had the server for a month. These are the two emails that they came in -- this is the smoking gun that they've come in -- this is all their evidence of competition or a duty of loyalty after having the server and all the emails for a month? We don't have anything. We've been locked out. They have all the evidence, and this is what they come up with. It's -- frankly, it's weak, and it's not grounds for a temporary restraining order.

With respect to the noncompete, Mr. Barry started by saying what I think is apparent on its face. The noncompete is broad, but it's not just broad. It is overly broad. And what the case law says in *Presto-X* and in *H&R Block* is that a noncompete agreement can be -- even in the sale of a business,

a sale of goodwill can be no greater than necessary to obtain its purpose.

In *H&R Block* -- this is 693 N.W.2d. 548 -- the Nebraska Supreme Court held any restraint may also go only so far as it is necessary to protect the buyer in the enjoinment of the goodwill for which he pays. So the inquiry for the Court, I think, at the first stage is, well, what did they buy? What did JDT buy here? Well, what we know, what Daws did before. It was a flatbed trucking company. That is a niche market, and that's what they bought. So to the extent that the goodwill was, you know, what Daws had, it was a niche market with a flatbed trucking company. They have now taken that to say you cannot compete in the, quote, business of trucking anywhere in the Continental United States for five years. That is greater than is necessary to protect the goodwill that they bought, which is a flatbed company, a flatbed hauling company.

A couple of examples, Your Honor. Well, one other legal issue. Under the Nebraska -- under Nebraska standard and *Presto-X*, if a noncompete agreement is greater than is necessary, it is invalid and void against public policy. That's not just in employment contracts. That's in a sale, a contract for a sale involving goodwill. The Court doesn't rewrite it. The Court doesn't narrow it. The Court says it's too broad. Too bad. That's the situation here.

I think at some point plaintiff's brief said, well, that

was drafted by Mr. Daws's lawyer. Again, look at the APA. It's paragraph 19. It says that the plaintiff had Clayton J. Springer, Attorney-at-Law at Rock Fusco & Connelly, as their lawyer. This is not, you know, construed against Jim Daws, because their lawyer drafted it. They had their lawyer. They looked at it, and they agreed to this overly broad noncompete, and now they want to try to enforce it when it is unenforceable.

So, Your Honor, big picture. What is the business that JDT needs protection from competition in? It's the flatbed hauling; right? That's the company, if you will, that they bought or the assets that they've bought, the goodwill that they bought. But think about these hypotheticals. Again, they've said, full stop, you are prohibited from engaging, participating in truck -- in the trucking business in the Continental United States. Jim has a CDL. He's a commercial driver. He drives truck. He drove truck when he was managing JDT, like, 60,000 miles. He loves driving truck.

If you -- if the Court were to accept the plaintiff's theory, Mr. Daws would be prevented from driving a reefer truck. JDT doesn't own any reefer trucks. It only owns flatbeds. It's a different market. He couldn't drive tanker trucks or drive trucks. That is incredibly broad, because they're over-reading the business of trucking. That's not what JDT did. It did flatbed hauling.

Second hypothetical. We all know Werner Enterprises. Nebraska company, big trucking company, publicly traded. What if Mr. Daws buys stock in that company? He's now a part owner of the company in a trucking business. That's crazy. That isn't competition. They don't need -- they don't need a restraint on trade to keep Jim from owning stock at Werner. They don't need a restraint on trade to keep Jim from driving a refrigerated truck, which is a market they don't operate in.

Those are two examples, hypothetical, maybe a little bit broader than what they're saying, but the point is their interpretation is so broad. It is so much greater than necessary.

So let's talk about real world, because these are the specifics that they allege. Mr. Daws has had an ownership interest in Columbus Transportation & Logistics. It's a brokerage. It doesn't haul any freight. It doesn't have any drivers. It brokers freight. Plaintiffs are contending that Mr. Daws, who has operated this company for long before the APA -- and this company was not sold in the APA -- is prohibited from doing that. That is broader than is necessary.

Mr. Daws has ownership interest in companies that own trucks and lease them to third parties, not a business JDT was in. JDT doesn't lease trucks to anybody. Plaintiffs say, well, that's the business of trucking. You're out. Too broad, Your Honor. That is not the competition that this was designed

to protect against. There really is -- and I think Mr. Barry would agree with me on this. Not to criticize other lawyers -- neither of our firms are involved in this -- this APA wasn't well drafted and it wasn't well thought out. It's too broad. It's far greater than is necessary with respect to the noncompete, and under Nebraska law it is void against public policy. Why that matters, Your Honor, is the plaintiff has to prove in this motion a likelihood of success on the merits to be entitled to a TRO. If the noncompete is not enforceable, if it's void, they can't meet that burden, and they haven't.

Lastly, Your Honor, an issue that hasn't been addressed. It's pretty clear that the plaintiff is trying to put all these other businesses out of business, and Mr. Daws submitted in his affidavit kind of what the revenue of those companies are. Again, Mr. Daws doesn't own all these companies. He's a third owner of one of the leasing companies, is a half owner. This has effects far beyond Mr. Daws, and so if they -- they are required by Rule 65 to post security in order to get a TRO.

So if there's going to be security issued here, we've given you the numbers of what, you know, we could expect of revenue, and we would ask that the plaintiff be forced to post a bond of $150,000 before the TRO takes effect. And then we will revisit that issue if the Court grants a TRO at the preliminary injunction, and we'll ask for a whole lot more money, because they're going to put these companies out of

business. And that's, I think, what they're trying to do even though these other companies have operated for years. We think they knew about them and didn't say anything until now. There's this breakup, and they're saying, oh, it's competition, you know, you're killing us.

