IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC, | Case No. 4:24-cv-03177 |
| Plaintiff, | |
| vs. | |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | |
| Defendants. | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Prepared and submitted by:

Andre R. Barry #22505
Henry L. Wiedrich #23696
Madeline C. Hasley #27870
CLINE WILLIAMS WRIGH
JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
(402) 479-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com
mhasley@clinewilliams.com

February 7, 2025

Plaintiff Jim Daws Trucking, LLC ("JDT" or "Daws Trucking") submits this Reply Brief in support of its Motion for Preliminary Injunction against Defendants Daws, Inc., James R. Daws ("Jim"), Lana R. Daws ("Lana"), Daws Trucking, Inc. ("DTI"), and Columbus Transportation and Logistics, LLC ("CTL").

## INTRODUCTION

JDT's Motion for Preliminary Injunction does not turn on a popularity contest between Jim and Rick. It rests on the noncompete Jim and Lana signed when they accepted $12 million from JDT for the business of Daws, Inc. as a going concern. In view of the amounts paid and the scope of the business that was purchased, the noncompete was appropriately broad and enforceable under Nebraska law. Jim's efforts to escape the noncompete betray his knowledge that it bars what he has been doing since before he resigned from JDT on September 30, 2024. Before and ever since that date, Jim has been participating, and in fact spearheading, a venture to continue in the business of trucking in competition with JDT. Jim does not deny that he has contacted customers or drivers or that he has helped establish Loyal Trucking, LLC ("Loyal Trucking") as a competitor to JDT. When it comes to Loyal Trucking, the evidence also shows that Jim lied, or at the very least misled the Court, in the Declaration he submitted on October 30, 2024, and that he has violated the TRO by participating with Loyal Trucking in the business he spent the month of October setting up outside JDT. For these reasons, the Court should enter a preliminary injunction to restore the status quo and prevent Jim and Lana, and those acting with them, from participating in any way in the business of trucking.

## ARGUMENT

### A.    Jim sold the business of Daws, Inc. to JDT as a going concern.

Try as he might, Jim cannot minimize what was sold to JDT. He tries to argue Daws, Inc. only sold "certain assets," and that the assets sold did not include a DOT number. However, in the Asset Purchase Agreement, the parties recited that Daws, Inc. "owns and operates a company specializing in hauling over the road flatbed freight, commonly known as Daws Trucking," defined as the "Business," and that Daws, Inc. "desires to sell the Business as a going concern." [Filing 54-1 at 1.] A "going concern" is a "commercial enterprise actively engaging in business with the expectation of indefinite continuance." *Black's Law Dictionary* (Seventh Ed. 1999). The APA listed, among the assets to be transferred, as "[t]he trade, business name, goodwill, and all other intangible assets of the Business, including but not limited to [the] Business's US DOT Number (hereinafter referred to as 'DOT Number') and Motor Carrier number (hereafter referred to as the 'MC Number') and all other assets of the Business whether described herein or not." [Filing 54-1 at 1.] If by saying Daws, Inc. sold "certain assets," Jim means it sold the entire business of Daws Trucking, including the DOT and MC Numbers used to operate the trucking company, then he is correct.

### B.    The Noncompete Provision is not limited to ownership or operation.

In the declarations Jim has offered, which were presumably prepared by Jim's attorneys, frequent claims are made as to Jim's not owning or operating a trucking company. For example, in her Declaration, driver Michel Marlowe states

3

she is "not aware of any driver who Jim Daws has encouraged to work for any company owned by or affiliated with Jim Daws." [Filing 65-9 at 2 ¶ 19.] She likewise disclaims awareness that Jim "is operating any trucking business." [*Id.* at 2 ¶ 20.]

Putting aside questions of whether drivers in fact know about Jim's ownership or operation of any business, the Noncompete Provision is not limited to ownership or operation. Here is what it provides:

> **12. Noncompetition Agreement by Seller.** It is understood and agreed that $4,500,000 of the purchase price shall be allocated to the goodwill of the Business, and in connection with the sale to the Buyer of the goodwill. Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any person deriving title to the goodwill of said business from Buyer carries on a like business in such area.
>
> By affixing their signatures to this Agreement, Seller's Shareholders join in the foregoing noncompetition agreement and agree to be individually bound thereby.

