IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC,<br><br>Defendants. | Case No. 4:24-cv-03177 |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION
FOR CONTEMPT SANCTIONS**

Prepared and submitted by:

Andre R. Barry #22505
Henry L. Wiedrich #23696
Madeline C. Hasley #27870
CLINE WILLIAMS WRIGHT
JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
(402) 479-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com
mhasley@clinewilliams.com

February 24, 2025

Plaintiff Jim Daws Trucking, LLC ("JDT" or "Daws Trucking") submits this Reply Brief in support of its Motion for Contempt Sanctions against Defendant James R. Daws ("Jim").

## INTRODUCTION

JDT filed a Motion for Contempt Sanctions on February 11, 2025, based on evidence produced in expedited discovery that Jim made false statements of various material facts and omitted material facts to secure a more limited Temporary Restraining Order ("TRO") than he otherwise would have been subject to, and then violated even that limited TRO. In opposition to JDT's motion, Jim notes that contempt sanctions are extremely serious. JDT agrees. But the seriousness of contempt does not shield Jim from the consequences of his deliberate choices. Rather, it underscores the severity of instances, such as those present here, where litigants "anoint themselves with the power to adjudge the validity of orders to which they are subject." *See Chicago Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500, 504 (8th Cir. 2000).

## ARGUMENT

### A. JDT filed its motion and brief in accordance with the rules.

Jim's attempts to use procedural arguments to deflect from his misconduct fall flat. He contends JDT's Motion for Contempt must fail because JDT did not file an index of evidence, purportedly violating NECivR 7.1(a)(2). [Filing 85 at 4.] This argument misapplies the rule and overlooks the sufficiency and substance of JDT's brief, which relies exclusively on evidence that was already part of the record, as is explicitly allowed in this district:

2

"when filing the supporting brief . . . [a party] must also file and serve supporting evidentiary materials **not previously filed**."

NECivR 7.1(a)(2) (emphasis added). Jim does not allege that such materials were not previously filed. It was proper for JDT to incorporate by reference evidence it filed previously instead of re-filing it. Under NECivR 7.1(a)(2), that *is* how motion practice works.

Contrary to Jim's arguments, JDT also properly put the Court and Jim on notice that JDT will rely on evidence to be presented at the upcoming hearing on JDT's Motion for Preliminary Injunction. [Filing 79 at 4-5.] As Jim acknowledges, his state of mind is a factor for the Court to consider when ruling on JDT's request for sanctions. It will be necessary for the Court to hear Jim's testimony, and the testimony of other witnesses, in considering that factor. There are also other documents included on JDT's exhibit list which bear both on the Motion for Preliminary Injunction and Motion for Sanctions, but whose full significance requires live testimony to explain the exhibit or its context. Jim is fully aware of those exhibits because they were included on JDT's exhibit list and because he was directly involved in the activities described in many.

Jim further argues that sanctions for his deception should have been pursued under Federal Rule of Civil Procedure 11 or 37. Jim does not try to explain how either would apply. Neither does. Rule 11 addresses misconduct related to the pleadings, motions, or other papers signed by an attorney, imposing sanctions for frivolous arguments, naked factual assertions, and vexatious purposes. See Fed. R. Civ. P. 11(b)–(c). Here, JDT's grounds for

3

contempt do not challenge the propriety of any filing signed by Jim's counsel. Instead, it addresses Jim's deception leading up to the Court's issuance of a TRO and his continued violation of the Order. Similarly, Rule 37 governs the discovery process and provides for sanctions when a party fails to comply with discovery orders. *See* Fed. R. Civ. P. 37(b). JDT's Motion for Contempt Sanctions does not arise from a discovery dispute. It stems from Jim's false statements of material facts and repeated violations of the TRO. Like most of Jim's arguments, his effort to reframe this matter under Rules 11 or 37 is an attempt to distract from the real issues before the Court. Even if either rule did apply, the Court's inherent powers would remain available to address Jim's misconduct.

B.  **Jim made false statements and material omissions of fact.**

In arguing first that he did not violate the TRO, Jim tries to slip past the threshold issue: his concealment of material facts and outright misstatements of fact to the Court. The Supreme Court settled long ago that concealment or misstatement are punishable as contempt if their tendency is to obstruct the process of justice. *See Clark v. United States*, 289 U.S. 1, 10 (1933). Jim's false statements and omissions obstructed justice by enabling Jim to secure a narrower TRO than the Court otherwise might have issued.

