IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>DAWS, INC., JAMES R. DAWS, LANA R. DAWS,  DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC,<br><br>Defendants. | 4:24CV3177<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Plaintiff Jim Daws Trucking, LLC's ("JDT") Motion for a Preliminary Injunction (Filing No. 17) and JDT's Motion for Contempt Sanctions (Filing No. 78).  A hearing on the motions was held February 26, 2025 through February 28, 2025, and then continued to March 12, 2025.

Having reviewed the record, and upon hearing the matter, the Court will grant the Motion for Preliminary Injunction and deny JDT's Motion for Contempt Sanctions.

**SUMMARY OF FACTS**

Over the course of several days in the courtroom, the parties presented a tremendous amount of information.  For purposes of brevity, the Court will not restate or summarize all evidence heard. Instead, the Court will highlight the points relevant to its findings in this Memorandum and Order.  Make no mistake, all evidence and arguments have been considered.

However, based on where this litigation presently stands, a recitation of the entire record is unnecessary.[1]

This litigation arises out of an Asset Purchase Agreement ("APA") executed between Plaintiff JDT and Defendant Daws Incorporated ("Daws, Inc.") on May 4, 2022. (Filing No. 54-1.) Under the APA, JDT was to acquire a trucking business (commonly referred to as Daws Trucking), which was owned and operated by Jim Daws ("Jim"). The purchase price was $12 million. (Filing No. 54-1.) JDT was to pay Daws, Inc. $8 million in cash, and Daws, Inc. was to finance the balance of the purchase through a loan to JDT. (Filing No. 22-1.) According to Jim, JDT has since defaulted on the loan and owes Daws, Inc. over $2.4 million. (Filing No. 22-1.)

The APA states that Daws, Inc. "owns and operates a company specializing in hauling over the road flatbed freight" and that Daws, Inc. "desires to sell the Business as a going concern." (Filing No. 54-1.) The "Business" was defined by the APA as "Daws Trucking." The sale included the "trade, business name, goodwill, and all other intangible assets of the Business, including but not limited to Business's US DOT Number . . . and Motor Carrier number . . . and all other assets of the Business." (Filing No. 19-2.) The APA also contained a noncompetition provision, which provides:

> It is understood and agreed that $4,500,000 of the purchase price shall be allocated to the goodwill of the Business, and in connection with the sale to the Buyer of the goodwill, Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any other person deriving title to the goodwill of said business from Buyer carries on a like business in such area.
>
> By affixing their signatures to this Agreement, Seller's Shareholders join in the foregoing noncompetition agreement and agree to be individually bound thereby.

(Filing No. 54-1.) The APA was signed by Jim, as President of Daws, Inc., and Ricardo Fernandez ("Rick") and Ricardo D. Fernandez ("Ricky") on behalf of JDT. (Filing No. 54-1.) Jim and his wife, Lana Daws ('Lana"), also signed the APA in their capacities as shareholders of Daws, Inc.,

---

[1] Findings of fact in a ruling on a motion for a preliminary injunction are "provisional" and are not binding in subsequent proceedings. *See Campaign for Fam. Farms v. Glickman*, 200 F.3d 1180, 1186 (8th Cir. 2000) ("[T]he district court's findings of fact and conclusions of law on an application for a preliminary injunction are tentative and provisional, in the sense that different findings might be warranted after a trial on the merits") (quotation omitted).

and agreed to be bound by the non-compete provision. (Filing No. 54-1.) Following the sale of the business, Jim became a salaried employee of JDT. (Filing No. 19-1.)

At the time the APA was executed, Jim was the owner, or part owner, of several other companies, including Defendants Daws Trucking, Inc. ("DTI") and Columbus Transportation & Logistics, LLC. ("CTL"). DTI, which has been in existence since 2002, was the operating company that Daws Trucking ran trucks under before the sale. (Filing No. 104 at CM/ECF p. 210.) DTI was not sold as part of the APA and does not have any employees. (Filing No. 104 at CM/ECF pp. 210-11.) "At one point," DTI sold and leased trucks to third parties. (Filing No. 104 at CM/ECF p. 211.) CTL is a registered freight broker with the Federal Motor Carrier Safety Administration ("FMCSA"). (Filing No. 104 at CM/ECF pp. 204-05.) CTL does not own trucks or trailers and has no authority to carry freight. (Filing No. 104 at CM/ECF pp. 205.)

