IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **JIM DAWS TRUCKING, LLC,** | |
| **Plaintiff,** | 4:24CV3177 |
| vs. | |
| **DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC,** | **MEMORANDUM AND ORDER** |
| **Defendants.** | |

This matter comes before the Court on Defendants' "Motion for Protective Order and Destruction of Privileged Documents in Plaintiff's Possession or Control" (Filing No. 34). Defendants seek a court order protecting from disclosure certain documents sought by Plaintiff because that they are protected by the attorney-client privilege. Plaintiff disputes the applicability of the attorney-client privilege to the documents identified by Defendants. And should the privilege apply, Defendants have expressly and/or impliedly waived it by sending e-mails on a work e-mail address and selling the server on which the e-mails are stored to Plaintiff. As explained below, the Court will deny the motion.

## BACKGROUND

On October 2, 2024, Plaintiff, Jim Daws Trucking, LLC ("JDT"), filed this action against Daws, Inc., James R. Daws ("Jim Daws" or "Jim"), Lana R. Daws ("Lana Daws" or "Lana"), Daws Trucking, Inc., and Columbus Transportation & Logistics, LLC ("CTL"), asserting claims of breach of contract, breach of fiduciary duty, tortious interference, and declaratory and injunctive relief. (Filing No. 1 at pp. 9-12).

Jim founded Daws Trucking, Inc. and served as its President. (Filing No. 35-1 at p. 1 ¶ 3). Jim and his wife also formed or acquired an ownership interest in other companies, including Daws Trucking, Inc., CTL, and J&L Enterprises, LLC, among others. (Filing No. 35-1 at p. 1 ¶¶ 3-4). In 2018 and 2021, Jim and Ricardo Fernandez ("Rick") discussed the sale of Jim's trucking business,

Daws Trucking, Inc. ("Daws Trucking"). (Filing No. 1 at p. 3). In 2022, Rick and his son, Ricardo Daniel Fernandez ("Ricky"), reached an agreement with Jim to purchase Daws Trucking as a "going concern." (Filing No. 1 at p. 3). Rick and Ricky then formed JDT, a Nebraska limited liability company, on April 19, 2022, to acquire Daws Trucking. (Filing No. 41-1 at p. 1 ¶ 2). On May 4, 2022, JDT and Daws, Inc., executed an Asset Purchase Agreement ("APA") under which JDT would acquire Daws Trucking. (Filing No. 1 at p. 3). JDT purchased the business as a "going concern and acquired all the tangible and intangible assets used in the business of Daws Trucking." (Filing No. 40 at p. 6).

Jim asserts he used his "jim@daws-trucking.com" e-mail address to conduct business for all his companies. (Filing No. 35-1 at p. 2 ¶ 5). Jim "never had an in-house IT department" but purchased a server for Daws, Inc. (Filing No. 35-1 at p. 2 ¶ 6). Jim has "long used" Julie Karavas and Tom Kranz of the law firm Karavas and Kranz, P.C. as his personal attorneys and as attorneys for his various companies. (Filing No. 35-1 at p. 2 ¶ 7). When Rick approached Jim about purchasing the assets of Daws Trucking, Jim retained Karavas and Kranz, P.C. for legal advice regarding the APA. (Filing No. 35-1 at p. 2 ¶ 8).

One of the items sold in the APA was Daws, Inc.'s server. (Filing No. 35-1 at p. 2 ¶ 10). The APA listed Daws, Inc.'s server as an asset transferred to JDT listed under "Office Equipment" and valued at $39,585.00. (Filing No. 1-1 at p. 15). The APA listed February 28, 2021, as the date of acquisition of the server, a year before the sale to JDT. (Filing No. 41-1 at p. 3 ¶ 7). Rick asserts that the APA transferred to JDT all data belonging to Daws Trucking, including the data on the server and other computer equipment. (Filing No. 41-1 at p. 3 ¶ 9). According to Jim, he is not "tech savvy" and did not "have an understanding of whether or how e-mails and data are stored on a server," and did not "intend" to sell the data contained on the server. (Filing No. 35-1 at p. 2 ¶ 10).

