IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM DAWS TRUCKING, LLC, | ) | CASE NO. 4:24-CV-3177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPLY BRIEF IN SUPPORT** |
| | ) | **OF STATEMENT OF** |
| DAWS, INC.; JAMES R. DAWS; LANA R. | ) | **OBJECTIONS TO** |
| DAWS; DAWS TRUCKING, INC.; and | ) | **MAGISTRATE JUDGE'S** |
| COLUMBUS TRANSPORTATION & | ) | **ORDER** |
| LOGISTICS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

In order to knowingly and intelligently waive a right, especially one as foundational to our justice system as the attorney-client privilege, one has to understand the contours of that right. Jim Daws Trucking, LLC ("JDT") does not dispute that Jim Daws ("Jim") did not know that his confidential e-mails with his long-time attorney regarding personal matters, such as his estate plan, were housed on the server that was sold to JDT. JDT does not dispute that Jim did not intend to sell his personal communications with his lawyer as part of the asset purchase agreement in which Daws, Inc. sold certain assets to JDT. JDT does not dispute that in the 30 years of operating Daws Trucking, Jim never monitored employee e-mails and never even fathomed that anyone could monitor his e-mails. Based on these undisputed facts, an objectively reasonable person in Jim's situation would believe that his communications with his lawyer would remain private. The Magistrate Judge clearly erred in holding that Jim, and/or his attorney, waived the

privilege. The decision of the Magistrate Judge should be vacated and Jim's requested protective order should be entered.

## ARGUMENT

### I.  JIM DID NOT WAIVE ANY OBJECTIONS.

JDT claims everything is a waiver. In its brief, JDT argues that Jim waived objections regarding pre-sale e-mail communications by failing to raise the issue in its briefing to the Magistrate Judge. (Filing 154 at ECF p. 5). This is nonsense. Pre-sale communications was the first category of documents identified in Jim's opening brief to the Magistrate Judge. (Filing 37 at ECF p. 6). Throughout its reply brief, Jim addressed the argument JDT made in its response brief that the sale of the server waived the attorney-client privilege. Jim specifically raised the issue that the sale of the server did not mean that all of Jim's personal data stored on the server was sold. (Filing 43 at ECF p. 5, 8, 9) ("But again, this pre-supposes that those attorney-client communications regarding personal matters, matters relating to Jim's other companies, and matters regarding the negotiation of the APA were sold with the server. They were not.") JDT's argument that Jim waived objections regarding pre-sale communications by not raising them below should be rejected.

### II.  THE MAGISTRATE JUDGE ERRED IN HOLDING THAT THE SALE OF THE SERVER WAIVED JIM'S ATTORNEY-CLIENT PRIVILEGE.

The Magistrate Judge held that "Jim waived such privilege as to pre-sale communications when he sold the server on which those communications were contained." (Filing 147 at ECF p. 9). But this presumes that Jim knew that his attorney-client privileged communications were housed on the server and that he

intended to disclose those communications when he sold it. The undisputed evidence is he did not. The undisputed evidence established that in the APA Jim did not intend to sell, and JDT did not intend to buy, Jim's personal e-mail communications with his lawyers. A reasonably objective person would not understand that selling a server waived the attorney-client privilege when the person did not understand that his or her communications with his or her attorney were housed on the server.

Suppose a person sells a car to a buyer. Unbeknownst to the seller, the seller's $20,000 diamond wedding ring fell off in the trunk when she was removing items and it wasn't located until the buyer found it after the sale. No fair person would say that the buyer should get to keep the wedding ring because the seller waived the right to the ring by selling the car in which the ring happened to be housed. But that is the position JDT takes here, and that the Magistrate Judge adopted. JDT did not buy Jim's personal e-mails with his lawyer in the APA. But because those e-mails were housed in the server (something that Jim did not know or understand at the time of the sale), JDT claims they belong to them and the privilege was waived. Jim's lack of knowledge about how an e-mail server works should not be a substitute for his knowing waiver of attorney-client privilege. The sacredness of the attorney-client privilege shouldn't turn on such gamesmanship.

