IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JIM DAWS TRUCKING, LLC, | Case No. 4:24-cv-03177 |
| Plaintiff, | |
| vs. | |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | |
| Defendants. | |

## PLAINTIFF'S SUR-REPLY BRIEF IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S ORDER DENYING DEFENDANTS' MOTION FOR PROTECTIVE ORDER

Prepared and submitted by:

Andre R. Barry #22505
Henry L. Wiedrich #23696
Madeline C. Hasley #27870
CLINE WILLIAMS WRIGHT
   JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 US Bank Building
Lincoln, NE 68508
(402) 479-6900
abarry@clinewilliams.com
hwiedrich@clinewilliams.com
mhasley@clinewilliams.com

November 6, 2025

Plaintiff Jim Daws Trucking, LLC (JDT) submits this Sur-Reply Brief in Opposition to Defendants' Objections to Magistrate Judge's Order (the Order) dated September 23, 2025. [Filing No. 147.]

### I. ARGUMENT

Like their opening Brief in Support of their Objections [Filing No. 153], Defendants' Reply Brief [Filing No. 155] fails to identify any error of law committed by Magistrate Judge Nelson in his decision denying their Motion for Protective Order. Defendants also fail to identify any finding of fact that was erroneous, let alone clearly erroneous. Defendants' Objection to Judge Nelson's decision should be overruled.

**A.    Defendants waived privilege with respect to pre-sale communications when they sold the server.**

On the issue of pre-sale communications, Judge Nelson cited *In-Store Advertising Securities Litigation,* 163 F.R.D. 452, 458 (S.D.N.Y. 1995), which held that a party waives attorney-client privilege with respect to communications that it transfers in connection with a sale of assets. The holding in *In-Store Advertising* directly controls the issue before the Court. Defendants did not argue that *In-Store Advertising* was wrongly decided below. [Filing No. 43 at 9.] They do not argue here that the holding is incorrect. [Filing No. 153 at 8–11; Filing No. 155 at 2–4.]  Nor have they ever argued there is an exception to the rule in *In-Store Advertising* when a party claims he didn't know his server contained privileged communications at the time it was sold. [*Id.*][1] No such exception exists.

---

[1] To be clear, JDT does dispute Jim Daws' self-serving and unbelievable testimony that he didn't know emails he sent using his company email address were stored on the

Even in their Reply Brief in Support of their Objection, Defendants do not attempt to argue Judge Nelson was wrong in identifying *In-Store Advertising* as the governing authority or in applying it to the facts of this case. [Filing No. 155 at 2–4.] Instead, they've constructed an analogy about a diamond ring left in a car, which they did not include in their argument to Judge Nelson. [Filing No. 155 at 3.] They cite no case law or governing authority to show whether their analogy is legally valid. In any event, it is not apposite. The emails on Daws, Inc.'s server were not the equivalent of a diamond ring accidentally left in a car. The primary purpose of a car is not to store diamond rings. In contrast, a computer server exists to store information, including emails.[2] Any reasonable business owner who sells his company server as part of the sale of a business for over $10 million will expect that the server contains information that will go to the buyer. If Jim was not certain what was on the server, he could have checked before he sold it. He and his companies had every opportunity to remove truly privileged information[3] before they sold the server. They simply failed to do so. Judge Nelson did not err, clearly or otherwise, in holding Defendants waived any privilege in communications stored on the server when it was sold to JDT.

---

company's server. Under *In-Store Advertising*, however, Jim's subjective belief is irrelevant, and Defendants did not argue otherwise below.

[2] To the extent an analogy is called for, a better analogy would be the sale of a file cabinet that contains the owner's personal papers. The owner would have no reasonable expectation of privacy in those papers once the file cabinet was sold.

[3] Many of the attorney-client communications would not have been privileged. For example, no privilege would have attached to communications regarding the sale, because Julie Karavas and her firm represented both sides in the transaction. *See* Neb. Rev. Stat. § 27-504(4)(c).

**B.     Jim did not have an objectively reasonable expectation of privacy in communications he sent using JDT's server.**

In their opening Brief in Support of their Objection, Defendants did not cite the governing case, *Asia Global Crossing*, let alone argue that Judge Nelson erred in applying its factors. They thus waived any argument that Judge Nelson committed factual or legal error with respect to Jim's communications while he was employed by JDT.

