IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM DAWS TRUCKING, LLC, | | |
| Plaintiff, | | **4:24CV3177** |
| vs. | | |
| DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC., and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | | **MEMORANDUM AND ORDER** |
| Defendants. | | |

This matter is before the Court on Defendants' Statement of Objections to the Magistrate Judge's Order (Filing No. 152) of September 23, 2025 (Filing No. 147). For the reasons explained below, the objections will be overruled.

## BACKGROUND

This litigation involves claims for breach of contract, breach of fiduciary duty and tortious interference arising from an Asset Purchase Agreement ("APA") executed between Plaintiff Jim Daws Trucking, LLC ("JDT") and Defendant Daws Incorporated ("Daws, Inc.").[1]  (Filing No. 1-1.) Under the APA, Jim JDT was to acquire a trucking business (commonly referred to as "Daws Trucking"), "as a going concern."  (Filing No. 1-1.) The sale included the trade, business name, goodwill, and all other assets of Daws Trucking.  (Filing No. 1-1.)  The APA was signed by Jim

---

[1] A detailed statement of facts relevant to this matter are contained in the Magistrate Judge's order.  Therefore, the undersigned will only set out a brief overview of facts here for context.

Daws ("Jim"), as President of Daws, Inc., and Ricardo Fernandez ("Rick") and Ricardo D. Fernandez ("Ricky") on behalf of JDT on May 4, 2022. (Filing No. 1-1.)

At the time the APA was executed, Jim was the owner, or part owner, of several other companies. (Filing No. 35-1.) Jim claims he used his jim@daws-trucking.com email address to conduct business for all his companies and used it for personal communications. (Filing No. 35-1.) Employees of Jim's various companies also used "daws-trucking.com" email addresses. (Filing No. 35-1.) Jim did not have an in-house IT department, but he purchased a server for Daws, Inc., which stored emails and other data. (Filing No. 35-1.) The APA listed the server as an asset transferred to JDT in the sale, and indicated that February 28, 2021 was the date of acquisition of the server. (Filing No. 1-1; Filing No. 41-1.) Rick contends that neither Jim nor his attorneys instructed anyone at JDT to delete any emails. (Filing No. 41-1.) Jim maintains he did not understand that emails and data are stored on a server, and did not intend to sell the information contained on the server. (Filing No. 35-1.)

When Rick approached Jim about purchasing the assets of Daws Trucking, Jim retained Julie Karavas ("Karavas") and the law firm Karavas & Kranz, P.C. for legal advice. (Filing No. 35-1.) Jim claims he has "long used" Karavas and Tom Kranz of Karavas & Kranz as his personal and business attorneys. (Filing No. 35-1.) Jim used his jim@daws-trucking.com email address to communicate with his attorneys regarding the negotiation of the APA. (Filing No. 35-1.) Following the sale of Daws Trucking, Jim became an employee of JDT and continued to use his jim@daws-trucking.com email to correspond with his attorneys regarding personal and business matters. (Filing No. 35-1.) Jim asserts that Rick had expressed to him that nothing would change with how the company was run before the APA. (Filing No. 35-1.)

After becoming a JDT employee, Jim did not receive a JDT employee handbook or email policy about his employment. (Filing No. 35-1.) Rick asserts that the Daws, Inc. handbook was used both before and after the APA and that Jim did not receive a new handbook because that handbook was still in effect. (Filing No. 41-1.)

The Daws, Inc. handbook provides that "[a]ll data entered on the Company's computers is considered the property of the Company," and that "the Company may need to access your E-mail for various reasons." (Filing No. 41-3.) The handbook warns that computers "should not be used

for personal business even during nonworking time if you don't want the Company to see your personal documents." (Filing No. 41-3.) The handbook further provides that email messages are not "entirely confidential" and can be "forwarded to others without the original sender's knowledge." (Filing No. 41-3.) The handbook prohibits derogatory or offensive language in emails. (Filing No. 41-3.) The handbook states that disclosure of email messages may be required in lawsuits against the Company and that employees should not send anything by email that they would not like to become public knowledge. (Filing No. 41-3.) Jim maintains the Daws, Inc. handbook did not apply to JDT employees and he was not subject to its policies. (Filing No. 35-1.) Jim further contends that he did not monitor employee emails when he was President of Daws, Inc. (Filing No. 35-1.)

The working relationship between Rick and Jim soured following execution of the APA. This discontent ultimately resulted in discussions about Jim buying-back the assets of the business. (Filing No. 35-1.) Jim communicated with Karavas about these negotiations using his jim@daws-trucking.com email address. (Filing No. 35-1.) Jim claims that he believed these communications would remain confidential and privileged. (Filing No. 35-1.) The buy-back negotiations were unsuccessful, and Jim resigned from JDT effective September 30, 2024. (Filing No. 35-1.) Jim continued using the jim@daws-trucking.com email address to communicate with his attorneys until September 30, 2024. (Filing No. 35-1.) However, Karavas inadvertently sent two emails to Jim—one dated October 1, 2024 and another October 9, 2024—to the jim@daws-trucking.com email address. (Filing No. 35-1.)

