# United States Court of Appeals
## For the Eighth Circuit

No. 25-1915

Jim Daws Trucking, LLC

*Plaintiff - Appellee*

v.

Daws, Inc.; James R. Daws; Lana R. Daws; Daws Trucking, Inc.; Columbus Transportation & Logistics, LLC

*Defendants - Appellants*

Appeal from United States District Court
for the District of Nebraska - Lincoln

Submitted: March 19, 2026
Filed: August 31, 2026

Before SHEPHERD, ERICKSON, and GRASZ, Circuit Judges.

SHEPHERD, Circuit Judge.

After purchasing a trucking company through an asset purchase agreement (APA) that included a noncompete provision, Jim Daws Trucking, LLC, (JDT) initiated this action against the sellers, James (Jim) and Lana Daws, their company, Daws, Inc., and two other companies Jim Daws had an ownership interest in, Daws Trucking, Inc., and Columbus Transportation & Logistics, LLC, (collectively

Defendants) alleging that they were engaging in a competing trucking business in violation of the noncompete provision in the APA. JDT also sought a temporary restraining order (TRO) or a preliminary injunction, and, after a hearing, the district court[1] immediately granted a TRO in part before later entering an order granting a preliminary injunction. Defendants appeal, asserting that the district court erroneously granted the preliminary injunction. Defendants also assert that the district court erred in ordering Defendants to tender $500,000 to JDT as a form of injunctive relief and by setting an inadequate bond. Having jurisdiction under 28 U.S.C. § 1292, we affirm.

I.

In May 2022, JDT and Daws, Inc., executed an APA for the sale of a trucking company that specialized in hauling over-the-road flatbed freight. Per the APA, Daws, Inc., sold the trucking business to JDT for a purchase price of $12 million, with JDT to pay Daws, Inc., $8 million upfront and the balance financed by the seller and to be paid over a period of 5 years. The APA detailed that the sale included the "trade, business name, goodwill, and all other intangible assets . . . and all other assets of the Business." The APA also contained a noncompete provision, which provides:

> It is understood and agreed that $4,500,000 of the purchase price shall be allocated to the goodwill of the Business, and in connection with the sale to the Buyer of the goodwill, Seller agrees that it shall not, either directly or indirectly, carry on or engage in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, so long as Buyer or any other person deriving title to the goodwill of said business from Buyer carries on a like business in such area.

[1]The Honorable Susan M. Bazis, United States District Judge for the District of Nebraska.

> By affixing their signatures to this Agreement, Seller's Shareholders join in the foregoing noncompetition agreement and agree to be individually bound thereby.

The APA bore the signatures of Jim Daws, as president of Daws, Inc., Jim and Lana Daws in their capacities as shareholders of Daws, Inc., and Ricardo (Rick) Fernandez and Ricardo (Ricky) D. Fernandez on behalf of JDT. After the sale of the business, Jim Daws became a salaried employee of JDT. However, by 2024, the working relationship between Jim Daws and Rick Fernandez had deteriorated, and, after failed attempts to buy back the company, Jim Daws informed Rick Fernandez in August 2024 that he was leaving JDT because he was planning to retire. Prior to his retirement from JDT, Jim Daws engaged in conversations with individuals from other trucking companies about working together, and he indicated his plans to continue working with some JDT personnel after he left JDT. Since Jim Daws left in September 2024, JDT has lost most of its office personnel and over half of its drivers.

In October 2024, JDT initiated this action, asserting claims for breach of the APA, breach of fiduciary duty, and tortious interference, and seeking declaratory and injunctive relief. In its complaint, JDT alleged that Jim Daws and Daws, Inc., were violating the noncompete provision of the APA by competing against JDT. JDT also alleged that Daws, Inc., refused to transfer business assets to JDT that were sold under the APA, and that Jim Daws and Daws, Inc. "prepared to compete, intend[ed] to compete, and on information and belief are competing against JDT in violation of the non-compete provision of the Asset Purchase Agreement." After JDT filed suit, it learned that Jim Daws had been communicating with former JDT employees about engaging in the hauling of flatbed freight with another entity, Loyal Trucking, LLC. Through its attorneys, JDT sent Jim Daws's attorneys a letter demanding compliance with the noncompete provision and that Jim Daws cease and desist all activities in the trucking business. Jim Daws, through his attorneys, responded that neither he nor his wife, Lana, nor any of their companies, would have any ownership interest in any business pursuits of the former JDT employees with whom Jim Daws had been communicating.