I think there's reasons that Mr. Fernandez may be having problems. Part of it was I think he announced to at least some people he was moving the operations to Illinois. Employees probably don't like that a whole lot. And so there are other issues going on here, Your Honor, and they're trying to blame it on Mr. Daws. Mr. Daws isn't doing anything in violation of any of these agreements. The agreement, the covenant not to compete, is not -- or is greater than is necessary to protect JDT's interest; therefore, it's void and unenforceable, and the TRO should be denied.

THE COURT: All right. Thank you.

Mr. Barry, a couple questions. And I will allow you to respond, but I have a couple questions, and then I'll probably allow each side to respond.

So as to Mr. Daws, Jim Daws, the other companies that he had, was your client aware of those companies that he had, these other companies, at the time of the asset purchase -- the purchase of -- that we're dealing with in this case?

MR. BARRY: My understanding is that at the time of the Asset Purchase Agreement, they're looking at the assets.

Jim says, yeah, I've got a couple of other companies. They own a few trucks that are used in connection with the business. Is that okay? Rick says that's fine.

Over the course of time, it turns out, number one, that he owned more than he had represented. Two, this was unbeknownst to Rick until the very end: He was having the company sell trucks that were -- that it owned to his own entities where he could make more money if he was owning them personally than the company could. But third, all of that that was happening, even though I think there are problems with the way he was doing it, he was -- the trucks were being run in connection with the business of JDT. It's obviously a fundamental change in what's happened after September 30th.

THE COURT: And what do you mean by that, that they were "run in connection with"? What do you mean exactly by that?

MR. BARRY: I mean they're hauling freight for JDT. And the payouts are different depending on who owns the truck, whether it's an independent contractor agreement or an employee, but this is -- these are jobs that JDT has. Drivers are being paid something, owners are being paid something, but ultimately all of it, it flows down in some way to the bottom line of JDT.

THE COURT: Okay. So --

MR. BARRY: They're not competing businesses.

THE COURT: All right. So -- well, okay. They're not competing businesses in that they're not transporting freight, but whoever -- but Mr. Daws may -- his other company, were they leasing trucks to JDT?

MR. BARRY: Yes, and they're transporting freight.

THE COURT: Right. I mean, they're transporting freight, but I mean his -- I guess I just want to clarify what you said, that we're not competing companies which -- well, let's start here, 'cause I want to make sure I have a clear picture of what each of these companies is doing.

So in regards to JDT Trucking, they're obviously transporting freight. But how does it come about that they're transporting it, meaning do they have another company that arranges -- that calls and says, "We need this freight picked up," and then they go and do that, or is JDT trying to generate that business themselves?

MR. BARRY: Your Honor, can I propose this? I have Mr. Fernandez here. I think he can answer these questions much better than I can.

THE COURT: Sure.

MR. BARRY: And I would be willing to have him sworn in and answer your questions, assuming the lawyers could ask follow-up questions.

THE COURT: Sure.

Mr. Thalken.

MR. THALKEN: That's acceptable.

THE COURT: All right. Raise your right hand, sir.

(Mr. Fernandez sworn.)

THE COURT: All right. So how did your company work -- or JDT work?

MR. FERNANDEZ: So JDT is a flatbed trucking company, as described.

MR. BARRY: Slow down a little bit for the court reporter.

MR. FERNANDEZ: I'm sorry.

THE COURT: That's okay.

MR. FERNANDEZ: Jim Daws Trucking Company is a flatbed trucking company, as they described. It's in the business of hauling specialized flatbed freight. Within that company you have three levels of revenue stream. One is the owner operators, people that own trucks, that lease themselves onto the trucking company. The other, the company owns trucks that employs drivers. The third is the company owns trucks that sometimes leases them to drivers. All those create a revenue stream.

In this instance JDT bought the entire company with all its owner operators. At the time JDT was about 60 percent company truck and about 40 percent owner operators. Those were true owner operators, at least I thought. Twenty percent of them were only true owner operators. The other 20 percent was

owned by affiliates to Jim Daws. At the time there were approximately, as he described, 12 trucks that were owned by affiliates of Jim Daws. In two and a half years, as disclosed in the memo, that escalated to almost 30-some odd trucks. Thirty-eight, I believe it was. That in its entirety is a functional system.

The problem becomes as the ownership affiliates are actually other employees of Jim Daws Trucking and they grew, escalated, the concern for any trucking company that has multiple operations working within the operation is at any time they can take their bat and ball and go across the street, collapsing the company. Plain and simple. Where the issue becomes is that where you involve a broker. Trucking companies deliberately do not use brokers to identify themselves with the same name.

Brokers are much -- what used to be simply described as travel agents. They are in the business of soliciting freight and disseminating it between alternate trucking companies. They call in the same customers, but they have the ability to give it to whoever they want. The reason they don't carry the same name is because most manufacturers -- or most people that you haul for don't necessarily like to engage with dealing with brokers. They like to deal with the company themselves.