[Filing 54-1 at 6.] The noncompete prohibits Jim from engaging in the business of trucking in the continental United States, for five years, not only as an "owner" or "part owner," or even as an "manager" or "operator," but also as an "employee," "agent," or "other participant." The Court grasped this at the TRO hearing on October 31, when it warned Jim's attorney that Jim should not "cross the line" into giving advice as to how to run a trucking company or otherwise participate in such a business, and entered its Temporary Restraining Order providing that if Jim leases real estate to a trucking company, he may not provide **any advice** as to how to operate their trucking company." [Filing 25 at 2 (emphasis added).]

4

**C.    The Noncompete Provision is enforceable under Nebraska law.**

"[A] covenant not to compete which is contained in a contract for sale of a business is a seller's self-imposed restraint from trade and is frequently necessary to make goodwill in the seller's business a transferable asset and ensure that the buyer receives the full value of acquired goodwill." *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 756, 472 N.W.2d 391, 397-98 (1991). While Jim now bemoans the breadth of the Noncompete Provision he and Lana willingly signed in return for $12 million, none of the cases Jim cites to contest enforceability of the noncompete apply here:

- Three of the cases invalidated Noncompete Provisions because their geographic scope was overly broad. *See Unlimited Opportunity, Inc. v. Waadah*, 290 Neb. 629, 640 (2015) (no territorial restriction); *Presto-X Co. v. Beller*, 253 Neb. 44, 60–61 (1997) ("within 100 miles of the trade area," with no evidence to show why this was necessary); CAE *Vanguard, Inc. v. Newman*, 246 Neb. 334, 339 (1994) ("anywhere in the world"). Jim doesn't argue the Noncompete is geographically overbroad. Nor could he, since he previously told the USPTO Daws Trucking was engaged in a nationwide trucking business, and on October 29, Lana made the same representation to Loyal Trucking's insurance broker.

- In *ADT Security Services, Inc. v. A/C Security Systems, Inc.*, 15 Neb. App. 666, 702 (2007), the court was unable to find that the noncompete was entered into in connection with the sale of a business. The Noncompete Provision here was undisputedly part of the sale of a business, so the holding in *ADT* does not apply.

- In *Antrim v. Pittman*, 189 Neb. 474, 476 (1973), the court held the words "similar business" in a noncompete in connection with the sale of a heating and air-conditioning business could not be construed to prevent the seller from selling water softeners. Here, the noncompete clearly covers the "business of trucking."

Although Jim tries to ignore the defined term "Business" in describing what Daws, Inc. sold to JDT, he also tries to use it to narrow the scope of the noncompete, arguing that when he agreed not to engage in the "business of trucking" he really meant only flatbed trucking, because that was the "Business" of Daws, Inc. But the Noncompete Provision doesn't use the defined term "Business" with a capital B. Thus, as the Court has observed, the Noncompete Provision covers "the business of trucking. It doesn't say 'flatbed trucking.'" [10/30/24 Hearing Transcript ("Tr.") at 38:13–23.] It was also drafted by Jim's own lawyer. [*Id.*] Moreover, even if the Noncompete Provision were somehow narrowed to flatbed trucking, that is exactly the business Jim is participating in.

Jim laments that there are other things he'd like to do in the trucking industry. Those things aren't what this case is about. For example, this dispute didn't arise because Jim wanted to occasionally pull a dry van trailer loaded with seed corn. [*See* Filing 68 at 22.] In any event, Jim didn't raise any of those concerns when his lawyer drafted the Noncompete Provision and he accepted $12 million in exchange for it, including $4.5 million the parties expressly allocated to goodwill. The Noncompete Provision is enforceable under Nebraska law, and Jim remains bound by it.