Jim made a false statement of fact when he stated, under penalty of perjury, that he had not "directly or indirectly, carried on, engaged in as an owner, part owner, manager, operator, employee, agent, or other participant in the business of trucking in the continental United States of America in which JDT carried on a like business in such area." [Filing 22-1 ¶ 27.]

4

The evidence that Jim was a participant in the business of trucking in direct competition with JDT, beginning at the latest on October 1, 2024, is overwhelming. Jim doesn't seriously contend otherwise. His lawyers argue he was not "operating" any trucking company that hauled flatbed freight. But the Noncompete Provision is not limited to "operating." It covers engagement, "directly or indirectly," as a "participant." Jim was not just leasing trucks. He was actively planning the continuance of his old trucking business centered on Loyal Trucking, using trucks from his other companies, including JLD Truck Lines and J&L. The Noncompete Provision is also not limited to hauling flatbed freight, as Jim still tries to argue. But even it was, the Business Plan for Loyal Trucking dated October 29, which Lana sent to an insurance broker on October 28, clearly stated that Loyal Trucking "will provide over the road flatbed trucking for all 48 continental United States," and had an "established customer list," "experienced drivers," and "experienced office and shop personnel." [Filing 75-2.]

Even if the Court somehow concludes that what Jim stated in paragraph 27 of his Declaration was true, he still concealed material facts. Jim argues "a witness is not required to discuss everything under the sun in a declaration." [Filing 85 at 11.] A witness is, however, required to tell the truth and not omit facts which, when missing, mislead the Court. The clear implication of Jim's statements that Loyal Trucking and JLD Truck Lines only leased trucks and that J&L only leased real estate was to conceal the fact that Jim was engaged in the

5

business of trucking, and that he was setting up a business, centered on Loyal, to compete with JDT during the term of the Noncompetition Provision.

These omissions were directly material to Jim's Declaration. Jim was also fully aware of them when he submitted his Declaration on October 30. On October 23, Jim texted RaNae, "We can start running flatbed freight if we can get trailers and activate loyal so we will be talking more this week." [Filing 54-19.] On October 28, Jim texted Jeremy Becker that "the enemy" had gotten his email describing their collaboration. [Filing 54-22.] Also on October 28, Jim texted Bryan Watson to help effectuate the plan to use Loyal Trucking. [Filing 87-10.] Moreover, Jim was undoubtedly aware that his wife and business partner, Lana, had prepared and submitted a Business Plan for the venture, which she emailed to an insurance broker on October 29. [Filing 75-3.] The plan to activate Loyal Trucking did not just slip Jim's mind. He omitted it **because** it was material to the issues before the Court.

Jim tries to fault JDT for not calling him on his lies: "Rick was present at the TRO hearing, testified, and could have clarified that J&L owned and leased trucks if he thought that fact was material." [Filing 85 at 12.] Jim had a positive obligation to tell the truth, not a license to lie unless the opposing party called him out. Even if accepted at face value, Jim's argument ignores what is most significant about J&L's involvement: the fact that J&L was contributing its trailers directly to Loyal Trucking's flatbed trucking business. JDT had no reason to know this without candor from Jim, and Jim concealed it from the Court.

6

Jim got caught with his hand in the cookie jar. He then lied to a federal court, under the penalty of perjury, about what he had been undertaking, to limit the damage. That alone warrants sanctions. *Chambers v. NASCO*, Inc., 501 U.S. 32, 44–45 (1991).

## C. Jim violated the TRO.

Having succeeded in getting a more limited TRO, Jim violated even that. Jim argues he did not violate the TRO because in his view, it expressly permitted him to continue to operate his other companies that were in existence at the time the Asset Purchase Agreement was executed, which include: Columbus Transportation & Logistics, LLC ("CTL"); Loyal Trucking, LLC ("Loyal Trucking"); JLD Truck Lines, LLC ("JLD"); and J&L Trucking LLC ("J&L"). [Filing 25 at p.2.] This argument misconstrues the scope and purpose of the TRO and relies on a misleading portrayal of Loyal Trucking's activities.