Jim and Lana also own J&L Enterprises, LLC ("J&L"), which began operations around 2000. (Filing No. 104 at CM/ECF pp. 211-12.) J&L owns real estate, including an office and shop, which it leased to JDT after the APA.² (Filing No. 104 at CM/ECF p. 212.) J&L also owns around 12 trucks, but it does not have a DOT number or any employees. (Filing No. 104 at CM/ECF pp. 215, 217.) Until October 2024, Jim also had a 50% ownership interest in JLD Truck Lines, LLC ("JLD"), which was formed around 2008. (Filing No. 104 at CM/ECF pp. 218-19.) JLD owned trucks that it leased to third parties. (Filing No. 104 at CM/ECF pp. 219.) At the time of the APA, Jim also had an ownership interest in Loyal Trucking LLC ("Loyal"). (Filing No. 104 at CM/ECF pp. 221-222.) He held this ownership interest with Corey Stull ("Corey") and Stanley Craig ("Craig"). (Filing No. 104 at CM/ECF pp. 221-22.) Loyal leased tractors and trailers to third parties. (Filing No. 22-1.) After the sale of Daws Trucking, J&L and JLD both leased trucks to JDT. (Filing No. 104 at CM/ECF pp. 219-21.)

The working relationship between Rick and Jim soured following execution of the APA. This discontent ultimately resulted in discussions during the spring of 2024 about Jim buying-back the assets of the business. (Filing No. 88-27.) In the summer of 2024, Jim began communicating with Jeremy Becker ("Jeremy")—the Chief Revenue Officer of another trucking company—about a business opportunity which involved Jim buying back JDT from Rick. (Filing No. 104 at

---

² Since January 1, 2025, the office and shop have been leased to Loyal Trucking LLC. (Filing No. 104 at CM/ECF pp. 214-15).

3

CM/ECF pp. 50, 247.) In an email to Jim dated July 23, 2024, Jeremy thanked Jim for "thinking of me when it comes to showing [me] an opportunity at a respected company you have built." (Filing No. 19-1; Filing No. 19-7.) In August and September, 2024, text messages continued to be exchanged between the two about Jim's plan to buy out Rick, and then Jeremy coming to work for Daws Trucking. (Filing Nos. 86-5 through 86-15; Filing No. 104 at CM/ECF pp. 56-57.) Then, on September 17, 2024, Jim's attorney, Julie Karavas, sent JDT's current counsel a letter stating that Jim was no longer interested in repurchasing the assets sold in the APA. (Filing No. 54-2.) After that, between September 24, 2024 and the date this lawsuit was filed, there were more conversations between Jim and Jeremy about Jeremy working with Jim in the trucking industry. (Filing No. 54-6; Filing No. 86-16; Filing No. 86-17; Filing No. 86-18; Filing No. 86-19.)

In August 2024, Jim told Rick that he was leaving JDT because he was going to retire.[3] (Filing No. 104 at CM/ECF pp. 60-61, 71.) Jim told Rick that other employees may not stay at JDT after he left. (Filing No. 104 at CM/ECF p. 60.) Jim informed Rick that he planned to retire in October 2024. (Filing No. 104 at CM/ECF pp. 60-61.) Jim testified that he told JDT employees sometime around September 24, 2024 that he was leaving effective September 30, 2024. (Filing No. 104 at CM/ECF p. 72.) On September 27, 2024, many of JDT's employees resigned. Tony Glenn ("Glenn"), who was JDT's Chief Financial Officer, also resigned effective September 27, 2024. (Filing No. 105 at CM/ECF pp. 485-86.) On September 27, 2024—while still a JDT employee—Jim sent an email to the other JDT employees listing contact information for everyone. (Filing No. 54-7.) Jim testified that he intended to continue working with some of them in the business of trucking after he left JDT. (Filing No. 104 at CM/ECF p. 74.)

Following the group resignation of employees, Rick physically removed JDT's computer server. Rick learned that during the week leading up to September 27, 2024, Glenn had emailed records from his Daws Trucking email address to a personal Gmail account. (Filing No. 87-12.) According to Jim, these records pertained to Jim's other companies that were housed on JDT's server. (Filing No. 22-1.) Since September 27, 2024, JDT has lost most of its office personnel and over half of its drivers. (Filing No. 19-1.)

---

[3] Jim acknowledged at the evidentiary hearing that he was not going to retire if he got Rick bought out. (Filing No. 104 at CM/ECF pp. 60-61, 71.)