Other employees of Jim's companies also used "daws-trucking.com" e-mail addresses. (Filing No. 35-1 at p. 3 ¶ 12). Jim claims that he knew that "employees would use their company e-mail addresses for personal communications" and that he did not examine or monitor his employees' e-mail use or e-mails, and that no one monitored his e-mails. (Filing No. 35-1 at p. 3 ¶ 12). However, Rick asserts that "Jim accessed information from employees' computer files on at least one occasion" resulting in Jim contacting Bizco, JDT's service provider. (Filing No. 41-1 at p. 6 ¶ 20). Rick further asserts that in a non-privileged e-mail sent from Jim to his attorney, Thomas

2

Kranz, on April 11, 2024, Jim described the results of a review of the computer files of a former JDT employee, Charles, and outlined the changes Charles had made to his work computer. (Filing No. 41-1 at p. 6 ¶ 20).

Jim utilized his "jim@daws-trucking.com" e-mail to communicate with his attorneys regarding the negotiation of the APA. (Filing No. 35-1 at p. 3 ¶ 11). According to Jim, he "believed that those communications were confidential." (Filing No. 35-1 at p. 3 ¶ 11). He used this e-mail address for business communications relating to all his companies and for personal communications, and did not believe he was selling those communications as part of the APA. (Filing No. 35-1 at p. 3 ¶ 11).

After the APA was executed, Rick asked Jim to stay at JDT and train Ricky. (Filing No. 35-1 at p. 3 ¶ 13). Jim asserts he did not have a written employment contract with JDT, and that Rick had expressed to Jim that nothing would change with how the company was run before the APA. (Filing No. 35-1 at p. 3 ¶ 13). Jim claims that after the APA and becoming an employee of JDT, he did not receive a JDT handbook or e-mail policy about his employment, and he continued to use his jim@daws-trucking.com e-mail to correspond with his attorneys regarding personal matters and business matters relating to his other companies, as he had done prior to the APA. (Filing No. 35-1 at p. 3 ¶ 14).

Jim asserts the Daws, Inc. handbook did not apply to JDT employees. (Filing No. 35-1 at p. 6 ¶ 27). The Daws, Inc. handbook states that "in some instances interpretations will be required, which will be made by the President of the Company at its sole discretion." (Filing No. 35-1 at p. 6 ¶ 28). As the President of Daws, Inc., Jim chose not to monitor employee e-mails, and claims he did not understand the handbook to apply to him as the President. (Filing No. 35-1 at p. 6 ¶ 28).

Conversely, Rick asserts the Daws Inc. Handbook was used by the business both before and after the APA. (Filing No. 41-1 at p. 3 ¶ 11). Jim became an employee of JDT and was subject to the employment policies that continued to exist after the sale. (Filing No. 41-1 at p. 3 ¶ 11). According to Rick, Jim never received a new handbook because the Daws Trucking Handbook was still in effect and Jim was subject to its policies. (Filing No. 41-1 at p. 3 ¶ 12). On several occasions after the APA was executed, employees of JDT sent e-mails referencing the Daw's Handbook. (Filing No. 41-1 at p. 4 ¶¶ 13-15).

After acquiring Daws, Inc., Rick asserts neither Jim nor his attorneys instructed anyone at JDT to delete any e-mails sent or received prior to executing the APA. (Filing No. 41-1 at p. 5 ¶

3

17). According to Rick, Jim continued to communicate with his attorneys and that the e-mails were saved to the Daws Trucking server. (Filing No. 41-1 at p. 5 ¶ 18). In reviewing these e-mails, Rick found communications both on behalf of JDT and adverse to JDT. (Filing No. 41-1 at p. 5 ¶ 18). Rick claims to have found e-mails between Jim and his attorneys working to create a "mass resignation of employees from JDT, receive additional value for what was already sold to JDT, and/or devalue JDT to the point where Jim could reacquire it for far less than he sold it to [him]." (Filing No. 41-1 at p. 5 ¶ 19).

Karavas & Kranz represented Rick and Ricky in the formation of JDT and purchase of Daws Trucking, while also representing Jim and some of his entities in the same transaction, failing to obtain consent to the conflict of interest. (Filing No. 41-1 at p. 6 ¶¶ 22-23). The joint representation continued after the sale in May 2022. (Filing No. 41-1 at p. 6 ¶¶ 22-23). Rick asserts JDT paid legal invoices from Karavas & Kranz, which included legal services for JDT and for Jim. (Filing No. 41-1 at p. 7 ¶ 25).