In its brief to the Magistrate Judge, Jim explained how each of the *Asia Global Crossing* factors supported the conclusion that Jim did not waive the privilege. (Filing 37 at ECF p. 8-10). Those factors are: "(1) does the corporation

maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?" *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257 (Bankr.S.D.N.Y.2005)); *In re Reserve Fund Secs. & Derivative Litig.*, 275 F.R.D. 154, 160 (S.D.N.Y.2011). The *Asia Global Crossing* factors demonstrate the fact-specific nature of the inquiry, and case law demonstrates the multitude of different facts that can affect the outcome which is why "[e]ach case should be given an individualized look to see if the party requesting the protection of the privilege was reasonable in its actions." *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009). Applying these factors to the specific facts in this case, the Magistrate Judge erred in holding that these factors established that Jim waived the attorney-client privilege.

### A.    JDT did not ban personal use of e-mail.

The answer to the first *Asia Global Crossing* factor – does the corporation maintain a policy banning personal or other objectionable use – is no. *In re Asia Global Crossing*, 322 B.R. at 257. The undisputed evidence established that JDT did not have a policy banning personal use of e-mail on corporate computers. The Magistrate Judge erred first in finding that the Daws, Inc. handbook applied to JDT employees. Daws, Inc. was not sold in the APA. After the APA, Daws, Inc. remained a company solely owned by Jim and Lana. Thus, it makes no sense that the Daws, Inc. handbook would apply to JDT's employees after the sale. The undisputed

evidence is that JDT never issued any handbook to its employees and had no personal e-mail use policy. The Magistrate Judge erred in holding otherwise.

JDT argues that there was evidence that after the sale, JDT continued to use Daws, Inc.'s handbook. (Filing 154 at ECF p. 8). But this "evidence" consisted of Rick's conclusory statement that "Jim never received a new employee handbook because the Daws Handbook was still in effect. And, as an employee, he was subject to the policies in the Daws Handbook." (Filing 41-1 at ECF p. 3). Thus, JDT admits it never issued a JDT handbook to Jim. This strongly supports the conclusion that an objectively reasonable person in Jim's situation would believe that his communications with his lawyer would remain private.

JDT also cited two e-mails in which an employee who performed payroll functions e-mailed pages of the Daws, Inc. handbook to one employee inquiring about bereavement policy with respect to PTO and a second e-mail that simply attached a page from the handbook regarding personal appearance with no context as to why the e-mail was sent. (Filing 41-4)(Filing 41-5). In a third e-mail, Jaisa Douty, whose signature line stated, "Daws Trucking, Inc.," one of Jim's separate companies that was not sold in the APA, e-mailed copies of the Daws Trucking driver orientation manual and employee handbook to Lana Daws, again with no context, or any reference to JDT or JDT's employees. (Filing 41-6). None of these e-mails refer to a JDT e-mail use policy. None of this weak evidence established that Jim did not have an objectively reasonable expectation that his personal communi-cations with his attorney would remain private.

5

### B.    JDT never monitored employee use of e-mail.

The second *Asia Global Crossing* factor is "does the company monitor the use of the employee's computer or e-mail." *In re Asia Global Crossing,* 322 B.R. at 257. JDT does not contend it ever monitored Jim's, or any other employee's e-mails. The evidence is undisputed that JDT never monitored any employee e-mails.

Instead, the Magistrate Judge held that having a policy that allows for monitoring employee e-mail is sufficient, even if the policy is never actually enforced. (Filing 147 at ECF p. 11). But as discussed above, JDT did not have a policy. In *Doe 1 v. George Washington University,* 480 F.Supp.3d 224, 227 (D.D.C., 2020), which the Magistrate Judge relied on, the court held that where there was no evidence that the student accepted the e-mail monitoring policy, the lead plaintiff, Doe 1, had "an objectively reasonable expectation of privacy in their e-mail communications with their attorneys that were sent and received through their GW-issued e-mail accounts." *Id*. In contrast, the Court found that two other employees, Does 2 and 3, did not have an objectively reasonable expectation of privacy because as a condition of using the e-mail system they were required to click on a link accepting the terms and conditions of the policy. *Id.* The undisputed evidence established that Jim's situation is the same as Doe 1, not Does 2 and 3.

Here, even if JDT had an e-mail monitoring policy, which it did not, there is no evidence that the policy was communicated to Jim or that he accepted it. JDT concedes Jim never signed any handbook containing an e-mail monitoring policy. Thus, the Magistrate Judge clearly erred in holding that this factor weighed in

6

favor of finding that Jim did not have an objectively reasonable expectation of privacy in his communications with his lawyer.