In their Reply Brief, Defendants now seek to address *Asia Global Crossing*. In doing so, they concede that *Asia Global Crossing* supplies the relevant legal standard with respect to communications Jim made while he was employed by JDT. [Filing No. 155 at 3–4.] They do not argue that Judge Nelson made any error of law in applying that standard. Instead, they argue Judge Nelson erred in finding as a matter of fact (1) that the Daws, Inc. handbook applied to JDT employees after the sale; (2) that JDT had a right to monitor emails; (3) that third parties had a right to access Jim's emails; and (4) that Jim was aware of the email policy. Judge Nelson did not commit any error—let alone clear error—in any of these findings of fact.

**1.     Judge Nelson correctly found the Daws, Inc. handbook applied at JDT after the sale.**

Defendants do not contest Judge Nelson's legal ruling that an employee handbook weighs against a finding of privilege if it gives an employer the right to monitor emails. [Filing No. 155 at 4–5.] Instead, they argue Judge Nelson erred "in finding that the Daws, Inc. handbook applied to JDT employees." [Filing No. 155 at 4.] But, as their Reply Brief underscores, there was ample evidence to

support Judge Nelson's conclusion that the Daws, Inc. employee handbook continued to apply at JDT, including (a) the fact that the business of Daws, Inc. was sold as a going concern; (b) Rick Fernandez's declaration testimony that the handbook continued to apply after the sale and that it applied specifically to Jim; and (c) emails showing that JDT employees continued to treat the handbook as applying to the business of Daws Trucking, which JDT had purchased.

Defendants try to explain away this evidence, arguing that it would have been illogical for the Daws, Inc. handbook to continue to apply. But it made perfect sense. JDT purchased the business of Daws, Inc., known as "Daws Trucking," as a going concern. The employees of Daws, Inc. became employees of JDT. One of the assets purchased was Daws, Inc.'s employee handbook, which the new company and its employees continued to treat as the employee handbook after the sale. Given this evidence, the only sensible finding was that the employee handbook used in the business of Daws Trucking continued to apply after the sale, as Rick testified it did. At a minimum, Judge Nelson did not commit any error in finding the handbook continued to apply.

### 2. Judge Nelson correctly found the employee handbook permitted JDT to monitor email.

The relevant evidence on the second *Asia Global Crossing* factor is the language of the employee handbook, which Judge Nelson correctly found gave the company the right to monitor employee email. He also rejected Defendants' argument that actual monitoring was required, holding that the right to monitor was sufficient. [Filing No. 147 at 11.] In their Reply Brief, Defendants do not argue that Judge Nelson got the legal standard wrong.

Defendants also do not argue Judge Nelson erred in finding that the employee handbook permitted the company to monitor employee emails. Instead, they first assert there is no evidence that JDT in fact monitored emails. But Judge Nelson found, as a matter of law, that actual monitoring is not required; the right to monitor is sufficient. [Filing No. 147 at 11–12.] Defendants do not argue otherwise. [Filing No. 155 at 6–7.] Defendants do argue that the policy was not communicated to Jim and that he did not accept it. [Filing No. 155 at 6–7.] This argument, however, does not address the second factor, which focuses on what the policy provided. As to that question, Judge Nelson correctly found that the employee handbook permitted the company to monitor emails.

### 3.   Judge Nelson correctly found JDT had a right to access emails sent using its computer system.

As Judge Nelson noted, Defendants did not fully address JDT's right of access to emails in their briefs below. [Filing No. 147 at 12.] They did not address this factor at all in their opening Brief in Support of their Objection. [Filing No. 153 at 14–15.] In their Reply Brief, Defendants try a new argument which they did not raise below. Specifically, they argue this factor supports them because Jim did not intend to give JDT access to his emails. [Filing No. 155 at 7.]

The third *Asia Global Crossing* factor, however, does not focus on an employee's (or a seller's) intent to disclose confidential information. Instead, as Judge Nelson held, it focuses on "the differences from email systems and files on a computer," *i.e.*, the fact that an employer can access emails without gaining access to an employee's office or physical computer. [Filing No. 147 at 12.]

6

As Judge Nelson found, "because JDT, a third-party, can access its servers and employee e-mails without having access to the employee's physical computer, this factor weighs against a finding of privilege." [Filing No. 147 at 12.] Judge Nelson found Defendants "understated" this difference below. [*Id.*] They do nothing here to challenge Judge Nelson's ruling on this point of law, or his finding that JDT had the ability to access Jim's emails without gaining access to his office or physical computer. Judge Nelson properly found that this factor weighs in favor of waiver under *Asia Global Crossing*.