On November 22, 2024 (shortly after this litigation commenced) Defendants filed a "Motion for Protective Order and Destruction of Privileged Documents in Plaintiff's Possession or Control," arguing that certain email communications on the server are protected by the attorney-client privilege. (Filing No. 34.) By order dated September 23, 2025 (Filing No. 147), the Magistrate Judge denied Defendants' motion. Defendants have objected to that order. (Filing No. 152.)

## STANDARD OF REVIEW

On review of a magistrate judge's decision on a nondispositive matter, the district court may reconsider any part of the magistrate judge's order that it finds clearly erroneous or contrary

3

to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). A decision is "clearly erroneous" when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed[,]" even if the record contains sufficient evidence to support the finding. *Light of the World Gospel Ministries, Inc. v. Village of Walthill, Nebraska*, 336 F.R.D. 567, 570 (D. Neb. 2020) (quoting *Lisdahl v. Mayo Found.*, 633 F.3d 712, 717 (8th Cir. 2011)) (quotations omitted). Magistrate judges retain "broad discretion in managing pretrial discovery" and in limiting discovery to what, in the magistrate judge's opinion, are the "'central issues.'" *Mehner v. Panera, LLC*, 8:22CV168, 2023 WL 6810277 (D. Neb. Oct. 16, 2023) (quoting *Hills v. Sw. Energy Co.*, 858 F.3d 481, 484 (8th Cir. 2017)).

## DISCUSSION

Defendants argue the Magistrate Judge's order was clearly erroneous and contrary to law because (1) Jim did not waive the attorney-client privilege over the emails between him and Karavas; (2) Jim did not waive the attorney-client privilege when Daws, Inc. sold the server to JDT; (3) the employee handbook applicable to Daws, Inc.'s employees did not apply to Jim; (4) Jim had a reasonable expectation of privacy in his post-sale communications with his lawyers using his jim@daws-trucking.com email address; and (5) Karavas did not waive Jim's attorney-client privilege respect to two emails she sent to Jim at his @daws-trucking.com email address. For the reasons explained below, the undersigned finds these arguments unpersuasive.

### 1.    Email Communications and Attorney-Client Privilege

The Magistrate Judge's conclusion that Defendants waived any attorney-client privilege attached to presale emails housed on the server was not clearly erroneous or contrary to law. The undersigned agrees with the Magistrate Judge that through the asset sale, Jim voluntarily disclosed these presale communications, thereby waiving the attorney-client privilege. Case law supports the Magistrate Judge's conclusion.

One case particularly on point is *Lynx Servs., Ltd. v. Horstman*, No. 3:14CV01967, 2016 WL 4565895 (N.D. Ohio Sept. 1, 2016). In *Lynx*, an asset sale of a business resulted in the buyer acquiring the corporate records, computers and servers of the purchased business. The plaintiff in a subsequent lawsuit sought emails from the buyer that were on the servers and written by and/or addressed to the purchased business' in-house counsel. The defendants argued the emails were

4

attorney-client privileged. The court disagreed, finding that by transferring the email communications to the buyer, the defendants voluntarily disclosed privileged information to a third-party, thereby waiving the attorney-client privilege as to those communications.

Similarly, in *GOT I, LLC v. XRT, Inc.*, No. 1:16-cv-00038, 2017 WL 3113408 (N.D. Ga. Feb. 28, 2017), the plaintiff entered into an asset purchase agreement with the defendant XRT (then known as Rhino Toys). Before the sale, the defendant's majority owner ("Silverglate") retained counsel to advise him regarding the transaction, and counsel communicated with him by emailing his Rhino Toys email account. The asset purchase agreement provided for the sale of substantially all the assets of Rhino Toys and, after the purchase agreement was signed, the plaintiff acquired XRT's computer server which housed Silverglate's correspondence with counsel. Following the sale, Silverglate became the plaintiff's employee. The defendants later filed a motion for protective order, asserting attorney-client privilege over the communications between Silverglate and counsel that were on the server.

The court denied the motion, concluding that the privilege was waived by the voluntary disclosure of the email communications. Notably, the defendant tried to distinguish *Lynx* by arguing that Silverglate became an employee of the plaintiff and retained a reasonable expectation of confidentiality in his emails. The court rejected this argument, finding it was irrelevant because the communications at issue were sent before Silverglate became an employee. *See also In re In-Store Advertising Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995) ("[W]here confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying the assets, the privilege is waived as to those communications"). The Magistrate Judge's conclusion that the attorney-client privilege was waived as to the presale emails was not clearly erroneous or contrary to law.