JDT then filed a motion for a TRO and a preliminary injunction and sought expedited discovery. The district court held a hearing, and it issued a TRO that same day and granted expedited discovery. The TRO prohibited Jim Daws and anyone acting on his behalf or in concert with him from "engag[ing] in the business of trucking in the continental United States of America" and specifically prohibited him from engaging in the venture described in the communications between Jim Daws and the former JDT employees. The TRO also prohibited Jim Daws from "provid[ing] any other company advice as to how to operate a trucking company," but allowed Jim Daws to continue to operate his other businesses that were in existence at the time the APA was executed. The TRO order also stated that it "will remain in effect until the Court rules on JDT's request for a preliminary injunction."

The district court later issued an order granting JDT a preliminary injunction. The district court first determined that JDT had shown a likelihood of success on the merits on the breach of contract claim based on the noncompete provision in the APA. In doing so, it concluded that the noncompete provision was valid and enforceable under Nebraska law. The district court noted that the noncompete provision was drafted by Jim Daws's attorneys and that the APA made clear that part of the sale was for the goodwill, i.e., Jim Daws's name and reputation in the trucking industry, which extended beyond flatbed trucking to the entire trucking industry. The district court also concluded that, because JDT was a nationwide company, the geographic restriction of the noncompete to the entire United States was reasonable because it was "coextensive with the employer's trade." The district court also concluded that the five-year duration of the noncompete provision was reasonable "considering the size and type of business purchased." The district court rejected Defendants' additional argument that even if the noncompete were enforceable, there was no evidence that it had been breached, specifically detailing the evidence showing that Jim Daws had engaged in communications with JDT employees about working on a new business venture in the trucking industry. The district court also concluded that it did not need to consider the likelihood of success on the merits of the breach of loyalty claim because it had concluded that JDT was likely to prevail on the merits of the breach of contract claim.

Turning to the issue of irreparable harm, the district court found that JDT had satisfied this factor, identifying the significant portion of the purchase price that was specifically attributed to the business's goodwill. The district court also cited Eighth Circuit case law explaining that loss of intangible assets such as goodwill can constitute irreparable injury and that the monetary harm attributable to such an injury is nearly impossible to quantify. The district court further found that the balance of the harms favored JDT because the injury to Jim Daws—not being able to engage in the trucking business—was self-inflicted and the public has an interest in the enforcement of contractual obligations. Based on the foregoing, the district court concluded that the restrictions in the TRO should remain in effect, "but on a broader scale." It then recited the broader restriction as follows:

> Jim, and anyone acting on his behalf or in concert with him, will be barred from engaging in the business of trucking in the continental United States. Jim may not provide any company advice as to how to operate a trucking company. Jim will be prohibited from providing financial support to anyone carrying out the business plan for Loyal. Jim may continue to operate his other companies that only lease real estate or lease or sell trucks to other companies, except that these companies may not lease or sell trucks or trailers to Loyal or otherwise use their assets to support Loyal.

The district court also ordered Jim Daws to release roughly $500,000 in funds held in an American National Bank (ANB) account to JDT. This account, which Jim Daws controlled, was used by JDT to operate its business, and the district court held that the funds belonged to JDT but could be used only for JDT expenses. Finally, the district court ordered JDT to pay a bond in the amount of $480,000, which represented 12 times the roughly $40,000 monthly income that one of Jim Daws's other trucking businesses was bringing in, noting that there was little evidence in the record of Loyal Trucking, LLC's income. Three days later, the district court amended its order to add additional limitations regarding Loyal. This appeal follows, with Defendants challenging the preliminary injunction, the order to release funds to JDT, and the bond amount set by the district court.

II.

First, Defendants assert that the district court erred in granting JDT's motion for a preliminary injunction. Defendants assert that the district court erroneously concluded that the noncompete provision is enforceable, and that this flawed premise led the district court to erroneously conclude the relevant factors warranted the issuance of a preliminary injunction. "When a party appeals a district court's preliminary injunction, . . . our standard of review is 'layered.' We review the district court's conclusions of law de novo, its findings of fact for clear error, and its application of the law to the facts for abuse of discretion." Cigna Corp. v. Bricker, 103 F.4th 1336, 1342-43 (8th Cir. 2024) (citation omitted).