The problem with our situation was Jim mentioned that it was a minimal part. In fact, he thought he was going to close

it. And I said, "Are you sure?" He said yes. The problem was the business grew, and all the trucking companies, the multitude of trucking companies working underneath Jim Daws Trucking, kept growing. The employees that did the payroll, that did the financials, that paid the drivers, all the inner workings of the back office functionality was being paid by me. Jim only shared in the profit. I shared in all the expenses. Plain and simple, I paid all the debt. And when you have a factory that owns nothing but machinery and everybody leaves and loses its customers, all you own is the debt.

THE COURT: One question I have is those that are the owner and operators, then, were those independent contractor agreements, then?

MR. FERNANDEZ: It's the same thing.

THE COURT: Okay. I just want to make sure. That's what I was assuming, but I wanted to make sure so...and I don't know if you know the answer to this but -- so when Jim was there working -- and obviously he had the brokerage company. That's a separate company that apparently was working out of the same space. Then is he -- was he using that brokerage company for JDT to get business?

MR. FERNANDEZ: He used -- so brokerage companies catch whatever business the company cannot do. That's what it's designed to do.

THE COURT: Oh, okay. So it's like the owner --

MR. FERNANDEZ: So if a customer wants 50 loads picked up and you only have 30 trucks --

(Court reporter requested clarification.)

MR. FERNANDEZ: I'm sorry. If a company has 50 loads to pick up and you only have 30 trucks, 20 go to the brokerage.

THE COURT: Okay. Because they want to -- because companies just want to work --

MR. FERNANDEZ: They want to satisfy the customers' needs.

THE COURT: We can't talk at the same time 'cause she --

MR. FERNANDEZ: Apologies.

THE COURT: -- can't do both. Sorry. And I'm sure you're nervous.

But because companies want to work with the transportation companies themselves rather than brokerage houses, basically?

MR. FERNANDEZ: Correct.

THE COURT: Okay. So the drivers that left -- because I know you had 80, and now you're down to about 30. So the drivers that left, were the majority of those independent contractors or were they employees or a combination of both, if you know?

MR. FERNANDEZ: They were independent contractors as far as we knew, only later to find out that some of them had trucks purchased for them by Mr. Daws. The way they ran the

employee scenario was that owner operators -- people that owned their own truck -- owner operators bought multiple trucks and declared them as company drivers when they filled those trucks, and all that expense of treating them as a company driver was funneled through the company. Or facilitated through the company. I shouldn't say "funneled." Facilitated.

THE COURT: Okay.

MR. FERNANDEZ: So that the illusion -- or not the illusion, but the fact that they would -- the company looked like it contained a lot of company drivers when, in fact, they were companies within companies that owned trucks. That ultimately did yield to the bottom line. But when you keep increasing that way, you have to bring in more fixed assets, flatbeds, 'cause they only owned the front part the tractor. They don't own the flatbeds.

THE COURT: Oh. So when you're talking truck ownership, you're just talking the front part?

MR. FERNANDEZ: Trucks. They do not own the back part. They make -- they shouldn't be able to make -- the company is responsible for maintaining and purchasing one of the most expensive components of the business. When they leave, they don't leave with their whole truck. They leave the back part, which happens to be more than 50 percent of the debt.

THE COURT: Is what?

MR. FERNANDEZ: Fifty percent of the debt.

THE COURT: Got it.

Okay. All right. Mr. Barry, any follow-up questions?

MR. BARRY: No, Your Honor.

THE COURT: Mr. Thalken, any --

MR. THALKEN: No, Your Honor.

THE COURT: Okay. So then, Mr. Thalken, so then my question to you is -- so now I kind of understand the brokerage part of it. But your client has two other companies, one which owns and leases tractors and trailers to third parties, and it sounds like maybe he was leasing those trucks to drivers based on -- at JDT. But just putting that aside, how does that -- do you know how that works for him? Meaning somebody wants a truck, so then they come and lease it from him, but he doesn't know what they're loading, what they're -- or what they're going to haul in regards to that?

MR. THALKEN: My understanding is pretty limited. Again, this motion was filed yesterday.

THE COURT: True.

MR. THALKEN: But my understanding from Mr. Daws's affidavit or his declaration is, yes, they own tractors and trailers and they would lease it to third parties. That's it. I don't know who they hauled for. Whether they hauled for JDT or other entities, I don't -- I don't know on this record. All I know is he was a partner with essentially two or three other

people to buy trucks and lease them to third parties. I don't think that's a trucking business. I think that's a leasing business.

THE COURT: And then J & L Trucking, which owned the real estate and the shop, we've talked about that. Do you know anything about HJ --

MR. THALKEN: I don't right offhand. I know that that is an entity. I'm assuming it's another partner. I think it may be another leasing company, but I don't want to speculate. J & L, Your Honor, I probably didn't address, but again, this is real estate. They could have bought the assets if they wanted to. They didn't, and now they're saying we can't even lease it to another trucking company, real estate. I mean, JDT isn't a real estate company. That's not the business, and real estate isn't the business of trucking. Again, it shows how overly broad their request is and why it's unenforceable.

THE COURT: Mr. Barry, anything else?

MR. BARRY: Really briefly, Your Honor. If you take a look at the Asset Purchase Agreement, as I think Mr. Fernandez referred to, the purchase was of the business as a going concern. That's in the first half of the first page of the Asset Purchase Agreement.

Mr. Thalken mentioned part of the standard on noncompetes and the sale of business. I think the most important legal

standard in Nebraska law comes from the *Swingle* case. It is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area and then use the funds thus obtained to do the very thing that contract prohibits. I think that's what we're dealing with here.