6

**D.   Jim misrepresented the scope of his activities to the Court.**

It is now clear Jim misrepresented the scope of his activities to the Court at the TRO hearing on October 30. Most significantly to the Court's ruling, Jim stated in his Declaration that he was a "co-owner of companies with other non-related partners who **own and lease** tractors and trailers to third parties. For example, I own one third of the membership shares in Loyal Trucking, LLC and 50% of the membership interests in JLD Truck Lines, LLC." [Filing 22-1 at ¶ 6 (emphasis added).] At the hearing, Jim's lawyer confessed to his limited understanding, but characterized the operations of Loyal Trucking and JLD Truck Lines as going no further than what Jim stated in his Declaration: "But my understanding from Mr. Daws's affidavit or his declaration is, **yes, they own tractors and trailers and they would lease it to third parties. That's it.**" [Tr. at 33:20–22 (emphasis added).][1]

Jim misled the Court about Loyal Trucking. In his statements to the Court, he did not disclose that one week before he submitted his Declaration, he had a plan to "activate" Loyal Trucking, which had its own DOT and MC Numbers. Based on text messages produced in discovery, it is clear this plan originated with Jim. [Filing 54-19 at 2.] Thanks to a subpoena response from Loyal Trucking's insurance broker, a more complete picture of the plan has emerged. On October 29, 2024, the day before Jim executed his Declaration, his wife Lana,

---

[1] JDT and its undersigned counsel are cognizant of the statements by Jim's attorney that he had limited knowledge of the facts at the time of the TRO hearing and that he needed to rely on what Jim stated under penalty of perjury in his Declaration. [Tr. at 33:7–34:17.]

who is also a Defendant and bound by the Noncompete Provision, submitted a business plan for Loyal Trucking to an insurance broker, Larry Nedder, for his review. [Ex. 27; Ex. 28.] Lana said that after she had Larry's thoughts, "I would have Corey send it to you 'officially.'" [*Id.*] The business plan said Loyal Trucking "will provide over the road flatbed trucking for all 48 continental United States," that it "will operate thirty (30) plus tractors," that it had an "[e]stablished customer list," "[e]xperienced drivers," and "[e]xperienced shop personnel." [*Id.*] All these relationships, of course, came from Daws Trucking/JDT. Jim told none of this to the Court.

Jim also misled the Court about J&L Enterprises ("J&L"). Jim avowed "an ownership interest with my wife, Lana, in J&L, LLC, which owns real estate where the shop and office out of which Daws, Inc. operated." [Filing 22-1 ¶ 7.] But his Declaration said nothing about J&L owning trucks. Thus, it was not surprising that Jim's attorney also characterized J&L as a "real estate company" which is not in the "business of trucking." [Tr. at 34:4–17.] The Court also plainly understood J&L to be solely a company that owned and leased real estate. [Tr. 43:14–44:4.]

*After* the TRO Hearing, however, J&L filed a lawsuit alleging that it owns not just real estate, but eighteen semi-tractors as well. [Ex. 39.] Not only does J&L still own those semi-tractors, but it is also using them in the venture with Loyal Trucking. Documents produced pursuant to subpoena by Tony Glenn, Jim's CFO, show that J&L's tractors are now being leased to Loyal Trucking. Not only that, J&L paid an additional $50,000 to Loyal Trucking, supposedly to cover

the upfront cost of physical damage insurance on J&L's trucks, which it never did for JDT. [Ex. 37; Ex. 38.]

Given what Jim said in his Declaration and the statements from counsel at the hearing, and the express terms of the TRO, the Court appears to have understood that the business of Loyal Trucking and JLD Truck Lines were limited to leasing trucks, and the business of J&L was limited to leasing real estate. [Tr. at 41:9–11.] Which is to be expected, because that is what Jim stated under the penalty of perjury.

Jim also said, "Other than my work performed as an employee of JDT for JDT, at no time since the APA have I directly or indirectly carried on, engaged in as an owner, part owner, manager, operator, employee, agent, or other participant in the business of trucking in the continental United States of America in which JDT carried on a like business in such area." [Filing 22-1 ¶ 27.] This was also a lie. Jim was working with his old crew from Daws Trucking to set Loyal Trucking up to compete with JDT, and was taking JDT's "established customer list," "experienced drivers," and "experienced shop personnel."

The Court's statements at the hearing on October 30 suggest the TRO would have been broader if Jim had told the truth:

- With respect to the plan to bring Jeremy Becker aboard, the Court said "there are two people involved from Daws Trucking that he is talking about that he would be working with [Corey and RaNae], so I will tell you the Court has a concern it would be in direct competition of the plaintiff, and that's not going to happen." [Tr. at 40:7–16.]