Jim scolds JDT for not quoting the entire TRO, but it is Jim who tries to ignore its controlling provisions. The TRO prohibited Jim or anyone acting on his behalf or in concert with him from engaging "in the business of trucking in the continental United States of America." It also expressly ordered Jim "may not provide any other company advice as to how to operate a trucking company." [Filing 25.] At the TRO hearing, the Court made clear that advice was part of a broader prohibition on participation: "He cannot participate, give advice, even if he's not getting paid for it." [Filing 73, Tr. at 43:25–44:4.] Tellingly, Jim's opposition brief omits any mention of this provision of the TRO or the Court's statement at the TRO hearing.

7

Jim was engaged in carrying out a plan (his plan) to "activate" Loyal Trucking. The redemption agreements Jim signed with Loyal Trucking and JLD Truck Lines didn't change that plan.[1] Jim said he expected the "kids" to finish what he had started. Jim continued to participate. Not only did Jim leave his $1 million-plus investment in place, but he also contributed an additional $50,000 as well as trucks and trailers from J&L. To the extent Jim tries to argue he was only prohibited from advising, the evidence shows he did that as well—speaking to those engaged in the enterprise, including Loyal Trucking employees, on a near-daily basis throughout the month of November.

To the extent Jim may argue his communications didn't relate to the business of trucking, he has lost all credibility. Documents show Jim lied in his Declaration with respect to what happened before October 30. The same is true after that date. Jim had one thing in common with the people he spoke to by phone in November: the "business of trucking."

---

[1] Jim can't get his story straight concerning the alleged redemption of his ownership interests in Loyal Trucking and JLD Truck Lines. The redemption agreements were dated October 29 and stated they were "effective" October 29. In his Declaration on October 30, Jim stated he was an owner of Loyal Trucking and JLD Truck Lines. [Filing 22-1 ¶ 6.] In his Brief in Opposition to JDT's Motion for Preliminary Injunction, Jim claimed he sold his interests on October 29. [Filing 68 at 7.] Now, in his Brief in Opposition to JDT's Motion for Contempt Sanctions, Jim argues the sale was "effective" November 1. [Filing 85 at 14.] This is so even though the redemption agreements state they are "effective" October 29. [Filing 61-11.] The agreements refer to a closing on November 1, but don't state what documents were to be exchanged at closing, and there is no evidence that a closing ever took place. None of this was disclosed to the Court and JDT when it should have been in Jim's Declaration. JDT agrees with Jim's meandering statements on his ownership of Loyal Trucking and JLD Truck Lines to this extent—as of October 30, when Jim signed his Declaration, nothing of substance had changed regarding his investment in Loyal Trucking and JLD Truck Lines. None of his investment had been repaid. In that sense, he remained an owner. Since that time, nothing of substance has changed. Loyal Trucking and JLD have continued to use Jim's capital, which he contributed to the enterprise, to compete with JDT.

## CONCLUSION

This is not "heads I win, tails you lose." Jim loses for two reasons. First, he lied to the Court to secure a more limited TRO than the Court is likely otherwise to have entered. He even went out to dinner to celebrate with his friends who were and continue to be involved. Second, having secured a more limited TRO, Jim promptly ignored it and did what it prohibited. In so doing, he failed to heed the Court's admonition that he "really needs to think about what he's doing in that regard." [Tr. at 42:15–25.] It is hard to imagine a clearer case in civil litigation for the imposition of sanctions.

Dated February 24, 2025

                                            JIM DAWS TRUCKING, LLC,
                                            Plaintiff

                            By     s/ Andre R. Barry
                                        Andre R. Barry #22505
                                        Henry L. Wiedrich #23696
                                        Madeline C. Hasley #27870
                                        CLINE WILLIAMS WRIGHT
                                        JOHNSON & OLDFATHER,
                                        L.L.P.
                                        233 South 13th Street
                                        1900 US Bank Building
                                        Lincoln, NE 68508
                                        (402) 479-6900
                                        abarry@clinewilliams.com
                                        hwiedrich@clinewilliams.com
                                        mhasley@clinewilliams.com

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the word count of this brief complies with local rule NECivR 7.1(d). The word-count function of Microsoft Word M365, states that this brief, inclusive of all text, contains 2324 words. No generative artificial intelligence program was used in drafting this brief.

s/ Andre R. Barry<br>
Andre R. Barry

**CERTIFICATE OF SERVICE**

I, Andre R. Barry, hereby certify that on February 24, 2025, I electronically filed the foregoing with the Clerk of the United States District Court for the District of Nebraska using the CM/ECF system, which sent notification of such filing to all registered case participants.

s/ Andre R. Barry<br>
Andre R. Barry

4933-5905-7183, v. 4