4

JDT filed this suit on October 2, 2024, asserting claims for breach of the APA against Daws, Inc. and Jim; breach of fiduciary duty against Jim; tortious interference against Jim, DTI and CTL; and declaratory and injunctive relief against Jim and Lana. (Filing No. 1.) The Complaint sets forth numerous allegations. Most significantly, the Complaint alleges that Jim and Daws, Inc. are operating a competing trucking business in violation of the non-compete provision in the APA. The Complaint also alleges that Daws, Inc. has refused to transfer business assets sold to JDT under the APA, including the DOT number associated with Daws Trucking. (Filing No. 1.) The Complaint further alleges that Jim encouraged JDT employees and drivers to quit working with JDT and to come work for another entity owned or affiliated with Jim. (Filing No. 1.)

On October 22, 2024, JDT discovered an email from Jeremy that had been sent to Jim's old JDT email address. (Filing No. 19-1; Filing No. 19-9.) In the email, Jeremy asked Jim to tell him "more about how you see ownership among [RaNae Muenchrath], Corey, and myself." (Filing No. 19-9.) Corey and Ranae are both former JDT employees. (Filing No. 19-1.) The email further states: "You mentioned you get your property back on [October] 31. Does this include everything except the trucks/trailers and staff that Rick has? Do you figure to move back into that property as fast as you can to help expedite our venture, right?" (Filing No. 19-9.) Jeremy further stated: "By the way, you (Jim) walking me through this is worth its weight in gold. One of the many big reasons I want to work with you moving forward is your knowledge and experience in all the categories I am asking about. You will teach me a ton about knowing more on the profitability of a trucking company." (Filing No. 19-9.) Then, on October 23, 2024, in a text message to RaNae, Jim said "we can start running flatbed freight if we can get trailers and activate loyal so we will be talking more this week. Jeff [Keeler] and I are having breakfast at pac n save at 8 if you want to join us." (Filing No. 54-19.)

On October 25, 2024, JDT's attorneys sent Jim's attorneys a letter demanding that Jim comply with his non-compete obligations and cease-and-desist all activity in the business of trucking. (Filing No. 19-10.) On October 28, 2024, Jim's attorneys responded with an email stating: "To be clear, neither Jim nor Lana, nor any of their companies, will have an ownership in whatever business [Jeremy] is planning and they have not received, nor will they receive, any payment relating to that business." (Filing No. 19-11.)

On October 29, 2024, Jim, with the help of attorney Julie Karavas, executed agreements pursuant to which Jim redeemed his equity interests in Loyal and JLD ("Redemption Agreements"). (Filing No. 61-10; Filing No. 61-11.) Jim testified that the idea for the Redemption Agreements occurred around October 19, 2024, and that he received a copy of the Redemption Agreements sometime before October 28, 2024. (Filing No. 104 at CM/ECF pp. 147-48.) Jim testified that the Redemption Agreements were executed so Loyal and JLD could continue to operate due to Jim's non-compete with JDT. (Filing No. 104 at CM/ECF pp. 148, 151.)

Under the redemption agreement applicable to Loyal, Jim sold his interest in Loyal to Corey and Craig for $666,667, effective November 1, 2024. (Filing No. 61-11.) Jim received $10,000 in cash for this redemption. Jim did not cash the $10,000 check until February, 2025. (Filing No. 104 at CM/ECF pp. 150-51, 198.) Other than the $10,000, Jim has not received any payment from Loyal, but Loyal has signed a promissory note agreeing to pay Jim $656,667 over five years, beginning in June 2025. (Filing No. 104 at CM/ECF p. 150; Filing No. 61-11.) Under the redemption agreement pertaining to JDL, Jim sold his interest to Keeler for $500,000. (Filing No. 61-10.) Of that amount, Jim has received a check for $25,000. (Filing No. 104 at CM/ECF pp. 151, 155.) As of the date of the preliminary injunction hearing, Jim had not cashed the check. (Filing No. 105 at CM/ECF pp. 315-16.) Jim expects to receive an additional $475,000 from JDL based on a promissory note executed in connection with the redemption agreement for JLD, agreeing to pay Jim over five years beginning June 1, 2025. (Filing No. 104 at CM/ECF p. 155; Filing No. 61-10.)