According to Jim's Declaration, his attorneys have identified 667 electronic files as communications between Jim and his attorneys, 428 of which he claims are privileged files. (Filing No. 35-1 at p. 4 ¶ 15). Jim asserts he expected communications using the "jim@daws-trucking" e-mail address with his attorneys regarding personal matters or relating to his other companies to be confidential and privileged, but is not claiming privilege for his e-mails with JDT's attorneys about legal advice for JDT's business. (Filing No. 35-1 at p. 4 ¶ 16-17). Jim relies on his prior understanding that communications with his counsel were confidential and subject to the attorney-client privilege. (Filing No. 35-1 at p. 4 ¶¶ 16-17). Prior to the APA, he had used the "jim@daws-trucking" e-mail address to communicate with his attorney, Karavas, who was representing him in the sale to JDT. (Filing No. 35-1 at p. 4 ¶ 17). Jim was under the impression that Rick and JDT were independently represented by attorneys based in Chicago. (Filing No. 35-1 at p. 4 ¶ 17). In 2022, Jim communicated with his attorney, Karavas, using the same e-mail address, to obtain legal advice regarding the transfer of the Daws, Inc. DOT number to JDT. (Filing No. 35-1 at p. 4 ¶ 18). After these negotiations, Jim asserts he was still under the belief that JDT and Rick were represented separately by a Chicago-based law firm. (Filing No. 35-1 at p. 4 ¶ 18). In 2024, Rick approached Jim about selling JDT's assets back to Jim. (Filing No. 35-1 at p. 5 ¶ 1). Jim communicated with Karavas about these negotiations, and believed these communications would remain confidential and subject to the attorney-client privilege. (Filing No. 35-1 at p. 5 ¶ 19).

The negotiations were not successful after many months, and in August 2024, Jim informed Rick of his intended resignation from JDT, effective September 30, 2024. (Filing No. 35-1 at p. 4 ¶ 20). Following his resignation announcement, Jim continued using the "jim@daws-trucking.com" e-mail address to communicate with his lawyers, again claiming an expectation that these e-mails were confidential and privileged. (Filing No. 35-1 at p. 5 ¶ 21). In September 2024, Rick threatened to sue Jim, and Jim used the same e-mail address to communicate with his attorneys, maintaining his belief his communications were privileged. (Filing No. 35-1 at p. 5 ¶ 22).

While employed at JDT, Jim claims JDT did not notify him it could monitor his e-mail, and he was unaware of any e-mail policy or practice of monitoring his or any employee's e-mails. (Filing No. 35-1 at p. 6 ¶ 23). On Jim's last day of employment at JDT, September 30, 2024, JDT informed Karavas that JDT was taking the position that Jim had waived all privilege relating to communications using his jim@daws-trucking.com e-mail address, and it intended to read his e-mail communications with his attorneys. (Filing No. 35-1 at p. 6 ¶ 24). Jim and his attorneys disputed JDT's position. (Filing No. 35-1 at p. 5 ¶ 24).

After September 30, 2024, Jim did not send additional e-mails to his lawyers using his "jim@daws-trucking.com" e-mail address. (Filing No. 35-1 at p. 6 ¶ 29). Jim asserts that had he known JDT would claim any communication using that e-mail address was property of JDT, he would not have communicated with his attorneys using it. (Filing No. 35-1 at p. 6 ¶ 29). After September 30, 2024, Jim only claims two e-mails are privileged, one dated October 1, 2024, and one dated October 9, 2024. (Filing No. 35-1 at p. 7 ¶ 30). Jim's attorney inadvertently sent these e-mails to the "jim@daws-trucking.com" e-mail address.