### C.    Third parties did not have a right of access to Jim's e-mails.

The answer to the third *Asia Global Crossing* factor – do third parties have a right of access to the computer or e-mails – is no. *In re Asia Global Crossing, 322 B.R. at 257.* The statute establishing attorney-client privilege in Nebraska states, "As used in this rule...[a] communication is confidential *if not intended* to be disclosed to third persons..." Neb. Rev. Stat. § 27-503(1)(d) (emphasis added). The statute does not state that the communication must actually remain undisclosed for the privilege to be maintained. In this case, there is no evidence that Jim intended to disclose his confidential attorney-client communications to third parties. Jim's lack of knowledge about technology or misunderstanding about server technology should not mean that Jim intended to disclose to third parties his confidential communications housed on the server. There was no evidence that third parties had the right to access Jim's e-mails. It is one thing to sell a server, a piece of hardware. It is quite another sell one's personal communications. Again, JDT did not buy, and Jim did not sell, his personal e-mails with his lawyer in the APA. JDT does not have the right to Jim's personal data, and data regarding his other companies, because it happened to be housed on the server.

### D.    JDT did not notify Jim, and Jim was not aware of, any use of monitoring policies of his e-mail by JDT.

The last *Asia Global Crossing* factor asks whether the corporation notified the employee, or was the employee aware, of the use and monitoring policies. *In re*

*Asia Global Crossing,* 322 B.R. at 257. The undisputed evidence established that JDT never notified Jim of any e-mail monitoring policy or practice. JDT did not have its own handbook or e-mail use policy, and never informed Jim that it would enforce the Daws, Inc. handbook against him once he became a JDT employee. JDT did not require that Jim sign the Handbook or advise him that it would be applying such policies to him, nor did it require him to click on anything acknowledging an e-mail use policy before using company e-mail. In such circumstances, courts routinely find that employees have an expectation of privacy, and using company e-mail to communicate with an attorney does not waive privilege. *See Convertino,* 674 F. Supp. 2d at 110 (employee's expectation of privacy in e-mails sent to his personal attorney through his work e-mail account was reasonable and, therefore, e-mails were protected from discovery by attorney-client privilege; DOJ maintained a policy that did not ban personal use of the company e-mail, and although the DOJ had access to personal e-mails sent through his account, employee was unaware that department would be regularly accessing and saving e-mails sent from his account); *Mason v. ILS Techs., LLC,* No. CIVA304CV-139RJC-DCK, 2008 WL 731557, at \*4 (W.D.N.C. Feb. 29, 2008) (declining to find waiver of privilege when no evidence established that the employee was aware of the employer's policy and no one alleged that he agreed to abide by it).

JDT never enforced the computer policy in the Daws, Inc. handbook, and even if it had, personal use was authorized in the Daws, Inc. policy. *Convertino,* 674 F. Supp. 2d at 110; *U.S. v. Long,* 64 M.J. 57, 64 (U.S. Armed Forces, 2006)

8

(defendant had reasonable expectation of privacy in work computer where policy regarding personal e-mails had always been lenient and such use of network was considered authorized).

JDT now argues that the exclusion of the President from the Daws, Inc. handbook doesn't apply arguing that Jim didn't claim to be President of JDT. (Filing 154 at ECF p. 9). The evidence is undisputed that Jim continued to run JDT for more than two years after the APA. JDT can't have it both ways. On the one hand it argues "After the sale, Jim became an employee of JDT and understood 'that nothing would change from how the company was run before the APA.'" (Filing 154 at ECF p. 8), while now claiming that Jim wasn't the President which clearly would be a change in how the company was run before the APA. Rick acknowledges that after the APA Jim would remain the CEO of JDT. (Filing 63-1 at ECF p. 21). Whether his title was Chief Executive Officer or President of JDT after the APA is a matter of semantics. The reality remains that in the thirty years he owned Daws Trucking, and the more than two years after the APA when he continued to run Daws Trucking for JDT, no one ever monitored Jim's e-mails which can only lead to the conclusion that Jim had an objectively reasonably expectation that his private communications with his lawyer would remain private. The Magistrate Judge clearly erred in holding otherwise.

The Magistrate Judge erroneously concluded that Jim was aware of JDT's e-mail monitoring policy because he erroneously concluded that the Daws, Inc. handbook applied to JDT employees. He then erroneously concluded that "[a]s

president Jim was aware of the [Daws, Inc.] handbook policies but simply interpreted the policies not to apply to him." (Filing 147 at 12). An objectively reasonable person would not believe that a former employer's handbook applied to his or her new employer, and that despite the employer allowing the use of company e-mail for personal use, and the employer never once monitoring e-mail communications, that the employee's private communications with his or her lawyer using a company e-mail were not confidential.