### 4.  Judge Nelson correctly found Jim was aware of JDT's policy.

The fourth factor under *Asia Global Crossing* is whether the employee was aware of the policy at issue. Defendants' argument under this factor is that Jim did not know the employee handbook first promulgated at Daws, Inc. continued to apply to him at JDT. [Filing No. 155 at 10.] This is a retread of Jim's argument, under the first factor, that the Daws, Inc. policy did not apply at JDT. [Filing No. 155 at 9–10.] Specifically, Defendants argue that Judge Nelson erred in concluding Jim was aware of the policy because he first erred in finding that the Daws, Inc. handbook applied to JDT employees. [*Id.*] But, as shown above, Judge Nelson's finding that the Daws, Inc. handbook continued to apply at JDT was correct. It was certainly not clearly erroneous.

With respect to the fourth factor, Judge Nelson found Jim "was aware of the handbook policies, but simply interpreted the policies not to apply to him." [Filing No. 147 at 12.] Judge Nelson based this finding on Jim's own declaration, which clearly showed he was aware of the policy, but that, when he was President

7

of Daws, Inc., he used discretion granted to the President in the policy not to apply it to himself. [Filing No. 35-1 at 6–7 ¶ 28.] Judge Nelson thus correctly found that Jim continued to be aware of (and governed by) the policy after he became an employee of JDT. [Filing No. 147 at 12–13.]

Defendants try to argue that whatever discretion the handbook gave Jim as President of Daws, Inc. continued to apply at JDT, and so Jim had discretion to exclude himself from the policy. But Jim was never President of JDT. Defendants do not dispute that in their Reply Brief. [Filing No. 155 at 9.] Defendants claim the difference between CEO and President is a "matter of semantics." It is not. As CEO of JDT,[4] Jim was no longer part of the ownership group that controlled the business, but an employee who was subject to control by the new owners. Moreover, as he was preparing to leave, Jim undoubtedly understood he would no longer even be CEO after he quit. No reasonable person in Jim's shoes would have believed that, after he quit, he would be in a position to interpret the policy for his own benefit and prevent JDT from accessing emails stored on its own server which directly pertained to the business of JDT.

---

[4] In support of its argument that Jim was able to interpret the policy for his own benefit as CEO, Defendants cite text messages that were offered in connection with JDT's Motion for Preliminary Injunction. [Filing No. 155 at 9 (citing Filing No. 63-1 at 21).] Defendants did not offer or argue this evidence in support of their Motion for Protective Order. While text messages identify Jim as CEO, they have nothing to do with the policy in the employee handbook. Moreover, if evidence from the preliminary injunction hearing is to be considered, it should be noted that other evidence undercuts Jim's self-serving claim that he was "not tech-savvy" by showing that Jim had no trouble switching to a Gmail address as soon as he found out Rick had taken control of the company's email server, which Rick clearly had the right to do as the owner of the company which owned the server. [Filing No. 109 (02/26/25 Tr.) at 72:18–74:19.] In short, Jim was fully aware and capable of understanding the policies in the employee handbook and taking steps to protect the confidentiality of emails if he had chosen to.

The language of policy, which Judge Nelson found to be "compelling," leaves no doubt that (a) "[a]ll data entered on the Company's computer's is the property of the Company"; (b) "the Company may need to access your E-mail for various reasons";  (c) email "should be used primarily for business purposes"; and (d) "any information input to the computer is property of the Company." [Filing No. 147 at 11.] This language, of which Jim was aware, placed him on notice that after his departure, the owners of JDT would have access to his emails, which were company property. Judge Nelson did not commit error of law or fact in finding that Jim was aware of the policy or that this factor weighs in favor of JDT.

**C.     Defendants' new arguments fail to show inadvertent disclosure.**

Defendants try to support their claim of inadvertent disclosure by arguing, "Mistakes happen." [Filing No. 155 at 12.] The law, however, requires more than a mistake. It requires Defendants to show how the claimed mistake happened and what was done to rectify the effort after they learned of it. [Filing No. 147 at 13.] Defendants do not contest the governing case law in their Reply Brief. [Filing No. 155 at 10–12.] As Judge Nelson correctly found, under the governing law, Defendants' failure to offer any evidence to support their claim prevented him from finding that privilege was not waived. [Filing No. 147 at 13–14.] At a minimum, Judge Nelson did not clearly err in holding there was no evidence to support such a finding.