The Court likewise finds no error in the Magistrate Judge's conclusion that Jim did not have a reasonable expectation of privacy in his post-sale email communications, thus waiving the protections of the attorney-client privilege. After the sale, Jim became a JDT employee and continued to use the same email address to communicate with his attorneys. As argued by the parties, in evaluating whether the attorney-client privilege applies to communications between an employee and his lawyer over a workplace email account, considerations include whether (1) the corporation maintains a policy banning personal or objectionable use of email, (2) the company

monitors the use of the employee's computer or email, (3) third-parties have a right of access to the computer or emails, and (4) the corporation notified the employee, or was the employee aware, of the use and monitoring policies. *See In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 255 (Bankr. S.D.N.Y. 2005). The Magistrate Judge considered these factors and found Jim did not have a reasonable expectation of privacy in his post-sale email communications.

Defendants argue the Magistrate Judge's conclusion in this regard is incorrect because the Daws, Inc. handbook did not apply to Jim or JDT employees. However, the Magistrate Judge's findings are supported by the record. As noted by the Magistrate judge, JDT purchased Daws Trucking as a "going concern." Jim, as himself admitted, believed nothing would change from how the company was run before the APA. (Filing No. 35-1.) It appears that employees—who became JDT employees following the sale—continued to refer to the Daws, Inc. handbook. (Filing No. 41-4; Filing No. 41-5; Filing No. 41-6.) As set out above, the Daws, Inc. handbook explicitly stated that data on computers was considered company property and that the company may need access to email. The handbook warned employees that computers should not be used for personal business if they did not want the company to see their personal documents. The handbook also advised that email messages were not "entirely confidential." In short, JDT had an employee policy regarding email confidentiality and had the right to access documents through the server.

Jim, as president of Daws, Inc., was aware of these policies. The evidence suggests that, at least on one occasion, Jim was privy to a review of a former employee's deletion of files from the computer system. (Filing No. 41-7.) Following the sale, Jim became a JDT employee and, as such, was subject to the policies contained in the handbook. Also, given Jim's knowledge of the policies, he should have been on notice that data on computers was considered the property of the company that he decided to sell. Further, although JDT (or Jim before it) may not have actively monitored employee emails, it clearly had the right to do so. This reservation of rights is sufficient. *See Doe 1 v. George Washington Univ.*, 480 F. Supp.3d 224, 227 (D.D.C. 2020) ("Where, as here, a company has explicit and straightforward guidelines addressing the monitoring of email communications, an employee has no reasonable expectation of privacy in the emails, even if the company does not routinely enforce the monitoring policy."). The evidence supports the Magistrate Judge's conclusion that Jim did not have a reasonable expectation of privacy in his post-sale email

communications. The Magistrate Judge's conclusion with respect to the post-sale emails was not clearly erroneous or contrary to law.

### 2. Inadvertent Disclosure of October Emails

Defendants also object to the Magistrate Judge's conclusion that the attorney-client privilege was waived as to the two October 2024 emails from Kavaras to Jim. Notably, these emails were sent after JDT's counsel notified Karavas that JDT did not believe that Jim's emails on the JDT server were privileged. (Filing No. 41-1.) The Magistrate Judge found that the disclosure that resulted from Kavaras sending the emails to the jim@daws-trucking.com email address waived any privilege that may have attached to those emails. Citing the five-step test that has been used by the Eighth Circuit for evaluating claims of inadvertent disclosure,[2] the Magistrate Judge reasoned that "Defendants provided no evidence of reasonable steps taken to protect the e-mails from inadvertent disclosure, nor do they provide evidence of reasonable steps taken to rectify the error after learning of it." (Filing No. 147.) Based on the record before the Magistrate Judge, the Court cannot conclude that the Magistrate Judge's decision was clearly erroneous or contrary to law.

**IT IS ORDERED** that Defendants' Statement of Objections to the Magistrate Judge's Order (Filing No. 152) is overruled.

Dated this 29th day of December, 2025.

BY THE COURT:

Susan M. Bazis
United States District Judge

---

[2] These factors include: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error." *Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir. 1996) (citing *Hydraflow, Inc. v. Enidine Inc*, 145 F.R.D. 626, 637 (W.D.N.Y. 1993)). *See also Gunter v. City of Omaha*, No. 8:21cv281, 2022 WL 3597762, at *2 (N. Neb. Aug. 23, 2022) ("[A]n inadvertent disclosure does not operate as a waiver of the attorney-client privilege if the holder of the privilege took reasonable steps to prevent disclosure and the holder promptly took reasonable steps to rectify the error after learning of the error").