"In deciding whether to grant preliminary injunctive relief, courts consider the four Dataphase[2] factors: '(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" Schmitt v. Rebertus, 148 F.4th 958, 966 (8th Cir. 2025) (citation omitted). Defendants' arguments on appeal regarding the district court's evaluation of the Dataphase factors are premised entirely on their argument that the noncompete provision is unenforceable under Nebraska law. While Defendants focus much of their briefing on their assertion that, without an enforceable noncompete provision, JDT cannot show it is likely to prevail on the merits, they also assert that the absence of an enforceable noncompete provision dictates that the remaining Dataphase factors weigh against issuance of a preliminary injunction.

Under Nebraska law, covenants not to compete must satisfy three general requirements:

> First, the restriction must be reasonable in the sense that it is not injurious to the public. Second, the restriction must be reasonable in

[2]Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109 (8th Cir. 1981) (en banc).

> the sense that it is no greater than reasonably necessary to protect the employer in some legitimate business interest. Third, the restriction must be reasonable in the sense that it is not unduly harsh and oppressive on the party against whom it is asserted.

H & R Block Tax Servs., Inc. v. Circle A Enters., Inc., 693 N.W.2d 548, 553-54 (Neb. 2005). However, "[w]hether a noncompete clause is valid and enforceable requires us to categorize the covenant as either an employment contract or the sale of goodwill." Unlimited Opportunity, Inc. v. Waadah, 861 N.W.2d 437, 442 (Neb. 2015). Under Nebraska law, noncompete provisions involving goodwill are looked upon more favorably, with the Supreme Court of Nebraska explaining that

> Nebraska courts are generally more willing to uphold promises to refrain from competition made in the context of the sale of goodwill as a business asset than those made in connection with contracts of employment, reasoning that in the sale of a business, "[i]t is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area, and then use the funds thus obtained to do the very thing the contract prohibits."

Id. at 443 (citations omitted). In contrast, in the context of an employment agreement, Nebraska courts have explained that "[a]n employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but is not entitled to protection against ordinary competition from a former employee." Mertz v. Pharmacists Mut. Ins. Co., 625 N.W.2d 197, 204 (Neb. 2001). Still, even in the context of the sale of goodwill, "a covenant not to compete ancillary to the sale of a business must be reasonable in both space and time so that it will be no greater than necessary to achieve its legitimate purpose." Waadah, 861 N.W.2d at 443.

Defendants assert that, while JDT has a legitimate interest in protecting the goodwill it purchased as part of the APA, the noncompete, which includes a nationwide ban on doing business in an entire industry for a period of five years, is greater than necessary to protect this interest. However, the district court made

several factual findings supporting its conclusion that the noncompete was not greater than necessary to protect JDT's interests. The district court noted that "[t]he APA is clear that part of the sale was for goodwill," which it defined as "Jim's name and reputation in the trucking industry." The district court also found that "Jim's reputation does not solely exist in the flatbed trucking market," because the "reputation Jim built extended to the entire trucking industry." The record evidence supports the district court's factual findings that the goodwill JDT purchased includes Jim Daws's nationwide name and reputation in the trucking industry. Testimony at the hearing on the preliminary injunction described Jim Daws as "a longstanding industry great," "a great trucking industry guy," and "really well-known in . . . the trucking industry," and at no point were discussions of Jim Daws's reputation and name recognition cabined to flatbed trucking. While the record reflects that Daws has a history in the flatbed sector of the trucking industry, it does not reflect that his name and reputation was similarly limited. The record also contains evidence demonstrating that JDT itself was not limited to exclusively operating in the specific subset of flatbed trucking. Testimony revealed JDT trucks can be used to pull tankers, dry vans, or other commercial trailers, inherently expanding the business beyond only the flatbed sector. Further, Jim Daws himself testified that the drivers he trained in flatbed hauling could pull other forms of commercial trailers, specifically acknowledging he had discussions about putting drivers to work pulling refrigerated trailers. We discern no clear error in the district court's conclusion, based on this evidence, that Jim Daws enjoyed a valuable, nationwide name and reputation in the trucking industry, and not one limited to only flatbed trucking. See Oden v. Shane Smith Enters., Inc., 27 F.4th 631, 633 (8th Cir. 2022) ("Clear error exists where, viewing the record as a whole, we are left with the definite and firm conviction that a mistake has been committed." (citation omitted)).