The reasonableness question in terms of, well, is this limited to flatbed trucking? Is it somehow unreasonable for the noncompete not to be limited to flatbed trucking? I don't think we're at the point where legally the Court could determine that's unreasonable, and I believe it's patently reasonable for it to be broader than just the specialized part of trucking. And that's highlighted by one of Jeremy Becker's emails, his email from October 22nd. He's over and over again mentioning the value that he gets from Jim Daws, both from his reputation and his knowledge.

He never says "flatbed trucking." He says "trucking." And Jeremy is someone who's been in the trucking business for maybe his whole career. He's a chief revenue officer at Kirsch Trucking, so there's -- it was reasonable for the parties to agree to a broader noncompete, because without it Rick doesn't get the benefit of the goodwill that he's purchased.

The relationship, this isn't just -- also this isn't just about, like, well, what's your general advice on how a company like this should finance buying trucks? It actually deals --

the email, again, deals specifically with Jim's relationships. He's talking about, well, would we get investment from Wayne Schmeeckle, or would we go to a bank? Maybe I'd like Wayne. But he says, "However, I am very observant of your solid relationships." This isn't what kind of advice Jim would give. This is a specific, specific relationship.

Just really quickly on the point of who initiated what, again, if you go to Jeremy Becker's email, July 23rd, 2024, it starts out, "Jim, first and foremost, thank you for thinking of me when it comes to showing an opportunity at a respected company you have built." Again, the instigation on all of this comes from Jim.

On the point about under Rule 65, how specific does the language need to be, I take Mr. Thalken's point on that. We're in a difficult position because we don't know what Jim has been doing, so it's difficult to propose clear language. Clearly, I mean, in our view it would be a breach if he's pursuing other corporate opportunities, but at a minimum the injunction ought to address this, whatever's being discussed with Jeremy Becker. I think that can be delineated clearly.

That's all I have, Your Honor.

THE COURT: Anything else, Mr. Thalken?

MR. THALKEN: We don't know what Jim's doing. That's the problem why there shouldn't be a TRO, because there isn't any evidence of what he's doing. If they're saying, well, in

general he shouldn't compete with us, or he should have been loyal to us and he shouldn't take corporate opportunities, how am I supposed to tell my client you're enjoined from taking corporate opportunity? Well, what does that mean, Tim? I don't know. That's why this is so vague and an injunction is not proper here, or at least a TRO.

THE COURT: All right. The Court's going to consider the matter submitted. The issue is -- and this is part of the problem with TROs are that discovery hasn't been done so we don't concretely know, and so that's why the burden is high in order to get a TRO, because it can prevent someone from doing something, whatever that may be. The point is well taken, though, that the Court has to have the ability to describe in sufficient detail for the party that a TRO is going against to know what he or she can and cannot do. And obviously in regards to the TRO, the Court has to balance irreparable harm, the likely *[sic]* to succeed on the merits, the balance of hardships, and the public interest factor.

We do have a noncompete at play. I do not think that it's appropriate without all of the evidence, which we don't have and we would have at a preliminary injunction, to say whether it is too broad or not, because in this case it's not -- in this Court's mind, it's not clear it is. It's not clear that it's not. It's more clear at this point that it's probably enforceable or potentially enforceable because, as the cases in

Nebraska have cited, a covenant not to compete in regards to the sale of a business and that goodwill transfer of assets, it is -- it would be unreasonable -- well, they're treated differently.

And the reason for that is, is that -- and the courts have been more willing to uphold those types of noncompetes because it would, quite frankly, make no sense to include it into an agreement. I mean, the whole point of the agreement of purchasing a business and having that included in the contract is so the seller cannot just then turn around and go out and directly compete against the individual who bought their business, and so they are treated differently.

Now, I don't disagree. I'm not so sure that this whole agreement was not drafted all that well. From one respect it is not limited to flatbed trucks. It doesn't say "flatbed trucks." It says "trucking." So it is not limited in that way, and both people were represented by counsel, and if they wanted it that way, then it could have been included, and it was not. So it's the business of trucking. It doesn't say "flatbed trucking."

In addition, for the defendant to come in and say that it shouldn't apply at all when he had his own lawyer, he agreed to this, he signed off on it, is a little disingenuous. I understand the parties' arguments, and obviously I'm not making any determination whether it will be enforced or not, but

clearly there is case law to substantiate that they should when it is the purchase of a business. And I understand all of the requirements that are required, and it can only be no greater than necessary to achieve the goal, and the goal is not to have direct competing trucking companies.

So the Court does find that -- and I don't have to find it's 100 percent chance. I don't even have to find it's a 50 percent in a TRO, but there's a fair chance that they may likely succeed on the merits in regards to the noncompete.

Now, the question becomes, obviously for the Court, what I do with that. Now, here's what I will say in regards to Mr. Becker. And I realize it's Mr. Becker writing the email and not Mr. Daws, but what he does say which is compelling -- and just so everybody knows, I've read all the evidence that was submitted, so I read both of these emails prior to today. And it is, "Do you figure to move back into the property as fast as you can to help expedite our venture?" "Our venture." So that implies to me, which maybe I'll be proven wrong later, but that implies to me that Mr. Daws was involved in this venture, and it seems to me that it is more than just his expertise.