9

- The Court also said, "Mr. Daws cannot have anything to do with Mr. Becker, that venture, the other two from JDT Trucking," *i.e.*, Corey and RaNae. [Tr. at 40:17–18.]

- With respect to Loyal Trucking generally, the Court also warned Jim's attorney "if he's going to pursue that [continuing to work with former drivers of JDT] in regards to these companies, then it may not be just a leasing company. It may be more than that in terms of his involvement. So he really needs to think about what he's doing in that regard." [Tr. at 42:15–25.]

- With respect to J&L, which was represented to only own real estate, the Court said "Mr. Daws can lease it to whoever he wants to. But it would cross the line if he is giving them advice as to how to run the company or how to manage things or manage the business or do anything with the business. Potentially then he is in violation of the noncompete at this point." [Tr. at 43:15–24.]

- In case there was any ambiguity, the Court added, "So as to the location and that property, lease it to whoever he wants, but that's all that can be done. He cannot participate, give advice, even if he's not getting paid for it, to whoever's going to be there, if that makes sense." [Tr. at 43:25–44:4.]

It is difficult to believe the Court would not have entered an injunction if Jim had stated, truthfully, that he was in the middle of an effort to "activate" Loyal Trucking's DOT and MC Numbers to "provide over the road flatbed trucking for all 48 continental United States," operating with "thirty (30) plus tractors," and the key employees, "established customer list," "experienced drivers," and

10

"experienced shop personnel" from JDT. After the Court entered a more limited injunction than JDT sought, based on what was said in, and omitted from, Jim's Declaration, Jim and his team went out to dinner to celebrate. [Ex. 32.]

**E.    Jim continued to participate in the venture with Loyal Trucking after the TRO.**

While Jim has taken steps to try to hide his involvement in the venture with Loyal Trucking since the entry of the TRO, he has been unable to do so. He not only launched the venture, which would not exist without his direction, assistance, investment, and influence, but he remains a participant:

•    As noted above, the plan to use Loyal Trucking as the hub of the trucking operating was hatched by Jim, and the initial business plan for Loyal Trucking was written by Lana, in clear violation of the Noncompete Provision Jim and Lana both signed.

•    On October 30, Jim emailed RaNae about having Keystone operating software set up for Loyal on CTL's server. Presumably, Keystone software is still running for Loyal Trucking and all the businesses associated with Jim on the server at CTL, a company which Jim also owns.

•    On November 1, Loyal Trucking provided its broker with a slightly revised version of its business plan Lana first drafted. [Ex. 31; Ex. 33.] It referred to an "established customer list," "experienced drivers," and "experienced office and shop personnel." It also listed Jeremy Becker and emphasized the "Loyal Trucking leadership team has an established customer base needing Loyal's expertise in moving freight." [*Id.*]

- One underwriter contacted by the insurance broker turned Loyal Trucking down because "there is still an ownership connection with Daws Trucking." [Ex. 36.] Specifically, the underwriter said it had "thoroughly dug into the submission" and "confirmed Jim would be a silent investor and executive of Loyal Trucking" and that "[t]he situation presented was that Loyal Trucking is essentially taking equipment, drivers, and routes from Daws." [*Id.*]

- While the broker, Mr. Nedder, said he had information to refute some of what was in the underwriter's email [*id.*], he later referred to Loyal Trucking as a "[s]pin off from JDT." [Ex. 40.]

- The "redemption" agreements Jim signed with Loyal Trucking and JLD Truck Lines have not resulted in any payments to Jim. Jim remains an investor in both companies. None of his capital has been returned, as shown on a balance sheet for Loyal Trucking that Tony Glenn provided to him in January. [Ex. 37.] This ongoing investment of over $1 million is undoubtedly "participating." Indeed, it is crucial to the ongoing operations of Loyal Trucking and JLD.

- The same balance sheet shows Jim contributed an additional $50,000 to Loyal Trucking in November, when it was applying for insurance and for credit from Jones Bank. [Ex. 37.] In a further subterfuge, over a month later, Jim told his CFO, Tony Glenn, that J&L's contribution should be characterized as prepayment of property insurance by J&L. [Ex. 38.] Rick will testify that J&L never prepaid property insurance to JDT.