On October 29, 2024—the same day the Redemption Agreements were executed—JDT filed a motion seeking a temporary restraining order, preliminary injunction, and expedited discovery. A hearing on the request for a temporary restraining order ("TRO") was scheduled for October 30, 2024. In advance of the hearing, Defendants submitted the Declaration of Jim Daws ("Declaration"), in which Jim states: "I am co-owner of companies with other non-related partners who own and lease tractors and trailers to third parties. For example, I own one third of the membership shares in Loyal Trucking, LLC and 50% of the membership interests in JLD Truck Lines, LLC." (Filing No. 22-1.) The Declaration also says that "Other than my work performed as an employee of JDT for JDT, at no time since the APA have I directly or indirectly carried on, engaged in as an owner, part owner, manager, operator, employee, agent, or other participant in

6

the business of trucking in the continental United States of America in which JDT carried on a like business in such area." (Filing No. 22-1.)

      Jim's Declaration does not mention that Loyal has its own DOT number, or that there was a plan to activate Loyal's DOT number to start running flatbed trucks. (Filing No. 104 at CM/ECF p. 140.) On October 29, 2024—the day before Jim's Declaration was executed—Lana had submitted a business plan for Loyal to insurance broker, Larry Needer ("Needer"). (Filing No. 75-2.) The business plan states that Loyal "will provide over the road flatbed trucking for all 48 continental United States" and "will operate thirty (30) plus tractors." (Filing No. 75-2.) It also states Loyal has an established customer list, experienced drivers, and experienced shop personnel. (Filing No. 75-2.) Jim testified at the hearing on the preliminary injunction that he had spent part of October on a plan for Loyal to be engaged in the trucking business. (Filing No. 104 at CM/ECF p. 140.) Jim claims it was Corey's idea to activate the DOT number. (Filing No. 104 at CM/ECF p. 140.) Jim acknowledged that he was part of some of the conversations to activate the DOT number and that he was an owner of Loyal at the time. (Filing No. 104 at CM/ECF pp. 140-41.) Although Jim admits he was part of the plan to activate Loyal, he said he had nothing to do with the business plan. (Filing No. 104 at CM/ECF pp. 141-42.) Jim testified that he understood there was a plan for Loyal to operate at the hub of a trucking business with most of the same drivers, office staff, shop staff, and customer base (including top customers) he had at JDT. (Filing No. 104 at CM/ECF pp. 140-43.)

      Jeremy testified at the hearing on the preliminary injunction that Jim did not tell him about Loyal, and that he learned about Loyal through Corey and RaNae. (Filing No. 105 at CM/ECF pp. 402-03.) Jeremy testified that he communicated about Loyal with Jim because Corey and RaNae were not good communicators. (Filing No. 105 at CM/ECF pp. 405-07.) Jeremy stated that he assumed Jim was an owner of Loyal. (Filing No. 105 at CM/ECF p. 407.)

      A hearing on JDT's request for a TRO was held on October 30, 2024. (Filing No. 24.) At the hearing, the Court questioned Jim's counsel about the nature of Jim's other businesses. (Filing No. 73.) Jim's counsel was not entirely certain as to those companies' operations but understood from Jim that the companies owned tractors and trailers and all they did was lease them to third parties. (Filing No. 22-1; Filing No. 73 at CM/ECF pp. 33-34.) The Court expressed concern that Jim would be competing against JDT if Jim would be working with Corey and RaNae, and

7

specifically stated that Jim could not have anything to do with Jeremy, the business venture mentioned in the emails, or the other two from JDT Trucking—meaning, Corey and RaNae. (Filing No. 73 at CM/ECF p. 40.)

Immediately following the hearing, the Court granted the request for a TRO, in part, prohibiting Jim, and anyone acting on his behalf or in concert with him, from engaging in the business of trucking in the continental United States of America, which included the venture described in Jeremy's emails to Jim on July 23, 2024 and October 22, 2024. (Filing No. 25.) The Court found that Jim could, however, continue to operate his other companies that were in existence at the time the APA was executed, including CTL, Loyal, JLD, and J&L. (Filing No. 25.) The Court stated that Jim could also lease his real estate to whomever he deemed appropriate but if he leased the property to a trucking company, he could not provide the company any advice as to how to operate the company. (Filing No. 25.) Then, on October 31, 2024, Jim emailed his attorney of record in this case,[4] stating "I would expect that Corey, Ranae, and Jeremy will finish getting a trucking company going." (Filing No. 87-23.)

On November 7, 2024, J&L filed suit against JDT in the District Court of Lancaster County, Nebraska. JDT removed the case to this Court on December 4, 2024. (Case No. 4:24CV3222, Filing 1.) J&L alleges in its complaint that it leased semi-tractors to JDT, but that JDT has refused to provide an accounting to J&L for the cargo JDT hauled using J&L's tractors and has also failed to pay J&L for use of its tractors. (Case No. 4:24CV3222, Filing 1.)