JDT retained Andre R. Barry ("Barry") as legal counsel, who corresponded with Karavas regarding the legal work performed for JDT, the server, and JDT's position that Jim had waived privilege in e-mails. (Filing No. 41-1 at p. 8 ¶ 39). On September 19, 2024, Barry followed up with Karavas, requesting responses to questions regarding Jim Daws' draft employment agreement, bills to JDT, and all communications related to work for JDT. (Filing No. 41-1 at p. 9 ¶ 40). Barry sent additional requests to Karavas on September 25 and September 26, 2024, for communications connected to her work on behalf of JDT. (Filing No. 41-1 at p. 9 ¶¶ 41-42). On September 30, 2024, Barry sent an e-mail to Karavas after a phone call, maintaining his position that the attorney-client privilege did not attach to any of the e-mails on the server, and even if any privilege did attach, it had been waived. (Filing No. 41-1 at p. 10 ¶ 43). On October 1, Karavas responded to

5

Barry, taking the position that certain pre-sale communications were privileged, but all communication and work product shared with JDT personnel covered by the invoices identified, if related to JDT business after May 4, 2022, are not privileged. (Filing No. 41-1 at p. 11 ¶ 44).

As ordered by the Court, Filing No. 29, Jim filed a privilege log for e-mails between Jim and his attorneys. (Filing No. 38-1). JDT has taken the position that all e-mails between Jim and his attorneys—regardless of subject-matter or timeframe—are not privileged because they exist on a server purchased by JDT in 2022 and are JDT's property as Jim's employer. (Filing No. 40 at p. 24).

Defendants have filed the instant motion asking the court to enter a protective order declaring the documents on Defendants' privilege log are protected by the attorney-client privilege, and ordering destruction of privileged documents in Plaintiff's possession or control. (Filing No. 34).

## ANALYSIS

In a diversity case, the court applies "federal law to resolve work product claims and state law to resolve attorney-client privilege claims." *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1053 (8th Cir. 2000). See also Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). In this diversity case, neither party disputes that Nebraska law applies to the present issues regarding attorney-client privilege and waiver thereof. (Filing No. 40 at p. 20 n. 1); (Filing No. 43 at p. 7) (citing Nebraska law); see also *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726 (8th Cir. 2002) (referencing Fed. R. Evid. 501).

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *United States v. Yielding*, 657 F.3d 688, 706-07 (8th Cir. 2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Under Nebraska law, "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (a) between himself or his representative and his lawyer…" Neb. Rev. Stat. § 27-503(2).

For the attorney-client privilege to apply, there must be an attorney client relationship. See *State ex rel. Stivrins v. Flowers*, 729 N.W.2d 311, 316 (Neb. 2007). "An attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance

6

sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *Flowers*, 729 N.W.2d at 317 (citing *McVaney v. Baird, Holm, McEachen, Pedersen, Hamann & Strasheim*, 466 N.W.2d 499, 506 (Neb. 1991)). "[T]o be protected from disclosure, a communication must be one which is essentially confidential in character and which relates to the subject matter upon which advice was given or sought. *State v. Hawes*, 556 N.W.2d 634, 637 (Neb. 1996). A communication is confidential if it is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication. See Neb. Rev. Stat. § 27-503(1)(d).

The attorney-client privilege is narrowly construed and "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *United States v. Ivers*, 967 F.3d 709, 716 (8th Cir. 2020) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

The party asserting the attorney-client privilege has the burden of proving the information sought is protected. *Greenwalt v. Wal-Mart Stores, Inc.*, 567 N.W.2d 560, 566 (Neb. 1997). The party claiming privilege must:

> (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A).

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending--or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action…

Fed. R. Civ. P. 26(c)(1).

A party may waive the attorney-client privilege. See *League v. Vanice*, 374 N.W.2d 849, 856 (Neb. 1985). "Fairness is an important and fundamental consideration in assessing the issue of whether there has been a waiver of the lawyer-client privilege." *League*, 374 N.W.2d at 856. A party waives the privilege if he "voluntarily discloses or consents to disclosure of any significant

7

part of the matter or communication." Neb. Rev. Stat. § 27-511. Under Nebraska law, an implied waiver of the attorney-client privilege occurs when "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." *Pamida,*, 281 F.3d at 731 (quoting *League*, 374 N.W.2d at 856).