Based on the undisputed evidence regarding these four factors, the Magistrate Judge clearly erred in holding that Jim did not have an objectively reasonable expectation that his personal communications with his attorney would remain confidential. Consequently, the Magistrate Judge erred in holding that Jim waived the privilege.

## III.    KARAVAS'S INADVERTENT DISCLOSURE DOESN'T WAIVE JIM'S PRIVILEGE.

On the day before the lawsuit was filed, and after it was clear that litigation was imminent, Karavas e-mailed Jim on October 1, 2024. Karavas also e-mailed Jim and current defense counsel on October 9, 2024 after this lawsuit was filed. JDT does not dispute that Karavas' e-mails were inadvertently sent to Jim's previous @daws-trucking.com e-mail in error. Rather than acknowledge this obvious error, JDT wants to take advantage of these mistakes to try to gain an advantage in this litigation.

In *Simmions v. Pierless Fish Corp.*, 592 F.Supp.3d 68, 74 (E.D.N.Y., 2020), the court dealt with a situation where an attorney inadvertently sent an e-mail

10

meant for the client to the opposing counsel who had the same first name. Similar to the present case:

> The disclosure occurred because of a common error that occurs frequently when using e-mail; both the client and plaintiff's counsel have the same first name and invariably, a simple click of the mouse on the wrong entry resulted in the e-mail being sent to the wrong person. It is completely understandable how the e-mail could have been sent inadvertently to the wrong 'Robert.' Moreover, there were limited measures that defendants' counsel could have taken in order to prevent the accidental e-mailing to opposing counsel in this instance.

*Id.* at 74. The Court held that under the circumstances, fairness required that this simple mistake was not a waiver and the receiving party should be ordered to destroy the e-mail.

The Eighth Circuit recognizes a fifth factor in determining whether an inadvertent disclosure constitutes a waiver that the Magistrate Judge did not address: "whether the overriding interest of justice would be served by relieving the party of its error." *Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir. 1996). Similarly, under Nebraska law, "Fairness is an important and fundamental consideration in assessing the issue of whether there has been a waiver of the lawyer-client privilege." *League v. Vanice*, 374 N.W.2d 849, 856, 221 Neb. 34, 44 (1985). Given the simple mistake made by Jim's lawyer in sending an e-mail to the wrong e-mail address in the thick of potential and then actual litigation, the overriding interest of justice, and simple fairness, requires that the privilege be protected. The Magistrate Judge clearly erred in failing to uphold the privilege.

JDT does not dispute that the attorney-client privilege belongs to the client, not the attorney. The fact that Karavas mistakenly sent an e-mail to Jim's company

11

e-mail address, rather than his personal e-mail address, should not operate as a waiver of Jim's privilege. Mistakes happen. When JDT claimed that it could review Jim's e-mails with his lawyers on October 1, 2024, Karavas timely objected (Filing 35-2). After unsuccessfully negotiating a resolution, current counsel filed a motion for protective order asking that the documents be returned and copies destroyed. These actions are sufficient to find that the attorney-client privileged was not waived.

The Magistrate Judge's order sets far too low of a bar for the waiver of the attorney-client privilege. The Order prioritizes gamesmanship, and a gotcha mentality, that erodes the important protections afforded to the attorney-client relationship. This is not the last time that an attorney-client e-mail will be mistakenly sent to a wrong recipient. The Order sets a terrible precedent for future cases.

## CONCLUSION

The Magistrate Judge's order should be vacated, and a protective order entered requiring JDT to turn over the disputed attorney-client communications and destroy all copies in its possession.

DATED this 28th day of October, 2025.

DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC. and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, Defendants


BY:    /s/ Timothy J. Thalken
       Timothy J. Thalken, #22173
       Meghan M. Bothe, #25208
       FRASER STRYKER PC LLO
       500 Energy Plaza
       409 South 17th Street
       Omaha, NE  68102-2663
       (402) 341-6000
       tthalken@fraserstryker.com
       mbothe@fraserstryker.com
       ATTORNEYS FOR DEFENDANTS


## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d), counsel certifies that this brief contains 3,389 words including all text, captions, headings, footnotes, and quotations according to the word count function of Microsoft Word 365. No generative artificial intelligence program was used in drafting the document, or that to the extent such a program was used, a human signatory of the document verified the accuracy of all generated text, including all citations and legal authority.

/s/ Timothy J. Thalken


## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of October, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Timothy J. Thalken

3475058.2

13