For the first time in their Reply Brief in Support of their Objections, Defendants cite *Simmions v. Pierless Fish Corp.*, 592 F. Supp. 3d 68, 74 (E.D.N.Y.

2020), and suggest the emails to Jim's address at JDT in October of 2024 were simply the result of an erroneous "click of the mouse." [Filing No. 155 at 11.] Defendants waived this argument by not making it below. Even if they hadn't waived the argument, it is only speculation without an affidavit or declaration to show (a) how Ms. Karavas came to send the email to Jim's old address, including precautions she took or didn't take; (b) when Defendants realized she had done so, and (c) when and how Defendants acted to correct it. If Defendants believed evidence to support a finding of inadvertent disclosure existed, they easily could have provided it. They chose not to do so.

Defendants also argue in the Reply Brief in Support of their Objection, that Judge Nelson should have found inadvertent disclosure, without any evidence, based on the "overriding interest of justice" listed in *Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir. 1996). Defendants did not make this argument in their opening Brief below. [Filing No. 37 at 11.] They did not address inadvertent disclosure at all in their Reply Brief below. [Filing No. 43.] And they did not make any argument on inadvertent disclosure under *Gray* in their initial Brief in Support of their Objections. [Filing No. 153 at 16–17.] Their new argument under *Gray* was therefore waived.

Even if it was not waived, Defendants' new argument does not show any error of law or fact on the part of Judge Nelson. Defendants do not argue that Judge Nelson was wrong, as a matter of law or fact, in applying any of the other four factors in *Gray*, or that he misapplied the rule that inadvertent disclosure does not operate as a waiver if the holder of the privilege took reasonable steps

to prevent disclosure and the holder promptly took reasonable steps to rectify the error after learning of the error. They cannot do so, because that is the very rule they argued to Judge Nelson in their opening Brief in Support of their Motion for Protective Order. [Filing No. 37 at 11 (citing *Gunter v. City of Omaha*, No. 8:21cv281, 2022 WL 3597762, at \*2 (D. Neb. Aug. 22, 2002) (opinion of Nelson, M.J.)).] Defendants also fail to cite any case holding that the fifth factor in *Gray*, standing alone, dispenses with the need to produce evidence in support of a claim of inadvertent disclosure. Defendants cannot now obtain a reversal of Judge Nelson for his correct application of a legal rule they themselves advocated below.

**D.    The crime-fraud exception will need to be decided if Judge Nelson's decision is not upheld.**

Because Judge Nelson correctly found attorney-client privilege had been waived, there was no need for him to address the crime-fraud exception under Neb. Rev. Stat. § 27-503(4)(a). Defendants do not dispute, in their Reply Brief, that the crime-fraud exception would remain for decision on the record below if the Court were somehow to find Judge Nelson committed an error of law or a clear error of fact.

## II. CONCLUSION

Judge Nelson did not set "too law a bar" for waiver of attorney client privilege. The bar he used was the same set of legal rules Defendants endorsed below, and his findings of fact, based directly on the evidence, were correct and not clearly erroneous. Because Judge Nelson did not commit any error of law or fact, his decision should be upheld in all respects.

11

Dated November 6, 2025

JIM DAWS TRUCKING, LLC,
Plaintiff

By: s/ Andre R. Barry
   Andre R. Barry #22505
   Henry L. Wiedrich #23696
   Madeline C. Hasley #27870
   CLINE WILLIAMS WRIGHT
    JOHNSON & OLDFATHER, L.L.P.
   233 South 13th Street
   1900 US Bank Building
   Lincoln, NE 68508
   (402) 479-6900
   abarry@clinewilliams.com
   hwiedrich@clinewilliams.com
   mhasley@clinewilliams.com

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the word count of this brief complies with local rule NECivR 7.1(d). The word-count function of Microsoft Word M365, states that this brief, inclusive of all text, contains 3,512 words. No generative artificial intelligence program was used in drafting this brief.

s/ Andre R. Barry
Andre R. Barry

## CERTIFICATE OF SERVICE

I, Andre R. Barry, hereby certify that on November 6, 2025, I electronically filed the foregoing with the Clerk of the United States District Court for the District of Nebraska using the CM/ECF system, which sent notification of such filing to all registered case participants.

s/ Andre R. Barry
Andre R. Barry

12