We acknowledge that Nebraska courts closely scrutinize noncompete provisions and on occasion have found geographic restrictions that cover the entire United States or sweeping restrictions on contacting clients to be overbroad and unenforceable. See, e.g., CAE Vanguard, Inc. v. Newman, 518 N.W.2d 652, 654, 656 (Neb. 1994) (affirming district court determination that non-compete was

unreasonable when it covered "the United States, the continent of North America, or anywhere else on earth"); Mertz, 625 N.W.2d at 205 (holding noncompete agreement was overly broad where it was not limited to clients with whom the former employee actually did business or personally contacted). But those cases present distinct factual scenarios involving former employees and employment agreements, not the sale of a business and its goodwill, especially where the goodwill constituted such a significant portion of the sale price—$4.5 million of a $12 million total. Further, Nebraska courts have explained that the duration of a noncompete is not subject to an arbitrary determination regarding whether it is reasonable; rather, this is a fact-specific inquiry. Presto-X-Company v. Beller, 568 N.W.2d 235, 240 (Neb. 1997) ("Whether a covenant not to compete is reasonable with respect to its duration and scope is dependent upon the facts of each particular case. . . . [W]e must look to the record for evidence which establishes that a [particular] restraint was a reasonable and necessary means of protecting the legitimate business interest . . . ." (citation omitted)).

In sum, Nebraska courts have "recognized the legitimate need of one who purchases a business to reasonably protect himself against competition from the seller," Presto-X, 568 N.W.2d at 238, and have upheld relatively broad noncompete provisions, including, for example, preventing the seller of a car dealership from selling new cars in that county for a period of 15 years, D.W. Trowbridge Ford, Inc. v. Galyen, 262 N.W.2d 442, 445 (Neb. 1978). The particular facts of this case, as found by the district court, demonstrate that Jim Daws had a wide influence and reputation in the entire national trucking industry and that the sale of the business was for a nationwide operation. For JDT to protect its business interests in that reputation, a five-year noncompete provision preventing Jim Daws from engaging in a competing business nationwide was not unreasonable. For the noncompete provision to protect the goodwill JDT purchased in the APA, it must protect what was sold. Here, the record demonstrates that the goodwill JDT purchased includes Jim Daws's valuable, nationwide reputation in the entire trucking industry. Accordingly, the district court did not err in concluding that the noncompete

provision was not greater than necessary to protect JDT's interest in protecting the goodwill it purchased in the APA.

Defendants also assert that the noncompete provision is unduly harsh and oppressive both in scope and duration, and that JDT failed to show that such expansive restrictions are necessary to protect the goodwill it purchased. And Defendants assert that the noncompete provision is injurious to the public because it violates Nebraska public policy against unreasonable restraints on trade. But again, these arguments ignore the district court's factual findings—which we have determined are not clearly erroneous—that the goodwill purchased in the APA was Jim Daws's name and reputation in the trucking industry and that this goodwill extended beyond just the flatbed trucking industry to the entire trucking industry nationwide. While the geographic scope and duration may be broad, the district court did not err in concluding that they were not unreasonably so; the unique nature of trucking as a nationwide industry, coupled with Jim Daws's reputation in that industry and roughly one-third of the purchase price being devoted to goodwill, demonstrates that a lesser restriction would not achieve JDT's legitimate purpose of protecting the goodwill it purchased through the APA. The district court thus did not err in concluding that the noncompete provision was enforceable and in further concluding that JDT was likely to prevail on the merits of its breach of contract claim. Because Defendants' arguments about the remaining Dataphase factors are premised on the same argument regarding the enforceability of the noncompete provision, we similarly conclude that the district court did not err in its analysis of these factors. Accordingly, the district court did not err in granting a preliminary injunction in favor of JDT.

III.

Next, we address Defendants' argument that the district court erroneously ordered Defendants to remit $500,000 to JDT as a form of injunctive relief. Defendants argue that the district court erred because JDT did not request this as a form of relief in its motion, instead raising the request only in its closing statement

during the hearing on the motion for the preliminary injunction. Further, Defendants assert that ordering them to remit these funds to JDT is an improper form of injunctive relief because there is an adequate remedy at law in the form of a conversion claim.