So I do think based on that, and I do think if Mr. Daws is allowed to go into a business venture that will be a trucking company, that is a violation of the noncompete and will irreparably harm the plaintiff in this case. And I think now

Mr. Daws has said in his declaration that he's not participating in a trucking company, he doesn't want to violate the noncompete, he's not doing any of those things that he is being claimed to have done. And so the balance of hardship in that respect is really nothing to Mr. Daws, 'cause he's saying he's not doing it.

So I do think that any business or possible business with Mr. Becker in regards to trucking, that he cannot have any part of, and from this part forward that does include any advice. Because potentially, if it's a trucking company, I don't know what type of trucking company or what they're even eventually going to be doing, but it does -- there are two people involved from Daws Trucking that he is talking about that he would be working with, so I will tell you the Court has a concern it would be in direct competition of the plaintiff, and that's not going to happen.

So Mr. Daws cannot have anything to do with Mr. Becker, that venture, the other two from JDT Trucking. And I do think certainly that the public interest factor is met as well, because people should not be able to sell businesses and then turn around and try to harm that business and compete with it, so that's what the Court's concern is about that. But I think Mr. Daws himself is saying he's not doing it. I will take him at his word, and so that shouldn't be an issue going forward.

I think the bigger question and concern for the Court is

whether -- in regards to the TRO the other companies that Mr. Daws has been operating, and it appears there was some knowledge on the part of the plaintiff prior to and after the purchase of the assets that he was operating these companies. I don't think -- based on what the plaintiff said today, he didn't know the full extent of it, and it turned out to be bigger than maybe what was disclosed, but he was aware. And so for the last two years there was not any effort to stop him from doing that so...and based on the information that the Court has today, I mean, we have the brokerage, the owner and lease of the tractor trailers, and then the rental property. And I'll get back to the rental property in a second.

Because those were ongoing businesses and the plaintiff was aware of those, I am not going to enter a TRO in regards to those businesses. But I will say this, Mr. Thalken, and I need you to relay this to your client. I am concerned about the drivers here in twofold. One, obviously the drivers left. They were independent contractors. They're free to go wherever they want. I can't force drivers to go back to JD Trucking. They may not want to go back for whatever reason, they don't like you, they think -- they don't like or think *[sic]* how it's going to be managed. I can't force them to go back to you. My other concern is I'm also not going to tie the hands of drivers who are not in this case to not earn a living.

But having said that, for example, if the owner of this

Loyal Trucking, which I understand he only owns 50 percent of the company and that -- and those individuals who own that part of that company are not part of this case but if -- because in this case there was a large portion of employees that resigned at the same time Jim Daws did. I think it was all on the same day. That is suspect. Now, they may all have a valid reason for why they did it. I don't know. We will figure that out at a later date. But just the looks of it is not good and leads some credence that based on the plaintiff's testimony, Mr. Fernandez's testimony and his declaration about -- and I'm just talking about what he visually saw of Mr. Daws talking to all these people all day, he wouldn't talk to him, and then at the end he says, "I'm leaving, and all these people are going with me," and really, that's what ended up happening.

There may be a valid reason for that, but what I'm saying is this. If there's leasing of the tractors or trailers to third parties and it's going to the drivers and there's some agreement for them to have left to do that, which will be found out in this case, which potentially could be resolved by a money judgment, your client needs to think really hard whether he wants to pursue that if that's happening, if you're understanding what I'm saying. What I'm saying is if those drivers left to go work for him on these companies that he's saying he is not doing trucking with, there's probably going to be a problem, and it very well may be a violation.

Obviously the duty to loyalty -- 'cause if he was working there at the time when they all left -- I understand what you're saying after they left, but they all left. And if they left for that reason, obviously, potentially an issue. And if he's going to pursue that in regards to these companies, then it may not just be a leasing company. It may be more than that in regards to his involvement. So he really needs to think about what he's doing in that regard. Does that make sense?

MR. THALKEN: Yes.

THE COURT: Okay. So I'm not going to enter a TRO in regards to those other companies. At this point he will be able to continue to operate those but hopefully with consideration of what the Court just said.

As to the real estate, I do not think the TRO is appropriate. The lease has ended. He can lease it to whoever he wants. However, obviously it's a trucking facility. It's a trucking -- I don't know if that's the right word for it, but a trucking facility of some sort. So obviously a trucking operation is probably -- that's who it's going to be leased to, and I think Mr. Daws can lease it to whoever he wants to. But it would cross the line if he is giving them advice as how to run the company or how to manage things or manage the business or do anything with the business. Potentially then he is in violation of the noncompete at this point.

So as to the location and that property, that company can

lease it to whoever he wants, but that's all that can be done. He cannot participate, give advice, even if he's not getting paid for it, to whoever's going to be there, if that makes sense.

So I think -- and, Mr. Barry, you can correct me if I'm wrong. I think I've kind of addressed all of the issues in regards to the TRO.

MR. BARRY: I believe that --

THE COURT: And I will enter -- and obviously I will enter a written order in regards to that.

MR. BARRY: I believe you have, Your Honor.

THE COURT: All right. So then I did indicate, or my staff did through an email, that it was my intent to grant the motion for expedited discovery and potentially expedited briefing in order to get to the preliminary injunction, because obviously the plaintiff's business has been affected by what has happened. So that is still the Court's intent.

So now I just -- I do want to say a couple of things too in response, 'cause obviously I know -- so I'm going to grant the motion for expedited discovery. I know there are a number of things listed in there. I don't know if the parties have talked in regards to everything that Mr. Barry has. I don't know if you have objections to that. And I'm also saying even if I grant that motion, once you look at it and start looking at it with your client, if there's an objection to any of the

items that they're requesting, you could still put that forward. And I'm going to tell you I would probably be the one that would handle that versus the magistrate judge so we can keep things moving.