12

- Throughout November, Jim remained in near-daily telephone communication with drivers and employees of Loyal Trucking. Jim may deny talking to them about business in which he invested over $1 million, which he helped launch, and which is being staffed with the same people who worked for him as his employees for years. Any such denial would strain credulity, particularly given the false statements and omissions of fact in Jim's Declaration.

- Tony continues to keep Jim informed on the financial status of all the businesses in which he has investments, including Loyal Trucking, JLD Truck Lines, J&L, and CTL, and to execute Jim's instructions on how transfers between the business should be characterized. [Ex. 37; Ex. 38.]

- Jim's production of emails and text messages, which directly contradicted what he told the Court under penalty of perjury, cut off in early November. Despite repeated requests to supplement Jim's production, his attorneys have refused. [Ex. 41; Ex. 44.] Common sense says that if the emails and text messages Jim exchanged with employees and drivers since early November were good for him, or even neutral, they would have been produced by now.

- Finally, aided by Jim's customer relationships, goodwill in the industry, capital investments, advice, trucks, and other contributions that remain to be seen, Loyal Trucking has been eating into JDT's customer base, stealing some customers entirely, and taking substantial business from other customers. While this will mainly be addressed through testimony, it is also documented. [Ex. 42.]

13

**F.     The declarations Jim submitted don't help his cause.**

Jim has submitted declarations from various categories of people affiliated with him—two employees, an independent contractor of CTL, Jeremy Becker, Wayne Schmeeckle, and numerous drivers. As set forth below, none of these declarations contradicts the evidence showing that Jim and Lana established and continue to participate in the business of trucking in a venture that includes Loyal Trucking, JLD Truck Lines, J&L, CTL, and many former employees and drivers of JDT, all in violation of the Noncompete Provision.

**1.     Employees of JDT—Caitlin Super and Mattie Hans.**

With his Opposition Brief, Jim has submitted Declarations from Caitlin Super ("Caitlin") and Mattie Hans ("Mattie"), two short-term employees of JDT who left on September 27, 2024. Caitlin says she didn't like Rick; Mattie said she didn't get "good vibes" from him. Neither of those things is relevant to whether Jim violated his noncompete or breached his duty of loyalty to JDT. What is relevant is that both resigned when long-term employees close to Jim quit. As Mattie put it, there was "buzz around the office" when Jeff, Corey Stull, RaNae, and JoAnn Roth "turned in their notices." [Filing 65-2.] Caitlin admits it was RaNae who told her she was resigning and who offered her a job a Loyal Trucking, where she now works. [Filing 65-1.] The Declarations show Jim's influence on the entire JDT office through those closest to him.

**2.     Independent Contractor of CTL—Shannon Dugan**

Shannon Dugan, who works as a broker for CTL, describes what she does for the company, and claims CTL has always operated separately from Daws

14

Trucking. It's not clear who she means by "Daws Trucking." If she means Loyal Trucking, she's wrong, because documents produced by Jim show that Loyal Trucking's operating software runs on a CTL server. [Ex. 29; Ex. 30.]

### 3.    Jeremy Becker

Jeremy now says he backed out of the trucking venture he discussed with Jim for over three months because "his family wasn't interested in moving to Milford." The fact is Jeremy was in regular and enthusiastic communication with Jim about going into business with Loyal Trucking until the Court ordered, in the TRO, that Jim could not participate in any business or possible business venture with Mr. Becker related to trucking. Maybe the injunction had something to do with his family's sudden lack of interest. In any event, the reasons for Jeremy's withdrawal from his relationship with Jim do not negate Jim and Lana's violations of the Noncompete Provision.

### 4.    Wayne Schmeeckle

Wayne Schmeeckle remains a customer of JDT and a friend of Jim Daws. He says he had discussions with Jim about purchasing Daws Trucking. He's vague about when that was, or how he could have purchased Daws Trucking from Jim, since Daws Trucking/JDT was not owned by Jim. Wayne says that to his knowledge, Jim Daws is not involved in any other trucking business. Evidence at the hearing will show otherwise.

### 5.     Drivers

Jim submitted more-or-less form declarations from many drivers. Several points are worth mentioning with respect to these declarations:

- First, while hearsay may be considered in connection with a motion for preliminary injunction, declarations are given less weight than the testimony of live witnesses who are available and subject to cross-examination. 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2949 (3d ed.).