On February 11, 2025, JDT filed a Motion for Contempt Sanctions (Filing No. 78) in this case, requesting that Jim be held in contempt of Court for alleged false statements and omissions of fact in his Declaration, as well as for alleged violations of the Court's TRO. JDT alleges that documents produced during discovery show that Jim has continued to participate in the venture described in the July 23, 2024 and October 22, 2024 emails in violation of the Court's TRO.

---

[4]Attorney-client privilege was waived as to this email because Jim forwarded the email to Jeremy and another individual. (Filing No. 87-23.)

## DISCUSSION

### 1. Motion for Preliminary Injunction

JDT seeks a preliminary injunction prohibiting Jim and anyone acting on his behalf or in concert with him from engaging in or carrying on, either as an owner, part owner, manager, operator, employee, agent, or other participant, in the business of trucking in the continental United States. This prohibition is to include actions taken in connection with any company that Jim holds a financial or ownership interest, to include Loyal Trucking, JLD, J&L, and CTL. JLD also requests that the Court prohibit Jim from interfering with JDT's use of funds in the American National Bank account that was used by JDT to operate its business.

In deciding a motion for injunctive relief, the court considers (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction would inflict on other interested parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.dd 109, 114 (8th Cir. 1981)). Because a preliminary injunction is an extraordinary remedy, the movant bears the burden of establishing its propriety under these factors. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). "No single factor is determinative." *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 974 (D. Neb. 2008).

#### A.   Probability of Success on the Merits

Likelihood of success on the merits is the most significant factor in the determination of whether a preliminary injunction should be issued. *Laclede Gas Co. v. St. Charles Cty*, 713 F.3d 413, 419-20 (8th Cir. 2013). To succeed on this factor, the movant "need only show a reasonable probability of success, that is, a fair chance of prevailing." *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

Jim contends JDT cannot succeed on its breach of contract claim because the covenant not to compete is unenforceable. "In Nebraska, partial restraints of trade, like non-compete and non-solicitation agreements, are not automatically invalid." *West Point Auto & Truck Center, Inc. v.*

*Klitz,* 492 F. Supp.3d 936, 942 (D. Neb. 2020). To be valid and enforceable, a non-compete agreement must be "(1) reasonable in the sense that it is not injurious to the public, (2) not greater than is reasonably necessary to protect the employer in some legitimate interest, and (3) not unduly harsh and oppressive on the employee." *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 275 Neb. 642, 748 N.W.2d 626, 638 (2008).

"Courts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts of employment." *West Point Auto*, 492 F. Supp.3d at 943 (quotation omitted). "[A] covenant not to compete which is contained in a contract for sale of a business is a seller's self-imposed restraint from trade and is frequently necessary to make goodwill in the seller's business a transferable asset and ensure that the buyer receives the full value of acquired goodwill." *Chambers-Dobson, Inc. v. Squier,* 238 Neb. 748, 756, 472 N.W.2d 391, 398 (1991). "The rationale behind the differential treatment is that in a sale of a business, it is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area, and then use the funds thus obtained to do the very thing the contract prohibits." *H & R Block Tax Servs. v. Circle A Enters.,* 269 Neb. 411, 417–18, 693 N.W.2d 548, 554 (2005) (quotation omitted). However, "[i]n the sale of a business the restraining promise is illegal as to lines of trade other than those sold by the party whom the covenant restrains." *Antrim v. Pittman*, 189 Neb. 474, 476, 203 N.W.2d 510, 512 (1973).

The restraint contained in the covenant must be reasonable in both space and time so that it will be no greater than necessary to achieve its legitimate purpose. *Presto–X–Co. v. Beller,* 253 Neb. 55, 568 N.W.2d 235, 239 (1997). "Whether such a covenant not to compete is reasonable with respect to its duration and scope is dependent upon the facts of each particular case." *Unlimited Opportunity, Inc. v. Waadah,* 290 Neb. 629, 861 N.W.2d 437, 443 (2015). Therefore, "unless a provision is impermissibly vague or plainly overbroad," an effective enforceability analysis "often necessitates full development of the record." *Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 194 (D.D.C. 2015).