Defendants request a protective order seeking destruction of certain e-mail communications in Plaintiff's possession between Jim and his attorneys contained on the JDT server that Defendants maintain are privileged. Plaintiff counters that Defendants waived any claim of privilege in these e-mail communications by selling the server to JDT; the post-sale communications were sent with no reasonable expectation of confidentiality; Defendants failed to meet their burden to show Defendants' attorneys took reasonable steps to avoid disclosure of these communications; but to the extent privilege attached to any communications and was not thereafter waived, Plaintiff seeks *in camera* review to determine whether the crime-fraud exception applies. (Filing No. 40 at pp. 21, 24, 37, 39).

I. **Pre-Sale E-mail Communications**

Defendants contend the documents in their privilege log are protected from disclosure by the attorney client-privilege. (Filing No. 37 at p. 5). Plaintiff argues Defendants have not met their burden to show existence of attorney-client privilege. (Filing No. 40 at p. 20). Nebraska law is unclear as to which party bears the burden of proving waiver or absence of waiver, and courts have reached differing conclusions on this point. Compare *Rasby v. Pillen*, No. 8:15CV226, 2016 WL 4995036, at *3 (D. Neb. Sept. 19, 2016) (applying Nebraska law to an attorney-client privilege question in a federal diversity case) ("The party asserting a privilege has the burden of proving its existence, which includes showing waiver did not occur.") with *Flowers*, 729 N.W.2d at 318 ("Once [the party asserting the privilege] established the attorney-client relationship, [the party challenging the privilege] had the burden to establish that the inquiry related to or was an exception to this rule or that the communications were outside the scope of the privilege."). In this case, regardless of which party has the burden to establish waiver, the Court finds the outcome is the same: the attorney-client privilege was waived.

With respect to Jim's pre-sale e-mail communications on the server, Defendants do not address the voluntary disclosure of allegedly privileged e-mails through the sale of the server.

8

Notably, after the APA, neither Jim nor his attorneys ever instructed JDT, Rick, or Ricky to delete any pre-sale communications. (Filing No. 40 at p. 9). After the asset sale, JDT took possession of the server, which included all pre-sale communications. (Filing No. 40 at p. 24). Jim claims he did not intend to sell the data on the server that belonged to his other companies or his other personal communications. (Filing No. 37 at p. 2). However, through the asset sale, Jim voluntarily disclosed the communications contained on the server, thereby waiving the attorney client privilege. See *In re In-Store Advert. Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995) ("[W]here confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying the assets, the privilege is waived as to those communications."). The Court finds that while the attorney-client privilege may have previously existed, Jim waived such privilege as to pre-sale communications when he sold the server on which those communications were contained.

## II.     Post-Sale E-mail Communications

Defendants also assert post-sale e-mail communications between Jim and his attorneys are protected by the attorney-client privilege. (Filing No. 37 at p. 6). After the sale, Jim continued to use the same e-mail address to communicate with his attorneys at Karavas & Kranz. (Filing No. 40 at p. 9 ¶ 18). At this time, Jim was an employee of JDT, and Rick had access to all such communications through the server sold to JDT under the APA. (Filing No. 40 at pp. 7, 9). Defendants rely on *United States v. Hudson*, No. CRIM.A. 13-20063-01, 2013 WL 4768084, at *9 (D. Kan. Sept. 5, 2013), which states, "The majority view is that the employees do not waive the privilege in material on their work computer simply because the employer can monitor their communications." *United States v. Hudson*, No. CRIM.A. 13-20063-01, 2013 WL 4768084, at *9 (D. Kan. Sept. 5, 2013). In *Hudson*, the United States District Court for the District of Kansas applied federal common law to resolve the defendant's assertion that certain communications made in connection with his application for disability retirement benefits were protected by the psychotherapist-patient privilege, attorney-client privilege, or physician-patient privilege. *Id.* at *1. The court looked to four factors and held that defendant did not waive the attorney-client privilege as to documents stored on his workplace computer because his workplace, a school district, did not prohibit personal use of technology and its policies did not specify whether the district monitored technology use. *Id.* at *9.