First, Defendants' argument that JDT made no request for return of these funds until the end of the preliminary hearing is belied by the record. In its brief in support of its motion for a preliminary injunction, JDT detailed Jim Daws's interference with the ANB account, detailing how "Jim . . . used control over the account to deprive JDT of its operating cash and to prevent JDT from paying the expenses of its drivers." Further, in its reply brief, JDT specifically requested that the district court "prohibit Jim [from] further interfering with JDT's use of its funds in the ANB account to pay bills in the ordinary course, and to the extent necessary, to complete the paperwork . . . to recognize Rick [as] having signature authority to replace former employees who left with Jim." These statements suffice to serve as a request for the form of relief the district court granted with respect to the ANB funds.

Second, as to the merits of Defendants' argument, this Court has stated that, when considering whether to issue a preliminary injunction, "the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Dataphase, 640 F.2d at 113. The district court's decision to order Defendants to return the nearly $500,000 in the ANB account was a proper exercise of its discretion to determine how best to preserve the status quo. The district court concluded that the funds in the ANB account belonged to JDT, not Jim Daws, and that the funds were for the purpose of supporting JDT's operations. Indeed, the record evidence demonstrates that the funds in the ANB account were for the day-to-day operation of JDT and that after Jim Daws left JDT he interfered with JDT's ability to access those funds for business purposes, which impeded JDT's ability to pay its bills. The district court's order to release the funds in the ANB account to JDT and its requirement that the funds could be used only for JDT's operational expenses, merely restored the status quo of those funds being used for JDT's day-to-day business and maintenance

expenses. This was not an abuse of discretion. See id. ("The equitable nature of the [preliminary injunction] proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case.").

IV.

Finally, we consider Defendants' contention that the district court erred by not setting an adequate bond. Defendants assert that the district court's allegedly erroneous decision to order them to release the roughly $500,000 from the ANB bank account to JDT was compounded by imposing an inadequate bond. According to Defendants, the district court set the bond amount based on the potential lost revenue to a non-party, rather than assuring the return of the ANB bank account funds should the injunction be reversed. Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, a district court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, we have explained that "the 'amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion.'" Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2016) (citation omitted).

JDT asserts that Defendants did not argue before the district court that it should have ordered security with respect to the ANB funds so they have waived that argument. Even assuming without deciding that Defendants did not waive this argument, they cannot prevail. The district court exercised its broad discretion in setting the amount of bond based on potential lost profits to another Jim Daws trucking business—which it identified as the potential damages Defendants could incur if the injunction were improperly issued—and in not including the ANB funds in this amount. As the district court noted, the ANB funds belonged to JDT, but were being controlled by Jim Daws, and there is no dispute that these funds were for the JDT's day-to-day operations. Because the record demonstrated that the funds

belonged to JDT, the district court was entitled to conclude that these funds would not be part of any damages should it be found that Defendants have been wrongly enjoined and thus need not be reflected by the bond amount. We therefore discern no abuse of discretion in the district court's decision to exclude the amount of funds in the ANB bank account in setting the bond amount.

V.

For the foregoing reasons, we affirm the judgment of the district court.

GRASZ, Circuit Judge, dissenting.

I would vacate the district court's preliminary injunction for three reasons. First, as read by the majority, the noncompete is unenforceable under Nebraska law. Second, the majority reads the noncompete more broadly than its terms allow. And third, even read correctly, the noncompete is unenforceable because it is still greater than reasonably necessary to protect JDT's legitimate interests.

Nebraska caselaw is replete with decisions saying courts "do not look with favor upon restraints against competition," including noncompetes. *E.g.*, *Griffeth v. Sawyer Clothing, Inc.*, 276 N.W.2d 652, 655 (Neb. 1979). "At common law[,] all contracts in restraint of trade were against public policy and void." *Secs. Acceptance Corp. v. Brown*, 106 N.W.2d 456, 462 (Neb. 1960). The sun may have set on free trade's heyday, *see Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127 (Neb. 2014) ("[P]artial restraints of trade[] are enforceable"), but noncompetes are still "'not favorites of the law'" and are only enforceable if "reasonable." *Id.* (quoting *Brown*, 106 N.W.2d at 462). "Regardless of the context," this means a noncompete "must be reasonable in the sense that it is" (1) "not injurious to the public"; (2) "no greater than reasonably necessary to protect . . . some legitimate business interest"; and (3) "not unduly harsh and oppressive on the party against whom it is asserted." *Unlimited Opportunity, Inc. v. Waadah*, 861 N.W.2d 437, 443 (Neb. 2015).