But in response to all of this, I am assuming either now or later the defendant wants to request or will request items off of the -- I'm going to call it a hard drive.

MR. THALKEN: Server.

THE COURT: The server. Thank you. -- the server in regards to the other businesses, because apparently, obviously, there was no separation there, it appears. That probably should have happened, but it didn't. And obviously through discovery -- other than the confidential information of JDT, through discovery they may very well be entitled to that information. So I don't know. The reason I'm bringing this up is so the parties could maybe work together to get it exchanged if he's got --

MR. BARRY: We should let you know something just because in the context of scheduling I think it's good to get it on the table with that. So we do have that server. We do have the emails. I could give you a number. It won't -- I won't remember it correctly, and it'll be huge. And now, at least, I won't know what it means, and I know Tim won't from his expression, but there's -- there are a ton of emails. We have looked at emails from, I think, three different people in

the last month as Rick has been dealing with other things. So there are a lot of emails there. There's a large volume, and we can certainly work with Tim on whether they want all of it at once or whatever. I'm guessing he's going to say give it all to us.

The other part of this is Jim Daws was emailing with a lawyer named Julie Karavas, who was providing advice to him while he was still employed at JDT. JDT, Rick's company, was paying for the work. We believe that there's no privilege that attaches to those emails, and in an abundance of caution, I haven't looked at them. I've mentioned it to Mr. Thalken. We'll continue to discuss it. I think I'm on the verge -- we've discussed getting essentially a computer-generated privilege log that just relies on subject lines, to the extent they exist, at the beginning.

But we may have some privilege issues because we believe that no privilege attaches to those emails, and I don't want to get into an extended argument about it, but I think the judge can appreciate what the legal issues are likely to be and the importance of those emails.

THE COURT: Okay. And so I would encourage the parties to talk to see if they can come to a resolution. If not, obviously you can come to me. I'm more than willing to have a discovery dispute conference on the record -- obviously on the record but over the phone, how we would normally do it

as a magistrate judge. I will tell you this, though. If privilege issues are at play, I prefer to have those briefed because I just think they're so important that it's really hard, and maybe unfair, to do it on the phone. But if the parties believe that that could be done by submitting the information to me ahead of time, I'm certainly willing to do that to keep this moving, not to prevent a delay.

But having said all of that and based on the number of documents that are in there that are going to have to be reviewed and to make sure everybody has enough time to prepare for the preliminary injunction hearing -- so then my question becomes: What do you think or would like the briefing schedule to be, then? Because I'm assuming you need some of the evidence, and you may too in order to do your response and argument.

MR. BARRY: I might get hit by my client, but I guess I would say I'd like to have a hearing -- just given the size, I'd like to have a hearing before Christmas. I know we had hoped originally to get something done before the end of November. I do think, you know, if there's a privilege issue for the Court to resolve, it may take a little bit longer. I don't know. Maybe Tim and I can come back to you with a proposal, but I'd like -- you know, if we can do the end of November, that would be great, but certainly before Christmas would be my goal.

THE COURT: I mean, I can certainly get you in that and into December. For whatever reason they don't want to do a lot of criminal trials in December, I don't know, so...but yeah, we can certainly do that, provided you're ready to do that. I have no problem with that. So I think at the end of the day -- and you may not know this now. Number one, I'm going to need to know how much time you're going to need. I mean, can we get it done in a day, a half a day? Do you need two days? And it may be too premature to do that.

But obviously if you can stipulate to facts, that's helpful. If you are going to stipulate to certain evidence, I would encourage you either to file it on the docket or get it to me ahead of time, because I will review it prior to the hearing unless you give it to me five minutes before the hearing. Then that's not going to happen. I'll just be honest. But I will do that.

So what I would suggest is that the parties meet and confer and maybe propose a progression schedule in regards to the briefing on the preliminary injunction and then -- now, granted, TRO is supposed to last 14 days or longer if everybody agrees, and so it would be my intention that the TRO would remain in place until we have the preliminary injunction hearing. Does either side have an objection to that?

And the only proviso I would say is if there is some evidence that comes forward that that needs to be changed, I

find either having a telephone conference or another hearing on that in regards to whatever that issue is -- so I guess what I'm saying, if you agree to it now and something develops in the evidence that we need to address that, I'm happy to do that.

MR. THALKEN: From my perspective, Your Honor, just because my client is here, I don't want to agree to that, but we may ultimately agree to it so --

THE COURT: Okay.

MR. THALKEN: -- we can -- can we get back --

THE COURT: If you don't agree to it, we're going to have a preliminary injunction hearing a lot sooner than we normally would.

MR. THALKEN: Right.

THE COURT: So that's really the issue, if you want to call and explain that to your client. So how I would tell you I would handle it is if I can get the order out today, I'm going to say the TRO is going to last until such time as we have the preliminary injunction hearing. And then if he wants to object, then we're going to have to do a faster hearing. If he doesn't, then it will be whatever you all decide in regards to the briefing schedule and then -- but -- and I will say this. I want to say it for the record and both sides. I do think it's important each side has enough time to assimilate their evidence and information for the preliminary injunction

hearing since that's so -- because the ramifications are so severe, so that will be part of my order.