- The declarations all take almost the same form and appear to have been drafted by lawyers. The drivers uniformly claim they're not aware of any driver whom Jim has encouraged "to work for any company owned by or affiliated with Jim Daws" and that they have not "hauled any load for Jim Daws or any of his affiliated companies." [e.g. Filing 65-10.] The drivers don't explain how they would know what companies Jim owns or doesn't own or what they understand "affiliated" to mean.

- With respect to the Noncompete Provision, it doesn't matter if Jim encouraged drivers to move, as long as he's participating in a trucking business.

- As noted above, statements that drivers aren't hauling for companies "owned," "operated," or "affiliated" with Jim doesn't disprove evidence showing he and Lana violated the Noncompete Provision, since the Noncompete Provision prohibits them from participating in a trucking business in the continental United States, directly or indirectly.

- Documents Loyal Trucking's insurance broker produced pursuant to subpoena show that eleven of the drivers who say they haven't "hauled any

16

load for Jim Daws or any of his affiliated companies" were listed as drivers by Loyal Trucking. [Ex. 34; Ex. 35.] Presumably, those drivers aren't denying they drove for Loyal Trucking.

- Interestingly, there are twenty drivers who were listed by Loyal Trucking in its insurance application who have not submitted declarations, whom, presumably, Jim or his attorneys either thought it not prudent to ask to provide a declaration or refused to do so.

- One driver who signed a declaration was Michel Marlowe. In a Google review of Daws, Inc. which appears to have been posted in November, she stated, **"Jim and his whole crew have been nothing but awesome to work with. I'm so glad I made the switch."** [Ex. 43 (emphasis added).] So much for "not haul[ing] any load for Jim or any of his affiliated companies."

## G.    JDT has lost business to the venture centered on Loyal Trucking.

Jim argues that JDT fails to identify any lost customer that are being served by a company "owned" or "operated" by Jim. [Filing 68 at 31.] Again, under the Noncompete Provision, Jim isn't just prohibited from "owning" or "operating" a trucking business. He can't "participate," directly or indirectly. Among other forms of direct participation, Jim is an investor in Loyal Trucking and JLD and has contributed trucks and cash to the venture through J&L. In documents and oral testimony at the hearing, JDT will show it lost business from many of its top customers to the competing venture. [Ex. 42.]

**H.    Jim has exercised wrongful control over JDT's funds.**

Jim has compounded these violations of the Noncompete Provision by refusing to relinquish control over JDT's funds in the ANB account that was used by JDT to operate the business. Jim claims ownership of the cash is "disputed," because in an email sent before the APA was signed, Rick agreed the funds in the ANB account at that time belonged to Jim. Those funds did belong to Jim, because they were generated before he sold the business.

When the APA was executed, however, JDT acquired "[a]ll of the cash and accounts receivable of the business on the date of Closing." [Filing 54 -1 at 1.] "[P]arol or extrinsic evidence will not be received to vary or add to the terms of a written agreement." *Traudt v. Nebraska Pub. Power Dist.*, 197 Neb. 765, 768, 251 N.W.2d 148, 150 (1977). Moreover, on September 25, 2024, Jim's attorney, Julie Karavas, wrote, "Jim agrees that all of the funds in the ANB account belong to the LLC; none of the funds are due to Jim or any other entity." [Ex. 26.] Jim's control over the funds he admitted belong to JDT is an ongoing wrong he is using to compete with JDT, *i.e.*, to deprive it of operating capital JDT needs to remain in business.

**H.    JDT stands by and incorporates all the arguments in its TRO Brief.**

In a lame attempt to avoid the facts and law set forth in JDT's submission in support of its Motion for TRO, Jim argues JDT conceded earlier arguments, specifically those arguments contained in its Brief in Support of Motion for Preliminary Injunction. [Filing 68 at 16–17.] JDT has done nothing of the sort. In its Brief in Support of Motion for Preliminary Injunction, JDT states:

> Many of the key facts are set forth in JDT's Brief in Support of its Motion for Temporary Restraining Order [Filing No. 18]. JDT incorporates those facts here in their entirety and will adduce evidence of them at the hearing on its Motion for Preliminary Injunction.