Paragraph 12 of the APA sets out a noncompetition provision, which states:

> It is understood and agreed that $4,500,000 of the purchase price shall be allocated to the goodwill of the Business, and in connection with the sale to the Buyer of the goodwill, Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any other person deriving title to the goodwill of said business from Buyer carries on a like business in such area.
>
> By affixing their signatures to this Agreement, Seller's Shareholders join in the foregoing noncompetition agreement and agree to be individually bound thereby.[5]

(Filing No. 19-2.) This provision was drafted by Jim's attorneys. Nevertheless, Defendants contend the non-compete is overly broad and unenforceable because it seeks to bar them from participating directly or indirectly in an *entire* industry ("the business of trucking"), even though JDT (and Daws Trucking before it) only operates in the flatbed submarket. Defendants also argue the non-compete is unduly harsh in geographic scope because it extends to the entire "continental United States of America." Finally, Defendants claim the five-year duration is excessive and that there is no evidence to justify the duration of this restraint. The Court finds each of these arguments unpersuasive.

The APA is clear that part of the sale was for goodwill, meaning Jim's name and reputation in the trucking industry. Jim's reputation does not solely exist in the flatbed trucking market. The evidence adduced shows that that reputation Jim built extended to the entire trucking industry. The scope of the non-compete to cover "the business of trucking" is not broader than necessary to protect the interests that JDT purchased. Further, where a company's business is nationwide such as JDT's, a more expansive geographical restriction is often appropriate. Even a geographic restriction to the "United States" can be reasonable when this territory is coextensive with the employer's trade. *Hulsenbusch v. Davidson Rubber Co.*, 344 F.2d 730, 736 (8th Cir. 1965). Also, the five-year duration is likewise reasonable considering the size and type of business purchased. The Court finds the non-compete provision that Jim's attorney drafted, and that Jim agreed to be bound by at the time he sold his business for $12 million, is valid and enforceable.

---

[5] The shareholders included Jim and Lana Daws. (Filing No. 19-2.)

Defendants alternatively argue that even if the non-compete is enforceable, JDT has failed to produce evidence that the provision was breached. The Court disagrees. JDT has, at the very least, a fair chance of prevailing on the merits. The evidence shows that Jim was engaged with Jeremy about the prospect of Jeremy working in a business venture with Jim. At one point, this venture appeared to be running Daws Trucking once the assets were repurchased from Rick. However, when it became clear the repurchase was not going to occur, communications continued between Jim and Jeremy about a business venture—specifically, Jeremy partnering with RaNae and Corey to run Loyal. Jim admitted at the evidentiary hearing that he spent part of the month of October on a plan for Loyal to be engaged in the trucking business and that he was part of the conversations about the activation of Loyal's DOT number. Jim was aware that a business plan had been created. He understood that a plan was coming together for Loyal to operate at the hub of a trucking business with some of the same drivers, staff, and customers as JDT. There is sufficient evidence that the non-compete provision was breached to support the entry of a preliminary injunction.

Jim also argues a preliminary injunction should not be granted because JDT cannot succeed on its breach of duty of loyalty claim against him. "Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his employment irrespective of the existence of a covenant not to compete or nonsolicitation clause." *West Plains, L.L.C. v. Retzlaff Grain Co.*, 870 F.3d 774 (8th Cir. 2017) (quotation omitted). "To give rise to liability, the employee's disloyal conduct must be so harmful as to substantially hinder the employer in the continuation of his business." *Id*. Jim contends he did not coordinate a mass resignation of employees, but rather employees left because they did not like or trust Rick. Jim also contends he did not encourage drivers to quit or work for a competing venture. The Court will not assess JDT's likelihood of success on its breach of loyalty claim in this Memorandum and Order. It is a fact dependent claim, and resolution of this issue is unnecessary at this point. JDT has already demonstrated a likelihood of success on its breach of contract claim, which is sufficient to satisfy this factor of the preliminary injunction analysis.

  B.  **Threat of Irreparable Harm to JDT**

"[I]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v.*

*Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quotation omitted). The mere "possibility of irreparable harm" will not suffice. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) The movant "must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023) (quotation omitted).

A significant portion of the purchase price of Daws Trucking was attributed to good will—$4.5 million to be exact. The Eighth Circuit has previously recognized that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury" and that "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Med Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (internal quotation omitted). *See also Right at Home, LLC v. Gaudet*, No. 8:20CV462, 2021 WL 308237, at *1 (D. Neb. Jan. 29, 2021) ("An award of money damages for breach of contract will not compensate . . . for the damage to . . . reputation and loss of goodwill . . . Damages to reputation and goodwill are not quantifiable"); *Am. Express Fin. Advisors, Inc. v. Yantis*, 358 F. Supp.2d 818, 835 (N.D. Iowa 2005) ("The courts of a number of states have held that the mere violation of a valid covenant not to compete supports an inference of the existence of the threat of irreparable harm . . . The Eighth Circuit Court of Appeals has employed this approach without concern of any particular state's laws"). Under the present circumstances, the amount of damages would be difficult, if not impossible, to ascertain with any degree of certainty. Therefore, the Court finds that JDT has satisfied its burden of showing a threat of irreparable harm.