In determining whether attorney-client privilege exists, courts often ask whether the expectation of privacy concerning communications with one's attorney was reasonable. See *In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 255 (Bankr. S.D. N.Y. 2005). "The attorney-client privilege applies only to a confidential communication." *Id.* "Confidentiality has both a subjective and objective component; the communication must be given in confidence, and the client must *reasonably* understand it to be so given." *Id.* (citing *United States v. Schwimmer,* 892 F.2d 237, 244 (2d Cir. 1989) (emphasis in original). Although no Nebraska court appears to have addressed this issue, both parties discuss four factors assessed by other courts to determine whether the attorney-client privilege applies to communications between an employee and his lawyer on an employer's e-mail address:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*In re Asia Global Crossing, Ltd.,* 322 B.R. at 257. The Court will address each factor below.

### a. Company Policy

Defendants contend that JDT did not have a policy banning personal use of company e-mail, and asserts, without support, that the Daws Inc. handbook did not continue to apply to employees after the APA. (Filing No. 37 at p. 8). The Court disagrees with Defendants' position that the Daws, Inc. handbook did not continue to apply after the APA was executed pursuant to the sale of the business. (Filing No. 37 at p. 8). The APA specifically states that JDT purchased Daws, Inc. as a "going concern." (Filing No. 1-1 at p. 1). The assets included "[t]he trade, business name, goodwill, and all other intangible assets of the Business, including but not limited to Business's US DOT Number…" (Filing No. 1-1 at p. 1). After the sale, Jim became an employee of JDT and understood "that nothing would change from how the company was run before the APA." (Filing No. 35-1 at p. 3 ¶ 13). Other employees at JDT also believed the Daws' Handbook continued to apply after the APA was executed. On three known occasions, JDT employees referred to the handbook policies in e-mails with other employees. (Filing No. 40 at p. 34). Thus, the handbook, which JDT bought as part of the transaction, served as the relevant handbook, and was treated as such by JDT employees. (Filing No. 40 at p. 8 ¶¶ 13-14).

Therefore, regardless of Jim's understanding as to whether he was bound by the handbook policies, the Court finds the handbook policies continued to apply to Jim as an employee, which supports a finding of waiver of privilege in his e-mails. Plaintiff points to compelling language in the Daws, Inc. handbook covering computer and e-mail policies. (Filing No. 40 at p. 33). First, the "Computer" section of the handbook begins with a disclaimer that "[a]ll data entered on the Company's computers is considered the property of the Company." (Filing No. 35-3 at p. 20). The "Electronic Mail" section further states in relevant part:

> Like your computer, the Company may need to access your E-mail for various reasons. You should be aware that such messages are not entirely confidential. They can be forwarded to others without the original sender's knowledge…As a rule of thumb, nothing should be sent by E-mail that you would not put in a formal memo or that you would not like to become public knowledge.

(Filing No. 35-3 at p.21).

The Daws, Inc. handbook does not explicitly ban personal use of company e-mail addresses but provides that it "should be used primarily for business purposes." (Filing No. 35-3 at p. 20). The handbook's "Computer" section also advises employees that "any information input to the computer is property of the Company." This weighs strongly against a finding that Jim's e-mails sent from his jim-daws e-mail address are privileged. See, e.g., *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1109 (W.D. Wash. 2011) ("[T]he [employee handbook] policy expressly warns employees that electronic communications are not private. Consequently, it would not be reasonable for an employee to believe that such communications stored on company hardware would be confidential.").

### b. Company Monitoring

In assessing the second factor, most courts have not required evidence that the employer actually monitored an employee's e-mail address. "Rather, the employer's reservation of the right to do so has sufficed as a basis for concluding that employees had no reasonable expectations of privacy." *Hanson v. First Nat. Bank*, No. CIV.A. 5:10-0906, 2011 WL 5201430, at *6 (S.D.W. Va. Oct. 31, 2011); *see also Doe 1 v. George Washington Univ.*, 480 F. Supp. 3d 224, 227 (D.D.C. 2020) ("Where, as here, a company has 'explicit and straightforward' guidelines addressing the monitoring of e-mail communications, an employee has no reasonable expectation of privacy in the e-mails, even if the company does not routinely enforce the monitoring policy." (citation omitted)).

The Court therefore finds Defendants' argument that "JDT never monitored employee use of e-mail" uncompelling. (Filing No. 37, at p. 9).