True, "Nebraska courts are generally more willing to uphold [noncompetes] made in the context of the sale of goodwill as a business asset than those made in connection with contracts of employment . . . ." *Id.* But make no mistake, the requirement that a noncompete must be "*no greater than necessary* to achieve its legitimate purpose" still applies in this context. *Id.* (emphasis added); *accord Chambers-Dobson, Inc. v. Squier*, 472 N.W.2d 391, 397 (Neb. 1991) ("The restraint of trade that is permissible . . . is no greater than is necessary to attain the desired purpose — the purpose of making good will a transferable asset."). And unlike most states, Nebraska will not judicially reform or "blue pencil" overbroad noncompetes. *See CAE Vanguard, Inc. v. Newman*, 518 N.W.2d 652, 655 (Neb. 1994) (noting the Nebraska Supreme Court "has *never* allowed reformation of a [noncompete]" (emphasis added)).

The Nebraska Supreme Court has explained that although this is the "minority view," it is "the most reasonable" and "most in harmony with existing precedent," because "courts may not rewrite a contract for parties." *Id.* at 655–56. When it has been asked to rethink this position, the Nebraska Supreme Court has flatly "decline[d the] invitation to reconsider [its] rejection of the blue pencil rule." *Waadah*, 861 N.W.2d at 442. This means our court must "strictly construe[]" the noncompete and resolve any doubt "against the latitudinarian construction thereof." *Griffeth*, 276 N.W.2d at 655. And if the noncompete is greater than necessary to protect JDT's legitimate interests when so construed, we must strike it down without flinching, just like the Nebraska Supreme Court has done each time it has encountered a noncompete that failed to meet this daunting standard. *See, e.g.*, *Waadah*, 861 N.W.2d at 444; *Presto-X-Company v. Beller*, 568 N.W.2d 235, 241 (Neb. 1997).

The majority's conclusion that the noncompete is enforceable and prohibits Defendants from engaging "in the entire national trucking industry," *ante* p. 9, is wrong twice over. For one, if the noncompete extends to the entire trucking industry, it is void because Nebraska only enforces noncompetes when they are limited to the seller's particular field. *See D.W. Trowbridge Ford, Inc. v. Galyen*, 262 N.W.2d 442,

445 (Neb. 1978) (holding the noncompete a Ford dealership's seller signed preventing him from selling new cars was enforceable because it was aimed at "protect[ing] the purchaser against the competition . . . *in the new car field* . . . ." (emphasis added)).

For example, in *Antrim v. Pittman*, Patrick Antrim signed a noncompete when he sold his heating and air conditioning business to Clyde Pittman. 203 N.W.2d 510, 511 (Neb. 1973). Before it expired, Antrim opened two businesses selling water softeners, and Pittman sued, alleging Antrim was breaching the noncompete. *Id.* The court acknowledged that selling heating and air conditioning equipment and water softeners were similar enough to come within the noncompete's terms, apparently because both involved selling household goods. *Id.* But it held that the noncompete was void and unenforceable because "[i]n the sale of a business the restraining promise is illegal as to lines of trade other than those sold by the party whom the covenant restrains." *Id.* at 512; *accord Squier*, 472 N.W.2d at 398 ("[A] reasonable restrictive covenant against the seller's competition in the type of business sold may be enforced."); *see also Bar's Prods. Inc. v. Bars Prods. Int'l Inc.*, 662 F. App'x 400, 410 (6th Cir. 2016) ("[A] restraint in the business-sale context may be as broad as the business covered by the agreement . . . ." (cleaned up)); *Nalco Chem. Co. v. Hydro Techs., Inc.*, 984 F.2d 801, 805 (7th Cir. 1993) ("[T]he prohibition against working in the entire industry was overbroad.").

It is undisputed that JDT is a specialized flatbed carrier. This was admitted in sworn testimony and JDT does not argue otherwise on appeal. And the APA itself could not be any clearer. Defendants only "own[ed] and operate[d] a trucking company specializing in hauling over the road flatbed freight . . . ." If the noncompete extends to the entire trucking industry, as the majority concludes, rather than flatbedding — the only field Defendants engaged in — it is void and unenforceable.

The majority's conclusion that JDT has a legitimate business interest in excluding Defendants from the entire trucking industry is a real headscratcher. *See*

*Mertz v. Pharmacists Mut. Ins. Co.*, 625 N.W.2d 197, 203–04 (Neb. 2001) (noting noncompetes that "are broader than reasonably necessary to protect *legitimate business interests* . . . are against public policy and void" (emphasis added)). To give just a few examples, JDT does not dispute, and there is no evidence in the record, that either Defendants *or* JDT have ever hauled refrigerated trailers or "reefers," moving trucks, livestock trailers or "bull racks," tankers, or dry vans. Rather, flatbedding is the *only* kind of trucking Defendants and JDT have *ever* done. On the majority's reading, the noncompete prohibits Defendants from engaging in all these different types of trucking just the same. And this does not square with Nebraska law. Noncompetes are only "available to prevent *unfair* competition," not to shield someone from "*ordinary* competition," and most definitely not to prevent someone from engaging in a business that would not compete at all. *E.g.*, *Squier*, 472 N.W.2d at 399 (emphasis added).

To reach the opposite result, the majority hinges its entire decision on the district court's factual finding that Jim Daws's reputation "extend[s] to the entire trucking industry." *Ante* pp. 7–10. It concludes this finding is not clearly erroneous by positing that JDT trucks "*can be used* to pull tankers, dry vans, or other commercial trailers," (emphasis added) if they were to be connected to such equipment instead of a flatbed. True enough. And if "ifs and buts were candy and nuts . . . ."[3] Fantasy aside, the undisputed evidence is that JDT is a specialty flatbed trucking company. *Ante* pp. 7–10. Even assuming Jim Daws's reputation extended far beyond his actual business, it is of no moment. Nebraska caselaw is clear; noncompetes are only enforceable within the seller's field of business, not in every field in which the seller is known. And this aside, the district court's finding *is* clearly erroneous. A factual finding is clearly erroneous "if it is unsupported by substantial record evidence," and this finding garners no support in the record. *E.g.*, *Staton v. Maries Cnty.*, 868 F.2d 996, 998 (8th Cir. 1989). As noted above, there is

[3]The English tradition has long recognized mere "ifs and buts" are limited to potential scenarios, not actual ones. *See* Sir Thomas More, The History of King Richard III 48 (Richard S. Sylvester ed., 1963) (originating the phrase "thou seruest me I wene w[ith] iffes & with andes," which evolved into the American idiom).

no evidence that Jim Daws ever engaged in anything but flatbedding or that his reputation extends beyond this subset of the trucking industry. And even ignoring this too, the finding says nothing about *where* Daws is known. The only evidence I see in the record on this point is that around 70% of his business was "located within 300 miles of Lincoln, Nebraska," and this does *not* support the idea that Daws was known coast-to-coast.

Second, the noncompete's terms themselves do not prohibit Defendants from engaging in the entire nationwide trucking industry. As the majority notes, the noncompete purports to prevent Defendants from,

> either directly or indirectly, carry[ing] on or engag[ing] in, either as an owner, part owner, manager, operator, employee, agent, or other participant, the business of trucking in the continental United States of America, for a period of no less than five (5) years from the date of this Agreement, *so long as [JDT] . . . carries on* ***a like business in such area***.

The noncompete's final clause limits its scope to businesses like JDT's in the area JDT operates in. That is, businesses that might actually compete with JDT.

There is no evidence, as noted above, that JDT engages in anything other than flatbedding, and the evidence regarding where it operates is scant at best. Nebraska law does not permit us to read noncompetes liberally to impose "just" results where equity favors a complaining business. Instead, we must strictly construe the noncompete, *see Griffeth*, 276 N.W.2d at 655, and "either enforce [it] as written or not enforce it at all." *Waadah*, 861 N.W.2d at 441 (cleaned up). So when the district court enjoined Defendants from participating in the entire nationwide trucking industry — without the evidence it needed to determine what the noncompete actually covers — it abused its discretion. *See Quiles v. Union Pac. R.R.*, 4 F.4th 598, 606 (8th Cir. 2021) ("[A] district court abuses its discretion when there is a lack of factual support for its decision . . . ." (alteration in original) (quoting *Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 969 (8th Cir. 2002))). And the abuse is particularly glaring because any doubt regarding the noncompete's scope was

supposed to be resolved "against the latitudinarian construction thereof," not in favor of the broadest reading possible. *Griffeth*, 276 N.W.2d at 655; *see also Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 913 (8th Cir. 2025) ("A district court 'by definition abuses its discretion when it makes an error of law.'" (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996))).

If this evidentiary mismatch between the noncompete's and the injunction's terms was the only problem, we could remand and direct the district court to reconsider its injunction's scope. *See, e.g.*, *Harper v. Gen. Grocers Co.*, 590 F.2d 713, 717 (8th Cir. 1979). But it isn't. The noncompete forbids Defendants from engaging in trucking, "either directly or indirectly, . . . as an owner, part owner, manager, operator, employee, agent, or other participant . . . ." Since stockholders are "part owners" of companies, as Defendants argue, this language is so broad that it prevents them from owning stock in massive, publicly traded trucking companies, such as FedEx, Knight-Swift, and J.B. Hunt. This alone is fatal to the noncompete because JDT does not have any conceivable business interest in preventing Defendants from investing in companies like these. *See Gaver*, 856 N.W.2d at 133 ("By attempting to restrict Gaver from . . . having an ownership interest in a competing business not coupled with a recognized protectable interest, Schneider's is attempting to prevent ordinary competition . . . , not unfair competition."); *accord N. Star Mgmt. of Am., LLC v. Sedlacek*, 762 S.E.2d 357, 364 (N.C. Ct. App. 2014) (concluding a noncompete preventing "owning stock as a passive investor in a publicly traded company" was unenforceable). And things go downhill from here.

The noncompete's "ban on indirect participation could have even more startling consequences: if [Defendants] ha[ve] retirement accounts invested in mutual funds, [they] may have to monitor their holdings to be sure [they are] not investing in companies similar to [JDT]." *RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 197 (4th Cir. 2016); *accord VisionAIR, Inc. v. James*, 606 S.E.2d 359, 362–63 (N.C. Ct. App. 2004) ("[B]y preventing James from even 'indirectly' owning any similar firm, James may, for example, even be prohibited from holding interest in a mutual fund invested in part in a firm engaged in business similar to VisionAIR.").

And worse still, the noncompete's "direct participation" prohibition means Defendants cannot "mow [competitors of JDT's] lawns, cater their business lunches, and serve as their realtor[s]." *Tuschen*, 831 F.3d at 197; *accord Yorsch v. Morel*, 223 So. 3d 1274, 1286–87 (La. Ct. App. 2017) (rejecting a similar noncompete with terms meaning "Morel could not get a job babysitting for an employee of a company that competes in any way with the business" or "cater the[ir] company crawfish boil . . ." (cleaned up)). Because the noncompete prevents Defendants from engaging in all this conduct, it sweeps broader than reasonably necessary to achieve its legitimate purpose and, as a result, is void and unenforceable. *See Squier*, 472 N.W.2d at 397.

Given the noncompete's striking breadth, the majority's conclusion that it is enforceable is tough to understand. I suspect this case is a prime example of "the old adage that 'bad facts make bad law.'" *Anderson v. Hansen*, 47 F.4th 711, 719 (8th Cir. 2022) (Grasz, J., dissenting); *see ante* p. 9 (trying to distinguish Nebraska caselaw by explaining that the sale of "goodwill constituted such a significant portion of the sale price"); *ante* p. 10 (noting again that "roughly one-third of the purchase price [was] devoted to goodwill"). I readily agree with the majority that Defendants are not sympathetic characters. After cashing in their business's goodwill — to the tune of nearly $5 million — they wasted no time in organizing a competing flatbedding business. *See ante* pp. 2–3. But "[c]ourts are duty-bound to lay aside their personal sympathies . . . and to decide cases that come before them in accordance with the rule of law." *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1268 (8th Cir. 1990).

Even though invalidating the noncompete may be a bitter pill to swallow, that is what Nebraska law demands, so that is what I would do. And I rest easily knowing that this did not have to be the result. If the noncompete had been drawn more narrowly, it could have been applied to prevent Defendants from engaging in the exact sort of unfair competition JDT is concerned about — *without* running afoul of Nebraska law. *See Gaver*, 856 N.W.2d at 127. If the en banc court does not do so first, I hope the Nebraska Supreme Court clarifies that this decision is out of step

with Nebraska law. Otherwise, decades of noncompete law will be needlessly unsettled. For these reasons, I respectfully dissent.[4]

______________________________

[4]Lastly, we learned at oral argument that JDT is suing the attorney that drafted the noncompete for malpractice. *See* Complaint at 3–11, *Jim Daws Trucking, LLC v. Karavas & Kranz, PC*, No. D16CI250000105 (Neb. Dist. Ct. for Seward County Aug. 22, 2025). This does not impact my analysis, but it seems hard to reconcile with JDT's position in this case that the noncompete is enforceable.