The other issue which we didn't discuss which was briefed is I do have to provide for security in regards to this case, and so based on how I have ruled today, it's going to be $1,000 because at this point -- I mean, well, that's what it is, and so that will be in my order. And then I will just indicate in my order that the motion for expedited discovery is going to be granted and that the parties will submit a progression order or proposed progression deadlines to chambers. And when do you want to do that by?

MR. BARRY: At the end of the day tomorrow, is that too soon?

MR. THALKEN: Might be too soon.

MR. BARRY: Okay. How about Monday?

MR. THALKEN: Monday? That's fine.

MR. BARRY: Yeah.

THE COURT: Monday?

MR. BARRY: Yeah.

THE COURT: Yeah. That's fine. So November 4th.

Okay. And then the only other question I have, 'cause I don't know if you're going to put this in the proposed progression deadlines, is whether you want me to -- once we get those to set a hearing and have the hearing which obviously, if we're not ready, we could move or -- I'm just trying to think

what's the best way to do it. And maybe with everybody's schedule we could just set the hearing, and then if it -- because if we're going to set the hearing, I need to know how long you think it's going to be, but my concern is you may not know that until you get through everything. Because I could do a hearing pretty quickly after it's fully briefed, but I'm fine doing it either way. I don't know if anybody has -- if either of you have any thoughts on that.

MR. THALKEN: I mean, part of the issue, I think, for us is we don't know what we don't know yet.

THE COURT: Right.

MR. THALKEN: Do we have to bring in 30 people to say what happened? For employees can we submit affidavits? It sounds like you're looking for in-court testimony. I know in the past we've done it just on declarations or a mix.

THE COURT: I mean, however you want to do it is fine. I'm not saying you have to do it, but I'm also not going to prevent somebody if -- like, for example, today I had a lot of questions and I didn't understand it, and obviously I need to understand to make a decision so, I mean, that's up to you. I don't -- it can all be done on declarations as far as I'm concerned. I don't care, but I want each side to be able to present how they want to present it so...I mean, do we want to do it for two days? Probably not, but if that's what -- that's what I'm here for, so if that's what we need to do.

I mean, what I envision and my hope would be is that the parties, to the best of their ability, can either agree that it's going to be on declarations or this person may testify live, this person may testify live. That's it. Everybody else will be declarations. Here's the evidence. It's going to be submitted to the Court, and then obviously the Court can review that. That's the ideal circumstance. Each case is different, so depending on how you feel it needs to be done, that might not be the right thing for this case. Hopefully -- I mean, obviously, if we do it that way, it would get done a lot quicker, and obviously then the Court can get a decision out a lot quicker in that regard.

So I'm just putting that out there.

MR. BARRY: And obviously my only concern with declarations in a case like this is I had a similar noncompete case several years ago involving customers, and we had about 25 affidavits from customers that said, "I made my own independent decision to move, I didn't talk to anybody," and then we took depositions, and the testimony was 180 degrees opposite so -- and maybe depositions that we just submit deposition testimony will be a way to save everybody time in a live hearing, but I think Tim and I can -- I didn't want to include depositions in a motion for expedited discovery because I didn't want to add to it but --

MR. THALKEN: And therein is the problem. If we're

deposing 30 people between now and Thanksgiving, that's --

MR. BARRY: Right.

MR. THALKEN: -- that's probably not going to help, to tell you the truth.

MR. BARRY: Well, yeah. On the other hand, if we have the declarations, depositions like that tend to take about 25 minutes so, you know....

THE COURT: So -- and I appreciate it and that you both are willing to work through this, because those are the concerns exactly that I have is that you have one side and there's no cross-examination of that other side. So is that accurate as to what happened? And based on the facts and circumstances of this case, a lot of things could turn on what exactly they say happened.

Now, everybody needs to keep in mind that this is not the trial; however, the Court can use testimony that is provided in the preliminary injunction for trial purposes and not have to repeat that, so we may be killing, you know, two birds with one stone, so to speak, in that regard. Not sure that's 100 percent what I would do, but I also, well, don't have to sit through and hear the same things so...but that's something to consider. But obviously that would be if the Court's hearing it and not a jury, so that's the other issue in that regard.

Now, having said that, though, I do think the noncompete

is a legal issue for the Court, and so for that consideration, obviously the Court could use whatever's at the preliminary injunction stage in order to make that determination. And quite frankly, obviously, I think maybe the sooner that's decided might be the better for everybody, provided that the Court has all that information to make that decision.

So having said that, maybe what we should do for everybody's schedule is if -- you have the last date that -- for the reply to be briefed. After that, how far after that do you want the hearing? For example, do you want it a week later, two weeks later? And the time frame within that that the parties would be available and how long you think the testimony will be or the hearing would last based on what you think you might do, then indicate that in there. And then what I'll do is I will set the hearing just so everybody has it on their calendar subject to --

And, sir, just so you know, this is subject to being moved if there's a delay. For example, if there's a privilege issue and it takes two weeks to get an order done on that, then that's going to delay it a couple of weeks. Knowing that we may have to move that depending on how much discovery there is, any discovery disputes we have, and how quickly those can be resolved, knowing that that date might have to move -- because my only thought is if we get through everything and the reply is there and we don't have a date on the calendar that then the

lawyers won't, based on their calendars, be able to do it is my thought, unless somebody wants to do it differently.

MR. BARRY: Your Honor, do you have a preference between the last date -- between the reply and the hearing, how long you would like there to be?

THE COURT: Ideally, I mean, provided I'm in town, a couple of days, I mean, unless you're going to submit a thousand pages of exhibits on the reply. Then I might need a little bit more time. I'm just saying. I'm just saying. So yeah, I mean, a couple of days or a week, whatever. And obviously the other side's going to have to look at that and decide what they want to do there. But I think, you know, a week is more than enough, but a couple days would probably be fine too unless it's -- and then the only other thing I would say to the parties, as we're going through, obviously if we have discovery dispute conferences, I'll check in and think whether we could still do that hearing.

But as we're going through it, if the parties think at some point we maybe need to move the hearing that we set for a couple of weeks for whatever reason, just reach out to chambers, and I can get on a telephone conference with the attorneys in order to do that. And the reason I'm saying is I'm worried about your schedule more than mine, to be honest with you. So I'm open to whatever we need to do to get that done and get the hearing done as soon as possible. So if we

need to move it, good communication, we can certainly do that and deal with that.

All right. So I think that resolves all of the issues we need to deal with.

MR. THALKEN: Can I raise one issue? 'Cause I think you touched on it. I just wanted some clarification, 'cause I think you said essentially kind of reciprocal expedited discovery or -- here's my issue is that obviously the Court is not enjoining the operation of most of Jim's companies. I think we've presented evidence that Jim -- you know, they have the server. They have these electronic files that we believe are our documents or our data. They won't give them to us voluntarily, and I guess I would orally move that the Court include that as part of the expedited discovery that they turn over -- you know, it's the Keystone data and Excel files relating to CTL, J&L, JLD, Loyal Trucking, HJ Trucking, Watson Trucking, those related companies that that -- you know.

If we have to give them stuff on a fast basis, we need those documents to operate the businesses which the Court has not enjoined, and so we would ask that that be part of a reciprocal expedited discovery, and we're not saying -- you know, we just want copies. They have it for discovery. We could request it, I guess, in discovery, but we really need those documents or that data to pay people.

THE COURT: Any comment, Mr. Barry?

MR. BARRY: I guess I prefer we get a discovery request for that so I can discuss it with my client.

THE COURT: Well, and what I was going to say is I'm assuming you're going to give a discovery request. The question is what's needed now for the preliminary injunction versus later, but this is what I was going to say about that and what I was trying to get at is, right or wrong, those were all on the server. If they have to do with his businesses, it is not the Court's intent to delay or cripple his business either because he doesn't have those documents.

You are fully entitled to take the server, sir. It was your server. You had every right to do that, and you have every right to your confidential documents that are on there and all of the business documents. But obviously it would only be copies that would be provided to the other side, and you're going to maintain those.

And so the problem is and the question is -- they're going to have to decipher, is this really that business, or does it have to do with Jim Daws Trucking, and is there some confidential element to that? But I am assuming that the parties could work that out, because I do agree -- and granted, everything should have been separated, but there's faults on both sides why that didn't happen, because it wasn't enforced by the plaintiff either. And so if those are business documents and that's how he's always run his business is doing

everything off of one server, his business documents, the defendant's entitled to -- and if he brought it to me in a discovery dispute, that's exactly what I'm going to tell you, and so he's entitled to that.

Obviously, privilege and confidential information that specifically has to do with JDT, that's a different issue. I'm not saying you're not entitled to those documents, but obviously there may be some restrictions in regards to that because of that information, not that Jim Daws probably doesn't know it anyway, but just to protect that information.

So you can provide your discovery requests, and they're going to have to respond to those.

MR. THALKEN: Okay.

MR. BARRY: And I just want to note I got a note from Rick. There may be some technical issues here with the proprietary software and the data and what's needed to operate it, so I'll talk with Tim about that. We understand the Court's perspective on who's entitled to what data. Whether we can provide what they want, I -- without giving them back the server, I'm not sure.

THE COURT: Oh. Might be another issue.

MR. BARRY: Yeah.

THE COURT: Okay. Got it. All right. Well, the parties can work and talk, and I think everybody understands where I'm coming from, where the Court's coming from so....

All right. Anything else we need to address today, Mr. Barry?

MR. BARRY: Just for the sake of clarity, on the privilege issue it's our position that the person asserting privilege has the burden of proof and the obligation to claim it. So whenever we go forward on those issues, we'll -- you know, I'll discuss it with Mr. Thalken, but we'll be expecting them -- if they decide that privilege needs to be asserted that they need to move forward with the Court on that, but we'll wait for --

THE COURT: I'm assuming, Mr. Thalken, you don't disagree with that.

MR. THALKEN: Don't disagree.

THE COURT: Okay.

MR. BARRY: I just didn't want to leave with any misunderstanding.

THE COURT: No. Absolutely. Completely understand.

Anything else today, Mr. Thalken?

MR. THALKEN: Just to clarify that we do not have to brief it by Friday, then, or --

THE COURT: No.

MR. THALKEN: Okay.

THE COURT: No, you don't have to brief anything by Friday. I'll await your progression order on Monday. That's where we are.

MR. THALKEN: You'll make an associate who has little kids who want to go trick-or-treating very happy.

THE COURT: Okay. You can tell them they can do that.

All right. Then we are in recess. Thank you, everyone.

MR. BARRY: Thank you, Your Honor.

MR. THALKEN: Thank you, Judge.

(Adjourned at 3:36 p.m.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Lisa G. Grimminger* February 6, 2025
Lisa G. Grimminger, RDR, CRR, CRC Date