[Filing 53 at 4.] The case Jim cites for this argument also doesn't support it. In *Dorosh*, the court held that a party had waived its claims by failing even to file a response brief. *Dorosh v. Minnesota Dep't of Hum. Servs.*, No. 23-CV-1144 (ECT/LIB), 2023 WL 6279374, at *9 (D. Minn. Sept. 26, 2023). Here, JDT filed a Brief in Support of its Motion for Preliminary Injunction which, to avoid repetition, expressly incorporated what it had already told the Court. Nothing has been waived.

## I. A preliminary injunction is warranted to prevent further irreparable harm.

Because a district court exercises the traditional authority of a chancellor, its discretion to grant or deny a preliminary injunction is broad." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342–43 (8th Cir. 2024). In addition, Rule 65 expressly provides that an injunction binds not only the parties, but also the parties' officers, agents, servants, employees, and attorneys, and other persons who are in active concert with them. Fed. R. Civ. P. 65(d)(2).

The evidence before the Court shows that Jim violated his Noncompete Provision before he even left JDT and continues to do so today. His violations of the Noncompete Provision are myriad. His communications with employees, drivers, and customers, his planning and encouragement, and his $1 million financial investment were all key to re-formation of a trucking venture centered

on Loyal Trucking. Lana also directly participated, by preparing Loyal Trucking's business plan. Without Jim and Lana, there would be no competing venture.

"The point of a prohibitive injunctive relief is to preserve the 'last uncontested status between the parties which preceded the controversy.'" *Ohlensehlen v. Univ. of* Iowa, 509 F. Supp. 3d 1085, 1104 (S.D. Iowa 2020) (citation omitted); *State of Kansas v. United States*, 192 F. Supp. 3d 1184, 1209 (D. Kan. 2016). The last uncontested status here was when Jim and his entities, Loyal Trucking, JLD Truck Lines, and J&L, leased trucks exclusively to JDT, and did not operate in competition with it.

To restore the status quo, the Court should enter an injunction prohibiting Jim and Lana from engaging in the business of trucking in the United States in any manner, including in connection in any way with any company in which they hold any financial interest or ownership interest, including Loyal Trucking, JLD Truck Lines, J&L, and CTL, or are engaged in any business, management, or advisory activities whatsoever. The Court should also prohibit Jim for further interfering with JDT's use of its funds in the ANB account to pay bills in the ordinary course, and to the extent necessary, to complete the paperwork needed for ANB to recognize Rick has having signature authority to replace former employees who left with Jim. Moreover, so long as Jim and Lana are investors or other participants, directly or indirectly, in Loyal Trucking, JLD Truck Lines, J&L, or any other company, the companies and their employees and independent contractors should likewise be prohibited from engaging in the business of trucking, unless they operate in connection with and under the direction of JDT.

20

**CONCLUSION**

For the foregoing reasons, JDT respectfully requests that the Court enter a preliminary injunction to restore the status quo, including by preventing prevent Jim, Lana, and those acting in concert or participation with them participating in any way, directly or indirectly, in the business of trucking within the continental United States.

Dated February 7, 2025

                              JIM DAWS TRUCKING, LLC,
                              Plaintiff

                         By:   s/ Andre R. Barry
                              Andre R. Barry #22505
                              Henry L. Wiedrich #23696
                              Madeline C. Hasley #27870
                              CLINE WILLIAMS WRIGHT
                              JOHNSON & OLDFATHER, L.L.P.
                              233 South 13th Street
                              1900 US Bank Building
                              Lincoln, NE 68508
                              (402) 479-6900
                              abarry@clinewilliams.com
                              hwiedrich@clinewilliams.com
                              mhasley@clinewilliams.com

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the word count of this brief complies with local rule NECivR 7.1(d). The word-count function of Microsoft Word M365, states that this brief, inclusive of all text, contains 5,380 words. No generative artificial intelligence program was used in drafting this brief.

                              s/ Andre R. Barry
                              Andre R. Barry

21

## CERTIFICATE OF SERVICE

I, Andre R. Barry, hereby certify that on February 7, 2025, I electronically filed the foregoing with the Clerk of the United States District Court for the District of Nebraska using the CM/ECF system, which sent notification of such filing to all registered case participants.

s/ Andre R. Barry
Andre R. Barry

4899-1633-1030, v. 8