### C.     Balance of Harms & Public Interest

Consideration of the balance of the harms factor requires the Court to balance the harm to the movant against the injury that granting the injunction will inflict on other litigants. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022). To prevail, the movant must show that "the balance of equities so favors [the movant] that justice requires the court to intervene to preserve the status quo until the merits are determined." *Sessler v. City of Davenport*, 990 F.3d 1150, 1157 (8th Cir. 2021) (quotation omitted).

Jim maintains that an injunction would primarily harm drivers who lease trucks from his other companies who need to haul loads to make ends meet, as well as employees and contractors

13

who are not bound by any non-compete. However, the Eighth Circuit has found that the balance of harms weighs in favor of the movant where the injury to the non-movant was "largely self-inflicted." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997 (8th Cir. 2011). *See also The Maids Int'l, Inc. v. Maids on Call, LLC*, No. 8:17CV208, 2017 WL 4277146, at *10 (D. Neb. Sept. 25, 2017) ("Where a party brings harm upon itself by virtue of its own recalcitrant behavior, the party opposing the injunction can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself"); *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 (S.D. Ohio 2000) (explaining that any harm to the defendant from restraining his violation of non-compete provisions "would be as a direct result of his own actions" because the defendant "was aware of the restrictive covenants, yet he chose to [violate them]").

Jim decided to accept $12 million for the sale of his business. He had his attorneys draft the covenant not to compete. He made the decision to leave JDT and then decided to be part of a plan to activate Loyal to compete with JDT. Lana made the choice to draft Loyal's business plan to further this venture. Quite honestly, any harm to Defendants is a monster of their own creation. The balance of harms favors JDT.

As to the public interest, this Court agrees with JDT that the public has an interest in enforcing contractual obligations. *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1019 (8th Cir. 2022). *See also Cigna Corp.v. Bricker*, 103 F.4th 1336, 1348 (8th Cir. 2024) (citing the same public interest in enforcing reasonable contract provisions in a case involving a non-compete agreement). This factor likewise weighs in favor of issuing a preliminary injunction.

D.     **Scope of the Preliminary Injunction & Security Requirement**

The Court finds the entry of a preliminary injunction is warranted in this case and therefore must now consider its proper scope. Importantly, the Court has the authority to grant a preliminary injunction not just against principal actors. It may also enter a preliminary injunction against officers, agents, servants, employees, and attorneys, as well as those persons in active concert or participation with such persons. *See* Fed. R. Civ. P. 65(d)(2). The Supreme Court has explained that the scope of a preliminary injunction is "often dependent as much on the equities of a given

case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (quotation omitted). Injunctive relief must also be "workable." *Id*.

Here, the Court finds the restrictions in the TRO applicable to Jim should remain in effect, but on a broader scale. Jim, and anyone acting on his behalf or in concert with him, will be barred from engaging in the business of trucking in the continental United States. Jim may not provide any company advice as to how to operate a trucking company. Jim will be prohibited from providing financial support to anyone carrying out the business plan for Loyal.[6] Jim may continue to operate his other companies that only lease real estate or lease or sell trucks to other companies, except that these companies may not lease or sell trucks or trailers to Loyal or otherwise use their assets to support Loyal.

As to the funds in the American National Bank ("ANB") account—JDT wants the funds released to JDT and for Jim to be ordered to take all steps necessary to do this. The Court finds this to be a reasonable request. These funds belong to JDT, not Jim. Jim claims he has an interest in the funds because Rick and Ricky have defaulted on their loan. However, Jim cannot unilaterally determine the money in this bank account is due and owing to him. In addition, JDT has not been sued for non-payment of the loan, only Rick and Ricky personally have been sued. Therefore, the funds in the ANB bank account need to be turned over to JDT, subject to any valid liens.[7] In addition, only JDT expenses may be paid out of this account. Rick and Ricky may not pay themselves or take a draw for themselves from this account due to the pending litigation. Jim shall have 14 days to take all necessary steps to turn over the money in the ANB account to JDT.[8]

---

[6] If Loyal wants to operate, it must pay Jim the full amount owed to him under its redemption agreement. Until such time as these funds are paid, Loyal may not operate due to Jim's financial interest in the company. Likewise, JLD may not use its equipment or assets to support Loyal unless it pays Jim the full amount it owes him under its redemption agreement.

[7] During the hearing, the Court was informed that there may be a bank lien on the funds. The parties shall work with the bank regarding this issue. The funds shall be turned over to JDT, subject to any valid liens on the money.

[8] If it is determined, after the parties have discussed this issue with the bank, that it would be more appropriate to pay the money into the Court until all issues can be resolved between the parties, the Court would consider this option upon the filing of a proper motion.

As to the bond requirement, Federal Rule of Civil Procedure 65(c) provides that the court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The "amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers, 826 F.3d 1030, 1043 (8th Cir. 2016) (quotation omitted).

In this case, the Court finds the appropriate bond amount to be $480,000, which is 12 times $40,000 of estimated income that JLD was bringing in per month. There is very little evidence in the record regarding Loyal's income or the amount of income Jim's other businesses generate from supporting Loyal's operations. There was testimony, however, that JLD's monthly income is between $40,000 and $45,000 per month. It is unclear, however, how much of this income is generated through business from Loyal. JDT argues Loyal would have similar income to JLD, and the Court has no evidence to the contrary. Because JLD will be prevented from providing support to Loyal until such time as Loyal and JLD each pay off the debt they owe to Jim and based on the shortage of evidence as to Loyal's income, the Court will use the $40,000 estimated monthly income figure to calculate the bond amount. However, this amount may be raised or lowered as the case progresses upon appropriate motion filed the parties. Therefore, JDT shall post a bond in the amount of $480,000.

2. **Motion for Contempt Sanctions**

"A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." In re Reed, 888 F.3d 930, 936 (8th Cir. 2018) (quotation omitted). "One of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject." Chicago Truck Drivers v. Brotherhood Labor Leasing, 207 F.3d 500, 505 (8th Cir. 2000). "A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order." Id.

JDT argues Jim should be held in contempt because he omitted information from his Declaration submitted in opposition to its motion for a TRO, made false statements in that Declaration, and has violated the TRO. The Court has carefully considered this issue and has decided not to sanction Jim for these omissions and/or misstatements given the preliminary injunction to be entered. However, the Court wants to make something crystal clear: The scope of the TRO previously entered would have been much broader had it known the extent of activities undertaken by Jim and Jim's other companies—particularly Loyal. The omission of this information was significant in the Court's evaluation of the request for a TRO. The Court attributes no wrongdoing to Defendants' counsel for this omission—counsel was going by what his clients told him and working on a very tight deadline. Defendants are advised, however, that in the event of non-compliance with the preliminary injunction or further omissions/misstatements, the Court will have no trouble reconsidering its ruling regarding contempt sanctions and then some.[9]

Accordingly,

**IT IS ORDERED:**

1. Plaintiff's Motion for a Preliminary Injunction (Filing No. 17) is granted.

2. Jim, and anyone acting on his behalf or in concert with him, is barred from engaging in the business of trucking in the continental United States. Jim may not provide any company advice as to how to operate a trucking company. Jim is prohibited from providing financial support to anyone carrying out the business plan for Loyal. Jim may continue to operate his other companies that only lease real estate or lease or sell trucks to other companies, except that these companies may not lease or sell trucks or trailers to Loyal or otherwise use their assets to support Loyal. If Loyal wants to operate, it must pay Jim the full amount owed to him under its redemption agreement. Until such time as these funds are paid, Loyal may not operate. JLD may not use its equipment or assets to support Loyal unless it pays Jim the full amount it owes him under its redemption agreement.

---

[9] On a similar note, the Court questions the credibility of several witnesses based on their testimony at the preliminary injunction hearing. Shifting stories and the inability to recall details, that only occurred months earlier, made it apparent that certain witnesses were not being entirely truthful with the Court.

3.     The funds in the ANB bank account shall be turned over to JDT, subject to any valid liens. Only JDT expenses may be paid out of this account.  Rick and Ricky may not pay themselves or take a draw for themselves from this account. Jim shall have 14 days to take all necessary steps to turn over the money in the ANB account to JDT.

4.     Pursuant to Federal Rule of Civil Procedure 65(c), the Court requires JDT to post a cash or surety bond with the Clerk of Court in the amount of $480,000.

5.     JDT's Motion for Contempt Sanctions (Filing No. 78) is denied.

Dated this 8th day of April, 2025.

BY THE COURT:

*Susan M Bazis*
Susan M. Bazis
United States District Judge