### c. Third-party Access

Defendants do not fully address this factor, merely stating that "Jim is not aware of any third parties that would have had access to his "jim@daws-trucking.com" e-mail during his employment." (Filing No. 37, at p. 9). With respect to the third factor, courts assess whether third parties have access to an employee's e-mail. See *In re Asia Glob. Crossing, Ltd.*, 322 B.R. at 259. Here, the documents Defendants seek to protect are e-mails. Defendants rely on *Hudson* and understate the differences from e-mail systems and files on a computer. See *id.* ("E-mail systems, in this regard, are different from office computers or hard copy files"). The Court finds Plaintiff's *Asia Global* argument compelling. In *Asia Global*, the court found this factor weighed against a finding of privilege because Asia Global, a party other than the employee, had access to its own servers and could access employee e-mails without requiring access to the employee's offices or office computers. *Id.* As such, because JDT, a third-party, can access its servers and employee e-mails without having access to the employee's physical computer, this factor weighs against a finding of privilege.

### d. Notification of Policy

The final factor courts assess is whether the employer notified the employee or whether the employee was aware of the policies in place. *In re Asia Glob. Crossing, Ltd.*, 322 B.R. at 257. Defendants' contention that Jim was unaware of the policy until his last day of employment is unpersuasive to weigh in favor of privilege. (Filing No. 37 at p. 9); *see Doe 1*, 480 F. Supp. 3d 224 at 227 ("Courts have found that this prong of the analysis does not require 'actual or direct' notification . . . of a [ ] policy governing e-mail communications sent or received on the [ ] network if the policy is available to the employee.") (citation omitted). As President, Jim was aware of the handbook policies, but simply interpreted the policies to not apply to him. (Filing No. 35-1 at p. 6 ¶ 28). Jim's misunderstanding of the handbook's application to him does not change the fact that he was aware of the policy. As set forth above, the Court has concluded the Daws, Inc. Handbook continued to apply to JDT and its employees after the APA. Regardless of whether Jim understood

12

he was bound by the policies, those policies continued to apply to him, thereby further supporting a finding of waiver of privilege.

In sum, the Court finds that Jim did not have a reasonable expectation of privacy in his post-sale e-mail communications, thus waiving protections of the attorney-client privilege. JDT acquired the Daws' handbook, which contained policies explicitly warning employees that information contained on workplace computers is not confidential and may be subject to monitoring. (Filing No. 35-3 at p. 21). Further, JDT had access to the company's servers and employee e-mails without requiring access to the employee's office computer. As the former president, Jim was aware of the Computer and E-mail policies of the Daws, Inc. handbook, which continued to apply after the APA was executed. Thus, the post-sale e-mail communications were not protected by the attorney-client privilege.

### III.   Inadvertent Disclosure of two October 2024 E-mails

Defendants also claim attorney-client privilege in two e-mails inadvertently sent by Jim's attorney to the "jim@daws-trucking.com" e-mail address on October 1 and October 9, 2024. (Filing No. 35-1 at p. 7 ¶ 30; Filing No. 37 at p. 11). The Court finds this inadvertent disclosure waived any privilege that may have attached to those e-mails. Nebraska courts have not directly addressed inadvertent disclosure of privileged communications, so the Court turns to the five *Hydroflow* factors followed by the Eighth Circuit.

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error.

*Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir. 1996) (citing *Hydraflow, Inc. v. Enidine Inc.*, 145 F.R.D. 626, 637 (W.D.N.Y. 1993)).

Under Rule 502(b), "an inadvertent disclosure does not operate as a waiver of the attorney-client privilege if the holder of the privilege took reasonable steps to prevent disclosure and the holder promptly took reasonable steps to rectify the error after learning of the error[.]" *Gunter v. City of Omaha*, No. 8:21CV281, 2022 WL 3597762, at *2 (D. Neb. Aug. 23, 2022). Here, Defendants provided no evidence of reasonable steps taken to protect the e-mails from inadvertent disclosure, nor do they provide evidence of reasonable steps taken to rectify the error after learning

13

of it. As such, the Court finds the inadvertent disclosure operated as a waiver of the privilege in these October 2024 e-mails. Accordingly,

**IT IS ORDERED**: Defendants' Motion for Protective Order and Destruction of Privileged Documents in Plaintiff's Possession or Control ([Filing No. 34](#)) is denied.

Dated this 23rd day of September, 2025.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge